**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DISTRICT**

| | | |
|---|---|---|
| BERKLEY NATIONAL INSURANCE COMPANY, | § § § | |
| Plaintiff, | § § | Civil Action No. 1:18-cv-195 |
| v. | § § | |
| XTO ENERGY, INC., | § § | |
| Defendant and Third-Party Plaintiff | § § § | |
| v. | § § | |
| COMMERCE AND INDUSTRY INSURANCE COMPANY, TORUS NATIONAL INSURANCE COMPANY, N/K/A STARSTONE NATIONAL INSURANCE COMPANY, AND SENECA SPECIALTY INSURANCE COMPANY, | § § § § § § § | |
| Third-Party Defendants. | § § | |

**BERKLEY NATIONAL INSURANCE COMPANY'S
<u>MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

Thomas C. Wright
Texas Bar No. 22059400
wright@wrightclosebarger.com
Elizabeth Rivers
rivers@wrightclosebarger.com
Texas Bar No. 24052020
Natasha N. Taylor
Texas Bar No. 24071117
taylor@wrightclosebarger.com
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056

Corey J. Quinton (#05342)
FISHER BREN & SHERIDAN, LLP
3137 32nd Avenue South, Suite 212
Fargo, ND 58103
cquinton@fisherbren.com

Susan A. Daigle (#4459)
DAIGLE RAYBURN LLC
600 Jefferson Street, Suite 1200
P. 0. Box 3667
Lafayette, Louisiana 70501
susan@djrlawfirm.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................3

SUMMARY ......................................................................................................................6

STATEMENT OF FACTS ...............................................................................................7

    A.    The Oil and Gas Explosion. ...............................................................8

        1.    Investigative Reports. .........................................................8

        2.    Witness Statements. .........................................................10

    B.    The Underlying Lawsuits.................................................................13

    C.    The Berkley Policies. ......................................................................15

    D.    Claims Handling. ............................................................................17

ARGUMENT & AUTHORITIES ..................................................................................18

    A.    North Dakota insurance law............................................................19

    B.    The pollution exclusion is unambiguous as a matter of law. ................19

    C.    Oil and gas are "pollutants." ...........................................................20

    D.    The bodily injuries arose out of or resulted from the actual discharge, release, or escape of oil and gas. ........................................21

    E.    Because the pollution exclusion applies, XTO's counterclaims cannot survive. ...............................................................................24

        1.    Berkley did not breach the Policies. ........................................24

        2.    The pollution exclusion precludes any duty for Berkley to defend XTO in the underlying lawsuits. ...................................25

        3.    As a matter of law, Berkley did not breach the common law duty of good faith and fair dealing..............................................26

        4.    As a matter of law, Berkley did not breach the Unfair Claim Settlement Practices Act. .......................................................27

    F.    Berkley is entitled to its attorney fees. ................................................30

CONCLUSION..............................................................................................................31

CERTIFICATE OF SERVICE .....................................................................................33

## TABLE OF AUTHORITIES

**Cases**

412 U.S. 1 (1973)......................................................................................................... 29

*Acuity v. Chartis Specialty Ins. Co.*,
   861 N.W.2d 533 (Wis. 2015)...................................................................................... 20

*Acuity v. North Cent. Video, LLLP*,
   No. 1:05-CV-010, 2007 WL 1356919 (D.N.D. May 7, 2007) ................................. 20

*Aetna Cas. & Sur. Co. v. Dow Chem. Co.*,
   933 F. Supp. 675 (E.D. Mich. 1996)......................................................................... 20

*Cincinnati Ins. Co. v. Becker Warehouse, Inc.*,
   635 N.W.2d 112 (Neb. 2001)..................................................................................... 18

*Continental Western Ins. Co. v. Dam Bar*,
   478 N.W.2d 373 (N.D. 1991) .................................................................................... 18

*Dvorak v. Am. Family Mut. Ins. Co.*,
   508 N.W.2d 329 (N.D. 1993) .............................................................................. 27, 28

*Estvold Oilfield Servs., Inc. v. Hanover Ins. Co.*,
   No. 1:17-CV-016, 2018 WL 1996453 (D.N.D. Apr. 27, 2018) ............................... 28

*Farmer's Union Cent. Exch., Inc. v. Reliance Ins. Co.*,
   675 F. Supp. 1534 (D.N.D. 1987)............................................................................. 27

*Farmers Union Mut. Ins. Co. v. Decker*,
   704 N.W.2d 857 (N.D. 2005) .............................................................................. 24, 25

*Federated Mut. Ins. Co. v. Abston Petroleum, Inc.*,
   967 So. 2d 705 (Ala. 2007)....................................................................................... 20

*Fetch v. Quam*,
   623 N.W.2d 357 (N.D. 2001) .............................................................................. 25, 26

*Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co.*,
   658 N.W.2d 363 (N.D. 2003) .................................................................................... 20

*Hanson v. Cincinnati Life Ins. Co.*,
   571 N.W.2d 363 (N.D. 1997) .................................................................................... 26

*Hartman v. Estate of Miller*,
   656 N.W.2d 676 (N.D. 2003) .................................................................................... 27

*Hayden v. Blue Cross & Blue Shield of Tex.*,
  No. 1:10-CV-50, 2010 WL 11564942 (D.N.D. Nov. 2, 2010) ................................. 27

*Heyman Assoc. Non. 1 v. Ins. Co. of State of Pa.*,
  653 A.2d 122 (Conn. 1995) ....................................................................... 20

*Hiland Partners GP Holdings, LLC v. National Union Fire Ins. Co. of Pittsburgh, PA*,
  847 F.3d 594 (8th Cir. 2017) .............................................................. passim

*Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  No. 1:14-CV-25, 2015 WL 11143072 (D.N.D. Sept. 17, 2015) .................... 21, 22, 23

*Houston Cas. Co. v. Strata Corp.*,
  915 F.3d 549 (8th Cir. 2019) .................................................................... 27

*Martin v. State Farm Fire & Cas. Co.*,
  932 P.2d 1207 (Ore. App. 1997) ................................................................ 20

*McGregor v. Allamerica Ins. Co.*,
  88 N.E.2d 1225 (Mass. 2007) ................................................................... 20

*Nationwide Mut. Ins. Co. v. Lagodinski*,
  683 N.W.2d 903 (N.D. 2004) ............................................................... 17, 18

*Noble Energy, Inc. v. Bituminous Cas. Co.*,
  529 F.3d 642 (5th Cir. 2008) ................................................................... 22

*Nodak Mut. Ins. Co. v. Heim*,
  559 N.W.2d 846 (N.D. 1997) ................................................................... 24

*Nw. G.F. Mut. Ins. Co. v. Norgard*,
  518 N.W.2d 179 .................................................................................. 19

*Schultze v. Continental Ins. Co.*,
  619 N.W.2d 510 (N.D. 2000) ................................................................... 24

*Sperling v. Allstate Indemnity Co.*,
  944 A.2d 210 (Vt. 2007) ......................................................................... 20

*Sprague v. Ticonic Nat'l Bank*,
  307 U.S. 161 (1939) .............................................................................. 29

*Star Insurance Company v. Contnental Resources, Inc.*,
  *et al.*, 2013 WL 11975128 ...................................................................... 28

*State Farm Mut. Auto. Ins. Co. v. Wolff*,
  926 F.2d 755 (8th Cir. 1991) ................................................................... 21

*Travelers Prop. Cas. Co. of Am. v. Klick*,
  867 F.3d 989 (8th Cir. 2017) ................................................................. 21

*Union Mutual Fire Ins. Co. v. Hatch*,
  835 F. Supp. 59 (D.N.H. 1993) .............................................................. 20

*Volk v. Wisconsin Mortg. Assur. Co.*,
  508 N.W.2d 40 (N.D. 1991) .................................................................. 28

*Whittier Props., Inc. v. Ala. Nat'l Ins. Co.*,
  185 P.3d 84 (Alaska 2008) .................................................................... 20

*Ziegelmann v. TMG Life Ins. Co.*,
  607 N.W.2d 898 (N.D. 2000) ................................................................ 18

**Statutes**

N.D.C.C. § 9-07-02 ................................................................................. 19

N.D.C.C. § 26.1-04-03 ...................................................................... 26, 27

**Other Authorities**

9 Couch on Insurance § 127:14 ............................................................. 19

Plaintiff Berkley National Insurance Company ("Berkley") files this Memorandum in Support of its Motion for Summary Judgment, and in support thereof, shows the Court as follows:

SUMMARY

This is an action for insurance coverage. XTO Energy, Inc. was the owner and lease operator of a producing oil and gas well in North Dakota (the "Well"). XTO contracted with Berkley's insured, Missouri Basin Well Service, Inc. ("MBI"), to monitor certain operations at the Well.

On June 18, 2016, oil and gas escaped from the Well during a "snubbing" operation, resulting in an explosion and a fire. The explosion injured several men, one fatally. The injured workers and their families filed suit against XTO and its contractors, and those claims were ultimately consolidated into two underlying lawsuits.

Berkley issued a commercial general liability policy and an umbrella liability policy to MBI. Claiming reliance on the insurance provision in the XTO-MBI master service agreement, XTO demanded defense and indemnity from Berkley in the underlying lawsuits. Berkley denied coverage for a number of reasons, including application of its Policies' pollution exclusion. XTO subsequently settled the underlying lawsuits on behalf of itself and its contractors—including MBI.

Berkley now seeks a declaration that XTO is entitled to neither defense nor indemnity under the Berkley Policies for claims made in the underlying lawsuits. The pollution exclusion in the Berkley Policies precludes coverage for injuries arising out of the escape of pollutants. Here, the undisputed facts show that the injuries at issue in the underlying lawsuits arose out of the escape of oil and gas from the Well, resulting in the explosion and fire that caused the workers' injuries. While Berkley maintains that XTO lacks coverage under the Berkley Policies for multiple reasons—including failure to qualify as an insured in the first place—the Court can and should

grant summary judgment on this narrow issue alone: the pollution exclusion precludes all coverage.

Because the pollution exclusion applies, Berkley is also entitled to summary judgment on all XTO's counterclaims. XTO seeks a declaration that it is entitled to defense and indemnity, and also asserts claims for breach of contract, violation of the common law duty of good faith and fair dealing, and violation of North Dakota's Unfair Claim Settlement Practices Act. Lack of coverage is determinative of XTO's counterclaims. Because the Policies afford no coverage to XTO for the underlying lawsuits, as a matter of law, XTO is not entitled to a declaration of coverage, Berkley did not breach the Policies by denying XTO's claim, and Berkley did not breach the common law duty of good faith and fair dealing by denying XTO's claim. XTO's claim under the Unfair Claim Settlement Practices Act—if such a private cause of action exists—must fail not only due to lack of coverage under the Policies, but also because XTO has failed to even allege the multiple and frequent violations required for liability under the Act.

The pollution exclusion's application in this case resolves all Berkley's claims[1] and all XTO's counterclaims as a matter of law. Berkley is therefore entitled to summary judgment in its favor, as well as its attorney fees in prosecuting this declaratory judgment action.

## STATEMENT OF FACTS

XTO, a wholly-owned subsidiary of ExxonMobil, is a producer of oil and natural gas in North Dakota. [Doc. 7 at 8] XTO owned and operated the Ryan 14X-09E oil well, located eight miles east of Watford City, North Dakota. [Doc. 7 at 8] XTO contracted with multiple companies to work on the Well, including Berkley's insured, MBI. The master service agreement between

---

[1]   The Court's declaration that Berkley has no duty to defend or indemnify XTO or its contractors from the claims made in the underlying lawsuits will moot Berkley's remaining claims for declaratory judgment.

XTO and MBI required MBI to obtain "Commercial General Liability Insurance INCLUDING CONTRACTUAL LIABILITY," but there was no requirement for pollution coverage.[2]

## A.      The Oil and Gas Explosion.

On June 18, 2016, XTO and its contractors[3] engaged in a "snubbing" operation, a process in which "a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the [well] hole."  [Doc. 7 ¶¶ 47, 49]  During the snubbing operation, the Well lost control twice, releasing hydrocarbons into the atmosphere at 1,000 psi. The hydrocarbons released during the second event ignited, causing the explosion that killed one worker and burned numerous others.[4,5]

### 1.      Investigative Reports.

Everyone who investigated the explosion reached the same conclusion: the explosion was caused by gas releasing from the Well and igniting.  OSHA concluded:

> . . . . A hole approximately 1.75 inches in diameter was exposed above the annular [Blowout Preventer], resulting in gases and fluids spewing from the well at 1,000 psi. At this point, well control was lost. The snubbing operator reversed the direction of the snubbers and moved the hole beneath the bag.

---

[2]     Ex. C at 8 (emphasis in the MSA itself).

[3]     Multiple contractors of XTO were at the Well site on the day of the explosion:

- Badlands Consulting, LLC ("Badlands") employed a supervisor, Thomas Jones, and a foreman, Ethan Bailey;

- KLX Energy Services, LLC ("KLX") operated the "downhole" tools;

- MBI employed a foreman, Carson Dokken;

- Most Wanted Well Service, LLC ("Most Wanted") performed the snubbing operation;

- Petroleum Experience, Inc. ("Petroleum Experience") employed a site supervisor, Allan Kolden;

- Sherwood Enterprises, Inc. ("Sherwood") operated the rig as part of the snubbing process; and

- Weatherford U.S. L.P. and Weatherford International, LLC (collectively, "Weatherford") provided the pipe.

Ex. D at 6, 23.

[4]     OSHA identified five parties injured in the explosion: John Stassinos, a Genie manlift operator, employed by Most Wanted; Justin Pyle, a snubbing supervisor employed by Most Wanted; Chad Maheu a floor hand, employed by Most Wanted; Daniel Pavon, a rig operator, employed by Sherwood; and Joe Guillen, a rig supervisor, employed by Sherwood. Stassinos' injuries were fatal, while the others survived. Ex. D at 18.

[5]     Ex. D at 18.

Those involved in the operation began to have a discussion about the next steps to take when the joint with the BHA[6] shot out of the hole and the well erupted. This was a full well blowout with gases and fluids escaping the well at approximately 1,000 psi. The BHA likely contacted other metal when it shot out and immediately ignited the well fluids and gases. The rig floor was engulfed in flames.[7]



Sherwood concluded:

Due to either human error of the operator of MWWS or mechanical failure of the MWWS snubbing unit, the last joint of tubing in the well was released and blown out of the well, thereby openly exposing the well to the atmosphere; resulting in the explosion.[10]

XTO's own investigation comported with those above:

A flash fire occurred at the Ryan 14X-09E wellsite on June 18, 2016 at approximately 8:15 AM (CST). **The fire was caused by hydrocarbons escaping the**

---

[6]   Bottom hole assembly.

[7]   Ex. D at 18; *see also* Ex. JJ at 19 ███████████████████████████████████
     ████████████████████████

[8]   Ex. KK at 4.

[9]   Ex. LL at 8.

[10]  Ex. E at 6.

> **wellbore and being ignited by an unknown ignition source.**[11]

**2.      Witness Statements.**

During the course of the OSHA investigation, many employees of XTO and its contractors testified that the source of the injury-causing fire was the release of gas into the atmosphere. Daniel Dickout, a Colter Energy employee, stated:

> When the tubing was almost at surface there was a **release of gas** from somewhere below the floor of the snubbing unit. The **gas immediately ignited** causing a fire that lasted approximately 30 seconds.[12]

Lyman Yazzie, a Colter Energy employee, stated:

> As I stood watching from the platform from the vessel, I heard a loud bang from the snubbing unit as pressure was being released. Then a minute or two after another load bang occurred and a second later the whole floor ignited and **created a huge fire from the blowing gas**. [13]

Cesar Contreras, a Sherwood Enterprises Derrick Hand, stated:

> I was underneath the [Blow Out Preventers] and the snubbing unit when it happen and I can remember is **when gas start coming out** . . . .[14]

Clifford Dahl, an employee of XTO and the superintendent at the Ryan Well, stated:

Q. Okay. What happened after the pipe dropped?

**A. The well blew out and BOPs were closed, which would be a few minutes or a few seconds, I don't know. I wasn't there, so I can't tell you how long it was.**

Q. Sure. And had anything like that occurred before with Most Wanted?

**A. No.**

Q. Had it occurred before with any other contractor that you had worked with?

**A. No.**

Q. What was your reaction when you heard that, Cliff?

---

[11]   Ex. F at 5 (emphasis added).

[12]   Ex. G at 1 (emphasis added).

[13]   Ex. H at 1 (emphasis added).

[14]   Ex. I at 1 (emphasis added).

**A. Concern.**

Q. Why?

**A. With a release of hydrocarbons, you know, it's -- there's some safety concerns. People could be hurt. There again, there's the spill that has to be taken care of.[15]**

Carson Dokken, an employee of contractor MBI and a foreman, stated:

Q. Was the plan to actually bring the hole above the bag?

**A. No.**

Q. And why not?

**A. Because that's just bad practice.**

Q. Why is that bad practice?

**A. Because you would be bleeding gas off to the atmosphere.**

Q. So you had not only an environmental concern, but you also had potential ignition sources?

**A. Correct.**

Q. So who made the decision to bring the hole above the bag?

**A. I don't know. And I don't believe they know. I don't believe -- it just happened. That's where they found it.[16]**

Nicholas Brown, a field supervisor at the Ryan Well stated: "There was a gas release. We saw it; came out from underneath the snubbing floor. And they pushed it back down because they found out it's a hole in the tubing, obviously."[17]

Tom Jones, a site supervisor employed by Badlands, stated:

KM: Okay. All right. So as far as the -- as far as the source of the fuel, potentially, you had that -- you had that pipe that came out that had the hole in it, so you could have natural gas, right, coming out of the pipe? Is that possible?

**TJ: Wellbore fluids, yes.**

KJ: And the fluids?

**TJ: Oil and gas.**

. . . .

---

[15]   Ex. J at 82:5–24.

[16]   Ex. K at 84:25–85:16.

[17]   Ex. L at 4:2–5.

KM: Yeah, correct me if I'm wrong. So they snubbed all this pipe out and they -- they had an indication that there was a problem, so they were looking for a hole or something. And then they got it all the way out, they found the hole. It was hissing or you could hear gases escape -- and I guess liquids, too, right? Or just gases?

**TJ: Gases and (indiscernible)**

KM: Gases and some liquids come out.[18]

Jones also stated: "You know, everything kind of happened so fast that it's hard recalling what I saw, I guess. I just remember the – you know, the hole coming above the bag and it was releasing and I yelled snub down, snub down, you know, and within just 30 seconds the explosion happened."[19]

Justin Pyle, an injured party who worked as a snubber for Most Wanted, stated the following:

JC: Okay. So when you guys got to the point where you pulled it out above the annular and you heard it -- you heard it blow, you immediately snubbed it back down, right?

**JP: Correct.**

JC: And then you said you guys just were discussing what you were going to do.

**JP: Correct.**

JC: So what would have been the best plan of action at that point, Justin?

**JP: Well, it would have been -- the best plan of action would have been to never get to that point and had a dead well. Obviously, we didn't. So like I said, we shoved both our snubbers, and what we were going to -- the process that I've done -- like I said, I've done this before. The process is to bring that hole up above the annular and, basically, it's going to blow for a few seconds and bleed off the gas and oil, and then you can try to snub it back, finish snubbing it up. That's basically the only option we had.[20]**

Joseph Guillen, an injured party and member of the well servicing crew for Sherwood stated:

---

[18]   Ex. M at 23:9–15.

[19]   Ex. N at 88:3–8.

[20]   Ex. O at 92:17–93:9.

KM: Yeah, it was -- and it was the gas that was burning.

**JG: Yeah, I didn't see any oil. It was a gas head from being shut in. I mean, the gas is lighter than everything else. So if you shut in a well for four hours, the gas is all going to rise to the top, above the oil, above the fluid, above everything else.**

KM: Right.

**JG: So it was only gas.[21]**

## B.    The Underlying Lawsuits.

Two underlying lawsuits were filed by or on behalf of the injured workers: *Mary Stassinos et al. v. XTO Energy Inc. et al.*; civil no. 1:17-CV-138, and *Richard Maheu et al. v. XTO Energy Inc. et al.*; civil no. 1:17-CV-102, both in the District of North Dakota, Western Division.

In the *Stassinos* lawsuit, Plaintiffs alleged in their Amended Complaint that:

When the piece of tubing with the hole reached the surface, the pressurized gas escaped and the explosion and fire followed.

. . . .

The tubing and other products were defective and unreasonably dangerous because of a hole that existed or developed in the tubing and/or other products which caused pressurized gas to escape when the tubing reached the surface and resulted in an explosion and fire.[22]

In the *Maheu* lawsuit, Plaintiffs and Intervenor Justin Pyle[23] alleged in Plaintiffs' Amended Complaint that:

Defendants knew, or reasonably should have known, that these serious well-control problems posed a substantial likelihood of a well blow-out, explosion, and fire – and a substantial likelihood of serious injuries or death to workers at the Well -- in the absence of safe and appropriate remedial measures.

On June 17 and 18, 2016, Defendants knew that the safest and most prudent remedial measure to deal with the serious well-control problems was to pump engineered fluids into the Ryan Well, "killing" the Ryan Well to create a barrier to

---

[21]   Ex. P at 37:3–7.

[22]   Ex. Q ¶¶ 32 & 78.

[23]   Justin and Brenda Pyle adopted all factual allegations in Plaintiffs' Original Complaint, which is substantively identical to the Amended Complaint.  Ex. R ¶ 10; compare Ex. S ¶¶ 17–54 with Ex. T ¶¶ 19–57.

uncontrolled flow from the bottom of the Ryan Well so that the tubing, BHA and drill bit could be safely removed from the Ryan Well without the release of pressurized gas to the surface and into the atmosphere. In addition, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden knew that killing the Ryan Well was required by XTO's own policy, and by federal and/or state regulations, which prohibited the release of hydrocarbons into the atmosphere.

. . . .

The remaining joints of Weatherford tubing could not be safely pulled out of the hole under the conditions present on June 18, 2016 because the inside of the tubing was still open to the atmosphere and uncontrolled flow was occurring to the surface.

. . . .

When the final joint of tubing was being pulled out of the stack under high pressure, a hole in the final joint, was exposed, and allowed uncontrolled pressures, fluids and gases through the hole and into the atmosphere. . . . These uncontrolled pressures caused the final joint of tubing, in spite of it being held by the snubbing unit, to rocket out of the Ryan Well and into the air, and an explosion and flash fire immediately occurred.[24]

In the *Maheu* lawsuit, Intervenors Daniel and Ana Pavon alleged in their Plea in

Intervention that:

Given that the bottom hole assembly was still attached and the location of the hole in the 2-3/8 tubing, this operational plan ensured that the hole in the 2-3/8 tubing would be exposed above the wellbore leading to a release of highly flammable natural gas around the operators working the snubbing unit. If the check valves provided by KLX Energy failed, this natural gas release would become a continuous release instead of a decreasing release of the gas contained within the volume of the drill string.

. . . .

This failure to hold pressure could exacerbate the already dangerous uncontrolled release of gas created by XTO's operational plan of raising a hole above the wellbore when the frac valves could not be closed given the length of the bottom hole assembly.

. . . .

During the snubbing operation at the Site on June 18, 2016, XTO's decision to raise the hole in the final 2-3/8th joint of tubing above the annular and leaks in the check

---

[24]   Ex. T ¶¶ 31–38.

valves caused a high pressure natural gas release, which resulted in an explosion and flash fire ("the subject incident").

. . . .

Specifically, Defendant XTO had actual, subjective awareness of the extreme risks associated with the subject snubbing operations, including the known and suspected problems with the drilling operations on the subject rig and the substantial risk of a gas release and catastrophic fire.[25]

**C.     The Berkley Policies.**

Berkley issued Energy Commercial General Liability policy no. EGL001672010 to MBI, effective April 13, 2016–17, with a $1,000,000 liability limit per occurrence (the "CGL Policy"). Berkley also issued Energy Commercial Umbrella Liability policy no. EUL001670910 to MBI, effective April 13, 2016–17, with a $25,000,000 liability limit per occurrence (the "Umbrella Policy").[26]

Relevant to this motion, the CGL Policy states:

**VII. <u>EXCLUSIONS</u>**

. . . .

**B.   Bodily Injury and Property Damage Liability Exclusions**

In addition to those Exclusions listed above in Section VII.A., the following Exclusions apply to Section II.A. Bodily Injury and Property Damage Liability;

This policy does not apply to:

. . . .

**13. <u>Pollution</u>:**

**a.   BODILY INJURY** or **PROPERTY DAMAGE** arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **POLLUTANTS**:

---

[25]   Ex. U ¶¶ 21, 26, 27 & 43.

[26]   Other policies at issue in this case may be triggered prior to the Berkley Umbrella Policy.

**(1)** At or from any premises, site, or location which is or was at any time owned or occupied by, or rented or loaned to, any **INSURED**. However, this Subparagraph (1) does not apply to:

    **(a)** **BODILY INJURY** if sustained within a building and caused by smoke, fumes, vapor, or soot produced by or originating from equipment that is used to heat, cool, or dehumidify the building or equipment that is used to heat water for personal use, by the building's occupants or their guests;

    **(b)** **BODILY INJURY** or **PROPERTY DAMAGE** for which **YOU** may be held liable, if **YOU** are a contractor and the owner or lessee of such premises, site, or location has been added to **YOUR** policy as an Additional Insured with respect to **YOUR** ongoing operations performed for that Additional Insured at that premises, site, or location; and such premises, site, or location is not and never was owned or occupied by, or rented or loaned to, any **INSURED**, other than that Additional Insured;

    **(c)** **BODILY INJURY** or **PROPERTY DAMAGE** arising out of heat, smoke, or fumes from a **HOSTILE FIRE**; or

    **(d)** **BODILY INJURY** or **PROPERTY DAMAGE** arising out of an **ELIGIBLE POLLUTION INCIDENT**; [27]

    . . . .

## IX. DEFINITIONS

. . . .

**BODILY INJURY** means physical injury, sickness, or disease sustained by a person, including death resulting from any of these at any time. **BODILY INJURY** includes mental anguish or other mental injury to that person sustaining physical injury.[28]

. . . .

**POLLUTANTS** means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and **WASTE**.[29]

In relevant part, the Umbrella Policy states:

---

[27] Ex. A at 22–23.

[28] *Id.* at 32.

[29] *Id.* at 35.

## I. COVERAGES

### A. Coverage A – Excess Follow Form Liability Insurance

Subject to all of the terms and conditions applicable to Coverage A – Excess Follow Form Liability Insurance, **WE** will pay on behalf of the **INSURED**, those damages or **POLLUTION CLEAN UP COSTS** covered by this policy in excess of the total applicable limits of **UNDERLYING INSURANCE**.  With respect to Coverage A, the terms and conditions of **UNDERLYING INSURANCE** are made a part of this policy, except with respect to:

1.  Any contrary provision contained in this policy; or

2.  Any provision in this policy for which a similar provision is not contained in **UNDERLYING INSURANCE**.

With respect to the exceptions stated above, nothing contained therein will serve to make this policy broader that the **UNDERLYING INSURANCE**.

If **UNDERLYING INSURANCE** does not apply to damages or **POLLUTION CLEAN UP COSTS**, for reasons other than exhaustion of applicable Limits Of Insurance by payment of **CLAIMS**, settlements, or judgments, then Coverage A does not apply to those damages or **POLLUTION CLEAN UP COSTS**.[30]

## D.    Claims Handling.

On February 16, 2018, MBI demanded defense and indemnity from XTO for the Maheu lawsuit.[31] On June 29, 2018, XTO demanded from Berkley defense and indemnity for itself and its contractors.[32]  On July 24, 2018, XTO accepted MBI's tender, but tendered coverage back to MBI's carrier in the same letter.[33]  On September 28, 2018, Berkley denied XTO's tender based, in part, on application of the pollution exclusion.[34]

---

[30]   Ex. B at 10.

[31]   Ex. V at 1–2.

[32]   Ex. W at 1–5.

[33]   Ex. X at 1–2.

[34]   Ex. Y at 1–8.

### ARGUMENT & AUTHORITIES

Because the Policies' pollution exclusion applies, Berkley had no duty to defend or indemnify XTO in the underlying lawsuits. The CGL Policy precludes coverage for "bodily injury . . . arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of pollutants" at or from a site owned or occupied by an insured.[35] "Pollutants means any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste."[36] The Umbrella Policy adopts these provisions.[37]

In this case, the bodily injuries arose out of or resulted from the actual discharge, release, and escape of oil and gas—a fact admitted by XTO and conclusively proven above. Oil and gas have long been established as pollutants in North Dakota and across the country.[38] XTO owned and occupied the Well site from which pollutants escaped, so for purposes of this Motion, the Well site was owned and occupied by an insured.[39] [Doc. 7 at 8] Furthermore, XTO cannot meet its burden to establish an exception to the pollution exclusion because no exceptions apply. *Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA,* 847 F.3d 594, 601 (8th Cir. 2017) (quoting *Nationwide Mut. Ins. Co. v. Lagodinski,* 683 N.W.2d 903, 907 (N.D. 2004)). As a result, Berkley had no duty to defend or indemnify XTO for the underlying lawsuits because,

---

[35] Ex. A at 22–23.

[36] *Id.* at 35.

[37] Ex. B. at 10.

[38] *See Aetna Cas. & Sur. Co. v. Dow Chem. Co.,* 933 F.Supp.675, 683 (E.D. Mich. 1996) (collecting cases).

[39] Berkley maintains that neither XTO nor XTO's contractors qualify as insureds on the Berkley Policies, and does not waive that issue by this Motion. The burden to prove insured status rests with XTO, and XTO has not and cannot satisfy that burden. *Hiland,* 847 F.3d at 601. However, if XTO were to establish insured status for itself or its contractors under the Policies, the burden would then shift to Berkley to establish the application of any exclusions, such as the pollution exclusion. Waiving nothing, this motion assumes that XTO and its contractors are insureds in order to demonstrate that even if XTO passed that hurdle, the pollution exclusion applies to preclude coverage.

even if XTO were an insured, the pollution exclusion applies to preclude coverage.  Berkley is therefore entitled to summary judgment in its favor on Berkley's declaratory judgment claim and on XTO's counterclaims.

**A.      North Dakota insurance law.**

"Determining the legal effect of an insurance contract . . . is generally a question of law for a court to decide." *Continental Western Ins. Co. v. Dam Bar*, 478 N.W.2d 373, 374 (N.D. 1991). The court looks first to the language of the insurance contract; "if the policy language is clear on its face, there is no room for construction." *Ziegelmann v. TMG Life Ins. Co.*, 607 N.W.2d 898, 900 (N.D. 2000). Thus, the court "will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage." *Id.* Although the court construes exclusionary provisions strictly, it does "not automatically construe every insurance exclusion against an insurer and in favor of coverage for the insured." *Nationwide Mut. Ins. Companies v. Lagodinski*, 683 N.W.2d 903, 907 (N.D. 2004). In short, the court "will not rewrite a contract to impose liability on an insurer if the policy unambiguously excludes coverage." *Id.*

**B.      The pollution exclusion is unambiguous as a matter of law.**

The pollution exclusion in the Berkley Policies is known as the "absolute" pollution exclusion. The absolute pollution exclusion generally excludes "'[b]odily injury' or 'property damage' arising out of the alleged or threatened discharge, dispersal, release or escape of pollutants." 9 Couch on Insurance § 127:14. While North Dakota state courts have yet to address the issue, "the 'majority of state and federal jurisdictions have held that absolute pollution exclusions are unambiguous as a matter of law.'" *Hiland*, 847 F.3d at 598 (citing *Cincinnati Ins. Co. v. Becker Warehouse, Inc.,* 635 N.W.2d 112, 118 (Neb. 2001) (collecting cases from multiple jurisdictions holding that "absolute pollution exclusions are unambiguous as a matter of law and, thus, exclude coverage for all claims alleging damage caused by pollutants")).

Because the pollution exclusion is unambiguous, the Court should apply the clear meaning of the exclusion. *Nw. G.F. Mut. Ins. Co. v. Norgard*, 518 N.W.2d 179, 181 (N.D. 1994 ("Unambiguous language will be given its clear meaning.") (citing N.D.C.C. § 9-07-02)). Here, the pollution exclusion clearly applies to preclude coverage for XTO's claim.

## C.   Oil and gas are "pollutants."

The CGL Policy defines "pollutants" as: "any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and waste."[40] As a matter of law, the oil and gas that was actually released from or escaped the Well are "pollutants."

In *Hiland,* the Eighth Circuit concluded that "condensate," a byproduct of processing gas and hydrocarbon products, was a "pollutant." *Hiland,* 847 F.3d at 598–600. Like the Berkley Policies, the policy at issue in *Hiland* defined "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," but did not define the terms "irritant" or "contaminant." Applying the plain, ordinary meaning of those terms, the court determined that "[a]n irritant is defined as 'something that irritates,' that is that 'produce[s] irritation,'" and "[a] contaminant is 'something that contaminates,' that is, that 'soil[s], stain[s], corrupt[s], or infect[s] by contact or association.'" *Id.* The court concluded that condensate was a contaminant "because flammable, volatile, and explosive liquid and gas has the ability to soil, stain, corrupt or infect the environment." *Id.* The court further noted that "[t]his conclusion is in accord with the 'bulk of the case authority . . . [which] holds that oil, gasoline, and

---

[40]   Ex. A at 35; Ex. B at 10 (adopting same).

other petroleum products are toxic by nature and therefore they constitute a contaminant when released into the environment.'" *Id.* (collecting cases).[41]

Courts across the country have agreed with this Court and the Eighth Circuit in *Hiland* that oil, gas, and petroleum byproducts are "pollutants" under a pollution exclusion.  *See Aetna Cas. & Sur. Co. v. Dow Chem. Co.,* 933 F. Supp. 675, 683 (E.D. Mich. 1996) (collecting cases holding that oil and gas are pollutants).[42] Oil and gas, like condensate and other petroleum products, have "flammable, volatile and explosive properties" and are thus contaminants—one of many applicable subcategories of "pollutant" under the Policies.  For that reason, the flammable oil and gas that escaped from the Well qualify as "pollutants" under the Berkley Policies.

**D.    The bodily injuries arose out of or resulted from the actual discharge, release, or escape of oil and gas.**

The pollution exclusion applies to bodily injury "arising out of or resulting from" the escape of pollutants.   "North Dakota applies the 'causal connection test' when construing the phrase 'arising out of' in an insurance policy." *Acuity v. North Cent. Video, LLLP*, No. 1:05-CV-010, 2007 WL 1356919, at *10 (D.N.D. May 7, 2007). "[T]he causal connection test is broad and comprehensive in scope," and "need not constitute a proximate cause." *Grinnell Mut. Reinsurance*

---

[41]    As the U.S. Secretary of Labor explained in response to interrogatories in the underlying lawsuits, "An employee exposed to the release of gases and liquids can suffer a multitude of injuries including burns, overexposure to hydrocarbons or H2S, loss of consciousness and falls, or being struck by moving equipment." Ex. II at 20.

[42]    *See, e.g., Acuity v. Chartis Specialty Ins. Co*., 861 N.W.2d 533, 541–48 (Wis. 2015) (holding gas released from a pipeline was a contaminant, and thus bodily injuries suffered during subsequent explosion and fire were covered under a pollution liability policy); *Whittier Props., Inc. v. Ala. Nat'l Ins. Co.*, 185 P.3d 84, 90 (Alaska 2008) (following majority approach in holding gasoline leaking underground was "pollutant" under absolute pollution exclusion); *Federated Mut. Ins. Co. v. Abston Petroleum, Inc.*, 967 So. 2d 705, 713 (Ala. 2007) (following majority approach in holding gasoline that leaks into the soil or fumes into the air is "pollutant" under absolute pollution exclusion); *McGregor v. Allamerica Ins. Co*., 88 N.E.2d 1225, 1227 (Mass. 2007) (home heating oil was "pollutant" under absolute pollution exclusion); *Sperling v. Allstate Indemnity Co*., 944 A.2d 210, 213 (Vt. 2007) (leaked home heating oil was pollutant under pollution exclusion); *Martin v. State Farm Fire & Cas. Co*., 932 P.2d 1207, 1210–11 (Ore. App. 1997) (petroleum products were "pollutants" under pollution exclusion); *Heyman Assoc. Non. 1 v. Ins. Co. of State of Pa*., 653 A.2d 122, 131 (Conn. 1995) (holding oil spilled into harbor was "pollutant" under pollution exclusion); *Union Mutual Fire Ins. Co. v. Hatch,* 835 F. Supp. 59, 64–66 (D.N.H. 1993) (gasoline leaked into soil and ground water was "pollutant" under absolute pollution exclusion).

*Co. v. Center Mut. Ins. Co.*, 658 N.W.2d 363, 371 (N.D. 2003) (holding injury arose out of use of an auto when "injury cannot be considered wholly disassociated from the use of the pickup"); *see also Travelers Prop. Cas. Co. of Am. v. Klick*, 867 F.3d 989, 991 (8th Cir. 2017) ("the phrase 'arising out of' means 'causally connected with' and not 'proximately caused by'") (applying Minnesota law). "'But for' causation or a cause and result relationship is enough to show a causal connection." *Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 1:14-CV-25, 2015 WL 11143072, at *3 (D.N.D. Sept. 17, 2015), aff'd, 847 F.3d 594 (8th Cir. 2017). The phrase "resulting from" likewise requires less than a causal relationship. *See State Farm Mut. Auto. Ins. Co. v. Wolff*, 926 F.2d 755, 757 (8th Cir. 1991) (explaining husband's derivative loss of consortium claim "result[s] from" wife's injuries). Even though the causation standard under the exclusion is somewhat relaxed, here the injuries were clearly caused by the escape of natural gas no matter what causation standard one wants to apply.

Here, the undisputed facts show that the injuries at issue in the underlying lawsuits arose out of or resulted from the actual discharge, release, or escape of oil and gas. The OSHA citation,[43] witness interview statements, underlying witness testimony, and XTO's own sworn discovery responses in the underlying lawsuits are consistent: the bodily injuries at issue resulted from the escape and subsequent explosion of oil and gas from the Well. As Nicholas Brown, a field supervisor, stated: "[Y]ou could see the gas shooting out and then I saw it ignite . . . ."[44] Tom Jones, Justin Pyle, and Daniel Dickout, all of whom were present at the time of the explosion and fire, also testified that they observed the release of gas into the atmosphere from a hole in the

---

[43]   Ex. MM at 6 ███████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████

[44]   Ex. Z at 54:11–21.

pipe.[45] Other witnesses testified that they heard the release of gas, even if they were not in a position to observe it.[46] Significantly, no witnesses testified that there was *not* a release of oil or gas from the well preceding the explosion and fire. Thus, OSHA concluded it "was a full well blowout with gases and fluids escaping the well."[47]

The pollution exclusion in *Hiland* was substantively identical to the exclusion at issue in this case.[48]   Notably, the Eighth Circuit in *Hiland* rejected the argument that the condensate at issue did not fall within the policy's definition of "pollutant" by "caus[ing] harm in a manner other than by contamination." *Id.* at 600. The court noted that condensate is a contaminant "because it is flammable, volatile, and explosive" and the overflow of the condensate tanks was alleged to have "caused ignition, fire, and an explosion," resulting in bodily injury. *Id.* The court thus concluded:

> Because condensate is a contaminant due to its flammable, volatile, and explosive properties and because [the] injuries were the result of an explosion, the nature of the harm here is directly related to the nature of the contaminant.

*Id.*; *accord Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642 (5th Cir. 2008) (holding that pollution exclusion barred coverage for bodily injuries resulting from explosion and fire caused by release of condensate).

In *Hiland,* the overflow of condensate was alleged to have resulted in the explosion and fire that caused the injuries at issue, and both this Court and the Eighth Circuit concluded that the pollution exclusion applied to bar coverage. Here, the undisputed facts show that the release of oil

---

[45]   Ex. AA at 229:13–23; Ex. BB at 91:6–10; Ex. CC at 26:17–25, 27:1–12.

[46]   Ex. DD at 96:1–5, 97:20-25; Ex. EE at 38:1–11; Ex. FF at 36:1–23.

[47]   Ex. D at 18.

[48]   The Berkley Policies' pollution exclusion section a.—on which Berkley relies in this case—is identical to that in *Hiland*.  (Ex. A at 22–23) *See Hiland*, 2015 WL 11143072, at *5.

and gas from the Well resulted in an explosion and fire, causing physical injury to several workers. Though common knowledge, XTO's engineers confirm in their testimony that gas is flammable,[49] and the contractors who witnessed the explosion uniformly testified that the ignition occurred immediately after gas escaped the well, engulfing the injured workers in flames.[50] Furthermore, as this Court explained in *Hiland*, the flammable quality of the oil and gas that escaped from the Well is undeniable:

> It would defy common sense to find that hydrocarbon condensate is not "something that irritates" when it explodes and causes a fire which results in serious burn injuries.

*Hiland*, 2015 WL 11143072, at 8.

The oil and gas in this case escaped the Well, then exploded and caused a fire that resulted in serious burn injuries. As a matter of law, the oil and gas that escaped the Well are "pollutants" under the Berkley Policies.

**E.  Because the pollution exclusion applies, XTO's counterclaims cannot survive.**

**1.  Berkley did not breach the Policies.**

For the same reason that Berkley is entitled to declaratory judgment that the Policies do not cover XTO's claim, Berkley is also entitled to judgment on XTO's counterclaim for breach of contract. Because the pollution exclusion applies, as a matter of law, Berkley did not breach the Policies. *See Clark v. Farmers Union Mutual Insurance,* 872 N.W.2d 620, 624 (N.D. 2015) (affirming the district court's dismissal of insured's breach of contract claim after determining there was no coverage).

---

[49]  Ex. GG at 93:9–12; Ex. HH at 104:15–25, 105:1–6.

[50]  Ex. D at 18; Ex. M at 20:5–10; CC at 29:19–23; Ex. FF at 35:11–25, 36:1–19.

2.    **The pollution exclusion precludes any duty for Berkley to defend XTO in the underlying lawsuits.**

XTO seeks a declaration that Berkley would be obligated to defend XTO after exhaustion of the policies that defended XTO in the underlying lawsuits.  This claim is now likely moot since the underlying lawsuits' settlement also ended any need for XTO to continue its underlying defense. Berkley is nevertheless entitled to summary judgment as a matter of law on XTO's counterclaim because the allegations in the underlying pleadings trigger the pollution exclusion.

"A liability insurer's obligation to defend its insured is ordinarily measured by the terms of the insurance policy and the pleading of the claimant who sues the insured. If the allegations of the claimant's complaint could support recovery upon a risk covered under the insurer's policy, a liability insurer has a duty to defend its insured." *Schultze v. Continental Ins. Co.,* 619 N.W.2d 510, 513 (N.D. 2000).  However, "[a]n insurer does not have a duty to defend an insured if there is no possibility of coverage under the policy." *Farmers Union Mut. Ins. Co. v. Decker*, 704 N.W.2d 857, 863 (N.D. 2005). "[T]he duty to defend does not depend on the nomenclature of the claim. Rather, the focus is on the basis for the injury." *Nodak Mut. Ins. Co. v. Heim*, 559 N.W.2d 846, 852 (N.D. 1997).  In other words, courts base any duty to defend on the factual allegations— not the legal claims—of the underlying pleading.

In all three underlying live petitions, plaintiffs and intervenors alleged that their injuries were caused by gas leaking from the well and igniting, resulting in an explosion:

> When the piece of tubing with the hole reached the surface, the pressurized gas escaped and the explosion and fire followed.  [Stassinos Plaintiffs][51]
>
> . . . .
>
> When the final joint of tubing was being pulled out of the stack under high pressure, a hole in the final joint, was exposed, and allowed uncontrolled pressures, fluids

---

[51]    Ex. Q ¶ 32.

and gases through the hole and into the atmosphere. Most Wanted snubbed the joint back into the stack, snubbed off and stopped work to evaluate what to do next. These uncontrolled pressures caused the final joint of tubing, in spite of it being held by the snubbing unit, to rocket out of the Ryan Well and into the air, and an explosion and flash fire immediately occurred. [Maheu Plaintiffs and Pyle Intervenors][52]

. . . .

During the snubbing operation at the Site on June 18, 2016, XTO's decision to raise the hole in the final 2-3/8th joint of tubing above the annular and leaks in the check valves caused a high pressure natural gas release, which resulted in an explosion and flash fire ("the subject incident").[53] [Pavon Intervenors]

Here, plaintiffs and intervenors in the underlying lawsuits all alleged that the workers' injuries arose out of the release of oil and gas from the Well.  Based on these allegations, there was no possibility of coverage under the Berkley Policies due to application of the pollution exclusion.  *See Farmers*, 704 N.W.2d at 863.  Berkley therefore had no duty to defend XTO in the underlying lawsuits.

   **3.     As a matter of law, Berkley did not breach the common law duty of good faith and fair dealing.**

XTO alleges that Berkley breached its common law duty to deal fairly and in good faith with XTO. [Doc. 7 at 22–23]  Because no coverage is available to XTO under the Berkley Policies for claims in the underlying lawsuits, as a matter of law, Berkley did not breach the common law duty of good faith and fair dealing.

Under North Dakota law, "[a]n insurer has a duty to act fairly and in good faith in its contractual relationship with its policyholders." *Fetch v. Quam,* 623 N.W.2d 357, 361 (N.D. 2001) "This duty of good faith imposed on an insurer . . . has its genesis in the contractual relationship between the insurer and its policyholders." *Id.* "The gravamen of the test for bad faith is whether

---

[52]   Ex. T ¶ 38.

[53]   Ex. U ¶ 28.

the insurer acts unreasonably in handling an insured's claim." *Id.* "An insurer acts unreasonably by failing to compensate the insured for a loss covered by  the policy  unless the insurer has a proper cause for refusing." *Id.* at 361–62 (citing *Hanson v. Cincinnati Life Ins. Co.,* 571 N.W.2d 363 (N.D. 1997)). Where a loss is not "covered by the policy" or the insurer has "a proper cause for refusing payment," summary judgment in favor of the insurer is proper. *See, e.g., Fetch,* 623 N.W.2d 357 (affirming summary judgment in favor of insurer on bad faith claim); *Hanson,* 571 N.W.2d 363 (same).

For the reasons set forth above, Berkley properly denied XTO's claim for coverage under the Policies. XTO's counterclaim for violation of the duty of good faith and fair dealing should therefore be dismissed.

### 4.     As a matter of law, Berkley did not breach the Unfair Claim Settlement Practices Act.

XTO alleges that Berkley violated the Unfair Claim Settlement Practices Act. N.D.C.C. § 26.1-04-03(9). [Doc. 7 at 23–24]  Because the pollution exclusion applies to XTO's claim for insurance coverage, as a matter of law, XTO's statutory claim cannot survive.

XTO alleges that Berkley violated the Unfair Claim Settlement Practices Act by "knowingly misrepresenting to XTO pertinent facts or policy provisions relating to coverages at issue; and (2) not attempting in good faith to effectuate prompt, fair, and equitable settlements of claims submitted in which liability had become reasonably clear." [Doc. 7 at 23]  The sections of the statute corresponding to XTO's claims are as follows:

> 9.   Unfair claim settlement practices. Committing any of the following acts, ***if done without just cause and if performed with a frequency indicating a general business practice***:
>
>    a.   Knowingly misrepresenting to claimants pertinent facts or policy provisions relating to coverages at issue.
>
>    . . . .

27

>    d.  Not attempting in good faith to effectuate prompt, fair, and equitable
>        settlements of claims submitted in which liability has become reasonably
>        clear.

N.D.C.C. § 26.1-04-03(9) (emphasis added).

First, the existence of a private cause of action for violation of the Act is questionable at best. *See Hayden v. Blue Cross & Blue Shield of Tex.*, No. 1:10-CV-50, 2010 WL 11564942, at *5 (D.N.D. Nov. 2, 2010) ("It should be noted that it is unclear whether a private cause of action is even available for violation of N.D.C.C. § 26.1-04-03 . . . ."); *Dvorak v. Am. Family Mut. Ins. Co.*, 508 N.W.2d 329, 332–33 (N.D. 1993) (not deciding whether the statute creates a private right of action under subsections (a) and (d), but holding a single act of misconduct cannot raise an actionable claim as a matter of law). This Court has predicted that the North Dakota Supreme Court would not recognize a private cause of action for violation of the statute. *Farmer's Union Cent. Exch., Inc. v. Reliance Ins. Co.*, 675 F. Supp. 1534, 1536–38 (D.N.D. 1987). Because the Act does not create a private cause of action, XTO's claim must be dismissed.

Moreover,  Berkley is entitled to summary judgment because Berkley had "just cause" to deny XTO's claim due to application of the pollution exclusion.  As the Eighth Circuit recently explained:

> [B]ecause the excess policy does not provide coverage for Faust's claims, Houston
> Casualty did not breach its duty of good faith. Under North Dakota law, an . . .
> insurer acts in bad faith when it "acts unreasonably in handling an insured's claim
> . . . by failing to compensate an insured for a loss covered by a policy, unless the
> insurer has a proper cause for refusing payment." For the reasons explained above,
> Houston Casualty had a proper cause for refusing payment because Strata's loss
> was not covered by its excess insurance policy.

*Houston Cas. Co. v. Strata Corp.*, 915 F.3d 549, 552 (8th Cir. 2019) (internal citations omitted); *see also Hartman v. Estate of Miller*, 656 N.W.2d 676, 681 (N.D. 2003) ("[A]s a matter of law, an insurer is not guilty of bad faith for denying a claim if the claim is fairly debatable, or if there is a reasonable basis for denying the claim or delaying payment."). Here, Berkley had "just cause" to

deny XTO's claim because the pollution exclusion precluded coverage.  Because Berkley had just

cause to deny the claim, as a matter of law, Berkley did not violate the Act.

Furthermore, XTO has failed to allege, and cannot show, that Berkley engaged in any

statutorily prohibited conduct "with a frequency indicating a general business practice."  The Act

"specifically requires that the proscribed acts be 'performed with a frequency indicating a general

business practice' to constitute an unfair claim settlement practice."  *Volk v. Wisconsin Mortg.*

*Assur. Co.,* 508 N.W.2d 40, 45 (N.D. 1991); *see* also *Dvorak*, 508 N.W.2d at 332–33.  Any alleged

violation of the Act for a <u>single</u> insurance claim cannot support statutory liability.

In the recent case of *Estvold Oilfield Services, Inc. v. Hanover Insurance Company*, No.

1:17-CV-016, 2018 WL 1996453, at *5–6 (D.N.D. Apr. 27, 2018), claimant Estvold also asserted

violations of the Unfair Claims Settlement Practices Act based on alleged improper denial of its

insurance claim.  The Court dismissed Estvold's cause of action because the pleadings failed to

assert, much less support, a general business practice:

> Common sense would seemly dictate that, for purposes of Ch. 26.1–04, the repeated
> denial of the same claim on the same grounds constitutes a single act as opposed to
> a pattern or practice. Otherwise every insured could arguably "manufacture" a
> claim against every insurer under Ch. 26.1–04 by repeatedly resubmitting claims
> that the insurers had denied in the first instance.
>
> In any event, Estvold's pleadings are devoid of any explicit assertion that Hanover
> engaged in a pattern or practice; tellingly, Estvold complains about the denial of its
> claim in the singular, not in the plural. . . . And for purposes of the instant motion,
> the court must focus on what is in the pleadings.
>
> The basis for Estvold's Unfair and Deceptive Insurance Practices Act claim is that
> Hanover wrongfully denied its fire loss claim. As this denial does not constitute a
> pattern for purposes of the Act, the pleadings fail to articulate a claim for which
> relief may be granted under the Act.

2018 WL 1996453, at *6; *see also  Star Insurance Company v. Contnental Resources, Inc., et al.*,

2013 WL 11975128, at *2 (dismissing claims under the Act when claimant "pled no facts which

support the proposition that Star Insurance has engaged in unfair practices with a frequency sufficient to constitute a general business practice").

Here, XTO alleges that Berkley violated the Act only through its denial of the claim at issue.  [Doc. 7 at 23–24]  XTO alleges no other prohibited conduct, much less prohibited conduct with a frequency indicating a general business practice. As a matter of law, XTO cannot support its claims for violation of the Act based on its pleadings alone.

Because XTO's pleadings do not include allegations to support liability under the Act (if a private cause of action even exists); because Berkley's proper denial of the claim based on application of the Policies' pollution exclusion "just cause"; and because violation of the statute as to a single claim does not violate the Act, Berkley did not violate the Unfair Claim Settlement Practices Act as a matter of law.  Berkley is therefore entitled to summary judgment on XTO's claims under the Unfair Claim Settlement Practices Act.

**F.     Berkley is entitled to its attorney fees.**

Berkley has sought, and is entitled to, recovery of its attorney fees in this case.  [Doc. 54 at 14]  The U.S. Supreme Court in *Hall v. Cole* held that although the American Rule ordinarily disfavors awarding attorneys' fees in the absence of a statute, "federal courts, in the exercise of their equitable powers, may award attorneys' fees when the interests of justice so require."  412 U.S. 1, 4–5 (1973).  The Supreme Court urged that federal courts have this power to award attorneys' fees as "'part of the original authority of the chancellor to do equity in a particular situation.'"  *Id*. at 5 (quoting *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 166 (1939)).  As such, federal courts should not be afraid to exercise this inherent power when "overriding considerations indicate the need for such a recovery."  *Id*. (internal quotations omitted).  Consequently, this Court

is empowered to, and should, award Berkley recovery of its attorneys' fees necessarily incurred to successfully prosecute this declaratory judgment action.[54]

## CONCLUSION

For the reasons above, Berkley is entitled to summary judgment in its favor on Berkley's declaratory judgment claim and on XTO's counterclaims. The Court should declare that Berkley has no duty to defend or indemnify XTO or its contractors in the underlying lawsuits, dismiss XTO's counterclaims against Berkley with prejudice, and award Berkley its attorney fees and costs. Berkley further prays for any other relief to which it may be entitled, in equity or at law.

Respectfully submitted,

*/s/ Thomas C. Wright*
Thomas C. Wright
Texas Bar No. 22059400
Elizabeth Rivers
Texas Bar No. 24052020
Natasha N. Taylor
Texas Bar No. 24071117
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
(713) 572-4320 (facsimile)
wright@wrightclosebarger.com
rivers@wrightclosebarger.com
taylor@wrightclosebarger.com

---

[54] Berkley continues to incur attorney fees in this lawsuit. Upon the Court's determination that Berkley is entitled to recovery of its fees, Berkley will submit its invoices for determination of the amount of fees to be awarded.

Corey J. Quinton (#05342)
FISHER BREN & SHERIDAN, LLP
3137 32nd Avenue South, Suite 212
Fargo, ND 58103
cquinton@fisherbren.com

Susan A. Daigle (#4459)
DAIGLE RAYBURN LLC
600 Jefferson Street, Suite 1200
P. 0. Box 3667
Lafayette, Louisiana 70501
Telephone: 337-234-7000
Facsimile: 337-237-0344
susan@djrlawfirm.com

**ATTORNEYS FOR BERKLEY NATIONAL
INSURANCE COMPANY**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of this document was served on all counsel of record in this case, identified below, on February 5, 2020, electronically through the electronic case filing system of the court:

| | |
|---|---|
| Joel A. Flom (#04469)<br>Jessica M. Rydell (#07801)<br>1703 – 32nd Avenue South<br>Fargo, ND 58103<br>(701) 280-1880 (facsimile)<br>joel@flomlaw.com<br>jessica@flomlaw.com<br><br>ATTORNEYS FOR COMMERCE AND<br>INDUSTRY INSURANCE COMPANY<br><br>Mark A. Solhein<br>Richard W. Bale<br>Larson · King, LLP<br>30 East 7th Street, Suite 2800<br>St. Paul, MN 55101<br>(651) 312-6618 (facsimile)<br>msolheim@larsonking.com<br>rbale@larsonking.com<br><br>ATTORNEY FOR STARSTONE NATIONAL<br>INSURANCE COMPANY | Leslie C. Thorne<br>Texas Bar No. 24046974<br>HAYNES AND BOONE, LLP<br>600 Congress, Suite 1300<br>Austin, Texas 78701<br>(512) 867-8470 (facsimile)<br>leslie.thorne@haynesboone.com<br><br>Ernest Martin, Jr.<br>Texas Bar No. 13063300<br>Carla Green<br>Texas Bar No. 24097762<br>HAYNES AND BOONE, LLP<br>2323 Victory Avenue, Suite 700<br>Dallas, Texas 75219<br>(214) 651-5940 (facsimile)<br>ernest.martin@haynesboone.com<br>carla.green@haynesboone.com<br><br>ATTORNEYS FOR XTO ENERGY, INC. |

*/s/ Elizabeth Rivers*
Elizabeth Rivers