IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| BERKLEY NATIONAL INSURANCE COMPANY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | |
| XTO ENERGY, INC., | ) ) | Civil No. 1:18-cv-00195-DMT-CRH |
| Defendant, Counter-Plaintiff and Third-Party Plaintiff | ) ) | |
| v. | ) ) | |
| BERKLEY NATIONAL INSURANCE COMPANY, | ) ) ) | |
| Counter-Defendant, | ) ) | |
| and | ) ) | |
| COMMERCE AND INDUSTRY INSURANCE COMPANY, TORUS NATIONAL INSURANCE COMPANY n/k/a STARSTONE NATIONAL INSURANCE COMPANY, and SENECA SPECIALTY INSURANCE COMPANY, | ) ) ) ) ) ) ) | |
| Third-Party Defendants. | ) | |

**THIRD-PARTY DEFENDANT COMMERCE AND INDUSTRY INSURANCE COMPANY'S MEMORANDUM OF LAW AND STATEMENT OF UNCONTESTED MATERIAL FACTS IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56(a), Fed. R. Civ. P., and Local Rule 7.1(A)(2), Third-Party Defendant

Commerce and Industry Insurance Company ("CIIC") hereby moves this Court to enter an Order

granting summary judgment in favor of CIIC and dismissing the claims of Third-Party Plaintiff

XTO Energy, Inc. ("XTO") with prejudice as against it. For the reasons set forth below, the Motion should be granted.

## INTRODUCTION

This is an action for insurance coverage. Third-Party Plaintiff XTO was the owner and lease operator of a producing oil and gas well in North Dakota (the "Ryan Well"). On or about June 18, 2016, an explosion and fire occurred at the well due to the escape of oil and gas under pressure during a "snubbing" operation (the "Accident").[1] The Accident resulted in one death and several serious injuries and led to multiple lawsuits against XTO and a number of its contractors, including Missouri Basin Well Service, Inc. ("MBI") (collectively, the "underlying lawsuits"). Berkley National Insurance Company ("Berkley") provided primary and first-layer excess coverage, and CIIC provided second-layer excess coverage, to MBI. XTO demanded coverage for the underlying lawsuits from Berkley and CIIC, and Berkley and CIIC denied coverage. XTO subsequently settled the underlying lawsuits on behalf of itself and its contractors, and now sues Berkley and CIIC for coverage. With regard to CIIC, XTO claims that CIIC breached the CIIC Policy by failing to reimburse XTO for the amounts it paid to settle the lawsuits. XTO also sues CIIC for breach of the duty of good faith and fair dealing, and unfair claim settlement practices.

Based on the undisputed facts and governing law, CIIC properly denied coverage for XTO's claim. The pollution exclusion in the CIIC Policy excludes coverage for injuries arising out of the escape of "pollutants," and it is well-settled that oil and gas are "pollutants" as defined by the CIIC Policy. Here, the undisputed facts show that the injuries at issue in the underlying lawsuits arose out of the escape of oil and/or gas from the well that caused the explosion and fire

---

[1] XTO has described "snubbing" as the process whereby "a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the [well] hole." [Doc. 7 at ¶ 49].

that resulted in the injuries. Accordingly, the pollution exclusion in the CIIC Policy bars coverage for XTO's claim.[2]

XTO's claims for breach of the common law duty of good faith and fair dealing and violation of Section 26.1-04-03(9), N.D.C.C., also fail. First, because CIIC properly denied coverage to XTO, no claim for breach of the common law duty of good faith and fair dealing will lie as a matter of law. Second, XTO fails to state a claim for unfair claim settlement practices because it has not alleged, much less shown, that CIIC has engaged in prohibited conduct "with a frequency indicating a general business practice," nor has XTO shown that CIIC lacked "just cause" to deny XTO's claim.

## STATEMENT OF UNCONTESTED MATERIAL FACTS

### THE CIIC POLICY

1.      CIIC issued a Commercial Umbrella Liability Policy to MBI with policy number 24238279 for the policy period April 13, 2016 to April 13, 2017 (the "CIIC Policy"). The CIIC Policy contained a $25,000,000 limit of liability, excess of "Scheduled Underlying Insurance." *See* Appendix in Support of Commerce and Industry Insurance Company's Motion for Summary Judgment ("App."), Ex. 1 at 3.[3] The CIIC Policy listed the Energy Commercial General Liability policy (with a $1,000,000 limit of liability) and the Energy Commercial Umbrella Liability policy (with a $25 million limit of liability) (collectively, the "Berkley Policies"), issued by The Berkley National Insurance Company ("Berkley") as "Scheduled Underlying Insurance."

---

[2] XTO's coverage claim also suffers from multiple other defects, not addressed here. CIIC reserves the right to file another motion for summary judgment addressing these defects should the Court deny the instant motion.
[3] The evidence on which CIIC relies in support of its Motion for Summary Judgment is contained in the Appendix.  Citations to the evidence appear as "App., Ex. --."

2.      The CIIC Policy contained the following pollution exclusion endorsement:

**Commercial Umbrella Liability Policy with CrisisResponse®
Time Element Pollution
Self-Insured Retention Endorsement**

This policy is amended as follows:

**Section V. EXCLUSIONS**, Paragraph Q. **Pollution** is deleted in its entirety and replaced by the following:

Pollution

This insurance does not apply to:

1. Any **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time;

. . . .

However, Paragraph 1 of this exclusion will not apply to **Bodily Injury** or **Property Damage** arising out of any discharge, dispersal, seepage, migration, release or escape of **Pollutants** that meets all of the following conditions:

    i.  It was abrupt and neither expected nor intended by the **Insured**. This condition does not apply to a non-routine incident where such discharge, dispersal, migration, release or escape of **Pollutants** was a result of an attempt by the Insured to mitigate or avoid a discharge, dispersal, seepage, migration, release or escape of **Pollutants** that was itself abrupt and neither expected nor intended by the **Insured** and where substantial third party **Bodily Injury** or **Property Damage** could have occurred;

    ii.  It commenced on a demonstrable, specific date during the **Policy Period**;

    iii.  Its commencement became known to the **Insured** within (7) calendar days;

    iv.  Its commencement was reported in writing to us within (21) calendar days of becoming known to the **Insured**; and

    v.  Reasonable effort was expended by the **Insured** to terminate the discharge, dispersal, seepage, migration, release or escape of **Pollutants** as soon as conditions permitted.

4

. . . .
All other terms, definitions, conditions, and exclusions of this policy remain
unchanged.

*See* App., Ex. 1 at 69 (the "Pollution Exclusion").

3.      The CIIC Policy defined "Pollutants" as: "any solid, liquid, gaseous or thermal
irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.
Waste includes materials to be recycled, reconditioned or reclaimed."  *See* App., Ex. 1 at 25.

## THE MASTER SERVICES AGREEMENT

4.      MBI entered into a master services agreement ("MSA") with XTO Energy, Inc.
("XTO"), wherein MBI agreed to perform certain work as a contractor for XTO.  *See* App., Ex. 2.

## THE ACCIDENT

5.      XTO is a producer of oil and natural gas in North Dakota. XTO controlled and
managed the Ryan 14X-09E oil well, located eight miles east of Watford City, North Dakota (the
"Ryan Well"). At the Ryan Well, XTO engaged in an operation known as "snubbing." [Doc. 7 at
¶ 47].

6.      XTO has described "snubbing" as the process whereby "a machine grabs the tubing
and pulls it out a little at a time while maintaining pressure in the [well] hole." *Id.* at ¶ 49.

7.      On June 18, 2016, while in the process of completing the snubbing operation, the
completion crew at the Ryan Well discovered a problem downhole, and attempted to determine
whether the problem was due to a hole in the pipe, a missing bottom hole assembly ("BHA"), or
some other cause. *Id.* The completion crew continued to remove the tube from the well resulting
in an explosion and fire, killing and severely injuring several workers (the "Accident"). *Id.*

8.      The Occupational Safety and Health Administration promptly investigated the
Accident and summarized its findings in a detailed report. *See* App., Ex. 3 (the "OSHA Citation").

9.      Multiple contractors of XTO were involved in the Accident. MBI employed a foreman, Carson Dokken; Most Wanted Well Service, LLC ("Most Wanted") performed the snubbing operation; Sherwood Enterprises, Inc. ("Sherwood") operated the rig as part of the snubbing process; Petroleum Experience, Inc. ("Petroleum Experience") employed a site supervisor, Allan Kolden; Badlands Consulting, LLC ("Badlands") employed a supervisor, Thomas Jones, and a foreman, Ethan Bailey; KLX Energy Services, LLC ("KLX") operated the "downhole" tools; and Weatherford U.S. L.P. and Weatherford International, LLC (collectively, "Weatherford") provided and operated the pipe. *See* App., Ex. 3. at 14-16.

10.     OSHA summarized the events leading up to the Accident as follows:

After the realization that the BHA was still connected to the last joint, the crew could deduce with some certainty that there was a hole or breach in the pipe. Still unclear about the location of a hole, or holes, the crew continued to remove pipe from the well. The crew was actively searching for a hole at this point. <u>A hole approximately 1.75 inches in diameter was exposed above the annular BOP, resulting in gases and fluids spewing from the well at 1,000 psi.</u> At this point, well control was lost. The snubbing operator reversed the direction of the snubbers and moved the hole beneath the bag.

Those involved in the operation began to have a discussion about the next steps to take when the joint with the BHA shot out of the hole and the well erupted. <u>This was a full well blowout with gases and fluids escaping the well at approximately 1000 psi. The BHA likely contacted other metal when it was shot out and immediately ignited the well fluids and gases.</u> The rig floor was engulfed with flames.

*See* App., Ex. 3 at 28 (emphasis added).

11.     OSHA identified five parties killed or injured in the Accident: John Stassinos, a Genie man lift operator, employed by Most Wanted; Justin Pyle, a snubbing supervisor employed by Most Wanted; Chad Maheu, a floor hand, employed by Most Wanted; Daniel Pavon, a rig operator, employed by Sherwood; and Joe Guillen, a rig supervisor, employed by Sherwood. Stassinos was killed in the Accident, and the others were injured. *Id.*

12.     During the course of the OSHA investigation, many employees of XTO and its contractors testified that the source of the injury-causing fire was the release of gas into the atmosphere. Clifford Dahl, an employee of XTO and the superintendent at the Ryan Well, stated:

> Q. Okay. What happened after the pipe dropped?
> **A. The well blew out and BOPs were closed, which would be a few minutes or a few seconds, I don't know. I wasn't there, so I can't tell you how long it was.**
> Q. Sure. And had anything like that occurred before with Most Wanted?
> **A. No.**
> Q. Had it occurred before with any other contractor that you had worked with?
> **A. No.**
> Q. What was your reaction when you heard that, Cliff?
> **A. Concern.**
> Q. Why?
> **A. With a release of hydrocarbons, you know, it's -- there's some safety concerns. People could be hurt. There again, there's the spill that has to be taken care of.**

*See* App., Ex. 4 at 82:5–24.

13.     Carson Dokken, an employee of contractor MBI and a foreman, stated:

> Q. Was the plan to actually bring the hole above the bag?
> **A. No.**
> Q. And why not?
> **A. Because that's just bad practice.**
> Q. Why is that bad practice?
> **A. Because you would be bleeding gas off to the atmosphere.**
> Q. So you had not only an environmental concern, but you also had potential ignition sources?
> **A. Correct.**
> Q. So who made the decision to bring the hole above the bag?
> **A. I don't know. And I don't believe they know. I don't believe -- it just happened. That's where they found it.**

*See* App., Ex. 5 at 84:25, 85:1-16.

14.     Nicholas Brown, a field supervisor at the Ryan Well stated: "There was a gas release. We saw it; came out from underneath the snubbing floor. And they pushed it back down because they found out it's a hole in the tubing, obviously." *See* App., Ex. 6 at 4:2-5.

15.     Tom Jones, a site supervisor employed by Badlands, stated:

KM: Okay. All right. So as far as the -- as far as the source of the fuel, potentially, you had that -- you had that pipe that came out that had the hole in it, so you could have natural gas, right, coming out of the pipe? Is that possible?
**TJ: Wellbore fluids, yes.**
KJ: And the fluids?
**TJ: Oil and gas.**
. . . .

KM: Yeah, correct me if I'm wrong. So they snubbed all this pipe out and they -- they had an indication that there was a problem, so they were looking for a hole or something. And then they got it all the way out, they found the hole. It was hissing or you could hear gases escape -- and I guess liquids, too, right? Or just gases?
**TJ: Gases and (indiscernible)**
KM: Gases and some liquids come out.

 *See* App., Ex. 7 at 23:9-15.

16.     Jones also stated: "You know, everything kind of happened so fast that it's hard recalling what I saw, I guess. I just remember the – you know, the hole coming above the bag and it was releasing and I yelled snub down, snub down, you know, and within just 30 seconds the explosion happened." *See* App., Ex. 8 at 88:3-8.

17.     Justin Pyle, an injured party who worked as a snubber for Most Wanted, stated the following:

JC: Okay. So when you guys got to the point where you pulled it out above the annular and you heard it -- you heard it blow, you immediately snubbed it back down, right?
**JP: Correct.**
JC: And then you said you guys just were discussing what you were going to do.
**JP: Correct.**
JC: So what would have been the best plan of action at that point, Justin?
**JP: Well, it would have been -- the best plan of action would have been to never get to that point and had a dead well. Obviously, we didn't. So like I said, we shoved both our snubbers, and what we were going to -- the process that I've done -- like I said, I've done this before. The process is to bring that hole up above the annular and, basically, it's going to blow for a few seconds and bleed off the gas and oil, and then you can try to snub it back, finish snubbing it up. That's basically the only option we had.**

*See* App., Ex. 9 at 92:17-25, 93:1-9.

18.     Joseph Guillen, an injured party and member of the well servicing crew for

Sherwood stated:

> KM: Yeah, it was -- and it was the gas that was burning.
> **JG: Yeah, I didn't see any oil. It was a gas head from being shut in. I mean,**
> **the gas is lighter than everything else. So if you shut in a well for four hours,**
> **the gas is all going to rise to the top, above the oil, above the fluid, above**
> **everything else.**
> KM: Right.
> **JG: So it was only gas.**

*See* App., Ex. 10 at 37:3-7.

## THE UNDERLYING LAWSUITS

19.     On or about September 14, 2016, Daniel Pavon sued XTO and Weatherford in

Harris County, Texas, Case No. 201661844-7 (the "Pavon Lawsuit").[4] During the course of the

case, many employees of XTO and its contractors testified consistent with the witness statements

provided to OSHA.

20.     Nicholas Brown, a field supervisor at the Ryan Well, stated:

Q. What are the dangers of snubbing out if you don't know if it is a problem with
the mill or a hole?
**A. Exactly what happened, pretty much. If you don't know where the hole is**
**exactly, you're gonna pull and it pulls to atmosphere and you're gonna have a**
**gas release and that's pretty dangerous because if you have gas release, there's**
**only so far – you have to pull up quite a ways to be able to shut the master**
**valve in.**
           . . . .
Q. Describe for me what actually happened then?
**A. They pulled up, there was a release of gas, came out the side, then [an**
**employee of Weatherford] shoved it back down – well, [an employee of**

---

[4] Justin Pyle intervened in the Pavon Lawsuit. The Pavon Lawsuit was subsequently dismissed on
venue grounds, whereupon both Pavon and Pyle sought and were granted leave to intervene in the
Maheu Lawsuit. Pyle also sought and was granted leave to intervene in the Stassinos Lawsuit. *See*
App., Ex. 11. The Maheu Lawsuit and the Stassinos Lawsuit (including the claims of Pavon and
Pyle) are collectively referred to herein as the "underlying lawsuits."

**Weatherford] didn't shove it back down, I guess it was pretty much the snubbing unit would have pushed it back down. They pushed it back down and then they stopped, then you could see them talking with each other about what to do and then while they were talking, another release happened and you could see the gas shooting out and then I saw it ignite, we, me our crew, saw it ignite and then it shot back towards the snubbing unit.**

*See* App., Ex. 12 at 38:10-17, 54:11-21.

21.   Edward Kleinsasser, an operator for Sherwood, stated:

Q. What did you see?
**A. I saw them snub it out, snub the hole past the bag and it started blowing, snubbed it right back down.**
Q. When you say it started blowing, it started blowing gas?
**A. Yes.**
Q. And how long was it from when they snubbed it out and the hole was exposed to when they snubbed it back down, how long did that take?
**A. Seconds. Snubbed it out, seen there was a hole and snubbed it right back down.**
Q. Okay. Could you visually see the hole or you just knew that's what was going on?
**A. I couldn't visually see. I just heard it.**
Q. Okay. You heard a noise?
**A. Yes.**
Q. And what noise did you hear?
**A. Sound of gas blowing.**

*See* App., Ex. 13 at 97:9-25, 99:1-2.

33.   Daniel Dickout, a well supervisor for Colter Energy, stated:

Q. Was there anything that you heard specifically or that you saw that indicated to you that another release was going on?
**A. I mean, it kind of happened all at once, the second one, there wasn't any warning or anything before that. It just happened and there was a release of gas. You could see it shoot out the side of the basket there and then it pretty well caught fire instantly.**

*See* App., Ex. 14 at 28:20-25, 29:1-2.

34.   Lyman Yazzie, a well supervisor for Colter Energy, stated:

Q. Explain to me what you saw or heard whenever the hole was exposed the first time?
**A. I heard this really loud like blowout or something, you know, like a loud gas release and I looked over and then it got quiet and I heard the rig running and**

**then they pushed the last pipe down hole, you know, I really didn't think anything of it at the time.**

Q. So the noise that you heard was a loud gas release?

**A. Yes.**

Q. And you looked over and how long did that gas release in terms of time, how long did it occur?

**A. Not very long. Maybe five seconds, five to ten seconds.**

Q. Okay. And when you looked over at the well, could you see anything that identified that a gas release was going on as well?

**A. Yes. I seen, you know, the pressure coming out and blowing out of there**.

Q. Where was it in relation to the rig?

**A. It was like right above the snubbing basket?**

Q. So you could tell that there was gas coming out above the snubbing basket at that point?

**A. Yeah.**

Q. Okay. You said that you think that it went for five to ten seconds?

**A. Maybe less. Yeah it wasn't very long at all.**

Q. And then you said you saw the pipe actually get shoved down back in?

**A. Yes.**

Q. How did you know that that's what happened?

**A. That the pipe was shoved back in? The rig went down and then I seen the blocks go down and I heard the brake handle go off and I think that's when they just kind of stopped to see what they were going to do.**

Q. And after you heard the blocks and the brake handle, what kind of timeline went by before the next that that you heard that something wrong was occurring?

**A. It was probably a minute, I'm guessing.** . . . .

Q. So the minute of time goes by. You don't see any changes or hear any changes on the rig floor or the snubbing unit and the next thing that you hear is a gas release again?

**A. Yeah. It was just that gas release?**

Q. And you said it started and it just got louder and louder. Give me a timeline from start as it's getting louder until you say that you saw the pipe blow out?

**A. I didn't see actually see pipe blow out, but I heard all the gas pressure and it louder and louder. It was probably like maybe 10-15 seconds of gas release and then I thought they were just trying to bleed it off or something**. . .

*See* App., Ex. 15 at 38:1-25, 39:1-15, 40:17-25, 41:1-17.

35.    Ociel Rodriguez, an operator at the well site for Weatherford, stated:

Q. Okay. Why don't you describe for me what you saw as the snubbing crew lifted the last joint of pipe out?

**A. They were on the last joint and they were coming out slow, like very slow, and then it got to a certain point where you can hear like a big hissing sound like very loud. Everything happened like consistently. Like you hear they're coming out and it was like a big (noise) and then all of a sudden at that second**

**you hear a bang, boom and then like everything there just you could see the flames and then after that like the fire expands wide in the air.**
Q. Okay. Let's go through that just a little bit. So are you watching them perform this operation?
**A. Correct.**
Q. And you're approximately 40 feet away?
**A. Yes.**
Q. You're on ground level watching them up in the snubbing basket?
**A. Yes.**
Q. Okay. At that time the first thing that you recall was hearing this loud noise?
**A. Correct.**
Q. And it was a hissing noise, a gas noise?
**A. Yeah.**

*See* App., Ex. 16 at 35:11-22.

36.     Bryan Lien, a foreman for XTO, stated:

Q. Okay. So the standard operating procedure for snubbing contemplates a risk of gas release, right?
**A. Yes, Sir.**

*See* App., Ex. 17 at 20:23-25.

37.     Cole Carveth, an operations engineer for XTO, stated:

Q. (BY MR. BRAUGH) Okay. And when you say you would have – you would have felt it's unsafe and you would have expressed concerns, why was it unsafe?
**A. Because you don't know what's below that last barrier that's in the two and three-eight profile.**
Q. And what are the hazards or risks that you would have recognized?
**A. Potential for exposed pressure.**
Q. And when you – when you have exposed pressure, what can happen? Give me some things that can happen to human beings and the environment.
**A. There's usually a release of some kind and a lot of things can happen. None of them good.**
Q. And can you confirm for us that – that everybody with any involvement with this well who worked for XTO knew the well was producing natural gas at the time?
**A. Yes. The wells always produce natural gas to begin with.**
Q. Right. So you're getting flowback reports and you're measuring the amount of gas coming back, right?
**A. Oil, gas and water.**
Q. And you can confirm for us that the oil and the gas that could possibly come out of that hole is flammable?
**A. Yes.**

Q. Right?
**A. It's natural gas.**

*See* App., Ex. 18 at 92:10-25, 94:1-14.

38.     Maximilian Boone, an employee of XTO, stated:

Q. Okay. If Mr. Carveth's testimony is that if they snubbed a bottomhole assembly out of the hole that did not fit in the BOP stack and the joint of the pipe that's depicted here, the PII-6 pipe depicted in this exhibit, has a hole in it, the potential is you're going to put gas into the atmosphere on location, right?
**A. In that scenario where you have a hole?**
Q. Yes.
**A. Yes, that's a possibility.**

*See* App., Ex.19 at 102:3-20.

39.     Justin Pyle stated:

Q. You saw the hole come up?
**A. Yes.**
Q. And you personally witnessed the gas coming out of the hole?
**A. Yes, I did.**
. . . .

Q. And so you believed once you pushed [the pipe] back down it looked like it was secure?
**A. That's what I thought at the moment.**
Q But what you know that immediately after that you heard a noise—
**A. It was something—correct.**
Q. And what you're saying is you don't know if the noise was the pipe actually starting to come through your slips uncontrollably or if it was a gas leak noise?
**A. That's correct.**
Q. Okay. But somehow gas escaped from the hole in that tubing, got to the atmosphere and caught on fire?
**A. Yes.**

*See* App., Ex. 20 at 100:17-25, 101:1-5.

40.     On or about May 22, 2017, Chad Maheu and Joseph Guillen sued XTO, Badlands,

Petroleum Experience, KLX, Weatherford, and MBI in the United States District Court for the

District of North Dakota, Case No. 1:17-CV-102 (the "Maheu Lawsuit"). *See* App., Ex. 21.

41.     The Maheu Amended Complaint alleged:

Under the orders of Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden, the Most Wanted and SEI crews proceeded with the snubbing and pulling-out-of-the-hole operations. When the final joint of tubing was being pulled out of the stack under high pressure, a hole in the final joint, was exposed, and allowed uncontrolled pressures, fluids and gases through the hole and into the atmosphere. Most Wanted snubbed the joint back into the stack, snubbed off and stopped work to evaluate what to do next. These uncontrolled pressures caused the final joint of tubing, in spite of it being held by the snubbing unit, to rocket out of the Ryan Well and into the air, and an explosion and flash fire immediately occurred.

*See* App., Ex. 21 at ¶ 38.

42.     On or about July 6, 2017, the heirs of Stassinos sued XTO, Badlands, Petroleum

Experience, KLX, Weatherford, and MBI in the United States District Court for the District of

North Dakota, Case No. 1:17-CV-00138 (the "Stassinos Lawsuit"). *See* App., Ex. 22.

43.     The Stassinos Amended Complaint alleged:

As the work continued, XTO, and/or other Defendants, upon information and belief, ordered and directed Sherwood and Most Wanted to remove the final joint of the pipe from the Well under pressure. That joint could not be safely removed under pressure given its length, the condition of the bottom hole assembly, and because the joint of tubing had a hole in it and could not contain the highly pressurized, dangerous natural gas.

*Id.* at ¶ 30.

. . . .

The Defendant Weatherford Entities supplied the tubing at the XTO Well Site. A piece of it had a hold in it, was defective, and failed. When the piece of tubing with the hole reached the surface, the pressurized gas escaped and the explosion and fire followed.

*Id.* at ¶ 32.

. . . .

The tubing and other products were defective and unreasonably dangerous because of a hole that existed or developed in the tubing and/or other products which caused

pressurized gas to escape when the tubing reached the surface and resulted in an explosion and fire.

*Id.* at ¶ 78.

## THE DEMANDS FOR COVERAGE

44.     On or about January 31, 2018, MBI provided notice of the Maheu Lawsuit to CIIC. *See* App., Ex. 23.

45.     On or about February 16, 2018, MBI tendered the Maheu Lawsuit to XTO, seeking defense and indemnification pursuant to the MSA. *See* App., Ex. 24 at 188-89 (February 16, 2018 Letter from Jason Vendsel to XTO, Attachment to June 29, 2018 Letter from Leslie Thorne to CIIC and Berkley).

46.     On or about February 16, 2018, MBI tendered the Stassinos Lawsuit to XTO, seeking defense and indemnification pursuant to the MSA. *See* App., Ex. 24 at 243-44 (February 16, 2018 Letter from Jason Vendsel to XTO, Attachment to June 29, 2018 Letter from Leslie Thorne to CIIC and Berkley).

47.     On or about June 29, 2018, XTO wrote to Berkley and CIIC to place the insurers on notice of the Accident and "to demand defense and indemnity on behalf of XTO and its contractors." *See* App., Ex. 24. Specifically, XTO asserted that "XTO and the Contractors [Badlands Consulting, Petroleum Experience, Weatherford, and KLX] [were] additional insureds under [MBI's insurance policies]." *Id.* at 3. XTO demanded that "Berkley defend and indemnify XTO and the Contractors for all claims raised in the Stassinos and Maheu Lawsuits." *Id.* In addition, XTO provided "notice to both Berkley and [CIIC] that the Berkley Umbrella Policy and the [CIIC] Policy may be involved." *Id.* at 4.

48.     On or about July 24, 2018, XTO conditionally accepted MBI's tender of defense and indemnity in the underlying lawsuits. *See* App., Ex. 25. Although XTO "conditionally

accepted" MBI's tender, XTO also advised MBI that "pursuant to Section 11.4 of the MSA, MBI's insurers [were] ultimately responsible for defending and indemnifying XTO, MBI, and all other members of the XTO Group." *See* App., Ex. 25 at 1.

49.     On or about September 28, 2018, Berkley denied XTO's demand for defense and indemnity under its policies. *See* App., Ex. 26.

50.     On or about October 5, 2018, CIIC denied XTO's demand for coverage, consistent with Berkley's denial. *See* App., Ex. 27.

51.     Thereafter, XTO settled all of the claims in the underlying lawsuits on behalf of XTO and all of its contractors (including MBI) and their insurers (except Berkley and CIIC). [Doc. 7 at ¶ 50].

52.     On or about November 7, 2018, XTO filed a Third-Party Complaint against Berkley and CIIC, among others. XTO alleged three counts against CIIC: Count 1–Breach of Contract; Count 3–Breach of the Common Law Duties of Good Faith and Fair Dealing; and Count 4–Statutory Claim for Unfair Claim Settlement Practices. [Doc. 7].

## **ARGUMENT**

### **The Court Should Enter Summary Judgment in Favor of CIIC**

### **I.      The Summary Judgment Standard.**

Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). The movant "bears the initial responsibility of informing the district court of the basis for its motion," and must identify "those portions of [the record] ... which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant does so, the

nonmovant must respond by submitting evidentiary materials that set out "specific facts showing that there is a genuine issue for trial." *Id.* at 324, quoting Fed.R.Civ.P. 56(e)(2). "On a motion for summary judgment, 'facts must be viewed in the light most favorable to the nonmoving party only if there is a genuine dispute as to those facts.'" *Ricci v. DeStefano*, 557 U.S. 557, 586, 129 S.Ct. 2658, 2677, 174 L.Ed.2d 490 (2009) (citation omitted). The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts," and must come forward with "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). *See Torgerson v. City of Rochester*, 643 F. 3d 1031, 1042 (8th Cir. 2011).

Here, because there is no genuine issue of fact regarding either the Accident or the CIIC Policy, the Court should grant summary judgment in favor of CIIC and dismiss XTO's claims against CIIC with prejudice.

## II.    The Principles of Insurance Policy Construction.

"Determining the legal effect of an insurance contract … is generally a question of law for a court to decide." *Continental Western Ins. Co. v. Dam Bar*, 478 N.W.2d 373, 374 (N.D. 1991). The court looks first to the language of the insurance contract; "if the policy language is clear on its face, there is no room for construction." *Ziegelmann v. TMG Life Ins. Co.*, 607 N.W.2d 898, 900 (N.D. 2000). Thus, the court "will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage." *Id.* Although the court "construes exclusionary provisions strictly," it will "not automatically construe every insurance exclusion against an insurer and in favor of coverage for the insured." *Nationwide Mut. Ins. Companies v. Lagodinski*, 683 N.W.2d 903, 907 (N.D. 2004). In short, the court "will not rewrite a contract to impose liability on an insurer if the policy unambiguously excludes coverage." *Id.*

### III.    The Pollution Exclusion in the CIIC Policy Bars Coverage for the Underlying <u>Lawsuits.</u>

The Pollution Exclusion in the CIIC Policy states:

**Pollution**

This insurance does not apply to:

Any **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time.

*See* App., Ex. 1 at 69.

XTO's claim for coverage for the underlying lawsuits falls squarely within this Pollution Exclusion. (i) There was a "release" of oil or gas. (ii) Oil and gas are "pollutants" as defined by the CIIC Policy. (iii) The injuries at issue in the underlying lawsuits "arose out of" the "release" of oil or gas from the Ryan Well. (iv) No exception to the Pollution Exclusion applies. Because the Pollution Exclusion bars coverage for the underlying lawsuits, all of XTO's claims against CIIC fail.

### A.  The Pollution Exclusion in the CIIC Policy Is Unambiguous as a Matter <u>of Law.</u>

Absolute pollution exclusions generally exclude "'[b]odily injury' or 'property damage' arising out of the alleged or threatened discharge, dispersal, release or escape of pollutants." *Absolute pollution exclusion*, 9 Couch on Ins. §127:14. In *Hiland Partners GP Holdings, LLC v. National Union Fire Ins. Co. of Pittsburgh, PA*, 847 F.3d 594 (8th Cir. 2017), the Eighth Circuit noted that "the 'majority of state and federal jurisdictions have held that absolute pollution exclusions are unambiguous as a matter of law.'" *Id.* at 598, citing *Church Mut. Ins. Co. v. Clay Ctr. Christion Church*, 746 F.3d 375, 380 (8th Cir. 2014) (quoting *Cincinnatti Ins. Co. v. Becker Warehouse, Inc.*, 262 Neb.746, 635 N.W.2d 112, 118 (2001) (collecting cases from multiple

jurisdictions holding that "absolute pollution exclusions are unambiguous as a matter of law and, thus, exclude coverage for all claims alleging damage caused by pollutants")). Here, the pollution exclusion in the CIIC Policy excludes bodily injury or property damage "arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time." Thus, as a matter of law, the pollution exclusion in the CIIC Policy is unambiguous.

### B. The Injuries at Issue in the Underlying Lawsuits Arose Out of the Actual Release or Escape of Oil and/or Gas.

"North Dakota applies the 'causal connection test' when construing the phrase 'arising out of' in an insurance policy." *Acuity v. North Cent. Video, LLLP*, No. 1:05-CV-010, 2007 WL 1356919, at *10 (D.N.D. May 7, 2007). "[T]he causal connection test is broad and comprehensive in scope." *Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co.*, 658 N.W.2d 363, 371 (N.D. 2003). "The 'causal relationship need not constitute a proximate cause.'" *Id.*

Here, the undisputed facts show that the injuries at issue in the underlying lawsuits arose out of the actual release or escape of oil and/or gas. The OSHA Citation, as well as the witness interview statements and deposition testimony consistently indicate that the explosion and fire that caused the injuries at issue resulted from the release of oil and/or gas from the Ryan Well during the snubbing operation. *See* App., Ex. 3. As Nicholas Brown, a field supervisor, stated: "There was a gas release. We saw it." *See* App., Ex. 6 at 4:2-5. Tom Jones, Justin Pyle, and Daniel Dickout, all of whom were present at the time of the explosion and fire, also testified that they observed the release of gas into the atmosphere from a hole in the pipe. *See* App., Ex.7 at 23:9-15, Ex. 9 at 92:17-25, Ex. 14 at 28:20-25, 29:1-2. Other witnesses testified that they heard the release of gas, even if they were not in a position to observe it. *See* App., Ex. 13 at 99:1-2, Ex. 15 at 41:1-17, Ex. 16 at 35:11-22. Significantly, no witnesses testified that there was *not* a release of oil or gas from

the well preceding the explosion and fire. Thus, the OSHA Citation concluded it "was a full well blowout with gases and fluids escaping the well." *See* App., Ex. 3 at 28.

### C.   Oil and Gas Are "Pollutants" as Defined by the CIIC Policy.

The CIIC Policy defines "Pollutants" as: "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." As a matter of law, the oil and/or gas that was actually released from or escaped the Ryan Well are "pollutants" as defined by the CIIC Policy.

In *Hiland,* the Eighth Circuit considered whether "condensate," a byproduct that results from the processing of gas and hydrocarbon products, was a "pollutant" and concluded that it was. *Hiland*, 847 F.3d at 598-600. The policy at issue in *Hiland*, just like the CIIC Policy at issue here, defined "pollutant" as "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste," but did not define the terms "irritant" or "contaminant." Applying North Dakota law, the Court turned to the dictionary for guidance. *Id.* at 599. The Court found that "[a]n irritant is defined as 'something that irritates,' that is, that 'produce[s] irritation,'" and "[a] contaminant is 'something that contaminates,' that is, that 'soil[s], stain[s], corrupt[s], or infect[s] by contact or association.'" *Id.* The Court concluded that condensate was a contaminant "because flammable, volatile, and explosive liquid and gas has the ability to soil, stain, corrupt or infect the environment." *Id.* The Court further noted that "[t]his conclusion is in accord with the 'bulk of the case authority … [which] holds that oil, gasoline, and other petroleum products are toxic by nature and therefore they constitute a contaminant when released into the environment.'" *Id.* (citing *Aetna Cas. & Sur. Co. v. Dow Chem. Co.*, 933 F.Supp. 675, 683 (E.D. Mich. 1996) (collecting cases holding that oil and gas are pollutants)).

Notably, the *Hiland* Court rejected the argument that the condensate at issue did not fall within the policy's definition of "pollutant" because it "caused harm in a manner other than by contamination." *Id.* at 600. The Court noted that condensate is a contaminant "because it is flammable, volatile, and explosive" and the overflow of the condensate tanks was alleged to have "caused ignition, fire, and an explosion," resulting in the injury at issue. *Id.* The Court thus concluded: "Because condensate is a contaminant due to its flammable, volatile, and explosive properties and because [the] injuries were the result of an explosion, the nature of the harm here is directly related to the nature of the contaminant." *Id.*; *accord Noble Energy, Inc. v. Bituminous Cas. Co.*, 529 F.3d 642 (5th Cir. 2008) (holding that pollution exclusion barred coverage for injuries resulting from explosion and fire caused by release of condensate).

The same analysis applies in this case. Oil and gas, like condensate and other petroleum products, have "flammable, volatile and explosive properties" and are contaminants for that reason. In *Hiland*, the overflow of condensate was alleged to have resulted in the explosion and fire that caused the injuries at issue and the Court concluded that the pollution exclusion applied to bar coverage. Here, the undisputed facts show that the release of oil and/or gas during the snubbing operation at the Ryan Well resulted in the explosion and fire that caused the injuries at issue. XTO's engineers testified that gas is flammable (*See* App., Ex. 18 at 92:10-25, 94:1-14, Ex. 19 at 102:3-20) and the contractors who witnessed the Accident uniformly testified that the pipe ignited immediately after the gas escaped the well, engulfing the injured parties in flames. *See* App., Ex. 3, Ex. 14 at 28:20-25, 29:1-2, Ex. 16 at 35:11-22].

### D. <u>The Exception to the Pollution Exclusion Does Not Apply.</u>

The Pollution Exclusion provides that it "will not apply" to injuries arising out of a release or escape of pollutants that "meets *all* of the following conditions." *See* App., Ex. 1 at 69 (emphasis

added)]. One of the conditions is that "[i]ts commencement was reported in writing to [CIIC] within (21) calendar days of becoming known to the Insured." *Id.* Courts have held similar provisions unambiguous and applied them according to their terms. *Hiland*, 847 F.3d at 601 (holding that "district court did not err by concluding that the exception to the exclusion did not apply" where "[insured] did not offer specific facts showing that it reported the pollution to [insurer] within twenty one days"); *In re Matter of Complaint of Settoon Towing, LLC*, 720 F.3d 268, 278 (5th Cir. 2013) (holding that "non-compliance prevents the exception to the exclusion from taking effect in the first instance, meaning the pollution exclusion remains in effect"); *Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F.Supp.3d 663, 677 (M.D. La. 2019) (same).

In North Dakota, the insurer bears the burden to prove the applicability of a policy exclusion but the insured "carries the burden to prove the applicability of 'an exception to the exclusion in order to benefit from coverage.'" *Hiland*, 847 F.3d at 601 (quoting *Nationwide Mut. Ins. Co. v. Lagodinski*, 683 N.W.2d 903, 907 (N.D. 2004).]. Here, the undisputed facts show that the Accident occurred on June 18, 2016; MBI did not give notice of the Accident to CIIC until January 31, 2018; and XTO did not give notice to CIIC until June 29, 2018. *See* Decl. of Pranothi Prabhakara ¶ 5, Exs. 2, 3. Moreover, it is clear from their participation in the OSHA investigation in 2016 that both MBI and XTO had knowledge of the Accident much earlier. *See* App., Ex. 3. Accordingly, neither MBI nor XTO is able to show that the required notice was provided to CIIC. Therefore, the exception to the Pollution Exclusion does not apply.

**IV.    CIIC Did Not Breach its Common Law Duty of Good Faith and Fair Dealing to XTO Because Its Denial of XTO's Claim for Coverage Was Proper.**

In Count 3 of its Third-Party Complaint, XTO alleges that CIIC breached its common law duty to deal fairly and in good faith with XTO. The Court should grant summary judgment to CIIC

22

and dismiss Count 3 with prejudice because, for the reasons set forth above, CIIC properly denied coverage to XTO and, in the absence of coverage, there can be no claim for breach of the duty of good faith and fair dealing.

Under North Dakota law, "An insurer has a duty to act fairly and in good faith in its contractual relationship with its policyholders." *Fetch v. Quam*, 623 N.W.2d 357, 361 (N.D. 2001). "This duty of good faith imposed on an insurer … has its genesis in the contractual relationship between the insurer and its policyholders." *Id.* "The gravamen of the test for bad faith is whether the insurer acts unreasonably in handling an insured's claim." *Id.* "An insurer acts unreasonably by failing to compensate the insured for a loss covered by the policy unless the insurer has a proper cause for refusing." *Id.* at 361-62 (citing *Hanson v. Cincinnati Life Ins. Co.,* 571 N.W.2d 363 (N.D. 1997)). Where a loss is not "covered by the policy" or the insurer has "a proper cause for refusing payment," summary judgment in favor of the insurer is proper. *See, e.g., Fetch*, 623 N.W.2d 357 (affirming summary judgment in favor of insurer on bad faith claim); *Hanson*, 571 N.W.2d 363 (same).

As set forth above, CIIC properly denied XTO's claim for coverage. Accordingly, no claim for breach of the duty of good faith and fair dealing will lie.

**V.      XTO Fails to State a Claim for Violation of Section 26.1-04-03(9), N.D.C.C.**

In Count 4 of its Third-Party Complaint, XTO alleges a statutory claim for unfair claim settlement practices under Section 26.1-04-03(9), N.D.C.C. (the "Act"). To state a claim for unfair claim settlement practices, XTO must show that CIIC acted "without just cause" *and* "with a frequency indicating a general business practice."[5] The Court should grant summary judgment to

---

[5] It remains unclear whether a private cause of action is even available for violation of Section 26.1-04-03(9). *Hayden v. Blue Cross & Blue Shield of Texas*, No. 1:10-CV-50, 2010 WL 11564942, at *5 (D.N.D. Nov. 2, 2010). However, this Court has predicted that the North Dakota

CIIC and dismiss Count 4 with prejudice because (i) the undisputed facts show that CIIC was not

"without just cause" to deny coverage to XTO, and (ii) XTO has failed to allege, much less show,

that CIIC engaged in any prohibited conduct "with a frequency indicating a general business

practice."

### A.  **CIIC Did Not Act "Without Just Cause."**

For the reasons amply set forth above, CIIC did not act "without just cause" in denying

XTO's claim. As the Eighth Circuit recently recognized, where, as here, an excess policy does not

provide coverage, an insurer does not breach its duty of good faith by refusing payment for the

loss. *Houston Cas. Co. v. Strata Corp.*, 915 F.3d 549, 552 (8th Cir. 2019) ("[B]ecause the excess

policy does not provide coverage for Faust's claims, Houston Casualty did not breach its duty of

good faith."); *Hartman v. Estate of Miller*, 656 N.W.2d 676, 681 (N.D. 2003) ("[A]s a matter of

law, an insurer is not guilty of bad faith for denying a claim if the claim is fairly debatable, or if

there is a reasonable basis for denying the claim or delaying payment."). Here, CIIC had just cause

to deny XTO's claim for all of the reasons set forth above, including the pollution exclusion.

Therefore, CIIC did not violate the Act.

### B.  **CIIC Did Not Act "With a Frequency Indicating a General Business Practice.**

"Section 26.1-04-03(9) specifically requires that the proscribed acts be 'performed with a

frequency indicating a general business practice' to constitute an unfair claim settlement practice."

*Volk v. Wisconsin Mortg. Assur. Co.*, 508 N.W.2d 40, 45 (N.D. 1991). "[A] single alleged act of

misconduct [does] not constitute an actionable claim under [the statute]." *Estvold Oilfield Servs.,*

---

Supreme Court would not recognize a private cause of action for violation of the statute. *Farmer's Union Cent. Exch., Inc. v. Reliance Ins. Co.*, 675 F. Supp. 1534, 1536 (D.N.D. 1987). If the Court determines it necessary to reach the issue, CIIC urges the Court to follow the analysis set forth in *Farmer* and hold that no private right of action is available.

*Inc. v. Hanover Ins. Co.*, No. 1:17-CV-016, 2018 WL 1996453, at *5 (D.N.D. Apr. 27, 2018) (citing *Volk*, 508 N.W.2d at 45, and *Dvorak v. American Family Mut. Ins. Co.*, 505 N.W. 329, 332 (N.D. 1993)). Here, XTO alleges only that CIIC violated Section 26.1-04-03(9) in connection with the claim at issue; XTO alleges *no* other prohibited conduct, much less prohibited conduct "with a frequency indicating a general business practice." [Doc. 7 at ¶ 88]. Because a "single alleged act of misconduct" is insufficient to state a claim for violation of Section 26.1-04-03(9), Count 4 should be dismissed.

## VI.     Conclusion

For the foregoing reasons, the Court should grant CIIC's Motion for Summary Judgment.


Respectfully submitted,

**STROOCK & STROOCK & LAVAN LLP**
200 South Biscayne Blvd.
Suite 3100
Miami, FL 33131
Tel.: (305) 358-9900

By:      */s/ Laura Besvinick*
          Laura Besvinick
          Florida Bar Number 391158
          lbesvinick@stroock.com

          and

By:      */s/ Joel A. Flom*
          Joel A. Flom   (#04469)
          Jessica M. Rydell  (#07801)
          joel@flomlaw.com
          jessica@flomlaw.com
          *Attorneys for Third Party Defendant*
          *Commerce and Industry Insurance Company*

## <u>CERTIFICATE SERVICE</u>

I HEREBY CERTIFY that on March 4, 2020, I electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system. Copies of the foregoing document will be served upon interested counsel either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

*/s/ Laura Besvinick*
Laura Besvinick
