IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| BERKLEY NATIONAL INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | C.A. NO. 1:18-CV-00195 |
| | § | |
| XTO ENERGY, INC., | § | |
| | § | |
| *Defendant, Counter-Plaintiff and* | § | |
| *Third-Party Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| COMMERCE AND INDUSTRY | § | |
| INSURANCE COMPANY, TORUS | § | |
| NATIONAL INSURANCE COMPANY | § | |
| n/k/a STARSTONE NATIONAL | § | |
| INSURANCE COMPANY, and SENECA | § | |
| SPECIALTY INSURANCE COMPANY, | § | |
| | § | |
| *Third-Party Defendants.* | § | |

**DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF XTO
ENERGY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR
PARTIAL SUMMARY JUDGMENT AGAINST TORUS NATIONAL INSURANCE
COMPANY n/k/a STARSTONE NATIONAL INSURANCE COMPANY**

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................ 1

STATEMENT OF UNDISPUTED MATERIAL FACTS ..................................... 4

   I.  The Underlying Lawsuits ......................................................................4

   II.  The Master Service Agreement between XTO and StarStone's insured, Badlands ..........7

   III. The Insurance Policies ..........................................................................8

       A.  The Seneca Policy ............................................................... 9

       B.  The StarStone Policy ......................................................... 10

   IV. Coverage Demand and Denial ............................................................11

   V.  The Settlement of the Lawsuits and the Coverage Litigation ...........................12

ARGUMENT & AUTHORITIES ...................................................................... 13

   I.  Summary Judgment Standard. ..........................................................13

   II.  The StarStone Policy Provides Coverage to XTO for the Lawsuits. ................14

       A.  Badlands' Obligations Under the MSA Implicate the StarStone Policy,
          Not Just The Primary Layer of Coverage. ............................... 14

       B.  XTO is an Additional Insured Under the Seneca Policy and, as a Result,
          the StarStone Policy. ....................................................... 16

          1.  The MSA Does Not Limit XTO's Additional Insured Status to
              Badlands' Indemnity Obligations. ..................................... 16

          2.  The Liability in the Underlying Lawsuits Was "Caused, In Whole
              or In Part" by Badlands' Acts or Omissions, Triggering XTO's
              Additional Insured Status. ............................................... 19

          3.  Alternatively, The Additional Insured Provision Is Ambiguous
              and Must be Construed in Favor of Coverage. ...................... 23

       C.  The Pollution Exclusion in the StarStone Policy Does Not Bar Coverage
          for the Lawsuits. ............................................................ 24

          1.  StarStone's Heavy Burden to Prove the Applicability of Any Exclusion. .......... 24

          2.  The Pollution Exclusion in the StarStone Policy Only Applies to
               Environmental-Type Harms, Not to Bodily Injury Claims Like
              Those Alleged. ............................................................ 25

          3.  Even if the Pollution Exclusion Applied, The Hostile Fire Exception
              Would Restore Coverage. ............................................... 30

          4.  Alternatively, The Pollution Exclusion and the Hostile Fire Exception Are
              Ambiguous and Must be Construed in Favor of Coverage. ................ 37

DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF XTO ENERGY
INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST TORUS  NATIONAL INSURANCE COMPANY n/k/a STARSTONE
NATIONAL INSURANCE COMPANY

ii

D.  StarStone Waived Its Right To Assert This Coverage Defense, And
In Any Event, The Texas Oilfield Anti-Indemnity Act Does Not Apply
to Badlands' Obligation to Name XTO as An Additional Insured
Under Its Policies. ..................................................................................... 37

CONCLUSION ......................................................................................................... 39

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Admiral Ins. Co. v. Trident NGL, Inc.*,
 988 S.W.2d 451 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)....................................22

*Am. Star Ins. Co. v. Grice*,
 854 P.2d 622 (Wash. 1993)..................................................................................................33

*Am. States Ins. Co. v. Koloms*,
 687 N.E.2d 72 (Ill. 1997)......................................................................................................26

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986)...............................................................................................................13

*Atlantic Mut. Ins. Co. v. McFadden*,
 595 N.E.2d 762 (Mass. 1992) ...............................................................................................27

*Barnard Pipeline, Inc. v. Travelers Prop. Cas. Co. of Am.*,
 3 F. Supp. 865 (D. Mont. 2014)......................................................................................23, 37

*Belt Painting Corp. v. TIG Ins. Co.*,
 795 N.E.2d 15 (N.Y. 2003)...................................................................................................26

*Besic v. Citizens Insurance Co.*,
 800 N.W.2d 93 (Mich. Ct. App. 2010) ...........................................................................35, 36

*Century Sur. Co. v. Hallandale Beach Serv. Station, LLC*,
 No. 10-21430—CIV, 2011 WL 13174906 (S.D. Fla. Mar. 21, 2011)........................31, 32, 33

*Clayton Williams Energy, Inc. v. National Union Fire Insurance Co. of La.*,
 No. 03-2980, 2004 WL 2452780 (E.D. La. Nov. 2004) .........................................................39

*Doerr v. Mobil Oil Corp.*,
 774 So.2d 119 (La. 2000) ......................................................................................................27

*Duensing v. Traveler's Companies*,
 849 P.2d 203 (Mont. 1993) ...................................................................................................25

*Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*,
 132 F.3d 526 (9th Cir. 1997) ...........................................................................25, 26, 29, 30

*Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*,
 256 S.W.3d 660 (Tex. 2008)...............................................................16, 17, 18, 22, 39

*ExxonMobil Corporation v. Electrical Reliability Services, Inc.*,
    868 F.3d 408 (5th Cir. 2017) ..................................................................18

*Fire Ins. Exch. v. Tibi*,
    51 F. Supp. 2d 1065 (D. Mont. 1995) ...............................................23, 37

*Gaylord Container Corp. v. CNA Ins. Cos.*,
    807 So. 2d 864 (La. App. 2001).........................................................26, 28

*Getty Oil Co. v. Ins. Co. of N. Am.*,
    845 S.W.2d 794 (Tex. 1992).........................................................18, 38, 39

*Great Northern Insurance Co. v. Greenwich Insurance Co.*,
    No. CV-05-635, 2007 WL 2458477 (W.D. Penn. Aug. 24, 2007), *vacated on*
    *other grounds* ........................................................................................33

*Greenwich Ins. Co. v. John Sexton Sand & Gravel Corp.*,
    No. 1-12-1263, 2013 WL 950755 (Ill. App. Ct. Mar. 11, 2013) ......................28, 33

*Hawkins Chemical, Inc. v. Westchester Fire Ins. Co.*,
    159 F.3d 348 (8th Cir. 1998) ..................................................................34

*Hiland Partners GP Holdings, LLC, et al. v. Nat'l Union Fire Ins. Co. of*
    *Pittsburgh,PA*, 847 F.3d 594 (8th Cir. 2017) ............................................24, 29, 31

*Johnson v. Center Mut. Ins. Co.*,
    529 N.W.2d 568 (N.D. 1995) .............................................................35, 36

*Jones v. Francis Drilling Fluids, Ltd.*,
    642 F. Supp. 2d 643 (S.D. Tex. 2009) ...............................................26, 28, 29

*Karroll v. Atomergic Chemetals Corp.*,
    194 A.D.2d 715 (N.Y. 1993) ...................................................................27

*Keggi v. Northbrook Property and Cas. Ins. Co.*,
    13 P.3d 785 (Ariz. 2000).........................................................................26

*Kent Farms, Inc. v. Zurich Ins. Co.*,
    969 P.2d 109 (Wash. App. 1998), aff'd, 998 P.2d 292 (2000)................................27

*MacKinnon v. Truck Insurance Exchange*,
    73 P.3d 1205 (Cal. 2003) ........................................................................27

*Masters Group International, Inc. v. Comerica Bank*,
    352 P.3d 1101 (Mont. 2015).....................................................................37

DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF XTO ENERGY       v
INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST TORUS  NATIONAL INSURANCE COMPANY n/k/a STARSTONE
NATIONAL INSURANCE COMPANY

*McCarthy Brothers Co. v. Continental Lloyds Ins. Co.*,
  7 SW.3d 725 (Tex. App.—Austin 1999, no pet.) ...............................................23

*Mesa Operating Co. v. California Union Ins. Co.*,
  986 S.W.2d 749 (5th Cir. 1999)........................................................................35

*Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*,
  16 S.W.3d 418 (Tex. App.—Waco 2000, pet denied)....................................32, 33

*Motorists Mut. Ins. Co. v. RSJ, Inc.*,
  926 S.W.2d 679 (Ky. App.1996) .........................................................................26

*Muehlenbein v. West Ben Mutual Insurance Co.*,
  175 Wis. 2d 259 (Wis. Ct. App. 1993) ................................................................35

*Nautilus Ins. Co. v. Jabar*,
  188 F.3d 27 (1st Cir.1999)..................................................................................26

*Newman v. Scottsdale Insurance Co.*,
  301 P.3d 348 (Mont. 2013)...........................................................................24, 25

*Noble Energy, Inc. v. Bituminous Casualty Co.*,
  529 F.3d 642 (5th Cir. 2008) ..............................................................................32

*Palmer v. Northland Cas. Co.*,
  No. CV 15-58-BLG-SPW-CSO, 2016 WL 5820191 (D. Mont. 2016) ...............24, 29, 31

*Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*,
  976 F.2d 1037 (7th Cir.1992) .............................................................................26

*Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co.*
  35 F.3d 494 (10th Cir. 1994) ..............................................................................27

*Revelation Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*,
  206 P.3d 919 (Mont. 2009)................................................................................13

*Scentry Biologicals, Inc. v. Mid-Continent Casualty Co.*,
  319 P.3d 1260 (Mont. 2014)..............................................................................14

*Schmid v. Fireman's Fund Ins. Co.*,
  97 F. Supp. 2d 967 (D. Minn. 2000)...................................................................33

*Star Ins. Co. v. Continental Resources, Inc.*,
  89 F.Supp.3d 1015 (D.N.D. 2015)......................................................................15

*Tafford v. Safeco Insurance Co. of America*,
  306 F. Supp. 3d 1243 (D. Mont. 2018)...............................................................13

*Travelers Casualty & Surety v. Ribi Immunochem Research,*
    108 P.3d 469 (Mont. 2005) .......................................................................................24

*WBI Energy Transmission, Inc. v. Colony Ins. Co.,*
    56 F. Supp. 3d 1194 (D. Mont. 2014) .....................................................................22

*Weaver v. Royal Ins. Co. of America,*
    674 A.2d 975 (N.H. 1996) .......................................................................................27

*Wellcome v. Home Insurance Co.,*
    849 P.2d 190 (Mont. 1993) ......................................................................................26

*West American Ins. Co. v. Tufco Flooring East, Inc.,*
    409 S.E.2d 692 (N.C. 1991), overruled on other grounds by *Gaston County*
    *Dyeing Mach. Co. v. Northfield Ins. Co.*, 524 S.E.2d 558 (N.C. 2000)..................27

*Western Heritage Ins. Co. v. Slopeside Condo. Ass'n. Inc.,*
    371 F. Supp. 3d 828 (D. Mont. 2019) ...............................................................13, 14

**Statutes**

Mont. Code § 33-15-316 ...................................................................................................36

MSA Section 11.1 ..............................................................................................................15

MSA Section 11.2 ...........................................................................................................7, 15

MSA Section 11.4 ........................................................................................................7, 8, 18

MSA Section 14.8 ...........................................................................................................8, 14

TEX. CIV. PRAC. & REM. CODE § 127.005 ..................................................................38

Texas Oilfield Anti-Indemnity Act.............................................................................3, 37

Texas Oilfield Anti-Indemnity Act..........................................................3, 4, 11, 14, 37, 40

TOAIA ....................................................................................................................3, 38, 39

**Other Authorities**

FED. R. CIV. P. 56(e) .......................................................................................................13

FED. R. CIV. P. 54(d) ........................................................................................................4

Defendant, Counter-Plaintiff and Third-Party Plaintiff XTO Energy, Inc. ("XTO") submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment against Torus National Insurance Company n/k/a StarStone National Insurance Company ("StarStone") (the "Motion").

## PRELIMINARY STATEMENT

This is an insurance coverage dispute stemming from StarStone's denial of coverage to XTO in connection with lawsuits arising from a well explosion that resulted in the serious injury and death of several people.

Badlands, StarStone's insured, was required under a Master Service Agreement (the "MSA") to name XTO as an additional insured. However, relying on baseless coverage defenses, StarStone improperly denied additional insured coverage to XTO under its policy for the lawsuits. Each of StarStone's affirmative defenses is meritless and unsupported by the plain terms of the MSA, the StarStone Policy, or the relevant case law. For instance:

StarStone asserts that the MSA only required Badlands to obtain insurance coverage up to a million dollars – an amount that would not trigger StarStone's umbrella policy – because the MSA only required that Badlands obtain minimum limits of $1,000,000.  *See* Doc. No. 32, ¶ 116 (Answer); Doc. No. 101, at 22-23 (StarStone Motion).  StarStone misreads the MSA, which explicitly states that (1) Badlands is required to purchase insurance and name XTO an additional insured and (2) the amount of insurance XTO is entitled to is the "actual insurance" purchased by Badlands.  Because Badlands purchased the StarStone policy, XTO is entitled to coverage under that policy pursuant to the MSA.

Second, StarStone attempts to avoid its obligations by asserting that XTO is not an additional insured under the policy.  *See* Doc. No. 32, ¶¶ 107, 109, 117; Doc. No. 101, at 16-22.

While StarStone argues that the Policy only affords coverage where its named insured must indemnify XTO, that is simply not the case under the Master Service Agreement ("MSA") between XTO and Badlands, the Policy, or settled law.   The MSA plainly requires Badlands to name XTO as an additional insured in its liability policies and the Policy does just that.  The MSA does *not* limit that obligation to situations in which Badlands has an indemnity obligation to XTO—indeed, the insurance and indemnity sections of the MSA are entirely separate. And courts across the country – including authorities governing this dispute – have consistently held that an insurer's obligation to name a party as an additional insured in a contract is just that—in independent obligation that should be read separately and apart from any indemnity obligation.  Just as the Policy and MSA provide, XTO is an additional insured entitled to coverage here.

Third, StarStone asserts that the well explosion and fire were caused by the release of gases and the pollution exclusion therefore bars coverage for the underlying lawsuits. *See* Doc. No. 32, ¶¶110-11, 115; Doc. No. 101, at 25-38.   Not so.  Courts across the country, including the Ninth Circuit (construing Montana law, which governs the StarStone policy's interpretation), have found that the pollution exclusion in the StarStone policy only applies to environmental-type harms, not to liability arising out of bodily injury.  Indeed, courts have explicitly held that identical pollution exclusions do not preclude coverage for bodily injuries stemming from an explosion—the precise situation here.  Moreover, the pollution exclusion in the StarStone policy would not apply in any event because it includes an exception for bodily injury "arising out of heat, smoke or fumes from a hostile fire."  Hostile fire is defined as fire "which becomes uncontrollable or breaks out from where it was intended to be."  The allegations in the underlying lawsuits assert, and the evidence shows, that the claimants' injuries were caused by a hostile fire.  The pollution exclusion therefore does not apply.

Finally, StarStone contends that the Texas Oilfield Anti-Indemnity Act (the "TOAIA") caps any potential additional insured coverage for XTO to the $1 million limits of Badlands' primary policy (the Seneca Policy). *See* Doc. No. 101, at 23-25. As an initial matter, the Court must reject this defense as StarStone neither raised nor pled a defense based on the TOAIA in any pleading. Instead, StarStone raised the TOAIA coverage defense for the first time in a supplemental reservation of rights letter less than three months ago and again in its Motion for Summary Judgment. StarStone has therefore waived this eleventh-hour defense. In any event, the TOAIA does not apply. The TOAIA is only applicable to insurance that <u>directly</u> relates to indemnity agreements, not to additional insured provisions that are <u>separate and apart</u> from any indemnity provision. Because Badlands' obligation to name XTO as an additional insured under the MSA's insurance provision is not tied to the MSA's indemnity provision, the additional insured provision is not subject to the Texas Oilfield Anti-Indemnity Act and in no way limits XTO's coverage.

XTO is entitled to summary judgment as a matter of law on several of StarStone's affirmative defenses. This Court should therefore grant XTO's Motion and dismiss StarStone's meritless affirmative defenses that: (1) there is no coverage for the Underlying Claims to the extent XTO and its contractors are not an insured or additional insured under the StarStone Policy (*see* Doc. No. 32, ¶ 107); (2) there is no additional insured coverage for the Lawsuits for XTO and its contractors arising out of the acts or omissions of Badlands or XTO (*id.*, ¶¶ 109, 117); (3) there is no coverage for the Lawsuits due to the application of the MSA entered into between XTO and Badlands (*id.*, ¶ 116); (4) the pollution exclusions in the Seneca Policy and StarStone Policy bar coverage for the Lawsuit, including because coverage under the StarStone Policy is no broader than would be afforded by the underlying insurance (*id.*, ¶¶ 110-11, 115). XTO also seeks the

Court reject StarStone's unpled defense that the Texas Oilfield Anti-Indemnity Act precludes any recovery by XTO under the StarStone Policy (*see* Ex. 3-A (App. 757-58) (StarStone Sup. Res. R. Letter).[1]

## STATEMENT OF UNDISPUTED MATERIAL FACTS[2]

### I.     The Underlying Lawsuits

1.      XTO conducts significant oil and gas operations throughout North Dakota. Among other things, it owned and was the lease operator of a producing oil and gas well located approximately eight miles east of Watford City, North Dakota at a drilling pad known as Ryan 14X-09E (the "Ryan Well").  Ex. 2 (App. 288, ¶ 3) (Arnold Affidavit).

2.      On or about June 18, 2016, an explosion and fire occurred at the Ryan Well, injuring or killing several people and resulting in two lawsuits:  *Mary Stassinos et al. v. XTO Energy Inc., et al;* Civil No. 1:17-CV-138 (the "*Stassinos* Lawsuit") and *Richard Maheu et al. v. XTO Energy Inc., et al.;* Civil No. 1:17-CV-102 (the "*Maheu* Lawsuit"), both pending in the District of North Dakota, Western Division (collectively, the "Lawsuits").[3]  Ex. 1-A (App. 008-32) (Stassinos Lawsuit); Ex. 1-B (App. 033-64) (Maheu Lawsuit). The Lawsuits named as defendants XTO and a number of its contractors, including Badlands.  *Id.*  The Lawsuits alleged that XTO and all other defendants were negligent and further sought to hold XTO accountable for the alleged negligence

---

[1] XTO reserves the right under Federal Rule of Civil Procedure 54(d) to seek its attorneys' fees.

[2] The evidence on which XTO relies in support of its Motion is contained in the Appendix.  Doc. No. 107.  Citations to the evidence in the Appendix appear as "Ex. __ (App. __)"

[3] XTO, among others, was also named a defendant in a lawsuit filed by Daniel Pavon in Harris County, Texas, Case No. 201661844-7 (the "*Pavon* Lawsuit").  Justin Pyle intervened in the *Pavon* Lawsuit.  The *Pavon* Lawsuit was dismissed in Texas on *forum non conveniens* grounds.  After dismissal of the *Pavon* Lawsuit, Pavon and Pyle sought and were granted leave to intervene in the *Maheu* Lawsuit. Ex. 1-C (App. 065-98); Ex. 1-D (App. 099-116).  Pyle also sought and was granted leave to intervene in the *Stassinos* Lawsuit.  As such, the Lawsuits include the claims of Pavon and Pyle.

of the various contractors named.  Ex. 1-A (App. 019-20); Ex. 1-B (App. 046-47); Ex. 1-C (App. 089-92); Ex. 1-D (App. 113).

3.      The allegations made in the Lawsuits (and the evidence proving certain facts asserted in the Lawsuits) are as follows:

- "On or before June 18, 2016, Defendant XTO was the lease operator of a well near Watford City, North Dakota, known as Ryan 14X-09E (Well Site).  On June 18, 2016, an explosion and fire occurred at the XTO Well Site causing serious injuries to Mr. Stassinos.  Mr. Stassinos received medical treatment for his injuries and suffered conscious pain and suffering, but subsequently died from those injuries." Ex. 1-A (App. 014, ¶ 12) (Stassinos Lawsuit); *see also* Ex. 2-E (App. 378) (Report confirming incident at the Well Site "TH Hill Report"); Ex. 2-F (App. 643) (Fire Report).

- "Although the Well Site had become dangerous and hazardous, XTO chose not to 'kill' it with appropriate and available fluids and also chose not to isolate the hazardous portion of the tubing with appropriate plugs. Instead of 'killing' the Well, XTO chose to remove the tubing from the hole by pulling it out in a process known as 'snubbing' in which a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the hole." Ex. 1-A (App. 014, ¶ 15); *see also* Ex. 2-F (App. 643) (Fire Report) (statement from Mr. Jones, Badland's consultant hired by XTO, discussing the events leading up to the explosion).

- "XTO retained Badlands and Petroleum Experience to provide "Company Man" services at the Well Site. In retaining the services of Badlands and Petroleum Experience, XTO knew or should have known that the work it retained them and their company men to do was likely to create, during its progress, a peculiar risk of physical harm to others unless special precautions were taken and had a duty to exercise reasonable care to undertake precautions against such dangers and hazards. XTO failed to do so."  Ex. 1-A (App. 015, ¶ 16); *see also* Ex. 1-E (App. 117-37) (MSA).

- "Upon information and belief, Badlands retained Mr. Jones as an employee, agent, representative, and/or independent contractor to provide Company Man services at the XTO Well Site."  Ex. 1-A (App. 015, ¶ 17); *see also* Ex. 2-C (App. 297) (Jones OSHA Depo. 1:5-6) (testimony from Mr. Jones confirming he is a "site supervisor for Badlands, contracted under XTO").

- "In retaining the services of company men, Badlands and Petroleum Experience knew or should have known the work that the company men were retained to do was likely to create, during its progress, a particular risk of harm to others unless special precautions were taken and Badlands and Petroleum Experience had a duty to exercise reasonable care to undertake precautions against such dangers and

hazards. Badlands and Petroleum Experience failed to do so." Ex. 1-A (App. 015-16, ¶ 19).

- "Defendants Mr. Jones and Mr. Kolden failed to exercise reasonable care in the performance of their duties at the Well Site and their failure to exercise reasonable care lead to the explosion and fire and subsequent death of Mr. Stassinos." Ex. 1-A (App. 016, ¶ 20).

- "In conformance with the business structure and working relationship that existed between XTO, on one hand, and Sherwood, Most Wanted, Badlands, Thomas Jones, Petroleum Experience, Allan Kolden, MBI and/or Yankee Consulting, and Carson Dokken, on the other, XTO supervised, directed, and controlled the work activities of these contractors and individuals such that XTO retained control over the methods, manner, and operative detail of the work performed by these contractors and individuals. XTO exercised the control it retained negligently and carelessly." Ex. 1-A (App. 016, ¶ 21); *see also* Ex. 1-E (App. 117-37) (MSA).

- "During this dangerous aspect of the snubbing process on June 18, 2016, the final joint of tubing reached the surface and rocketed out of the Well and into the air resulting in an explosion and fire and serious injuries to Mr. Stassinos which, subsequently, resulted in his death." Ex. 1-A (App. 0116-117, ¶ 24); *see also* Ex. 2-E (App. 378-79) (TH Hill Report); Ex. 2-F (App. 642) (Fire Report).

- "Instead of acting reasonably and prudently by killing the Ryan Well, Defendants XTO, MBI [Missouri Basin], Dokken, Badlands, Jones, Petroleum Experience, and Kolden instead negligently and recklessly ordered the Most Wanted and SEI crews to conduct snubbing operations in an attempt to pull out of the hole the remaining joints of tubing from the Ryan Well while the Ryan Well was still under dangerously high pressure." Exhibit 1-B (App. 041, ¶ 35) (Maheu Lawsuit).

- "After receiving the order from Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden to pull the remaining joints of tubing from the Ryan Well, Most Wanted and SEI foremen asked these Defendants to bleed the Ryan Well down so that their crews would be dealing with lower pressures while pulling the tubing out of the hole. In response to this request, these Defendants bled the Ryan Well down and lowered the pressure. Then, inexplicably, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden ordered the Most Wanted and SEI crews to undergo a time-consuming random urinalysis test. While the crews were undergoing the urinalysis test, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden shut the Ryan Well in and negligently and recklessly allowed uncontrolled well bore pressures to build up to a dangerously high level." Ex. 1-B (App. 041-42, ¶ 37); *see* Ex. 2-D (App. 348) (Rodriguez Depo. 106:10-25) (testimony regarding shutting down the Ryan Well during drug test).

- "As a proximate result of the blow-out, explosion, and fire, and as a proximate result of the acts and omissions of Defendants, one man was killed and others suffered serious, life-threatening burns and injuries." Ex. 1-B (App. 042, ¶ 39); Ex. 2-D (Rodriguez Depo. 45:2-6; 46:1-9) (App. 347); 2-F (App. 643) (Fire Report).

- "The blow-out, explosion, fire, and subsequent injuries and damages sustained by Plaintiffs were proximately caused by the negligent and reckless acts and omissions of Defendants who were acting through their agents, representatives, servants, and employees, all of whom were acting within the scope of their employment or agency duties."  Ex. 1-B (App. 045, ¶ 49); Ex. 1-E (App. 117-37) (MSA).

- "Defendant XTO, acting through its agents, representatives, servants, and employees, knew or reasonably should have known of, the hazards and unreasonable risks of harm at the Ryan Well on June 18, 2016, and Defendant XTO was ultimately responsible for the negligent and reckless decision not to kill the Ryan Well and, instead, to negligently and recklessly order the dangerous removal of tubing under pressure, which resulted in the blow-out, explosion, and fire."  *Id.* at ¶ 50.

## II.     The Master Service Agreement between XTO and StarStone's insured, Badlands

4.      On December 2, 2011, XTO and Badlands (StarStone's insured) entered into a Master Service Agreement wherein Badlands agreed to provide certain services to XTO at the Ryan Well (the "MSA").  Ex. 1-E (App. 117-37) (Badlands MSA).

5.      The MSA required Badlands to secure and maintain commercial general liability policies with at least $1 million limits per occurrence.  *Id.* (App. 125).

6.      Section 11.2 of the MSA further provides:

[S]hould [Badlands] maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which [Badlands] shall provide hereunder will be such larger amounts carried by [Badlands]…and not the minimums referenced in Sections 11.1.1-11.1.5 above.

*Id.*

7.      Section 11.4 of the MSA also provides:

Primary Coverage and Additional Insureds. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO

AND PROTECT THE XTO GROUP[4] TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY <u>CONTRACTOR</u> [Badlands] UNDER THIS AGREEMENT. ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

*Id.* (App. 125-26).

8.      Pursuant to Section 14.8, the MSA is governed by the laws of the State of Texas.

*Id.* (App. 129).

## III.      The Insurance Policies

9.      Several insurance carriers participated in the defense and/or settlement of the Lawsuits, but only two are relevant to the instant motion for partial summary judgment: Seneca Specialty Insurance Company ("Seneca") and StarStone, who both issued policies to Badlands. Ex. 1-F (App. 138-219); Ex. 1-G (App. 220-267).  Seneca is no longer a party to this coverage action; however, because the StarStone Policy (defined below) is excess to the Seneca primary policy, certain provisions in the Seneca policy are important to understand coverage under the StarStone Policy.

---

[4] The MSA defines the XTO Group as individually or in any combination XTO, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at the Site, joint interest owners, joint venturers, partners, contractors and subcontractors other than Contractor, Contractor Group, or its or their Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.  *See* Ex. 1-E (App. 118). Because the other defendants named in the Lawsuits were XTO's "contractors and subcontractors other than [Badlands]," those defendants are also encompassed in the definition of "XTO Group."

### A.      The Seneca Policy

10.     The Seneca policy bears Policy Number SPP 0031807 and is a primary-level general liability policy (the "Seneca Policy"). Ex. 1-F (App. 138-219) (Seneca Policy).  The Seneca Policy was issued to Badlands, effective from January 20, 2016 to January 20, 2017, and has a $1,000,000 per occurrence limit.  *See id.* (App. 151).

11.     The Seneca Policy provided liability coverage for damages the insureds must pay because of bodily injury caused by a covered occurrence.  *Id.* (App. 162).

12.     The Seneca Policy includes XTO and the other contractors named as defendants in the Lawsuits as Additional Insureds under a "DESIGNATED PERSON OR ORGANIZATION" endorsement providing:

**'Who Is An Insured** is amended to include as an additional insured [those person(s) or organization(s) as required by contract], but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:
(1) In the performance of your ongoing operations; or
(2) In connection with your premises owned by or rented to you.
 …..

B.   With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**
If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of
the additional insured is the amount of insurance:
1.   Required by the contract or agreement; or
2.   Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

*Id.* (App. 185).

**B.      The StarStone Policy**

13.      StarStone[5] issued Commercial Umbrella Policy No. 82068H152AL1 to Badlands (the "StarStone Policy").  Ex. 1-G (App. 220). The StarStone Policy has a $5 million limit that "sits on top" of the Seneca Policy.  *See id.* (App. 221).

14.      The StarStone Policy includes XTO and the other contractors named as defendants in the Lawsuits as Additional Insureds because the StarStone Policy covers "any person or organization…included as an additional insured under [the Seneca Policy], but not for broader coverage than would be afforded under [the Seneca Policy]." *Id.* (App. 242).

15.      The StarStone Policy also includes a pollution exclusion that provides as follows:

**SECTION IV – EXCLUSIONS**

This insurance does not apply to any liability, damage, loss, cost or expense:

**K.      POLLUTION LIABILITY**

1.      Arising out of the actual, alleged or threatened discharge, dispersal, seepage. migration, release or escape of pollutants:

   a.      At or from any premises, site or location which is or was at any time owned or occupied by. or rented or loaned to. any insured:

   b.      At or from any premises, site or location which is or was at any time used by or for any Insured or others for the handling, storage, disposal, processing or treatment of waste:

   c.      Which are or were at any lime transported. handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible:

   d.      At or from any premises, site or location on which any insured or any contractors or subcontractors working directly or indirectly on any lnsured's behalf are performing operations:

---

[5] The StarStone Policy was issued by Torus National Insurance Company n/k/a StarStone National Insurance Company.

1)    If the pollutants are brought on the premises, site or location in connection with such operations by such Insured, contractor or subcontractor. or

2)    If the operations are the test for, monitor, clean up, remove, contain. treat. detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants;

**Sub-paragraphs 1.a. and 1.d.1) do not apply to bodily Injury or property damage arising out of heat, smoke or fumes from a hostile fire.**

**As used in this exclusion, a hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be.**

e.    For liability included within the products -completed operations hazard.

*Id.* (App. 264-65) (emphasis added).

## IV.   Coverage Demand and Denial

16.    On July 27, 2018, XTO sent a letter to StarStone demanding defense and indemnity for itself and the rest of the "XTO Group" in connection with the Lawsuits. Ex. 1-H (App. 269-73) (Kuhn Aff.).

17.    On or about October 9, 2018, StarStone denied coverage for the Lawsuits, asserting that (1) XTO is not an additional insured under the Seneca Policy, and thus, not an additional insured under the StarStone Policy; and (2) even if XTO was an additional insured, the pollution exclusion in the StarStone Policy barred coverage for the Lawsuits.  Ex. 1-I (App. 275-84) (StarStone Denial Letter); *see also* Doc. No. 32 at 12 (StarStone's Answer and Counterclaim).

18.    On January 9, 2020, StarStone sent a supplemental reservation of rights letter which purported to provide "additional information concerning [StarStone's] assessment of XTO's claim." Ex. 3-A (App. 757-58) (StarStone Supp. Res. R. Letter).  In this letter, StarStone asserted for the first time its coverage defense related to the Texas Oilfield Anti-Indemnity Act. *Id.*

## V.      The Settlement of the Lawsuits and the Coverage Litigation

19.      On or about October 12, 2018, all defendants in the Lawsuits and their insurance carriers participated in a mediation with the plaintiffs in the Lawsuits.  At that mediation, XTO was able to secure settlements with all but one of the underlying plaintiffs.  After the mediation, XTO settled with the last remaining underlying plaintiff.  Ex. 1 (App. 005, ¶ 11) (Kuhn Aff.).

20.      All known insurance carriers for the defendants named in the Lawsuits, with the exception of Berkley (insurer who initiated this action) and CIIC, agreed to provide their respective limits to settle the Lawsuits.  *Id.* (App. 005, ¶ 12).

21.      Seneca and StarStone paid their policy limits but reserved all rights to arbitrate or litigate the insurance coverage issues to recoup any payments made. *Id.* (App. 005, ¶ 13).

22.      While the terms of the settlement agreements are confidential, the total amount of the settlements far exceed the total limits of the StarStone policy.  *Id.* (App. 005, ¶ 14).  StarStone is aware of the amounts paid in settlement of the Lawsuits.

23.      Berkley, another insurer responsible for providing XTO with additional insured coverage, filed this action on September 28, 2018.  Doc. No. 1 (Berkley Complaint).

24.      XTO filed its Answer, Counterclaim and Third-Party Complaint on November 7, 2018 and named StarStone, among others, as third-party defendants.  Doc. No. 7 (XTO Answer, Counterclaim and Third-Party Complaint).

25.      StarStone filed its Answer to XTO's Third-Party Complaint and Counterclaim on January 11, 2019. Doc. No. 32.

## ARGUMENT & AUTHORITIES

### I.      Summary Judgment Standard.

Summary judgment is appropriate where the relevant evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c).  Once the movant has discharged its initial burden to demonstrate the absence of a genuine issue of material fact, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  A fact is "material" to preclude summary judgment only if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be denied." *Id.* at 249-50 (citations omitted).

Moreover, in the context of a dispute involving an insurance policy, "ambiguities are construed against the insurer and exclusions from coverage are construed narrowly because they are contrary to the fundamental protective purpose of insurance policies." *Western Heritage Ins. Co. v. Slopeside Condo. Ass'n. Inc.*, 371 F. Supp. 3d 828, 832 (D. Mont. 2019); *Revelation Industries, Inc. v. St. Paul Fire & Marine Ins. Co.*, 206 P.3d 919, 929 (Mont. 2009) (Any ambiguity in an insurance policy must be construed in favor of the insured and in favor of extending coverage.).  Insurance policies are strictly construed against the insurer and in favor of coverage. *Tafford v. Safeco Insurance Co. of America*, 306 F. Supp. 3d 1243, 1249 (D. Mont. 2018).  Under

Montana law,[6] the "interpretation of an insurance policy is a question of law" to be resolved by the court. *Scentry Biologicals, Inc. v. Mid-Continent Casualty Co.*, 319 P.3d 1260, 1264 (Mont. 2014); *Western Heritage*, 371 F. Supp. 3d at 832.

Here, the issues presented center on contract interpretation and are ripe for summary judgment by the Court. StarStone's affirmative defenses are based on improper interpretations of the StarStone Policy and the MSA. XTO therefore requests that the Court grant XTO's Motion and dismiss StarStone's following affirmative defenses: (1) the StarStone Policy is not implicated by the MSA; (2) XTO is not an additional insured under the StarStone Policy; (3) the Texas Oilfield Anti-Indemnity Act applies to limit XTO's coverage; and (4) the pollution exclusion in the StarStone Policy bars coverage for the Lawsuit.   Doc. No. 32 (StarStone Answer).

## II.   The StarStone Policy Provides Coverage to XTO for the Lawsuits.

StarStone is obligated to indemnify XTO in connection with the Lawsuits because: (1) the MSA and the StarStone Policy clearly provide that XTO is an additional insured under the StarStone Policies; (2) Badlands' obligations under the MSA trigger the StarStone Policy, not just the Seneca Primary Policy; (3) the Texas Oilfield Anti-Indemnity Act has no bearing on the additional insured provision in the MSA; and (4) the pollution exclusions in the Seneca Policy and StarStone Policy do not bar coverage for the Lawsuit.   As such, the Court should grant XTO's Motion and dismiss StarStone's affirmative defenses.

### A.   Badlands' Obligations Under the MSA Implicate the StarStone Policy, Not Just The Primary Layer of Coverage.

First, StarStone contends that XTO is an additional insured under Badlands' policies only to the extent of "the amount of the insurance required by the [MSA]."   Ex. 3-B (App. 764-65)

---

[6] Montana law governs the interpretation of the Seneca Policy and StarStone Policy as the policies were issued to Badlands, a Montana resident, in Montana.  However, the interpretation of the MSA is governed under Texas law as provided under Section 14.8 of the MSA. Ex. 4 (App. 129) (MSA).

(StarStone Resp. to Interrogs., Rog. No. 2).  No dispute there.  But StarStone then asserts that Badlands was only required to obtain insurance with minimum per occurrence limits of $1,000,000, and therefore, the MSA does not implicate the StarStone Policy, which sits on top of the first $1 million in limits.  *Id.*  StarStone is mistaken.

The clear language of the MSA dictates that the amount of coverage will be the <u>actual</u> insurance Badlands maintains, including the StarStone Policy.  Section 11.1 of the MSA provides that "**Subject to the provisions of Section 11.2**, Contractor will secure and maintain…during the term of this Agreement the following insurance coverages **with limits not less than the amounts specified**…"  Ex. 1-E (App. 124) (MSA) (emphasis added).  Under Section 11.1.2, the MSA requires Badlands procure commercial general liability insurance with minimum limits of $1,000,000.  However, under **Section 11.2**, the MSA provides that:

> <u>Actual Insurance</u>.  Notwithstanding the minimum coverages specified in Sections 11.1.1 – 11.1.5 above, should Contractor maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, **in amounts greater than such minimums, then the actual insurance** which Contractor (or indicated in any certificate of insurance furnished by Contractor) and ***not*** the minimums referenced in Sections 11.1.1 – 11.1.5 above.

*Id.* (App. 125).  As such, the MSA does not limit coverage to the minimums referenced in Section 11.1, but instead to the actual insurance Badland's maintains. *See e.g., Star Ins. Co. v. Continental Resources, Inc.*, 89 F.Supp.3d 1015 (D.N.D. 2015) (holding that, even absent an actual insurance provision, a contractor was not limited to the minimum amount of insurance coverage given the contract did not require or suggest <u>specific</u> limits of insurance).  Therefore, the Court must find as a matter of law that StarStone's affirmative defense asserting there is no coverage for the Lawsuits due to the application of the MSA entered into between XTO and Badlands must fail. Doc. No. 32, ¶ 116.

**B.    XTO is an Additional Insured Under the Seneca Policy and, as a Result, the StarStone Policy.**

**1.    The MSA Does Not Limit XTO's Additional Insured Status to Badlands' Indemnity Obligations.**

StarStone asserts that the "MSA provides that the XTO Group is to be an additional insured on Badlands' insurance but only to the extent of insuring Badlands' indemnity obligations in favor of XTO that are described in section 10.1 [indemnification provision], which did not arise in this case." Ex. 3-B (App. 770) (StarStone Resp. to Interrogs., Rog. No. 8).  StarStone further contends that, because Badlands has no indemnity obligations to the XTO Group, Badlands' insurance (*i.e.*, the Seneca and StarStone policies) is not implicated. *Id.*  In other words, StarStone argues that, because Badlands did not have a contractual obligation to indemnify XTO against the underlying claims, it has no obligation to name XTO as an additional insured under its policies. *See id.*  This flies in the face of the policy language and Black letter law.

StarStone's reading of the MSA conflates two entirely separate obligations: Badlands' obligation to indemnify XTO and its obligation to name XTO as an additional insured under its policies.  XTO is not seeking indemnification <u>from Badlands</u> pursuant to the MSA's indemnity provision but instead XTO is seeking indemnification <u>from StarStone</u> by virtue of its status as an additional insured on the StarStone Policy issued to Badlands.  *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 669 (Tex. 2008) (finding under a similar contract that the indemnity provision and insurance provision created two, separate and distinct obligations).

The leading case on this precise issue dictates that XTO is an additional insured.  In *Evanston,* the contract at issue had an indemnity provision that required the subcontractor to indemnify the contractor for personal injury under certain circumstances.  *Id.* at 662.  The contract

also included a separate insurance provision that also required the subcontractor name the contractor as an additional insured. *Id*. An employee of the subcontractor was injured at the contractor's premises and filed suit against both the subcontractor and contractor. *Id*. The insurer denied coverage on the same basis that StarStone does here: the contractor was not allowed to seek indemnification from the subcontractor under the contract, and thus, was not an additional insured under the subcontractor's umbrella policy. *Id*. at 663-64. The Texas Supreme Court disagreed and held that the subcontractor's duty to indemnify and its duty to name the contractor as an additional insured were two separate and distinct obligations under the contract. *Id*. at 660.

Here, like the contract in *Evanston*, Badlands' indemnity obligations and its insurance obligations appear in entirely separate sections of the MSA. Further, the plain language of the insurance provision in the MSA requires Badlands to name XTO as an additional insured and that requirement is in <u>no way</u> tied to any indemnity obligations under the MSA's indemnity provision. The additional insured provision makes no references to any indemnity obligation, providing:

> **ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES** AND WILL BE PRIMARY TO, AND RECEIVE NOT CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABIITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT. **ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED**. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

Ex. 1-E (App. 126-27) (emphasis added).

Texas law (which governs the MSA) on this issue is settled and dictates that indemnity provisions and insurance provisions in contracts with identical wording such as that found in the Badlands MSA should be read <u>separately</u> and <u>independently</u>. *Evanston*, 256 S.W.3d at 670; *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794 (Tex. 1992) (holding that where an additional insured provision is separate from and additional to an indemnity provision, the scope of the insurance requirement is not limited by the indemnity clause); *ExxonMobil Corporation v. Electrical Reliability Services, Inc.*, 868 F.3d 408 (5th Cir. 2017) (finding that an additional insured provision stating that the subcontractor's liability policies "shall cover Exxon and Affiliates as additional insureds," was not tied to the scope of liability under the indemnity provision.).

Pursuant to Section 11.4 of the MSA, Badlands had an obligation to name the XTO Group as an additional insured under its policies (*i.e.*, the Seneca and StarStone Policies) entirely separate and apart from any indemnity obligations it did or did not have. There is simply nothing in the contract that ties these obligations to one another. To the contrary, 11.4 provides that "all insurance policies and coverages listed in this article XI will extend to and protect the XTO Group **to the fullest extent and amount of such coverage, including excess or umbrella insurances**." *Id.* (App. 125) (emphasis added).

This is further bolstered by the fact that there would be no need to name XTO as an additional insured under Badlands' policies if indeed the intent was only to provide coverage for indemnifiable claims. The StarStone Policy provides coverage for Badlands' contractual obligation to indemnify XTO under the MSA. Indeed, the contractual exclusion in the StarStone (and Seneca) Policy provides an exception "for liability for damages assumed in a contract or agreement…." Ex. 1-F (App. 163); (Ex. 1-G) (App. 228). This exception to the contractual exclusion provides that indemnifiable claims under the MSA would be covered under the

StarStone Policy, as such, there would be no need to add XTO as an additional insured under the StarStone Policy for these claims. The separate obligation to name XTO as an additional insured under Badlands' policies shows a clear intent that Badlands agreed to provide XTO with **direct** coverage for liability caused, in whole or in part, by Badlands' acts or omissions, not only for indemnifiable claims under the MSA.

> **2.    The Liability in the Underlying Lawsuits Was "Caused, In Whole or In Part" by Badlands' Acts or Omissions, Triggering XTO's Additional Insured Status.**

Although StarStone admits that XTO is an additional insured under its Policy if XTO is also an additional insured under the Seneca Policy, it disputes that XTO enjoys that status. Ex. 3-B (App. 764) (StarStone ROR Letter).  StarStone is wrong.  XTO is an additional insured under the Seneca Policy, and thus an additional insured under the StarStone Policy.  The relevant portion of the additional insured provision in the Seneca Policy (the "AI endorsement") provides:

'**Who Is An Insured** is amended to include as an **additional insured** [those person(s) or organization(s) as required by contract], but only with respect to liability for "bodily injury", "property damage" or "personal and advertising injury" caused, in whole or in part, by your acts or omissions or the acts or omissions of those acting on your behalf:
(1) In the performance of your ongoing operations; or
(2) In connection with your premises owned by or rented to you.
…..

B.  With respect to the insurance afforded to these additional insureds, the following is added to **Section III - Limits Of Insurance:**
If coverage provided to the additional insured is required by a contract or agreement, the most we will pay on behalf of the additional insured is the amount of insurance:
1.    Required by the contract or agreement;  or
2.    Available under the applicable Limits of Insurance shown in the Declarations;

whichever is less.

Ex. 1-F (App. 185) (Seneca Policy).  The AI endorsement requires two conditions be met: (1) a written contract that required Badlands to name XTO as an additional insured; and (2) respect liability caused, in whole or in part, by Badlands' acts or omissions in the performance of Badlands' ongoing obligations.  *Id.*  Both conditions have been met.

First, it is undisputed that the first condition is met: the MSA (written contract/agreement) required Badlands to name XTO as an additional insured under its policies.  Ex. 1-E (App. 125-26) (MSA).   Under the MSA, Badlands contracted to and did provide liability insurance to XTO as an additional insured.  *Id.*

Second, the additional insured endorsement provides that XTO is an insured "with respect to liability caused, in whole or in part, by [Badland's] acts or omissions in the performance of [Badlands'] ongoing obligations."  The underlying allegations and the facts established through discovery in the Lawsuits make clear that XTO's liability in the Lawsuits was caused, at least in part, by Badlands' operations. Indeed, StarStone is not disputing this fact as it has not moved on this issue in its Motion.  *See* Doc. No. 101.  StarStone cannot do so because it cannot dispute that XTO's liability was clearly caused in part by Badlands' acts or omissions.  The Lawsuits allege and discovery supported that this was the clearly the case, *inter alia*:

- "XTO retained Badlands and Petroleum Experience to provide "Company Man" services at the Well Site. In retaining the services of Badlands and Petroleum Experience, **XTO knew or should have known that the work it retained them and their company men to do was likely to create, during its progress, a peculiar risk of physical harm to others unless special precautions were taken and had a duty to exercise reasonable care to undertake precautions against such dangers and hazards. <u>XTO failed to do so</u>.**" Ex. 1-A (App. 015, ¶ 16); *see also* Ex. 1-E (App. 117-37) (MSA);

- "Upon information and belief, Badlands retained Mr. Jones as an employee, agent, representative, and/or independent contractor to provide Company Man services at the XTO Well Site." Ex. 1-A (App. 015, ¶ 17); *see also* Ex. 2-C (App. 297) (Jones OSHA Depo. 1:5-6) (testimony from Mr. Jones confirming he is a "site supervisor for Badlands, contracted under XTO");

- "In retaining the services of company men, Badlands and Petroleum Experience knew or should have known the work that the company men were retained to do was likely to create, during its progress, a particular risk of harm to others unless special precautions were taken and Badlands and Petroleum Experience had a duty to exercise reasonable care to undertake precautions against such dangers and hazards. Badlands and Petroleum Experience failed to do so." Ex. 1-A (App. 015-16, ¶ 19).

- "Defendants Mr. Jones and Mr. Kolden failed to exercise reasonable care in the performance of their duties at the Well Site and their failure to exercise reasonable care lead to the explosion and fire and subsequent death of Mr. Stassinos." Ex. 1-A (App. 016, ¶ 20).

- "In conformance with the business structure and working relationship that existed between XTO, on one hand, and Sherwood, Most Wanted, Badlands, Thomas Jones, Petroleum Experience, Allan Kolden, MBI and/or Yankee Consulting, and Carson Dokken, on the other, XTO supervised, directed, and controlled the work activities of these contractors and individuals such that XTO retained control over the methods, manner, and operative detail of the work performed by these contractors and individuals. XTO exercised the control it retained negligently and carelessly." Ex. 1-A (App. 016, ¶ 21); *see also* Ex. 1-E (App. 117-37) (MSA).

- "Instead of acting reasonably and prudently by killing the Ryan Well, Defendants XTO, MBI [Missouri Basin], Dokken, Badlands, Jones, Petroleum Experience, and Kolden instead negligently and recklessly ordered the Most Wanted and SEI crews to conduct snubbing operations in an attempt to pull out of the hole the remaining joints of tubing from the Ryan Well while the Ryan Well was still under dangerously high pressure." Exhibit 1-B (App. 041, ¶ 35) (Maheu Lawsuit).

- "After receiving the order from Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden to pull the remaining joints of tubing from the Ryan Well, Most Wanted and SEI foremen asked these Defendants to bleed the Ryan Well down so that their crews would be dealing with lower pressures while pulling the tubing out of the hole. In response to this request, these Defendants bled the Ryan Well down and lowered the pressure. Then, inexplicably, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden ordered the Most Wanted and SEI crews to undergo a time-consuming random urinalysis test. While the crews were undergoing the urinalysis test, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden shut the Ryan Well in and negligently and recklessly allowed uncontrolled well bore pressures to build up to a dangerously high level." Ex. 1-B (App. 041-42, ¶ 37); *see also* Ex. 2-D (App. 348) (Rodriguez Depo. 106:10-25) (testimony regarding shutting down the Ryan Well during drug test).

- "Defendant XTO, **acting through its agents, representatives, servants, and employees,** knew or reasonably should have known of, the hazards and unreasonable risks of harm at the Ryan Well on June 18, 2016, and **Defendant XTO was ultimately responsible for the negligent and reckless decision not to kill the Ryan Well** and, instead, to negligently and recklessly order the

dangerous removal of tubing under pressure, which resulted in the blow-out, explosion, and fire." Ex. 1-B (App. 045, ¶ 50) (emphasis added).

Here, the two conditions required by the AI endorsement have been met: (1) XTO and Badlands entered into a written agreement in which Badlands agreed to name XTO as an additional insured on its liability policies; and (2) XTO's liability in the Lawsuits was caused, at least in part, by Badland's operations.

Courts have consistently found additional insured coverage in precisely these circumstances. For instance, in *WBI Energy Transmission, Inc. v. Colony Ins. Co.*, 56 F. Supp. 3d 1194, 1205 (D. Mont. 2014), a Montana district court likewise held that a pipeline owner was an additional insured under its general contractor's commercial general liability policy under Montana law because the bodily injuries were caused "at least in part" by the general contractor. Like the AI endorsement in the Seneca Policy, the AI endorsement in the policy in *WBI Energy* also provided coverage to the pipeline owner for "liability for bodily injury…caused, in whole or in part by [contractor]'s acts or omissions…in the performance of [contractor]'s ongoing operations for the additional insured. *Id.* at 1202.  The complaint in *WBI Energy* included factual allegations that the contractor's employees' injuries were caused in part due to the contractor's acts or omissions. *Id.* at 1203.  The court therefore held that, because the contractor's employee alleged the acts or omissions of the contractor was at least a partial cause of his injuries, the additional insured endorsement in the policy did not preclude coverage for the pipeline owner. *Id.*; *see e.g. Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex. 2008)(construing a similar additional insured provision in favor of coverage because, for an event to "respect" operations, there need only exist a "casual connection or relation" between the event and the operations); *Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 453-54 (Tex. App.—

Houston [1st Dist.] 1999, pet. denied) (same); *McCarthy Brothers Co. v. Continental Lloyds Ins. Co.*, 7 SW.3d 725, 730 (Tex. App.—Austin 1999, no pet.) (same).

Here, the AI endorsement's two requirements are clearly met. Therefore, XTO is an additional insured under the StarStone Policy.  Accordingly, XTO requests this court hold as a matter of law that XTO is entitled to additional insured coverage under the StarStone Policy. Because XTO has shown as a matter of law that it is an additional insured under the StarStone Policy, this Court should dismiss StarStone's following affirmative defenses: (1) there is no coverage for the Underlying Claims to the extent XTO and its contractors are not an insured or additional insured under the StarStone Policy (*see* Doc. No. 32, ¶ 107); (2) there is no additional insured coverage for the Lawsuits for XTO and its contractors arising out of the acts or omissions of Badlands or XTO (*id.*, ¶¶ 109, 117).

### 3. Alternatively, The Additional Insured Provision Is Ambiguous and Must be Construed in Favor of Coverage.

Under Montana law, when interpreting an insurance policy, a court is required to construe any limitation on coverage narrowly in favor of the insured.  *See Fire Ins. Exch. v. Tibi*, 51 F. Supp. 2d 1065 (D. Mont. 1995) ("All words of limitation and exclusions in an insurance policy must be strictly construed against the insurer regardless of whether or not they are ambiguous."). Furthermore, where the language of an insurance policy is ambiguous—i.e. it is capable of at least two reasonable interpretations, one favorable to the insured and one favorable to the insurer—the court should resolve all ambiguities in favor of the insured. *Barnard Pipeline, Inc. v. Travelers Prop. Cas. Co. of Am.*, 3 F. Supp. 865 (D. Mont. 2014).

To the extent the Court finds the additional insured provision ambiguous, the Court should construe the StarStone Policy against StarStone and in favor of coverage for XTO.  *Id.* ("Any ambiguity in an insurance policy must be construed in favor of extending coverage".).

**C.   The Pollution Exclusion in the StarStone Policy Does Not Bar Coverage for the Lawsuits.**

StarStone has also denied coverage based on the pollution exclusion in the StarStone Policy.  Ex. 3-B (App. 776-78) (StarStone Resp. to Interrog., Rog. No. 13).  Specifically, StarStone contends the pollution exclusion in the StarStone Policy precludes coverage because "the hydrocarbon gas and fluid released at the Ryan well shortly before the explosion are 'pollutants,'" thus triggering the pollution exclusion.  Id. (App. 776).  StarStone relies on two cases for its assertion that the pollution exclusion applies: *Palmer v. Northland Cas. Co.*, No. CV 15-58-BLG-SPW-CSO, 2016 WL 5820191 (D. Mont. 2016); *Hiland Partners GP Holdings, LLC, et al. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, PA, 847 F.3d 594 (8th Cir. 2017).

The *Hiland* and *Palmer* holdings are inapposite.  The pollution exclusion in the StarStone Policy does not preclude coverage because: (1) under Montana law, the pollution exclusion in the StarStone Policy applies only to environmental-type harms, not bodily injury or explosions; (2) even if the pollution exclusion is triggered by bodily injury claims, the hostile fire exception in the StarStone Policy applies to provide coverage; and alternatively, (3) the StarStone pollution exclusion, including the hostile fire exception, is ambiguous and the court  must construe coverage in favor of XTO.

**1.   StarStone's Heavy Burden to Prove the Applicability of Any Exclusion.**

Under Montana law, it is the insurer's burden to prove that an exclusion in its policy precludes coverage.  *Travelers Casualty & Surety v. Ribi Immunochem Research*, 108 P.3d 469 (Mont. 2005).  "Exclusions must be narrowly and strictly construed because they are contrary to the fundamental protective purpose of an insurance policy." *Newman v. Scottsdale Insurance Co.*, 301 P.3d 348, 355 (Mont. 2013).  Moreover, because exclusions are contrary to the fundamental purpose of the policy, such exclusions are frequently subject to challenge for ambiguity or

inconsistency.  *Id.*  As such, exclusions from broad coverage in an insurance policy are strictly construed against the insurer.  *Duensing v. Traveler's Companies*, 849 P.2d 203, 206 (Mont. 1993). Further, while exclusions are interpreted narrowly, exceptions to exclusions are broadly construed in favor of the insured.  *Id.*

### 2. The Pollution Exclusion in the StarStone Policy Only Applies to Environmental-Type Harms, Not to Bodily Injury Claims Like Those Alleged.

The injuries giving rise to the Lawsuits were alleged to be caused by an explosion, fire and blunt force, not "exposure to hydrocarbon vapors" or some other pollution exposure type of injury. Ex. 1-A (App. 016, ¶ 24) (Stassinos Lawsuit) ("[T]he final joint tubing reached the surface and rocketed out of the Well and into the air resulting in an explosion and fire and serious injuries to Mr. Stassinos which, subsequently, resulted in his death."); Ex. 1-B (App. 42, ¶¶ 40-41) (Maheu Lawsuit) ("Plaintiff Maheu was hit by the explosion and flames of the flash fire, and was thrown down a flight of stairs, his body engulfed in flames.  Plaintiff sustained severe full-thickness burns on sixty to seventy (60-70%) of his body…").

These injuries are simply not the type of environmental harm the pollution exclusion was meant to address.  Courts around the country have refused to apply the pollution exclusion in circumstances similar to the facts at hand.  For example, the Ninth Circuit, applying Montana law, found that a pollution exclusion did not apply in a similar case for this very reason.  *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526 (9th Cir. 1997). In *Enron*, a pipeline exploded as a result of an injection of foreign substances into the crude oil carried by the pipeline. *Id.* at 528.  In finding that the "pollution exclusion" did not bar coverage, the Ninth Circuit held that the terms of the exclusion sent the "unmistakable message to the reasonable reader that the exclusion deals with environmental-type harms."  *Id.* at 530-31.  And "[e]ven if a contrary interpretation could be given to the clause, the objectively reasonable expectations of applicants

and intended beneficiaries regarding the terms of insurance contracts will be honored." *Id.*; *see also Wellcome v. Home Insurance Co.*, 849 P.2d 190 (Mont. 1993) (recognizing the reasonable expectation doctrine because it "is in accord with our strong public policy that insurance is intended to serve a fundamental protective purpose; to this extent the doctrine goes hand in hand with our rule of strictly construing policy exclusions."). Accordingly, the Ninth Circuit held that the pollution exclusion did not apply to the explosion.

Many other courts have reached similar conclusions, refusing to apply pollution exclusions in circumstances similar to the case at hand. *See, e.g., Belt Painting Corp. v. TIG Ins. Co.,* 795 N.E.2d 15 (N.Y. 2003); *Gaylord Container Corp. v. CNA Ins. Cos.*, 807 So. 2d 864, 872 (La. App. 2001) ("[w]e hold that when a fortuitous event such as an explosion occurs, and that event incidentally involves a chemical agent, the absolute pollution exclusion operates to exclude coverage for environmental damage only."); *Jones v. Francis Drilling Fluids, Ltd.*, 642 F. Supp. 2d 643, 667 (S.D. Tex. 2009) (holding that while a chemical explosion caused a worker's injuries, no environmental cleanup was required, thus, the pollution exclusion did not apply); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 31 (1st Cir.1999) (reasonable interpretation of exclusion is that it applies only to environmental pollution); *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir.1992) (literal interpretation of pollution exclusion's terms would be overbroad and would render judicial limitations on insurance policies meaningless); *Keggi v. Northbrook Property and Cas. Ins. Co.*, 13 P.3d 785, 791 (Ariz. 2000) (exclusion intended only to exclude coverage for traditional environmental pollution); *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) (pollution exclusion does not apply to "toxic torts" but is restricted to instances of classic pollution such as groundwater or soil contamination from industrial operations); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 680–82 (Ky. App.1996) (total

pollution exclusion uses terminology from environmental law and the historical objective of the exclusion was to avoid coverage for environmental catastrophes); *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 135 (La. 2000), corrected, 782 So.2d 573 (La.2001) (absolute pollution exclusion not intended to exclude coverage for all interactions with irritants or contaminants and should be construed to exclude coverage only for environmental pollution); *Atlantic Mut. Ins. Co. v. McFadden*, 595 N.E.2d 762, 764 (Mass. 1992) (pollution exclusion's terms are terms of art in environmental law); *Weaver v. Royal Ins. Co. of America*, 674 A.2d 975, 977 (N.H. 1996) (where phrase "discharge, dispersal, release or escape" was not defined, it should be construed against the insurer); *Karroll v. Atomergic Chemetals Corp.*, 194 A.D.2d 715 (N.Y. 1993) (exclusion reasonably interpreted to apply only to environmental pollution); *West American Ins. Co. v. Tufco Flooring East, Inc.*, 409 S.E.2d 692, 699 (N.C. 1991), overruled on other grounds by *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 524 S.E.2d 558 (N.C. 2000) (terms such as "discharge, dispersal, release, or escape" are environmental terms of art meant to apply to environmental pollution); *Kent Farms, Inc. v. Zurich Ins. Co.*, 969 P.2d 109, 111–12 (Wash. App. 1998), aff'd, 998 P.2d 292 (2000) (reasonable reading of the exclusion limits it to traditional environmental damages); *MacKinnon v. Truck Insurance Exchange,* 73 P.3d 1205, 1209 (Cal. 2003) (recognizing split of authority but observing that "considering those jurisdictions that have taken a definitive position, as represented by a published opinion of the state supreme court, the narrower interpretation of the pollution exclusion appears to be in the majority."); *Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co.* 35 F.3d 494 (10th Cir. 1994) (holding carbon monoxide from residential heater not excluded, applying Colorado law to determine "reasonable expectations of ordinary policyholder").

These courts all acknowledge that if the total pollution exclusion is construed broadly to exclude the bodily injuries at issue here, such an interpretation would contravene the very purpose of a CGL policy.  The liability imposed on XTO (and Badlands) due to these bodily injuries was precisely the type of risks it expected its liability policy to cover.  Instead, StarStone urges this Court to construe the pollution exclusion in a manner that would defeat the very purpose of the StarStone Policy.  This Court should refuse to do so.

In addition to the numerous courts rejecting the pollution exclusion's applicability to non-environmental harms, courts also have repeatedly held that pollution exclusions should not be applied to exclude coverage for injuries caused by explosions.  For example, the court in *Gaylord* refused to apply a total pollution exclusion to exclude coverage for an explosion that occurred when a railcar filled with nitrogen tetroxide exploded on the way to a factory.  *Gaylord Container Corp.*, 807 So. 2d at 866.  The insured sought coverage under its policies for many personal injury suits stemming from the explosion.  The Gaylord court concluded that the total pollution exclusion did not bar coverage because the insured was not seeking a defense or indemnity "for suits that relate to environmental cleanup claims arising out of the" explosion, but instead for personal injury claims arising out of an accident.  *Id.* at 872.  The court in *Jones v. Francis Drilling Fluids, Ltd.*, 642 F. Supp. 2d 643 (S.D. Tex. 2009) also agreed that a total pollution exclusion did not apply to a chemical explosion that caused a worker's injuries.  The *Jones* court reasoned that the pollution exclusion was intended only to apply to long-term, catastrophic environmental pollution, not to a one-time, explosion in which the insured was not seeking damages for clean up, but rather for the injuries sustained by the worker.  *Id.* at 668; *see also Greenwich Ins. Co. v. John Sexton Sand & Gravel Corp.*, No. 1-12-1263, 2013 WL 950755, at ¶ 25 (Ill. App. Ct. Mar. 11, 2013) (holding that the pollution exclusion did not apply to an explosion).  Here, like the insureds in *Gaylord* and

*Jones*, XTO is not seeking defense or indemnity for the pollution caused by the Ryan Well explosion; it is seeking coverage for personal injuries arising from an accident.  These bodily injuries caused by an explosion are not barred under either the Seneca or StarStone pollution exclusions.

The unpublished *Palmer* case—out of the District of Montana—on which StarStone relies, is easily distinguished here. While that court read a pollution exclusion to exclude a bodily injury claim, the case involved an injury—exposure to hydrocarbon vapors—much more akin to traditional pollution injuries than the explosion, fire and blunt force trauma at issue here (which much more closely aligns to the injuries alleged in *Enron* and other cases refusing to apply the pollution exclusion).  *See Palmer*, 2016 WL 5820191 at 2. Indeed, the court cited the "kind of" injury as its reason to distinguish Enron.  *Id.* at 4.

Moreover,  *Palmer*, (which has never been cited) offers no substantive (or even shallow) reasoning that would differentiate the case from *Enron,* instead baldly stating that "it was questionable whether the oil company's wrongful injection of a diluted mix into the oil pipeline was the kind of 'contamination' contemplated by the pollution exclusion in *Enron*, [whereas] here, it is unequivocally clear that injury caused by the release of hydrocarbon vapors is the kind of "bodily injury" the Oil/Gas Exclusion excludes."  *Id.*  The lack of analysis in and lack of future citation to *Palmer* certainly casts doubt on whether the case is indeed good law.

The other case on which StarStone relies – *Hiland* – is likewise inapposite.  First, the **only** issue the *Hiland* court addressed was whether hydrocarbons constitute a "pollutant."  *Hiland*, 847 F.3d at 598-99.  The insured did not raise, nor did the *Hiland* court address, whether pollution exclusions applied only to environmental-type harms.  *Id.*  Therefore, the narrow holding in *Hiland* in which the court held a hydrocarbon is a "pollutant" under a policy analyzed under North Dakota

law (as opposed to Montana law) does not run contrary to the Ninth Circuit's holding in *Enron* that pollution exclusions should only be applied to environmental-type harms.

The explosion and bodily injuries alleged in the Lawsuits are not the type of environmental-type harms the StarStone's pollution exclusion was intended to address. Thus, the pollution exclusion does not apply to preclude coverage.

### 3. Even if the Pollution Exclusion Applied, The Hostile Fire Exception Would Restore Coverage.

<p style="padding-left: 2em;">i. <u>The Hostile Fire Exception Applies to Provide Coverage for the Underlying Lawsuits.</u></p>

The StarStone pollution exclusion includes an exception where the injury "arises out of heat, smoke or fumes from a hostile fire…[A] hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be." Ex. 1-G (App. 264-65). Here, Berkley does not dispute that an explosion caused an uncontrollable fire that resulted in the injuries alleged in the Lawsuits. Doc. No. 54, at 2 ("This lawsuit concerns contract and insurance claims stemming from an <u>explosion and fire</u> at the Ryan 14X-09E well on June 18, 2016…. <u>Several people were injured in the explosion</u>….") (emphasis added); *see also* Ex. 2 (App. 290, ¶ 14) (Arnold Aff.). Indeed, as noted by the witness testimony of Badlands' own consultant, Mr. Jones, an uncontrollable fire broke out which caused the bodily injuries at issue:

<blockquote>To his knowledge, Jones stated, nobody touched any controls or moved anything, when he heard a very loud 'clank' noise this was followed by a loud hissing and an explosion that all occurred in a couple of seconds or less. <strong>Jones stated, he was blown back by the flash explosion. When he looked up, Jones stated, all he could see were guys on the rig that were on fire</strong>.</blockquote>

<blockquote>Ex. 2-F (App. 643) (Fire Investigation Report) (emphasis added).</blockquote>

Other contractors who witnessed the incident likewise testified regarding the explosion and uncontrollable fire that caused the injuries at issue in the Lawsuits:

Lyman Yazzie, a contractor for Colter Energy, gave the following account in a witness statement:

> Then a minute or two after another loud bang occurred and ***a second later the whole floor ignited and created a huge fire*** from the blowing gas.  Ex. 2-B (App. 295) (emphasis added).

Ociel Rodriguez, a contractor for Weatherford International, LLC, testified regarding the explosion and injuries as follows:

> [I]t was like a big (noise) and then all of a sudden at that second you hear a bang, boom and then like ***everything there just you could see the flames*** *and then after that like* **the fire expands wide in the air**…. **He was burned** from head to toes wide open. (Ex. 2-D) (App. 345) (emphasis added).

These circumstances clearly bring the claims within the hostile fire exception even if the pollution exclusion would otherwise apply.  The *Hiland* and *Palmer* courts *did not* address whether the hostile fire exception applied.  Other courts interpreting identical hostile fire exceptions and similar facts have held that the hostile fire exception applied.  For instance, in *Hallandale*, employees of the insured-gas station were injured while working on underground gasoline storage tanks. *Century Sur. Co. v. Hallandale Beach Serv. Station, LLC*, No. 10-21430—CIV, 2011 WL 13174906, * 1 (S.D. Fla. Mar. 21, 2011).  As they worked, a container storing four gallons of acetone spilled, and the fumes migrated to the employee's customized lights. *Id.* When the acetone reacted with the customized lights, a violent oxidation reaction occurred – the gas exploded, creating a fireball that injured several of the employees. *Id.*

The policy in *Hallandale* included an identical pollution exclusion which barred coverage for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants…"  *Id*. The policy also contained the hostile fire exception which provided the exclusion did not apply to "bodily injury…arising out of heat, smoke or fumes from a 'hostile fire.'"  *Id.*  Hostile fire was likewise defined as a fire "which becomes uncontrollable or breaks out from where it was intended to be." *Id.*

The insurer argued that the exception did not apply, focusing on the word "becomes" and asserting that because a fire must "become uncontrollable" for it to be considered a hostile fire, the insurer argued there must first be a pre-existing, controlled fire before it can become uncontrollable. *Id.* at 3. The insured, on the other hand, focused on the word "uncontrollable," and noted that the fire became uncontrollable immediately after breaking out. The court found that nothing in the exception's language indicated that there must have been a pre-existing, controlled fire and held the hostile fire exception applied to restore coverage. *Id.*

In reaching this conclusion, the court rejected the insurer's citation to *Noble Energy, Inc. v. Bituminous Casualty Co.*, 529 F.3d 642 (5th Cir. 2008) in which the Fifth Circuit held that a "hostile fire" exception "applies only if a pre-existing fire causes the pollution," noting that nothing in the plain language of the hostile fire exception mentions a pre-existing fire or demands that the fire "cause" the pollution. *Id.* at 4. The court further noted that the court in *Noble* did not explain how it reached its conclusion, and thus, found the court's holding unavailing. *Id.*

One key reason the *Hallandale* court rejected the *Noble* holding was the *Noble* court's decision to completely ignore an earlier Texas case which, contrary to *Noble*, held that the hostile fire exception was ambiguous and must be construed in favor of coverage. *Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*, 16 S.W.3d 418 (Tex. App.—Waco 2000, pet denied). In *Safe Tire*, a Texas appellate court ruled that the hostile fire exception applied in a case involving damage to neighboring people and property caused by smoke after an uncontrolled, accidental and unintended fire broke out in a pile of rubber chips and wire at a scrap rubber recycling facility. *Id.* at 418. There, the insurer had argued that the hostile fire exception only applied "if Safe Tire intentionally set a controlled fire in an appropriate location on its premises which becomes uncontrollable or breaks out from its place of origin." *Id.* at 422. The court disagreed and found a

"friendly fire" was not required under the language of the exception, but rather, it was more reasonable to include "any 'accidental' or 'unintended' fire," as these are "not restrained, directed or regulated by someone." *Id.* The court held the definition of "hostile fire" was ambiguous and adopted the interpretation put forth by the insured. *Id.*

The *Safe Tire* and *Hallandale* courts are not alone. The Western District of Pennsylvania held that an identical hostile fire exception applied to an oil and gas well explosion. *Great Northern Insurance Co. v. Greenwich Insurance Co.*, No. CV-05-635, 2007 WL 2458477 (W.D. Penn. Aug. 24, 2007), *vacated on other grounds*. In *Greenwich*, there was a natural gas well blowout and after the blowout, a fire ignited. *Id.* at *2. During the course of the blowout, a large amount of crude oil, gas and combustible material was spread via smoke over the surrounding area of the well, causing damage to automobiles, homes and property owned by third parties. *Id.* The insurer argued that the exception did not apply because the fire did not "become" uncontrollable, but instead was "uncontrollable from its inception." *Id.* at 11. Also relying on *Safe Fire*, the court concluded the term "becomes uncontrollable" can be interpreted to include both "controllable fires that subsequently become uncontrollable and fires that are uncontrollable from their inception," as such, the exception was ambiguous, and the policy had to be construed in favor of coverage. *Id.* at 12.

Several other courts have also construed the hostile fire exception in favor of the insured. *See, e.g., Schmid v. Fireman's Fund Ins. Co.*, 97 F. Supp. 2d 967 (D. Minn. 2000) (holding the hostile fire exception applied when an unaligned flame in a natural gas heater emitted carbon monoxide into the air causing bodily injury because, even though the fire could be "controlled," *i.e.* turned off, the fire was still in a location not intended.); *Am. Star Ins. Co. v. Grice*, 854 P.2d 622 (Wash. 1993) (holding a hostile fire exception was ambiguous and that "the ability

of the pollution exclusion to limit coverage is itself limited by the hostile fire clause which provides an exception to that exclusion."); *Hawkins Chemical, Inc. v. Westchester Fire Ins. Co.*, 159 F.3d 348 (8th Cir. 1998) (applying Minnesota law) (holding hostile fire exception to pollution exclusion applied and insurer was required to defend and indemnify insured for fire which destroyed a warehouse sending toxic fumes into the air).

<div align="center">ii.   The Hostile Fire Exception Must Be Considered.</div>

StarStone contends that the Court can completely disregard the Hostile Fire Exception under the novel theory that the StarStone Policy—in its definition of "insured" – provides coverage for anyone "included as an additional insured under underlying insurance, but not for broader coverage than would be afforded under such underlying insurance." Ex. 3-B (App. 764) (StarStone Resp. to Interrogs., Rog. No. 2).  Because the Seneca policy does not include a Hostile Fire Exception, the argument goes, it need not be considered in determining coverage under the StarStone Policy. *Id.*  StarStone is mistaken.

The Hostile Fire Endorsement, which by its terms changed the Policy, eliminates the pollution exclusion when bodily injury arises out of heat, smoke, or fumes from a hostile fire and applies to all insureds, including additional insureds, not just the Named Insured. Thus, to the extent the Policy as originally worded would not afford any broadening of coverage for additional insureds, the Hostile Fire Endorsement changed the Policy allowing additional insureds the benefit of broadened coverage.   The language in the Hostile Fire Endorsement provides that the broad pollution exclusion applicable to ***any*** "insured" does not apply to bodily injury arising out of heat, smoke, or fumes from a hostile fire:

This insurance does not apply to any liability, damage, loss, cost or expense:

**K.  Pollution Liability**

    1.   Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants:

        a.   At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, ***any*** insured;

\*\*\*

**Sub-paragraphs 1.a** and 1.d.1) do not apply to bodily injury or property damage arising out of heat smoke or fumes from a hostile fire.

(App. 264) (StarStone Policy, Hostile Fire Endorsement) (emphasis added)

Here, the pollution exclusion bars coverage for liability arising out of the release of pollutants at a location which was owned or occupied by ***any*** insured. *Id.* However, the hostile fire exception claws back coverage for ***any*** insured – including XTO[7] – if the bodily injury arose out of "heat smoke or fumes from a hostile fire." Here, the Hostile Fire Endorsement clearly changed any limitation in what coverage was afforded to additional insureds found in the StarStone Policy. *Johnson,* 529 N.W.2d at 572; *see also Mesa Operating Co. v. California Union Ins. Co.*, 986 S.W.2d 749, 754 (5th Cir. 1999) ("Endorsements to a policy generally supersede and control over conflicting printed terms within the main policy."); *Muehlenbein v. West Ben Mutual Insurance Co.*, 175 Wis. 2d 259, 265 (Wis. Ct. App. 1993) ("An endorsement is a provision added to an insurance contract altering its scope or application that takes precedence over printed portions of the policy in conflict therewith."); *Besic v. Citizens Insurance Co.*, 800 N.W.2d 93 (Mich. Ct. App. 2010) ("When a conflict arises between the terms of an endorsement and the form provisions of an insurance contract, the terms of the endorsement prevail.").

Indeed, the StarStone Policy itself dictates when terms in the Policy can be amended or changed, and this is by endorsement.

---

[7] It is undisputed that XTO was the owner and lease operator of the Ryan Well. See Doc. No. 82, at 1 (StarStone Motion); see also Ex. 2 (App. 288) (Arnold Aff.).

DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF XTO ENERGY,        Page 35
INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY
JUDGMENT AGAINST TORUS  NATIONAL INSURANCE COMPANY n/k/a STARSTONE
NATIONAL INSURANCE COMPANY

**D. CHANGES.**

> This contract contains all the agreements between you and us concerning the insurance afforded.  The terms of this insurance can be amended or waived only by endorsement issued by us and made a part of this insurance.

*Id.* (App. 236).

The Hostile Fire Endorsement unambiguously did just that – it changed the StarStone Policy to broaden the coverages available to additional insureds such that the hostile fire exception applies to XTO.  *See* 1 Couch, Insurance §§ 4:32, 4:36 ("Special rules of construction govern policy endorsements.  An endorsement is part of the insurance contract between the parties."); Mont. Code § 33-15-316 ("Every insurance contract shall be construed according to the entirety of its terms and conditions as set forth in the policy and as amplified, extended <u>or modified</u> by any rider, <u>endorsement</u> or application which is part of the policy.") (emphasis added); *Johnson v. Center Mut. Ins. Co.*, 529 N.W.2d 568 (N.D. 1995) (holding where there is a conflict between an endorsement and other policy provisions, the endorsement prevails).   The Hostile Fire Endorsement likewise confirms that the endorsement can (and did) change the StarStone Policy:

| Named Insured: | Badlands Consulting, LLC |
| Policy No: | 82068H152ALI |
| Endorsement No: | 13 |
| Endorsement Effective Date: | 10/14/2015 |

**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**

**COMMERCIAL UMBRELLA LIABILITY INSURANCE POLICY**

**POLLUTION EXCLUSION
(HOSTILE FIRE)**

*Id.* (App. 264).

Accordingly, the Hostile Fire Exception in the StarStone Policy must be considered.  If the Court finds any ambiguity in the definition of "insured" or in the Hostile Fire Endorsement, that ambiguity must be construed in favor of coverage. *Barnard Pipeline, Inc. v. Travelers Prop. Cas. Co. of Am.*, 3 F. Supp. 865 (D. Mont. 2014).

### 4. Alternatively, The Pollution Exclusion and the Hostile Fire Exception Are Ambiguous and Must be Construed in Favor of Coverage.

Under Montana law, when interpreting an insurance policy, a court is required to construe any exclusion from coverage narrowly in favor of the insured.  *See Fire Ins. Exch. v. Tibi*, 51 F. Supp. 2d 1065 (D. Mont. 1995) ("All words of limitation and exclusions in an insurance policy must be strictly construed against the insurer regardless of whether or not they are ambiguous."). Furthermore, where the language of an insurance policy is ambiguous—i.e. it is capable of at least two reasonable interpretations, one favorable to the insured and one favorable to the insurer—the court should resolve all ambiguities in favor of the insured. *Barnard Pipeline, Inc. v. Travelers Prop. Cas. Co. of Am.*, 3 F. Supp. 865 (D. Mont. 2014).

To the extent the Court finds the StarStone Pollution Exclusion and/or the Hostile Fire Exception ambiguous, the Court should construe the StarStone Policy against StarStone and in favor of coverage to XTO.  *Id.* ("Any ambiguity in an insurance policy must be construed in favor of extending coverage".).  Because neither of the hostile fire exclusions in the Seneca Policy or StarStone Policy preclude coverage of the Lawsuits, XTO requests the Court grant its Motion and dismiss StarStone's pollution exclusion affirmative defense. *See* Doc. No. 32, ¶¶110-11.

### D. StarStone Waived Its Right To Assert This Coverage Defense, And In Any Event, The Texas Oilfield Anti-Indemnity Act Does Not Apply to Badlands' Obligation to Name XTO as An Additional Insured Under Its Policies.

By not affirmatively asserting this defense in any of its pleadings, StarStone has waived its coverage defense related to the Texas Oilfield Anti-Indemnity Act (the "TOAIA").  *Masters Group*

DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF XTO ENERGY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST TORUS  NATIONAL INSURANCE COMPANY n/k/a STARSTONE NATIONAL INSURANCE COMPANY

Page 37

*International, Inc. v. Comerica Bank*, 352 P.3d 1101 (Mont. 2015) ("An affirmative defense is generally waived if not set forth affirmatively."). StarStone did not raise any defense related to the TOAI in its original reservation of rights letter (*see* Ex. 1-I (App. 275-84) nor did it plead this defense in its Answer or Counterclaim (*see* Doc. No. 32). In fact, StarStone raised its TOAIA coverage defense for the first time in an eleventh-hour supplemental reservation of rights letter less than three months ago. Ex. 3-A (App. 757-58). StarStone has therefore waived its TOAIA coverage defense.

In any event, the TOAIA is irrelevant to the MSA and the StarStone Policy. Because the TOAIA only applies to indemnity agreements, the TOAIA has no application to the additional insured provision in the MSA. TEX. CIV. PRAC. & REM. CODE § 127.005. StarStone asserts that XTO is not entitled to coverage because the TOAIA limits XTO to the one million in limits under the Seneca Policy. However, the TOAIA <u>does not</u> regulate any agreement for the purchase of insurance unless it is ***in support of*** indemnity agreements. *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794 (Tex. 1992).

In Getty, the Texas Supreme Court held that the TOAIA applies exclusively to indemnity agreements and did not prohibit an additional insured provision that is not directly tied to an indemnity provision. *Id* at 794. The *Getty* court reasoned that:

> [The TOAIA] now codified and amended at Tex. Civ. Prac. & Rem. Code § 127.005 does not prohibit 'insurance shifting' schemes that do not fall within [the TOAIA's] parameters; rather, it permits certain indemnity agreements if they are supported by liability insurance and meet the section's other requirements. The [TOAIA] statute does not purport to regulate any agreements for the purchase of insurance unless they are in support of indemnity agreements.
>
> *Id.* at 796.

Like the MSA between Badlands and XTO, the contract in Getty included separate indemnity and insurance obligations. *Id.* at 805. Therefore, because the insurance provision did not "directly support" the indemnity provision, but instead was a separate and independent obligation, the Texas Supreme Court held that the additional insured provision was not subject to the TOAIA. *Id.*; see also *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 672 (Tex. 2008) (affirming its holding that when an additional insured provision is separate and apart from the indemnity provision, the prohibition of the TOAIA does not apply); *Clayton Williams Energy, Inc. v. National Union Fire Insurance Co. of La.*, No. 03-2980, 2004 WL 2452780, at * 6 (E.D. La. Nov. 2004) (noting that, under Texas law, the additional insured provision was valid under Texas law because it is a separate obligation that falls completely outside of the TOAIA's purview.).   Accordingly, the TOAIA does not apply to limit coverage.   XTO therefore requests that this Court hold as a matter of law that StarStone waived this coverage defense, or in the alternative, that the TOAIA does not apply to the additional insured provision in the MSA.

## CONCLUSION

For the reasons set forth above, XTO respectfully requests that the Court grant its Motion and issue an order dismissing StarStone's following affirmative defenses: (1) there is no coverage for the Underlying Claims to the extent XTO and its contractors are not an insured or additional insured under the StarStone Policy (*see* Doc. No. 32, ¶ 107); (2) there is no additional insured coverage for the Lawsuits for XTO and its contractors arising out of the acts or omissions of Badlands or XTO (*id.*, ¶¶ 109, 117); (3) there is no coverage for the Lawsuits due to the application of the MSA entered into between XTO and Badlands (*id.*, ¶ 116); (4) the pollution exclusions in the Seneca Policy and StarStone Policy bar coverage for the Lawsuit, including because coverage

under the StarStone Policy is no broader than would be afforded by the underlying insurance (*id.*, ¶¶110-11, 115).   XTO also seeks the Court reject StarStone's unpled defense that the Texas Oilfield Anti-Indemnity Act precludes any recovery by XTO under the StarStone Policy (*see* Ex. 3-A (App. 757-58) (StarStone Sup. Res. R. Letter).

Dated:  April 22, 2020

Respectfully submitted,

/s/  Leslie Thorne
Leslie C. Thorne
Texas State Bar No.  24046974
leslie.thorne@haynesboone.com
HAYNES AND BOONE, L.L.P.
600 Congress Ave., Suite 1300
Austin TX 78701
Telephone: (512) 867-8400
Telecopier: (512) 867-8470 Facsimile


Ernest Martin, Jr.  *(pro hac vice pending)*
Texas State Bar No. 13063300
ernest.martin@haynesboone.com
Carla Green *(pro hac vice pending)*
Texas State Bar No. 24097762
carla.green@haynesboone.com
HAYNES AND BOONE, L.L.P.
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Telephone:      (214) 651-5000
Telecopier: (214) 651-5940

**ATTORNEYS FOR XTO ENERGY, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was sent to all parties of record pursuant to the ECF guidelines and the Federal Rules of Civil Procedure on this 22 day of April, 2020.

/s/ *Leslie Thorne*_____