IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| BERKLEY NATIONAL INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | C.A. NO. 1:18-CV-00195 |
| | § | |
| XTO ENERGY, INC., | § | |
| | § | |
| *Defendant, Counter-Plaintiff and* | § | |
| *Third-Party Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | |
| COMMERCE AND INDUSTRY | § | |
| INSURANCE COMPANY, TORUS | § | |
| NATIONAL INSURANCE COMPANY | § | |
| n/k/a STARSTONE NATIONAL | § | |
| INSURANCE COMPANY, and SENECA | § | |
| SPECIALTY INSURANCE COMPANY, | § | |
| | § | |
| *Third-Party Defendants.* | § | |

**DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF XTO ENERGY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST <u>BERKLEY NATIONAL INSURANCE COMPANY</u>**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

STATEMENT OF UNDISPUTED MATERIALS FACTS ........................................ 4

I.       The Underlying Lawsuits .............................................................................4

II.      The Master Service Agreement between XTO and Berkley's Named Insured,
         Missouri Basin .............................................................................................7

III.     The Berkley Policies ...................................................................................9

IV.      Coverage Demands and Denials ...............................................................11

V.       The Settlement of the Lawsuits and the Coverage Litigation...................11

ARGUMENT & AUTHORITIES ........................................................................... 12

I.       Summary Judgment Standard. ..................................................................12

         II.   The Berkley Policies Provide Coverage to XTO for the Lawsuits. ........... 14

         A.   The MSA Does Not "Release" Missouri Basin's Obligation to Name
              XTO  as an Additional Insured Under the Berkley Policies. ...................... 14

         B.   XTO is an Additional Insured Under the Berkley Policies. ....................... 16

               1.    The MSA Does Not Limit XTO's Additional Insured Status to
                     Claims in Which Missouri Basin Assumed Responsibility Under
                     the MSA. ........................................................................................ 16

               2.    The Liability in the Underlying Lawsuits "Arose Out of Missouri
                     Basin's Operations," Triggering XTO's Additional Insured Status. ................ 20

               3.    Alternatively, The Additional Insured Provision Is Ambiguous and
                     Must be Construed in Favor of Coverage. ....................................... 25

         C.   The Pollution Exclusion in the Berkley Policies Does Not Bar Coverage
              for the Lawsuits. ....................................................................................... 26

               1.    The Pollution Exclusion in the Berkley Policies Only Applies to
                     Environmental-Type Harms, Not to Bodily Injury or Explosions.................... 27

               2.    Even if the Pollution Exclusion Applied, Exceptions to the Pollution
                     Exclusion Restore Coverage. ........................................................... 31

               3.    Alternatively, The Pollution Exclusion, including the Hostile Fire
                     Exception and Additional Insured Exception, Is Ambiguous and Must
                     be Construed in Favor of Coverage. ................................................ 39

CONCLUSION........................................................................................................ 39

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Admiral Ins. Co. v. Trident NGL, Inc.*,
988 S.W.2d 451 (Tex. App.—Houston [1st Dist.] 1999, pet. denied)....................................23

*Am. Star Ins. Co. v. Grice*,
854 P.2d 622 (Wash. 1993)..........................................................................................................35

*Am. States Ins. Co. v. Koloms*,
687 N.E.2d 72 (Ill. 1997)..............................................................................................................28

*American Casualty Co. v. General Star Indemnity Co.*,
125 Cal. App. 4th 1510 (Cal. Ct. App. 2005) .............................................................................24

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)........................................................................................................................13

*Atlantic Mut. Ins. Co. v. McFadden*,
595 N.E.2d 762 (Mass. 1992) .....................................................................................................29

*Belt Painting Corp. v. TIG Ins. Co.*,
795 N.E.2d 15 (N.Y. 2003)...........................................................................................................28

*Century Sur. Co. v. Hallandale Beach Serv. Station, LLC*,
No. 10-21430—CIV, 2011 WL 13174906 (S.D. Fla. Mar. 21, 2011).................32, 33, 34, 35

*Doerr v. Mobil Oil Corp.*,
774 So.2d 119, 135 (La. 2000), corrected, 782 So.2d 573 (La.2001) ....................................28

*Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*,
132 F.3d 526 (9th Cir. 1997) .................................................................................................27, 30

*Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*,
256 S.W.3d 660 (Tex. 2008)..............................................................15, 16, 17, 18, 23, 24

*ExxonMobil Corporation v. Electrical Reliability Services, Inc.*,
868 F.3d 408 (5th Cir. 2017) .......................................................................................................18

*Fisher v. American Family Mut. Insurance Co.*,
579 N.W.2d 599 (N.D. 1998) .........................................................................................13, 25, 39

*Gaylord Container Corp. v. CNA Ins. Cos.*,
807 So. 2d 864 (La. App. 2001)............................................................................................28, 30

*Getty Oil Co. v. Ins. Co. of N. Am.*,
845 S.W.2d 794 (Tex. 1992) ...................................................................15, 18

*Great Northern Insurance Co. v. Greenwich Insurance Co.*,
No. CV-05-635, 2007 WL 2458477 (W.D. Penn. Aug. 24, 2007), *vacated on other grounds*, *Great Northern Insurance Co. v. Greenwich Insurance Co.*,
2008 WL 2048354 (W.D. Penn. May 12, 2008) .........................................34, 35

*Greenwich Ins. Co. v. John Sexton Sand & Gravel Corp.*,
No. 1-12-1263, 2013 WL 950755 (Ill. App. Ct. Mar. 11, 2013) ................30, 34, 35

*Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co.*,
658 N.W.2d 363 (N.D. 2003) ..................................................................24

*Hawkins Chemical, Inc. v. Westchester Fire Ins. Co.*,
159 F.3d 348 (8th Cir. 1998) ..................................................................35

*Hiland Partners GP Holdings, LLC, et al. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
847 F.3d 594 (8th Cir. 2017) .............................................26, 30, 31, 32

*Jones v. Francis Drilling Fluids, Ltd.*,
642 F. Supp. 2d 643 (S.D. Tex. 2009) ..................................................28, 30

*Karroll v. Atomergic Chemetals Corp.*,
194 A.D.2d 715 (N.Y. 1993) ..................................................................29

*Keggi v. Northbrook Property and Cas. Ins. Co.*,
13 P.3d 785 (Ariz. 2000) ........................................................................28

*Kelley-Coppedge, Inc. v. Highlands Ins. Co.*,
980 S.W.2d 462 (Tex. 1998) ..................................................................37

*Kent Farms, Inc. v. Zurich Ins. Co.*,
93 Wash. App. 414, 969 P.2d 109, 111–12 (1998), aff'd, *1066 140 Wash.2d 396, 998 P.2d 292 (2000) ......................................................................29

*MacKinnon v. Truck Insurance Exchange*,
73 P.3d 1205 (Cal. 2003) ........................................................................29

*McCarthy Brothers Co. v. Continental Lloyds Ins. Co.*,
7 SW.3d 725 (Tex. App.—Austin 1999, no pet.) ....................................23

*Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*,
16 S.W.3d 418 (Tex. App.—Waco 2000) ..............................................34, 35

**DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF XTO ENERGY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BERKLEY NATIONAL INSURANCE COMPANY**

iii

*Motorists Mut. Ins. Co. v. RSJ, Inc.*,
   926 S.W.2d 679 (Ky. App.1996) .........................................................................28

*Nautilus Ins. Co. v. Jabar*,
   188 F.3d 27 (1st Cir.1999) ...................................................................................28

*Noble Energy, Inc. v. Bituminous Casualty Co.*,
   529 F.3d 642 (5th Cir. 2008) .........................................................................33, 34

*Pasadena Refining System, Inc. v. McCraven*,
   2012 WL 1693697 (Tex. App.—Houston [14th Dist.] May 15, 2012) ..................24

*Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*,
   976 F.2d 1037 (7th Cir. 1992) .............................................................................28

*Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co.*
   35 F.3d 494 (10th Cir. 1994) ...............................................................................29

*Schmid v. Fireman's Fund Ins. Co.*,
   97 F. Supp. 2d 967 (D. Minn. 2000)......................................................................35

*Scottsdale Ins. Co. v. Tri-State Ins. Co.*,
   302 F. Supp. 2d 1100 (D.N.D. 2004).......................................................13, 26, 39

*Spring Glen Apartments LLP v. Arch Specialty Insurance Co.*,
   307 F. Supp. 3d 975 (D.N.D. 2018).......................................................................13

*Tow v. Gemini Ins. Corp. (In re ATP oil & Gas Corp.)*,
   No. 12-36187, 2015 WL 5965600 (Bankr. S.D. Tex. Oct. 9, 2015).......................38

*U.S. Fid. & Guar. Co. v. B&B Oil Well Service, Inc.*,
   910 F.Supp. 1172 (S.D. Miss. 1995).......................................................................37

*Weaver v. Royal Ins. Co. of America*,
   674 A.2d 975 (N.H. 1996) .....................................................................................29

*West American Ins. Co. v. Tufco Flooring East, Inc.*,
   409 S.E.2d 692 (N.C. 1991), overruled on other grounds by *Gaston County
   Dyeing Mach. Co. v. Northfield Ins. Co.*, 524 S.E.2d 558 (N.C. 2000)..................29

*Zurich Am. Ins. Co. v. Southern-Owners Ins. Co.*,
   314 F. Supp. 3d 1284 (Fla. Dist. Ct. 2018)............................................................24

**Other Authorities**

FED. R. CIV. P. 56(c) ................................................................................................................12

FED. R. CIV. P. 56(e) ................................................................................................................13

FED. R. CIV. P. 54(d) ................................................................................................................4

Defendant, Counter-Plaintiff and Third-Party Plaintiff XTO Energy, Inc. ("XTO") submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment against Berkley Insurance Company ("XTO's Motion").

## PRELIMINARY STATEMENT

This is an insurance coverage dispute stemming from Berkley's wrongful denial of coverage to XTO in connection with wrongful death and bodily injury lawsuits arising from a well explosion and fire. The Berkley Insurance Company ("Berkley") policies plainly provide coverage and the Court must reject Berkley's baseless coverage defenses.

Missouri Basin Well Services, Inc. ("Missouri Basin"), Berkley's named insured, was required under a Master Service Agreement (the "MSA") to name XTO as an additional insured—and the policies indeed cover those for whom Missouri Basin was required to secure coverage. Nevertheless, Berkley improperly denied additional insured coverage to XTO under its policy for the lawsuits. Instead of defending and indemnifying XTO as required under its policies, Berkley filed the instant action seeking declaratory relief relating to its meritless coverage defenses. Each of Berkley's coverage defenses is unsupported by the plain terms of the MSA, the Berkley Policies, and/or the relevant case law.

There can be no dispute that the MSA requires Missouri Basin to name XTO as an additional insured on its policies, but Berkley tries to escape this reality by arguing that "release" language in the indemnification provision of the MSA between XTO and Missouri Basin – standard language that "releases" Missouri Basin from indemnifiable claims – also acts to "release" Missouri Basin from naming XTO as an additional insured under its policies. *See* Doc. No. 54, ¶ 23 (Amended Comp.); *See* Doc. No. 23, ¶ 100 (Answer). This argument runs contrary

to the plain language of the MSA and black letter law.  The release language in the indemnity provision is standard in these types of contracts and expressly releases *Missouri Basin* for claims arising out of injury or death of employees of XTO's contractors.  There is absolutely nothing in this provision that releases *Berkley* from anything.  Further, the MSA broadly obligates Missouri Basin to name XTO as an additional insured in a separate provision.  It is well settled in Texas that additional insured provisions are not limited to the scope of indemnity obligations in the same contract.  As such, the "release" language in the indemnity provision of the MSA did not release Missouri Basin from its obligation to name XTO as an additional insured in its policies.

Relatedly, Berkley also argues that XTO is not an additional insured because additional insured status only extends to Missouri Basin's indemnity obligations under the MSA—which are not triggered by the lawsuits.  Doc. No. 54, ¶ 24, 27; Doc. No. 23, ¶ 101, 104.  But neither the MSA nor the policies limit XTO's additional insured status to indemnity obligations in the MSA. Indeed, courts across the country have consistently held that an insurer's obligation to name a party as an additional insured in a contract should be read separate and apart from any indemnity obligation.

Berkley next attempts to avoid its obligation by asserting that XTO is not an additional insured under the Berkley policies in any event under the theory that XTO's liability did not "arise out of" Missouri Basin's acts or omissions.  *See* Doc. No. 54, ¶¶ 26-27; Doc. No. 23, ¶ 101, 103- 104.  But this argument flies in the face of the allegation and facts in the underlying lawsuits, which make crystal clear that XTO's liability arose out of Missouri Basin's acts or omissions.

Finally, Berkley denies it owes any obligation to defend or indemnify XTO on the basis that the policies' pollution exclusion bars coverage for the underlying lawsuits. *See* Doc. No. 23,

¶ 113; Doc. No. 54, ¶ 32.  Berkley argues that the bodily injuries asserted in the underlying lawsuits were caused by the release of gases and therefore, the pollution exclusion bars coverage.  Not so. Courts across the country have found that the pollution exclusion in the Berkley policies should only be applied to environmental-type harms, not to liability arising out of bodily injury or explosions.

Moreover, the pollution exclusion provides two exceptions that apply to provide coverage for the underlying lawsuits.  The first provides that the pollution exclusion does not apply to bodily injury "arising out of heat, smoke or fumes from a hostile fire."  Hostile fire is defined as fire "which becomes uncontrollable or breaks out from where it was intended to be."  Here, the underlying claimants' injuries were undoubtedly caused by a hostile fire.

A second exception independently applies to restore coverage for bodily injury "for which You may be held liable, if you are a contractor and the owner or lessee of such premises…has been added to Your policy as an Additional Insured with respect to your ongoing operations performed for that Additional Insured; and such premises…was never owned or occupied by, or rented or loaned to, any Insured, other than the Additional Insured."  Here, "You" refers to Missouri Basin (the named insured under the Berkley policies), undisputedly a contractor.  Because Missouri Basin has been named a defendant in the underlying lawsuits, there is no doubt that Missouri Basin may be held liable for the bodily injury that is the subject of the underlying lawsuits.  Further, XTO (the owner of the Ryan Well) was added to the Berkley Policy as an additional insured with respect to Missouri Basin's ongoing operations [as provided by the MSA and AI endorsement]. Finally, Missouri Basin never owned, occupied, or rented the Ryan Well—XTO was the owner

and lease operator of the Ryan Well who contracted with Missouri Basin to provide limited service. Therefore, the additional insured exception to the pollution exclusion clearly applies.

Finally, if there is any ambiguity in the Berkley policies, the Court must construe the policies in favor of XTO, the insured, as consistent with North Dakota law.

XTO is entitled to summary judgment as a matter of law on several of Berkley's claims for declaratory relief.  This Court should therefore grant XTO's Motion and dismiss Berkley's declaratory claims and affirmative defenses that: (1) the "release" language in the indemnification provision of the MSA (between XTO and Missouri Basin) acted to "release" Missouri Basin from naming XTO as an additional insured under its policies (*see* Doc. No. 23, ¶ 100; Doc. No. 54, ¶ 23); (2) the MSA did not require Missouri Basin to provide additional insured coverage (*id.*, ¶¶ 101, 104; ¶ ¶24, 27); (3) XTO is not an additional insured because XTO's liability did not arise out of Missouri Basin's operations (*id.*, ¶¶ 103, 104; ¶¶ 26, 27); (4) the Berkley policies do not cover the claims made by XTO in the Lawsuits due to the application of the pollution exclusion of the Berkley primary policy's "Pollution" exclusion and the umbrella policy's incorporation of that exclusion (*id.*, ¶ 113; ¶ 32).[1]

## STATEMENT OF UNDISPUTED MATERIALS FACTS[2]

### I.      The Underlying Lawsuits

1.      XTO conducts significant operations throughout North Dakota. Among other things, it owned and was the lease operator of a producing oil and gas well located approximately

---

[1] XTO reserves the right under Federal Rule of Civil Procedure 54(d) to seek its attorneys' fees.
[2] The evidence on which XTO relies in support of its Motion is contained in the Appendix.  Doc. No. 112  Citations to the evidence in the Appendix appear as "Ex. __ (App. __)."

eight miles east of Watford City, North Dakota at a drilling pad known as Ryan 14X-09E (the "Ryan Well").  Ex. 2 (App. 259, ¶ 3) (Arnold Affidavit).

2.      On or about June 18, 2016, an explosion and fire occurred at the Ryan Well, injuring or killing several people and resulting in two lawsuits:  *Mary Stassinos et al. v. XTO Energy Inc., et al;* Civil No. 1:17-CV-138 (the "*Stassinos* Lawsuit") and *Richard Maheu et al. v. XTO Energy Inc., et al.;* Civil No. 1:17-CV-102 (the "*Maheu* Lawsuit"), both pending in the District of North Dakota, Western Division (collectively, the "Lawsuits").[3]  Ex. 1-A (App. 008-32) (Stassinos Lawsuit); Ex. 1-B (App. 033-64) (Maheu Lawsuit). The Lawsuits named as defendants XTO and a number of its contractors, and the Maheu Lawsuit specifically named Missouri Basin as a defendant. *Id.*  The Lawsuits alleged that XTO and its contractors were negligent and further sought to hold XTO accountable for the alleged negligence of the various contractors.  Ex. 1-A (App.019-21); Ex. 1-B (App. 046-47).

3.      The allegations made in the Lawsuits (and the evidence proving certain facts asserted in the Lawsuits) are as follows:

- "On or before June 18, 2016, Defendant XTO was the lease operator of a well near Watford City, North Dakota, known as Ryan 14X-09E (Well Site).  On June 18, 2016, an explosion and fire occurred at the XTO Well Site causing serious injuries to Mr. Stassinos.  Mr. Stassinos received medical treatment for his injuries and suffered conscious pain and suffering, but subsequently died from those subsequent injuries."  Ex. 1-A (App. 014, ¶ 12) (Stassinos Lawsuit); *see also* Ex. 1-B (App. 040, ¶ 32) (Maheu Lawsuit); Ex. 2-E (App. 349-56) (Report confirming incident at the Well Site (the "TH Hill Report")); Ex. 2-F (App. 614) (Fire Report).

---

[3] XTO, among others, was also named a defendant in a lawsuit filed by Daniel Pavon in Harris County, Texas, Case No. 201661844-7 (the "*Pavon* Lawsuit").  Justin Pyle intervened in the *Pavon* Lawsuit.  The *Pavon* Lawsuit was dismissed in Texas on *forum non conveniens* grounds.  After dismissal of the *Pavon* Lawsuit, Pavon and Pyle sought and were granted leave to intervene in the *Maheu* Lawsuit.  Ex. 1-C (App. 065-98); Ex. 1-D (App. 099-116).  Pyle also sought and was granted leave to intervene in the *Stassinos* Lawsuit.  As such, the Lawsuits include the claims of Pavon and Pyle. *Id.*

- "Although the Well Site had become dangerous and hazardous, XTO chose not to "kill" it with appropriate and available fluids and also chose not to isolate the hazardous portion of the tubing with appropriate plugs. Instead of "killing" the Well, XTO chose to remove the tubing from the hole by pulling it out in a process known as "snubbing" in which a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the hole." *see also* Ex. 2-E (App. 349-56) (TH Hill Report); Ex. 2-F (App. 614) (Fire Report).

- "During this dangerous aspect of the snubbing process on June 18, 2016, the final joint of tubing reached the surface and rocketed out of the Well and into the air resulting in an explosion and fire and serious injuries to Mr. Stassinos which, subsequently, resulted in his death." Ex. 1-A (App. 014, ¶ 12) (Stassinos Lawsuit); *see also* Ex. 1-B (App. 040, ¶ 32) (Maheu Lawsuit); Ex. 2-E (App. 349-56) (TH Hill Report); Ex. 2-F (App. 614) (Fire Report).

- "In its discretion, Defendant XTO contracted with Defendant MBI to provide a senior consultant, Defendant Dokken, to supervise operations on XTO's behalf, including supervision of Defendants Kolden and Jones." Ex. 1-B (App. 039, ¶ 27 (Maheu Lawsuit); *see also* Ex. 2-G (App. 623) (Dokken Depo. 10:16 – 11:12) (testimony from Mr. Dokken confirming that he was hired by Missouri Basin to provide services for XTO); Doc. No. 78, at 8 (Berkley Motion) ("Multiple contractors of XTO were at the Well site on the day of the explosion: MBI employed a foreman, Carson Dokken").

- "Through the XTO company men they assigned to the Ryan Well, Defendants MBI, Badlands, and Petroleum Experience regularly reported to, communicated with, provided recommendations to, and followed the orders and directions of Defendant XTO regarding operations and conditions at the Ryan Well." Ex. 1-B (App. 039, ¶ 27; *see also* Ex. 2-G (App. 623) (Dokken Depo. 10:16 – 11:12) (testimony from Mr. Dokken confirming that he was hired by Missouri Basin to provide services for XTO); Doc. No. 78, at 8 (Berkley Motion) ("Multiple contractors of XTO were at the Well site on the day of the explosion: MBI employed a foreman, Carson Dokken").

- "Instead of acting reasonably and prudently by killing the Ryan Well, Defendants XTO, MBI [Missouri Basin], Dokken, Badlands, Jones, Petroleum Experience, and Kolden instead negligently and recklessly ordered the Most Wanted and SEI crews to conduct snubbing operations in an attempt to pull out of the hole the remaining joints of tubing from the Ryan Well while the Ryan Well was still under dangerously high pressure." Exhibit 1-B (App. 041, ¶ 35).

- "After receiving the order from Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden to pull the remaining joints of tubing from the

Ryan Well, Most Wanted and SEI foremen asked these Defendants to bleed the Ryan Well down so that their crews would be dealing with lower pressures while pulling the tubing out of the hole. In response to this request, these Defendants bled the Ryan Well down and lowered the pressure. Then, inexplicably, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden ordered the Most Wanted and SEI crews to undergo a time-consuming random urinalysis test. While the crews were undergoing the urinalysis test, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden shut the Ryan Well in and negligently and recklessly allowed uncontrolled well bore pressures to build up to a dangerously high level." Exhibit 1-B (App. 041-42, ¶ 37); *see also* Ex. 2-G (App. 647) (Dokken Depo. 106:10–107:116) (testimony from Mr. Dokken regarding shutting in the Ryan Well during drug test).

- "As a proximate result of the blow-out, explosion, and fire, and as a proximate result of the acts and omissions of Defendants, one man was killed and others suffered serious, life-threatening burns and injuries." Exhibit 1-B (App. 042, ¶ 39); Ex. 2-F (App. 614) (Fire Report).

- "Plaintiff Maheu was hit by the explosion and flames of the flash fire, and was thrown down a flight of stairs, his body engulfed in flames." Exhibit 1-B (App. 042, ¶ 40); Ex. 2-F (App. 614); Ex. 2-D (App. 318) (Rodriguez Depo. 45:2-8).

- "The blow-out, explosion, fire, and subsequent injuries and damages sustained by Plaintiffs were proximately caused by the negligent and reckless acts and omissions of Defendants who were acting through their agents, representatives, servants, and employees, all of whom were acting within the scope of their employment or agency duties." Exhibit 1-B (App. 045, ¶ 49).

## II.     The Master Service Agreement between XTO and Berkley's Named Insured, Missouri Basin

4.     On December 2, 2011, XTO and Missouri Basin (Berkley's named insured) entered into a Master Service Agreement wherein Missouri Basin agreed to provide certain services to XTO at the Ryan Well (the "MSA").  Ex. 1-E (App. 117-39) (Missouri Basin MSA).

5.     The MSA required Missouri Basin to secure and maintain commercial general liability policies with at least $1 million limits per occurrence. *Id.* (App. 125).

6.     Section 11.2 of the MSA further provides:

[S]hould [Missouri Basin] maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which [Missouri Basin] shall provide hereunder will be such larger amounts carried by [Missouri Basin]…and not the minimums referenced in Sections 11.1.1-11.1.5 above.

*Id.*

7.      Section 11.4 of the MSA also provides:

Primary Coverage and Additional Insureds. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP[4] TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR [Missouri Basin] UNDER THIS AGREEMENT. ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

*Id.* (App. 125-26).

8.      Pursuant to Section 14.8, the MSA is governed by the laws of the State of Texas.

*Id.* (App. 129).

---

[4] The MSA defines the XTO Group as individually or in any combination XTO, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at the Site, joint interest owners, joint venturers, partners, contractors and subcontractors other than Contractor, Contractor Group, or its or their Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees. *See* Ex. 1-E (App. 118-19). Because the other defendants named in the Lawsuits were XTO's "contractors and subcontractors other than [Missouri Basin]," those defendants are also encompassed in the definition of "XTO Group."

### III.     The Berkley Policies

9.      The first Berkley policy bears Policy Number EGL–001672010 and is a primary-level general liability policy (the "Berkley Primary Policy"). Ex. 1-F (App. 140-97) (Berkley Primary Policy).  The Berkley Primary Policy was issued to Missouri Basin, effective from April 13, 2016 to April 13, 2017, and has a $1,000,000 per occurrence limit.  *See id.* (App. 141).

10.     The second Berkley policy issued to Missouri Basin bears Policy Number EUL-00167910 and is an umbrella policy (the "Berkley Umbrella Policy," and together with the Berkley Primary Policy, the "Berkley Policies).  Ex. 1-G (App. 198-240) (Berkley Umbrella Policy).  The Berkley Umbrella Policy has a $25 million per occurrence limit and follows the terms and conditions in the Berkley Primary Policy. *See id.* (App. 199, 208).

11.     The Berkley Policies provide liability coverage for damages the insureds must pay because of bodily injury caused by a covered occurrence.  Ex. 1-F (App. 152); Ex. 1-G (App. 208).

12.      The Berkley Policies include XTO and the other contractors named as defendants in the Lawsuits as Additional Insureds under the following provision:

> **Additional Insured:**
> Any person or organization with whom **YOU** agree in a written contract or written agreement to add as an Additional Insured on your policy or to provide liability insurance for, but only with respect to liability arising out of **YOUR** operations or liability arising out of premises owned by or rented to **YOU.**·
>
> In addition, the written contract or written agreement requiring **YOU** to include a person or organization as an Additional Insured must be in effect during the policy period and executed before the **BODILY INJURY, PROPERTY DAMAGE,** or **PERSONAL AND ADVERTISING INJURY** occurred. Furthermore, the insurance provided will not exceed the lesser of: ·
>
>> a.   The coverage, terms, and/or limits of this policy; or

> b. The coverage, terms, and/or limited required by said written contract or written agreement.

        . . . .

Ex. 1-F (App. 150-51).[5]

13.     The Berkley Primary Policy also requires Berkley to defend its insureds against claims potentially falling within coverage: "We will have the right and Duty to Defend the Insured, including without limitation, to appoint counsel to represent the Insured against any Claim or Suit seeking damages…to which this policy applies."  Ex. 1-F (App. 152).

14.     The Berkley Primary Policy also includes the following pollution exclusion:

**Pollution**:

a. Bodily Injury or Property Damage arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of Pollutants:

> (1) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any Insured. **However, this Subparagraph (1) does not apply to:**

\*\*\*

> > **(b) Bodily Injury or Property for which You may be held liable, if you are a contractor and the owner or lessee of such premises, site, or location has been added to Your policy as an Additional Insured with respect to Your ongoing operations performed for that Additional Insured at that premises, site, or location; and such premises, site, or location is not and never was owned or occupied by, or rented or loaned to, any Insured, other than that Additional Insured;**

> > **(c) Bodily Injury or Property Damage arising out of heat, smoke, or fumes from a Hostile Fire;**

\*\*\*

---

[5] The Berkley Umbrella Policy follows form to the Berkley Primary Policy.  Therefore, the Berkley Umbrella Policy provides coverage to any person or organization that qualifies as an insured under the Berkley Primary Policy.  Ex. 1-G (App. 209).

> **Hostile Fire means one which becomes uncontrollable or breaks out from where it was intended to be.**

Ex. 1-F (App.162-63) (emphasis added)

15.    The Berkley Umbrella Policy incorporates the pollution exclusion, and the exceptions thereto, in the Berkley Primary Policy.  Ex. 1-G (App. 208).

## IV.    Coverage Demands and Denials

16.    On June 29, 2018, XTO sent a letter to Berkley demanding defense and indemnity for itself and the rest of the "XTO Group" in connection with the Lawsuits. Ex. 1-H (App. 241-46).

17.    On or about September 28, 2018—two weeks before the Lawsuits were to be mediated—Berkley denied coverage under the Berkley Policies for the claims based largely on the argument that the pollution exclusion barred coverage for the Lawsuits.  Ex. 1-I (App. 247-55) (Berkley Denial Letter); *see also* Doc. No. 1 at 13 (Berkley Complaint).

## V.    The Settlement of the Lawsuits and the Coverage Litigation

18.    On or about October 12, 2018, all defendants in the Lawsuits and their insurance carriers participated in a mediation with the plaintiffs in the Lawsuits.  At that mediation, XTO was able to secure settlements with all but one of the underlying plaintiffs.  After the mediation, XTO settled with the last remaining underlying plaintiff.  Ex. 1 (App. 005, ¶ 11) (Kuhn Aff.).

19.    All known insurance carriers for the defendants named in the Lawsuits, with the exception of Berkley and CIIC (another insurer that issued a policy to Missouri Basin), actively engaged in the mediation and settlement of the Lawsuits.  *Id.* (App. 005, ¶¶ 11-12). Furthermore, all known insurance carriers for the defendant named in the Lawsuits, with the exception of

Berkley and CIIC, agreed to provide their respective limits to settle the Lawsuits. *Id.* (App. 005, ¶ 12).

20.     While the terms of the settlement agreements are confidential, the total amount of the settlements far exceed the total limits of the Berkley Policies. *Id.* (App. 005, ¶ 13).  Berkley is aware of the amounts paid in settlement of the Lawsuits.

21.     Berkley filed this action on September 28, 2018, the day after it denied XTO coverage.  Doc. No. 1.  Berkley filed an amended complaint on May 13, 2019 to include another basis on which it contends it is entitled to attorneys' fees.  Doc. No. 54 (Berkley Amended Complaint).

22.     Among other claims for relief, Berkley seeks a declaration that the pollution exclusion in the Berkley Policies bars coverage for the Lawsuits, *id.* at 32.

23.     XTO filed its Answer, Counterclaim and Third-Party Complaint on November 7, 2018, asserting—among other things—that it is entitled to coverage under the Berkley Policies. Doc. No. 7 (XTO Answer, Counterclaim and Third-Party Complaint).

## ARGUMENT & AUTHORITIES

### I.     Summary Judgment Standard.

Summary judgment is appropriate where the relevant evidence shows that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(c).  Under North Dakota law[6], the "interpretation of an insurance

---

[6] North Dakota law governs the interpretation of the Berkley Policies as the policies were issued to Missouri Basin, a North Dakota resident, in North Dakota.  The explosion that is at issue in the underlying Lawsuit also occurred in North Dakota.  However, the interpretation of the MSA will be governed under Texas law as provided under Section 14.8 of the MSA.  Ex. 1-E (App. 129) (MSA).

policy, including whether it is ambiguous, is a question of law" to be resolved by the court.  *Fisher v. American Family Mut. Insurance Co.*, 579 N.W.2d 599, 602 (N.D. 1998); *Scottsdale Ins. Co. v. Tri-State Ins. Co.*, 302 F. Supp. 2d 1100, 1103 (D.N.D. 2004).

Once the movant has discharged its initial burden to demonstrate the absence of a genuine issue of material fact, the nonmoving party must set forth specific facts, by affidavits or otherwise, showing there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  A fact is "material" to preclude summary judgment only if it will "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be denied."  *Id.*  at 249-50 (citations omitted).

Moreover, in the context of a dispute involving an insurance policy, all doubts regarding the interpretation of ambiguous policy terms are resolved in favor of the insured.  *Scottsdale Ins. Co. v. Tri-State Ins. Co.*, 302 F. Supp. 2d 1100 (D.N.D. 2004) ("Any ambiguity or reasonable doubt as to the meaning of an insurance policy is strictly construed against the insurer and in favor of the insured."); *Spring Glen Apartments LLP v. Arch Specialty Insurance Co.*, 307 F. Supp. 3d 975 (D.N.D. 2018) ("Should a court uncover any ambiguous terms within the policy, the  meaning of those terms out to be interpreted in favor of the insured.").

Here, the issues presented center on policy interpretation and are ripe for summary judgment by the Court.  Berkley has based its denial of coverage on an improper interpretation of the Berkley Policies and the MSA.  XTO therefore requests that the Court deny Berkley relief as

to its following declaratory claims: (1) the "release" language in the indemnification provision of the MSA (between XTO and Missouri Basin) acted to "release" Missouri Basin from naming XTO as an additional insured under its policies (*see* Doc. No. 23, ¶ 100; Doc. No. 54, ¶ 23); (2) the MSA did not require Missouri Basin to provide additional insured coverage (*id.*, ¶¶ 101, 104; ¶¶ 24, 27); (3) XTO is not an additional insured because XTO's liability did not arise out of Missouri Basin's operations, *i.e.*, vicarious liability (*id.*, ¶¶ 103, 104; ¶¶ 26, 27); (4) the Berkley policies do not cover the claims made by XTO in the Lawsuits due to the application of the Berkley primary policy's "Pollution" exclusion and the umbrella policy's incorporation of that exclusion (*id.*, ¶ 113; ¶ 32). These declaratory claims are unsupported and should be rejected.

## II.   The Berkley Policies Provide Coverage to XTO for the Lawsuits.

Berkley is obligated to defend and indemnify XTO in connection with the Lawsuits because: (1) the MSA in no way "released" Missouri Basin's obligation to name XTO as an additional insured under its policies; (2) XTO is an additional insured under the Berkley Policies; and (3) the pollution exclusions in the Berkley Policies do not bar coverage for the Lawsuits. As such, the Court should grant XTO's Motion and dismiss Berkley's declaratory claims.

### A.   The MSA Does Not "Release" Missouri Basin's Obligation to Name XTO as an Additional Insured Under the Berkley Policies.

Berkley asserts in its Amended Complaint that, pursuant to Section 10.2.1 of the MSA, XTO agreed to "release" Missouri Basin from and against any and all indemnifiable claims, defined as "any and all claims, demands, and causes of action of every kind and character arising out of, without limitation, injury to or death of employees of XTO's contractors." Doc. No. 54 at 11; *see also* Ex. 1-I (App. 250-51) (Denial Letter). Without citing to any legal support (and XTO has located none), Berkley contends that this "release" language extends to and includes any claims

that Missouri Basin is obligated to name the "XTO Group" as additional insureds on its policies in connection with injury claims —despite that very obligation appearing elsewhere in the MSA. Berkley's position is meritless and not supported by Texas law.[7]

Berkley's argument that the MSA is releasing Missouri Basin from another discrete obligation (to name XTO as an additional insured) appearing **in the very same contract** is patently absurd and belied by the contract language itself.  The release language—standard in these types of contracts—appears in an indemnity provision (Ex. 1-E) (App. 122-23) and expressly releases Missouri Basin from liability for "claims… arising out of…injury to or death of employees of XTO's contractors."  *Id.* (App. 123).  Nothing in the provision indicates that Missouri Basin need not satisfy its straightforward obligation to name XTO as an additional insured (as provided in 11.4 of the MSA).  Nor does the provision release *Berkley* from anything.  There can be no dispute that, here, XTO is directly seeking coverage from Berkley—not Missouri Basin—as an Additional Insured under its policies.

If Berkley is arguing that the "release" somehow means that Missouri Basin need not name XTO as an additional insured for circumstances in which Missouri Basin has itself been released or indemnified, the MSA contains no such limitation.  Instead, it broadly obligates Missouri Basin to "name the XTO Group as an additional insured."  *Id.* (App. 125-26).  And as a Texas court held in *Getty*, additional insured provisions are not limited to the scope of indemnity obligations in the same contract.  *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794 (Tex. 1992); *see also Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 670 (Tex. 2008) (holding that a

---

[7] While the Berkley Policies Policy are subject to North Dakota law, the interpretation of the MSA will be governed under Texas law as provided under Section 14.8 of the MSA.  Ex. 1-E (App. 129) (MSA).

similar MSA extended direct insured status to contractor as an additional insured, and such an obligation was separate and independent of contactor's agreement to forego contractual indemnity for its own negligence").  Here, XTO's obligation to "release" Missouri Basin from certain wrongful death and injury claims under the indemnity provision of the MSA has no bearing whatsoever on Berkley's obligation to provide XTO with additional insured coverage under the Berkley Policies.

Accordingly, XTO asks the Court to find as a matter of law that the MSA does not "release" Missouri Basin's obligation to name XTO as an Additional Insured under the Berkley Policies. *See* Doc. No. 23, ¶ 100; Doc. No. 54, ¶ 23.

**B.      XTO is an Additional Insured Under the Berkley Policies.**

**1.   The MSA Does Not Limit XTO's Additional Insured Status to Claims in Which Missouri Basin Assumed Responsibility Under the MSA.**

In a related position, Berkley argues that the MSA does not require Missouri Basin to provide additional insured coverage to XTO because Missouri Basin did not have a contractual obligation to indemnify XTO against the underlying claims. Doc. No. 23 at 101; Doc. No. 54 at 24.   Again, this flies in the face of the policy language and black letter law.

Berkley's reading of the MSA conflates two entirely separate obligations: (1) The parties' indemnity obligations to one another and (2) Missouri Basin's obligation to name XTO as an additional insured under its policies.  XTO is not seeking indemnification <u>from Missouri Basin</u> pursuant to the MSA's indemnity provision; it is seeking coverage (i.e. defense and indemnity) <u>from Berkley</u> by virtue of its status as an additional insured on the Berkley Policies issued to Missouri Basin.  *Evanston Insurance Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660, 669 (Tex. 2008) (finding under a similar contract that the indemnity provision and insurance provision

created two, separate and distinct obligations).   The MSA and the Policies plainly provide coverage and nothing in either one of them limits additional insured status to instances where Missouri Basin has an obligation to indemnify XTO.

The leading case on this precise issue dictates that XTO is an additional insured.  In *Evanston,* the contract at issue had an indemnity provision that required the subcontractor to indemnify the contractor for personal injury under certain circumstances.  *Id.* at 662.  The contract also included a separate insurance provision that required the subcontractor to name the contractor as an additional insured.  *Id.*  An employee of the subcontractor was injured at the contractor's premises and filed suit against both the subcontractor and contractor.  *Id.*  The insurer denied coverage on the same basis that Berkley does here: the contractor was not allowed to seek indemnification from the subcontractor under the contract, and thus, was not an additional insured under the subcontractor's umbrella policy.  *Id.* at 663-64.  The Texas Supreme Court disagreed and held that the subcontractor's duty to indemnify and its duty to name the contractor as an additional insured were two separate and distinct obligations under the contract.  *Id.* at 660.

Here, like the contract in *Evanston*, Missouri Basin's indemnity obligations and its insurance obligations appear in entirely separate sections of the MSA.  Further, the plain language of the insurance provision in the MSA requires Missouri Basin to name XTO as an additional insured and that requirement is in <u>no way</u> tied to any indemnity obligations under the MSA's indemnity provision.  The additional insured provision makes no references to any indemnity obligations, providing:

> **ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE,**

**INCLUDING EXCESS OR UMBRELLA INSURANCES** AND WILL BE PRIMARY TO, AND RECEIVE NOT CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABIITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT. **ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED**. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

Ex. 1-E (App. 125-26) (emphasis added).

Texas law (which governs the MSA) on this issue is settled and dictates that indemnity provisions and insurance provisions in contracts with identical wording such as that found in the Missouri Basin's MSA should be read separately and independently. *Evanston*, 256 S.W.3d at 670; *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794 (Tex. 1992) (holding that where an additional insured provision is separate from and additional to an indemnity provision, the scope of the insurance requirement is not limited by the indemnity clause); *ExxonMobil Corporation v. Electrical Reliability Services, Inc.*, 868 F.3d 408 (5th Cir. 2017) (finding that an additional insured provision stating that the subcontractor's liability policies "shall cover Exxon and Affiliates as additional insureds," was not tied to the scope of liability under the indemnity provision.).

Pursuant to Section 11.4 of the MSA, Missouri Basin had a separate and additional obligation to name the XTO Group as an additional insured under Missouri Basin's policies, *i.e.*, the Berkley Policies. Further, Missouri Basin's obligation to name XTO as an additional insured was not tied to any obligation under the indemnity provision of the MSA. Ex. 1-E (App. 125-26) (MSA). To the contrary, 11.4 provides that "all insurance policies and coverages listed in this

article XI will extend to and protect the XTO Group **to the fullest extent and amount of such coverage**, including excess or umbrella insurances." *Id.* (App. 125) (emphasis added).

This is further bolstered by the fact that there would be no need to name XTO as an additional insured under Missouri Basin's policies if indeed the intent was only to provide coverage for indemnifiable claims. Separate and apart from any additional insured provisions, the Berkley Policies provide coverage for Missouri Basin's contractual obligation to indemnify XTO under the MSA. Indeed, the contractual exclusion in the Berkley Policy[8] provides an exception "for liability for damages assumed in a contract or agreement…." Ex. 1-F (App. 161); Ex. 1-G (App. 208). This exception to the contractual exclusion provides that indemnifiable claims under the MSA would be covered under the Berkley Policies. As such, there would be no need to add XTO as an additional insured under the Berkley Policies for these claims. The separate obligation to name XTO as an additional insured under Missouri Basin's policies shows a clear intent that Missouri Basin agreed to provide XTO with **direct** coverage for liability arising out of Missouri Basin's operations, not only for indemnifiable claims under the MSA.

Because Missouri Basin's insurance obligations are not tied to the indemnity obligations in the MSA, XTO requests the Court hold as a matter of law that the MSA does not limit XTO's Additional Insured status to claims in which Missouri Basin assumed responsibility under the MSA.

---

[8] The Berkley Umbrella Policy incorporates the contractual exclusion, and the exception thereto, of the Berkley Primary Policy. Ex. 1-G (App. 208).

## 2. The Liability in the Underlying Lawsuits "Arose Out of Missouri Basin's Operations," Triggering XTO's Additional Insured Status.

Berkley also seeks to avoid its obligations by noting that the Berkley Policies afford additional insured status "only with respect to liability arising out of Missouri Basin's operations." Doc. No. 54 at 12. And, because Missouri Basin is itself a defendant in (at least some of the Lawsuits), Berkley contends that neither XTO's nor its subcontractors' liability can "arise out of" Missouri Basin's operations because Missouri Basin's liability for its operations will already be assessed in the Lawsuits. Berkley is wrong.

The language in the Berkley Policies' additional insured endorsement (the "AI endorsement") and the allegations/facts in the Lawsuits plainly establish that XTO is an insured under the Berkley Policies. The relevant portion of the additional insured provision provides:

> **Additional Insured:**
>
> Any person or organization with whom **YOU** agree in a written contract or written agreement to add as an Additional Insured on your policy or to provide liability insurance for, but only with respect to liability arising out of **YOUR** operations or liability arising out of premises owned by or rented to **YOU**.

Ex. 1-F (App. 150-51).[9]

The AI endorsement requires two conditions be met: (1) a written contract or agreement must be entered in which Missouri Basin agrees to provide liability coverage for XTO; and (2) the loss must respect liability arising out of Missouri Basin's operations or premises owned by or rented to Missouri Basin.

---

[9] The Berkley Umbrella Policy includes a provision that includes as insured "other persons or organizations qualifying as an Insured in [the Berkley Primary Policy]…." Ex. 1-G (App. 209). Therefore, to the extent XTO is an insured under the Berkley Primary Policy, it is also an insured under the Berkley Umbrella Policy.

First, it is undisputed that the first condition is met: the MSA (written contract/agreement) required Missouri Basin to name XTO as an additional insured under its policies. Ex. 1-E (App. 125-26) (MSA). Under the MSA, Missouri Basin contracted and otherwise agreed to provide liability insurance to XTO as an additional insured. *Id.*

Second, the additional insured endorsement provides that XTO is an insured "with respect to liability arising out of [Missouri Basin's] operations." The underlying allegations and the facts established through discovery in the Lawsuits make clear that XTO's liability in the Lawsuits "arose out of" Missouri Basin's operations, *inter alia*:

- "On or before June 18, 2016, Defendant XTO was the lease operator of a well near Watford City, North Dakota, known as Ryan 14X-09E (Well Site). On June 18, 2016, an explosion and fire occurred at the XTO Well Site causing serious injuries to Mr. Stassinos. Mr. Stassinos received medical treatment for his injuries and suffered conscious pain and suffering, but subsequently died from those subsequent injuries." Ex. 1-A (App. 014, ¶ 12) (Stassinos Lawsuit); *see also* Ex. 1-B (App. 040, ¶ 32) (Maheu Lawsuit); Ex. 2-E (App. 349-56) (TH Hill Report); Ex. 2-F (App. 614) (Fire Report).

- "Although the Well Site had become dangerous and hazardous, XTO chose not to "kill" it with appropriate and available fluids and also chose not to isolate the hazardous portion of the tubing with appropriate plugs. Instead of "killing" the Well, XTO chose to remove the tubing from the hole by pulling it out in a process known as "snubbing" in which a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the hole." Ex. 1-A (App. 014-15, ¶ 14); *see also* Doc. No. 85, at 6 (CIIC Motion) ("Multiple contractors of XTO were involved in the Accident. MBI employed foreman, Carson Dokken…").

- "During this dangerous aspect of the snubbing process on June 18, 2016, the final joint of tubing reached the surface and rocketed out of the Well and into the air resulting in an explosion and fire and serious injuries to Mr. Stassinos which, subsequently, resulted in his death." Ex. 1-A (App. 014, ¶ 12) (Stassinos Lawsuit); *see also* Ex. 1-B (App. 040, ¶ 32) (Maheu Lawsuit); Ex. 2-E (App. 349-56) (TH Hill Report); Ex. 2-F (App. 614) (Fire Report).

**DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF**
**XTO ENERGY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST**
**BERKLEY NATIONAL INSURANCE COMPANY**

**Page 21**

- "In its discretion, Defendant XTO contracted with Defendant MBI to provide a senior consultant, Defendant Dokken, to supervise operations on XTO's behalf, including supervision of Defendants Kolden and Jones." Ex. 1-B (App. 039, ¶ 27 (Maheu Lawsuit); *see also* Ex. 2-G (App. 623) (Dokken Depo. 10:16 – 11:12) (testimony from Mr. Dokken confirming that he was hired by Missouri Basin to provide services for XTO); Doc. No. 78, at 8 (Berkley Motion) ("Multiple contractors of XTO were at the Well site on the day of the explosion: MBI employed a foreman, Carson Dokken").

- "Through the XTO company men they assigned to the Ryan Well, Defendants MBI, Badlands, and Petroleum Experience regularly reported to, communicated with, provided recommendations to, and followed the orders and directions of Defendant XTO regarding operations and conditions at the Ryan Well." Ex. 1-B (App. 039, ¶ 27; *see also* Ex. 2-G (App. 623) (Dokken Depo. 10:16 – 11:12) (testimony from Mr. Dokken confirming that he was hired by Missouri Basin to provide services for XTO); Doc. No. 78, at 8 (Berkley Motion) ("Multiple contractors of XTO were at the Well site on the day of the explosion: MBI employed a foreman, Carson Dokken").

- "Instead of acting reasonably and prudently by killing the Ryan Well, Defendants XTO, MBI [Missouri Basin], Dokken, Badlands, Jones, Petroleum Experience, and Kolden instead negligently and recklessly ordered the Most Wanted and SEI crews to conduct snubbing operations in an attempt to pull out of the hole the remaining joints of tubing from the Ryan Well while the Ryan Well was still under dangerously high pressure." Exhibit 1-B (App. 041, ¶ 35).

- "After receiving the order from Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden to pull the remaining joints of tubing from the Ryan Well, Most Wanted and SEI foremen asked these Defendants to bleed the Ryan Well down so that their crews would be dealing with lower pressures while pulling the tubing out of the hole. In response to this request, these Defendants bled the Ryan Well down and lowered the pressure. Then, inexplicably, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden ordered the Most Wanted and SEI crews to undergo a time-consuming random urinalysis test. While the crews were undergoing the urinalysis test, Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden shut the Ryan Well in and negligently and recklessly allowed uncontrolled well bore pressures to build up to a dangerously high level." Exhibit 1-B (App. 041-42, ¶ 37); *see also* Ex. 2-G (App. 647) (Dokken Depo. 106:10–107:116) (testimony from Mr. Dokken regarding shutting in the Ryan Well during drug test).

- "As a proximate result of the blow-out, explosion, and fire, and as a proximate result of the acts and omissions of Defendants, one man was killed and others suffered serious, life-threatening burns and injuries." Exhibit 1-B (App. 042, ¶ 39); Ex. 2-F (App. 614) (Fire Report).

- "The blow-out, explosion, fire, and subsequent injuries and damages sustained by Plaintiffs were proximately caused by the negligent and reckless acts and omissions of Defendants who were acting through their agents, representatives, servants, and employees, all of whom were acting within the scope of their employment or agency duties." Exhibit 1-B (App. 045, ¶ 49).

Here, the two conditions required by the AI endorsement have been met: (1) XTO and Missouri Basin entered into a written agreement in which Missouri Basin agreed to name XTO as an additional insured on its liability policies; and (2) XTO's liability in the Lawsuits arose out of Missouri Basin's operations.

While Berkley suggests that XTO is only an insured to the extent it is sued for vicarious liability, this position is meritless. Such a requirement is not a condition in the AI endorsement and courts construing identical additional insured endorsements have rejected the very same argument. For instance, the additional insured provision in *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex. 2008) provided a "person or organization is an insured only with respect to operations performed by you or on your behalf, or facilities owned or used by you." The insurer argued that the loss resulted from the additional insured's own negligence, and thus, under the AI language, no coverage was afforded under the policy. *Id.* at 663.

In analyzing this argument, the Texas Supreme Court relied on two other appellate court decisions[10]—construing Additional Insured language identical to that in the Berkley Policy—that found in favor of additional insured coverage. Like the AI endorsement in the Berkley Policy,

---

[10] *Admiral Ins. Co. v. Trident NGL, Inc.*, 988 S.W.2d 451, 453-54 (Tex. App.—Houston [1st Dist.] 1999, pet. denied); *McCarthy Brothers Co. v. Continental Lloyds Ins. Co.*, 7 SW.3d 725, 730 (Tex. App.—Austin 1999, no pet.).

those provisions created coverage only "with respect to liability arising out of" the named insured's operations, and in both cases the claimants had alleged the additional insured companies were themselves negligent.  The appellate courts used a liberal causation theory and held that because the accident occurred while the insured's employee was present and performing maintenance when the accident occurred, the liability "arose out of" the insured's operations, even though the named insured was not even a named defendant. Noting that its holding was consistent with the majority rule, the Texas Supreme Court concluded that for an event to "respect" operations there need only exist "a causal connection or relation" between the event and the operations, and no proximate cause or legal cause is required. *Id.* at 666.[11]   The court further noted that if the insurer meant to only insure the contractor for vicarious liability only, "language clearly embodying that intention was available." *Id.*

Indeed, courts around the country have held that absent clear policy language limiting coverage only to vicarious liability, an additional insured is entitled to coverage for its own negligence.  *See, e.g., Evanston*, 256 S.W.3d at 666 ("The insurer easily could have limited coverage by including in its endorsement terms such as 'vicarious liability' or 'negligence of the named insured.'"); *see also Pasadena Refining System*, *Inc. v. McCraven*, 2012 WL 1693697 (Tex. App.—Houston [14th Dist.] May 15, 2012); *Zurich Am. Ins. Co. v. Southern-Owners Ins. Co.*, 314 F. Supp. 3d 1284, 1304 (Fla. Dist. Ct. 2018) ("Courts have determined that in the absence of clear policy language limiting coverage to vicarious liability, the additional insured was entitled to coverage for its own negligence."); *American Casualty Co. v. General Star Indemnity Co.*, 125

---

[11] Like a majority of states across the county, North Dakota has also adopted the causal connection test.  *Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co.*, 658 N.W.2d 363 (N.D. 2003).  As the North Dakota Supreme Court has noted, the causal connection test "is broad and comprehensive in scope."  *Id.* at 371.

Cal. App. 4th 1510, 1511 (Cal. Ct. App. 2005) ("Insurance companies are free to, and commonly have, issued additional insured endorsements that specifically limit coverage to situations in which the additional insured is faced with vicarious liability for negligent conduct by the named insured. When an insurer chooses not to use such clearly limited language in an additional insured clause, but instead grants coverage for liability arising out of the named insured's work, the additional insured is covered without regard to whether injury was caused by the named insured or the additional insured.").

Here, the two conditions required by the AI endorsement have been met: (1) XTO and Missouri Basin entered into a written agreement in which Missouri Basin agreed to name XTO as an additional insured on its liability policies; and (2) XTO's liability in the Lawsuits "arose out of" Missouri Basin's operations.  Further, the AI endorsement in the Berkley Policy does not limit additional insured coverage for XTO's vicarious liability.  Accordingly, XTO asks this court to hold as a matter of law that XTO is entitled to additional insured coverage under the Berkley Policies.

### 3.   Alternatively, The Additional Insured Provision Is Ambiguous and Must be Construed in Favor of Coverage.

Under North Dakota law, when interpreting an insurance policy, a court is required to construe any coverage limitation narrowly in favor of the insured.  *See Fisher v. Am. Family Mut. Ins. Co.*, 579 N.W.2d 599, 602 (N.D. 1998).  Furthermore, where the language of an insurance policy is ambiguous—i.e. it is capable of at least two reasonable interpretations, one favorable to the insured and one favorable to the insurer—the court should resolve all ambiguities in favor of the insured. *Id.*

To the extent the Court finds the additional insured provision ambiguous, the Court should construe the Berkley Policies against Berkley and in favor of coverage to XTO. *Scottsdale Ins. Co. v. Tri-State Ins. Co.*, 302 F. Supp. 2d 1100 (D.N.D. 2004) ("Any ambiguity or reasonable doubt as to the meaning of an insurance policy is strictly construed against the insurer and in favor of the insured.).

### C.   The Pollution Exclusion in the Berkley Policies Does Not Bar Coverage for the Lawsuits.

Berkley next asserts that the Policies' pollution exclusions bar coverage because the Lawsuit arose from an explosion and fire caused by escaping pressured gas. Doc. No. 54, ¶ 32; Ex. 1-I (App. 254) (Berkley Denial Letter). Berkley relies on a single case for its assertion that the pollution exclusion applies: *Hiland Partners GP Holdings, LLC, et al. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 847 F.3d 594 (8th Cir. 2017).

The *Hiland* holding concerns one issue only: Whether "condensate" was a pollutant that triggered the CGL policy's pollution exclusion. That issue has no bearing to the case at bar. Here, XTO does not dispute whether the gases released from the Ryan Well are pollutants. Instead, XTO argues that: (1) the pollution exclusion in the Berkley Policies applies only to environmental-type harms, not bodily injury from an explosion; (2) even if the pollution exclusion were initially triggered (which it is not), the hostile fire exception and the additional insured exception each independently apply to restore coverage; and alternatively, (3) the Berkley pollution exclusion, including the exceptions thereto, are ambiguous and the court must construe coverage in favor of XTO. *Hiland* did not discuss these issues and therefore lacks any application.

**1. The Pollution Exclusion in the Berkley Policies Only Applies to Environmental-Type Harms, Not to Bodily Injury or Explosions.**

It is undisputed that the injuries giving rise to the Lawsuits were caused by explosion, fire and blunt force, not "exposure to hydrocarbons vapors" or some other pollution exposure type of injury. Ex. 1-A (App. 016-17, ¶ 24) ("[T]he final joint tubing reached the surface and rocketed out of the Well and into the air resulting in an explosion and fire and serious injuries to Mr. Stassinos which, subsequently, resulted in his death."); Exhibit 1-B (App. 042, ¶¶ 40-41) (Maheu Lawsuit) ("Plaintiff Maheu was hit by the explosion and flames of the flash fire, and was thrown down a flight of stairs, his body engulfed in flames. Plaintiff sustained severe full-thickness burns on sixty to seventy (60-70%) of his body…"); Doc. No. 54, ¶¶ 9-10 ("This lawsuit concerns contract and insurance claims stemming from an explosion and fire at the [Ryan Well]….Several people were injured in the explosion…").

These bodily injuries are simply not the type of environmental harm the pollution exclusion was meant to address and courts around the country have refused to apply the pollution exclusion in circumstances similar to the facts at hand. For example, in a strikingly similar case, the Ninth Circuit found that a similar pollution exclusion was ambiguous and therefore construed the policy in favor of coverage. *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526, 528 (9th Cir. 1997). In *Enron*, a pipeline exploded as a result of an injection of foreign substances into the crude oil carried by the pipeline. In finding that the "pollution exclusion" did not bar coverage, the Ninth Circuit held that the terms of the policy send an "unmistakable message to the reasonable reader that the exclusion deals with environmental-type harms." *Id.* at 530-31. Accordingly, the Ninth Circuit held that the pollution exclusion did not apply to the explosion or the resulting loss.

Many other courts have reached similar conclusions, refusing to apply pollution exclusions in circumstances similar to the case at hand.  *See, e.g., Belt Painting Corp. v. TIG Ins. Co.,* 795 N.E.2d 15 (N.Y. 2003); *Gaylord Container Corp. v. CNA Ins. Cos.*, 807 So. 2d 864, 872 (La. App. 2001) ("We hold that when a fortuitous event such as an explosion occurs, and that event incidentally involves a chemical agent, the absolute pollution exclusion operates to exclude coverage for environmental damage only."); *Jones v. Francis Drilling Fluids, Ltd.*, 642 F. Supp. 2d 643, 667 (S.D. Tex. 2009) (holding that, because an underlying lawsuit sought damages for a worker's injuries sustained by an explosion, and not environmental cleanup costs, the pollution exclusion did not apply); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 31 (1st Cir.1999) (reasonable interpretation of exclusion is that it applies only to environmental pollution); *Pipefitters Welfare Educational Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) (literal interpretation of pollution exclusion's terms would be overbroad and would render judicial limitations on insurance policies meaningless); *Keggi v. Northbrook Property and Cas. Ins. Co.*, 13 P.3d 785, 791 (Ariz. 2000) (exclusion intended only to exclude coverage for traditional environmental pollution); *Am. States Ins. Co. v. Koloms*, 687 N.E.2d 72, 81 (Ill. 1997) (pollution exclusion does not apply to "toxic torts" but is restricted to instances of classic pollution such as groundwater or soil contamination from industrial operations); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 680–82 (Ky. App.1996) (total pollution exclusion uses terminology from environmental law and the historical objective of the exclusion was to avoid coverage for environmental catastrophes); *Doerr v. Mobil Oil Corp.*, 774 So.2d 119, 135 (La. 2000), corrected, 782 So.2d 573 (La.2001) (absolute pollution exclusion not intended to exclude coverage for all interactions with irritants or contaminants and should be construed to exclude coverage only for

environmental pollution); *Atlantic Mut. Ins. Co. v. McFadden*, 595 N.E.2d 762, 764 (Mass. 1992) (pollution exclusion's terms are terms of art in environmental law); *Weaver v. Royal Ins. Co. of America*, 674 A.2d 975, 977 (N.H. 1996) (where phrase "discharge, dispersal, release or escape" was not defined, it should be construed against the insurer); *Karroll v. Atomergic Chemetals Corp.*, 194 A.D.2d 715 (N.Y. 1993) (exclusion reasonably interpreted to apply only to environmental pollution); *West American Ins. Co. v. Tufco Flooring East, Inc.*, 409 S.E.2d 692, 699 (N.C. 1991), overruled on other grounds by *Gaston County Dyeing Mach. Co. v. Northfield Ins. Co.*, 524 S.E.2d 558 (N.C. 2000) (terms such as "discharge, dispersal, release, or escape" are environmental terms of art meant to apply to environmental pollution); *Kent Farms, Inc. v. Zurich Ins. Co.*, 969 P.2d 109, 111–12 (Wash. App. 1998), aff'd, 998 P.2d 292 (Wash. App. 2000) (reasonable reading of the exclusion limits it to traditional environmental damages); *MacKinnon v. Truck Insurance Exchange,* 73 P.3d 1205, 1209 (Cal. 2003) (recognizing split of authority but observing that "considering those jurisdictions that have taken a definitive position, as represented by a published opinion of the state supreme court, the narrower interpretation of the pollution exclusion appears to be in the majority."); *Regional Bank of Colorado v. St. Paul Fire & Marine Ins. Co.* 35 F.3d 494 (10th Cir. 1994) (holding carbon monoxide from residential heater not excluded, applying Colorado law).

These courts all acknowledge that if the total pollution exclusion is construed broadly to exclude the bodily injuries at issue here, such an interpretation would contravene the very purpose of a CGL policy.  The liability imposed on XTO (and Missouri Basin) due to these bodily injuries was precisely the type of risks it expected its liability policy to cover.  Instead, Berkley urges this

DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF
XTO ENERGY, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST
BERKLEY NATIONAL INSURANCE COMPANY

Page 29

Court to construe the pollution exclusion in a manner that would defeat the very purpose of the Berkley Policies.  This Court should refuse to do so.

In addition to the numerous courts rejecting the pollution exclusion's applicability to non-environmental injuries, courts also have repeatedly held that pollution exclusions should not be applied to exclude coverage for injuries caused by explosions specifically.  In addition to *Enron*, the court in *Gaylord* refused to apply a total pollution exclusion to exclude coverage for an explosion that occurred when a railcar filled with nitrogen tetroxide exploded on the way to a factory.  *Gaylord Container Corp.*, 807 So. 2d at 866.  The insured sought coverage under its policies for many personal injury suits stemming from the explosion.  The *Gaylord* court concluded that the total pollution exclusion did not bar coverage because the insured was not seeking a defense or indemnity "for suits that relate to environmental cleanup claims arising out of the" explosion, but instead for personal injury claims arising out of an accident.  *Id.* at 872.

The court in *Jones v. Francis Drilling Fluids, Ltd.*, 642 F. Supp. 2d 643 (S.D. Tex. 2009) also agreed that a total pollution exclusion did not apply to a chemical explosion that caused a worker's injuries.  The *Jones* court reasoned that the pollution exclusion was intended only to apply to long-term, catastrophic environmental pollution, not to a one-time explosion in which the insured was not seeking damages for clean up, but rather for the injuries sustained by the worker. *Id.* at 668; *see also Greenwich Ins. Co. v. John Sexton Sand & Gravel Corp.*, No. 1-12-1263, 2013 WL 950755, at ¶ 25 (Ill. App. Ct. Mar. 11, 2013) (holding that the pollution exclusion did not apply to an explosion).[12]  Here, like the insureds in *Enron*, *Gaylord* and *Jones*, XTO is not seeking

---

[12] The *Hiland* case did involve an explosion; however, the insured failed to argue that the pollution exclusion does not apply to explosions or non-environmental bodily injury.  Instead, as noted above, the *Hiland* court was merely asked

defense or indemnity for pollution caused by the Ryan Well explosion; it is seeking coverage for personal injuries arising from an accident.  These bodily injuries caused by an explosion are not barred under Berkley's pollution exclusions.

The bodily injuries here are not the type of environmental-type harms the Berkley pollution exclusion was intended to address.  Thus, the pollution exclusion does not apply to preclude coverage.

### 2. Even if the Pollution Exclusion Applied, Exceptions to the Pollution Exclusion Restore Coverage.

#### i. The Hostile Fire Exception Applies to Provide Coverage for the Underlying Lawsuits.

The pollution exclusion includes an exception where the injury "arises out of heat, smoke or fumes from a hostile fire…[A] hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be." Ex. 1-F (App. 163).  Here, it is undisputed that an explosion caused an uncontrollable fire, resulting in the injuries alleged in the Lawsuits.  Doc. No. 54, ¶ 32 ("This lawsuit concerns contract and insurance claims stemming from an ***explosion and fire*** at the Ryan 14X-09E well on June 18, 2016….***Several people were injured in the explosion***….") (emphasis added); *see also* Ex. 2 (App. 261, ¶ 14) (Arnold Aff.).  The contractors who witnessed the incident testified regarding the explosion and uncontrollable fire that caused the injuries:

Tom Jones, a contractor for Badlands Consulting, LLC, gave the following statement to the North Dakota Fire Marshall:

> To his knowledge, Jones stated, nobody touched any controls or moved anything, when he heard a very loud 'clank' noise this was followed by a loud hissing and **an explosion that all occurred in a couple of seconds or less.  Jones stated, he was**

---

to determine whether "condensate" was a pollutant that triggered the CGL's policy's pollution exclusion. *Hiland*, 847 F.3d at 599.

**blown back by the flash explosion.  When he looked up, Jones stated, all he could see were guys on the rig that were on fire.**  Ex. 2-F (App. 614) (emphasis added).  Ex. 2-F (App. 614) (Fire Report).

Lyman Yazzie, a contractor for Colter Energy, gave the following account in a witness statement:

Then a minute or two after another loud bang occurred and **a second later the whole floor ignited and created a huge fire** from the blowing gas.  Ex. 2-B (App. 266) (emphasis added).

Ociel Rodriguez, a contractor for Weatherford International, LLC, testified regarding the explosion and injuries as follows:

[I]t was like a big (noise) and then all of a sudden at that second you hear a bang, boom and then like **everything there just you could see the flames** and then after that like **the fire expands wide in the air**…. He was burned from head to toes wide open. Ex. 2-D (App. 316, 35:11-22) (emphasis added).

These circumstances clearly bring the claims within the hostile fire exception even if the pollution exclusion would otherwise apply.  The *Hiland* court *did not* address whether the hostile fire exception applied, nor has any North Dakota court.  However, other courts interpreting identical hostile fire exceptions and similar facts have held that the hostile fire exception applied.  For instance, in *Hallandale*, employees of the insured-gas station were injured while working on underground gasoline storage tanks. *Century Sur. Co. v. Hallandale Beach Serv. Station, LLC*, No. 10-21430—CIV, 2011 WL 13174906, * 2 (S.D. Fla. Mar. 21, 2011).  As they worked, a container storing four gallons of acetone spilled, and the fumes migrated to the employee's customized lights. *Id.* When the acetone reacted with the customized lights, a violent oxidation reaction occurred – the gas exploded, creating a fireball that injured several of the employees. *Id.*

The policy in *Hallandale* included an identical pollution exclusion which barred coverage for "bodily injury or property damage arising out of the actual, alleged or threatened discharge,

dispersal, seepage, migration, release or escape of pollutants…" *Id.* at 3. The policy also contained the hostile fire exception which provided the exclusion did not apply to "bodily injury…arising out of heat, smoke or fumes from a 'hostile fire.'" *Id.* Hostile fire was likewise defined as a fire "which becomes uncontrollable or breaks out from where it was intended to be." *Id.*

The court held that the pollution exclusion was unambiguous, and, under its language, barred coverage for the bodily injury of the employees. *Id.* However, the court further held that the "hostile fire" exception to the exclusion also applied, and as a result, the total pollution exclusion did not preclude coverage. *Id.* 4. The court found that the definition of "hostile fire" was ambiguous. *Id.* The insurer focused on the word "becomes" and asserted that because a fire must "become uncontrollable" for it to be considered a hostile fire, the insurer argued there must first be a pre-existing, controlled fire before it can become uncontrollable. The insured, on the other hand, focused on the word "uncontrollable," and noted that the fire became uncontrollable immediately after breaking out. The court held both interpretations were reasonable; however, it agreed that nothing in the exception's language indicated that there must have been a pre-existing, controlled fire. *Id.* The court therefore construed the exception in favor of the insured and held the hostile fire exception applied. *Id.*

In reaching this conclusion, the court rejected the insurer's citation to *Noble Energy, Inc. v. Bituminous Casualty Co.*, 529 F.3d 642 (5th Cir. 2008) in which the Fifth Circuit held that a "hostile fire" exception "applies only if a pre-existing fire causes the pollution," noting that nothing in the plain language of the hostile fire exception mentions a pre-existing fire or demands that the fire "cause" the pollution. *Id.* The court further noted that the court in *Noble* did not explain how it reached its conclusion, and thus, found the court's holding unavailing. *Id.*

One key reason the *Hallandale* court rejected the *Noble* holding was the *Noble* court's decision to completely ignore an earlier Texas case which, contrary to *Noble*, held that the hostile fire exception was ambiguous. *Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*, 16 S.W.3d 418 (Tex. App.—Waco 2000). In *Safe Tire*, a Texas appellate court ruled that the hostile fire exception applied in a case involving damage to neighboring people and property caused by smoke after an uncontrolled, accidental and unintended fire broke out in a pile of rubber chips and wire at a scrap rubber recycling facility. *Id.* at 420. There, the insurer had argued that the hostile fire exception only applied "if Safe Tire intentionally set a controlled fire in an appropriate location on its premises which becomes uncontrollable or breaks out from its place of origin." *Id.* at 422. The court disagreed and found a "friendly fire" was not required under the language of the exception, but rather, it was more reasonable to include "any 'accidental' or 'unintended' fire," as these are "not restrained, directed or regulated by someone." *Id.* The court held the definition of "hostile fire" was ambiguous and adopted the interpretation put forth by the insured. *Id.*

The *Safe Tire* and *Hallandale* courts are not alone. The Western District of Pennsylvania held that an identical hostile fire exception applied to an oil and gas well explosion. *Great Northern Insurance Co. v. Greenwich Insurance Co.*, No. CV-05-635, 2007 WL 2458477, at * 11 (W.D. Penn. Aug. 24, 2007), *vacated on other grounds*, *Great Northern Insurance Co. v. Greenwich Insurance Co.*, 2008 WL 2048354, at *2 (W.D. Penn. May 12, 2008). In *Greenwich*, there was a natural gas well blowout. After the blowout, a fire ignited. *Id.* at *2. During the course of the blowout, a large amount of crude oil, gas and combustible material was spread via smoke over the surrounding area of the well, causing damage to automobiles, homes and property owned by third parties. *Id.* The insurer argued that the exception did not apply because the fire

did not "become" uncontrollable, but instead was "uncontrollable from its inception." *Id.* at 11. Also relying on *Safe Fire*, the court concluded the term "becomes uncontrollable" can be interpreted to include both "controllable fires that subsequently become uncontrollable and fires that are uncontrollable from their inception," as such, the exception was ambiguous, and the policy had to be construed in favor of coverage. *Id.* at 12

Several other courts have also construed the hostile fire exception in favor of the insured. *See, e.g., Schmid v. Fireman's Fund Ins. Co.*, 97 F. Supp. 2d 967 (D. Minn. 2000) (holding the hostile fire exception applied when an unaligned flame in a natural gas heater emitted carbon monoxide into the air causing bodily injury because, even though the fire could be "controlled," *i.e.* turned off, the fire was still in a location not intended.); *Am. Star Ins. Co. v. Grice*, 854 P.2d 622 (Wash. 1993) (holding a hostile fire exception was ambiguous and that "the ability of the pollution exclusion to limit coverage is itself limited by the hostile fire clause which provides an exception to that exclusion."); *Hawkins Chemical, Inc. v. Westchester Fire Ins. Co.*, 159 F.3d 348 (8th Cir. 1998) (applying Minnesota law) (holding hostile fire exception to pollution exclusion applied and insurer was required to defend and indemnify insured for fire which destroyed a warehouse sending toxic fumes into the air).

Here, the injuries the subject of the Lawsuits clearly fall within the hostile fire exception. Indeed, while Berkley fails to acknowledge the hostile fire exception, Berkley does not dispute that an explosion and fire caused the injuries. Doc. No. 54, ¶ 32 ("This lawsuit concerns contract and insurance claims stemming from an ***explosion and fire*** at the Ryan 14X-09E well on June 18, 2016….***Several people were injured in the explosion***….").  Like the hostile fire exception found in *Safe Tire*, *Hallandale* and *Greenwich*, nothing in the Berkley Policies' hostile fire exception's

language indicates that there must have been a pre-existing, controlled fire.  Because the hostile fire exception in the Berkley Policies applies to restore any coverage lost through the pollution exclusion, Berkley's Motion must be denied.

        ii.   <u>The Additional Insured Exception Independently Applies.</u>

The pollution exclusion in the Berkley Policies also contains an additional insured exception which provides in pertinent part:

> However, this Subparagraph (1) [to the pollution exclusion] does not apply to:
>
> \*\*\*
>
>     (b) Bodily Injury or Property for which You may be held liable, if you are a contractor and the owner or lessee of such premises, site, or location has been added to Your policy as an Additional Insured with respect to Your ongoing operations performed for that Additional Insured at that premises, site, or location; and such premises, site, or location is not and never was owned or occupied by, or rented or loaned to, any Insured, other than that Additional Insured
>
> Ex. 1-F (App. 163).

Because "You" refers to Missouri Basin, the Policy's named insured, the exception applies if (1) Missouri Basin is a contractor; (2) XTO is the owner or lessee of the Ryan Well; (3) Missouri Basin, Berkley's insured, may be held liable for the bodily injuries; (4) Missouri Basin added XTO as an additional insured to the Berkley Policy; and (5) the Ryan Well was not owned, occupied, rented or loaned to Missouri Basin.  It is undisputed the first two requirements are met:  Berkley itself admits that MBI is a contractor (*see* Doc. No. 1 at 2, "XTO contracted with Missouri Basin Well Services, Inc…."); Ex. 1-E (App. 117-39) (MSA)) and XTO was the owner and lease operator of the Ryan Well (*see* Doc. No. 73 "XTO Energy, Inc. was the owner and lease operator of [the

Ryan Well].”); Ex. 2 (App. 259, ¶ 3) (Arnold Aff.); Doc. No. 23, ¶ 47 (Answer) (admitting allegation that XTO was owner and lease operator of the Ryan Well).

The last three conditions are likewise met. Because Missouri Basin has been named a defendant in the *Maheu* Lawsuits,[13] there is no doubt that Missouri Basin may be held liable for the bodily injuries asserted. Ex. 1-B (App. 033-64) (Maheu Lawsuit). Further, XTO was added to the Berkley Policies as an additional insured with respect to Missouri Basin’s ongoing operations [as provided by the MSA and AI endorsement]. Ex. 1-E (App. 125-26) (MSA.); Ex. 1-F (App. 150-51) (Berkley Primary Policy); Ex. 1-G (App. 209) (Berkley Umbrella Policy). Lastly, the Ryan Well was not owned, occupied, rented or borrowed by Missouri Basin (and Berkley does not appear to contend otherwise). XTO owned and controlled the Ryan Well – Missouri Basin was contracted by XTO only to perform limited work at the Ryan Well. Ex. 2 (App. 259, ¶ 3) (Arnold Aff.) (“As owner and lease operator of the Ryan Well, XTO did not rent or loan the Ryan Well to any third-party.”); Doc. No. 23, ¶ 47 (Answer) (admitting allegation that XTO was owner and lease operator of the Ryan Well); Doc. No. 78, at 8 (Berkley Motion) (“Multiple contractors of XTO were at the Well site on the day of the explosion: MBI employed a foreman, Carson Dokken”); *see also U.S. Fid. & Guar. Co. v. B&B Oil Well Service, Inc.*, 910 F.Supp. 1172, 1178 (S.D. Miss. 1995) (holding occasional and limited work performed by a subcontractor at well sites operated and controlled by others does not amount to occupancy); *Kelley-Coppedge, Inc. v. Highlands Ins. Co.*, 980 S.W.2d 462, 463–64 (Tex. 1998) (finding a the term “occupied” in a

---

[13] Missouri Basin was only named a defendant in the *Maheu* Lawsuit; however, XTO paid substantially more than the limits of the Berkley Policies towards the settlement of the *Maheu* Lawsuit. Ex. 1 (App. 005, ¶ 14).

**DEFENDANT, COUNTER-PLAINTIFF AND THIRD-PARTY PLAINTIFF**                                         **Page 37**
**XTO ENERGY, INC.’S MEMORANDUM OF LAW IN SUPPORT OF ITS**
**MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST**
**BERKLEY NATIONAL INSURANCE COMPANY**

pollution exclusion did not encompass the insured's operations on another's premises).  Therefore, the additional insured exception to the pollution exclusion clearly applies.

While case law is sparse regarding this exception, at least one court has analyzed this additional insured exception and held under similar circumstances that the exception applied to provide coverage.  The policy in *Tow v. Gemini Ins. Corp. (In re ATP oil & Gas Corp.)*, No. 12-36187, 2015 WL 5965600, at * 8 (Bankr. S.D. Tex. Oct. 9, 2015) included an identical additional insured exception as that found in the Berkley Policies, providing the pollution exclusion did not apply to "Bodily Injury or Property Damage for which You may be held liable, if You are a contractor and the owner, or location is not and never was owned or occupied by, or rented or loaned to, any Insured, other than that Additional Insured."  The developer – ATP – sought additional insured coverage under its subcontractor Greystar's policy.  The MSA between Greystar and ATP required Greystar to name ATP as an additional insured under Greystar's liability policies.[14]  Greystar's employee was injured on ATP's platform and filed suit against ATP.  Greystar's insurer argued, among other things, that the pollution exclusion barred coverage for the suit.  The insurer also argued that the additional insured exception did not apply because Greystar was not a named defendant in the underlying Lawsuit.  The court disagreed and held the language "may be held liable" in the additional insured exception was broad and applied if Greystar could be in any way held liable, either as a named defendant in the underlying lawsuit or through the indemnification provision of the MSA.  Here, Missouri Basin is a named defendant in the Lawsuits – therefore, there is no question that Missouri Basin "may be held liable" for the Lawsuits.

---

[14] The MSA was analyzed under Louisiana law and the policy was analyzed under Texas law.

Here, Missouri Basin is a named defendant in the *Maheu* Lawsuit – therefore, there is no question that Missouri Basin "may be held liable" for the *Maheu* Lawsuit.   Because all conditions under the exception are met, it therefore applies to restore coverage for XTO.   Berkley's motion for summary judgment on its declaratory claim must be denied.

   **3.  Alternatively, The Pollution Exclusion, including the Hostile Fire Exception and Additional Insured Exception, Is Ambiguous and Must be Construed in Favor of Coverage.**

Under North Dakota law, when interpreting an insurance policy, a court is required to construe any exclusion from coverage narrowly in favor of the insured.   *See Fisher v. Am. Family Mut. Ins. Co.*, 579 N.W.2d 599, 602 (N.D. 1998).  Furthermore, where the language of an insurance policy is ambiguous—i.e. it is capable of at least two reasonable interpretations, one favorable to the insured and one favorable to the insurer—the court should resolve all ambiguities in favor of the insured. *Id.*

To the extent the Court finds the Pollution Exclusion, the Hostile Fire Exception and/or the Additional Insured Exception ambiguous, the Court should construe the Berkley Policies against Berkley and in favor of coverage to XTO.   *Scottsdale Ins. Co. v. Tri-State Ins. Co.*, 302 F. Supp. 2d 1100 (D.N.D. 2004) ("Any ambiguity or reasonable doubt as to the meaning of an insurance policy is strictly construed against the insurer and in favor of the insured.).

## CONCLUSION

For the reasons set forth above, XTO respectfully requests the Court grant XTO's Motion and dismiss Berkley's declaratory claims that: (1) the "release" language in the indemnification provision of the MSA (between XTO and Missouri Basin) acted to "release" Missouri Basin from naming XTO as an additional insured under its policies (*see* Doc. No. 23, ¶ 100; Doc. No. 54, ¶

23); (2) the MSA did not require Missouri Basin to provide additional insured coverage (*id.*, ¶ 101, 104; ¶¶ 24, 27); (3) XTO is not an additional insured because XTO's liability did not arise out of Missouri Basin's operations, *i.e.*, vicarious liability (*id.*, ¶¶ 103, 104; ¶¶ 26, 27); (4) the Berkley policies do not cover the claims made by XTO in the Lawsuits due to the application of pollution exclusion of the Berkley primary policy's "Pollution" exclusion and the umbrella policy's incorporation of that exclusion (*id.*, ¶ 113; ¶ 32).

Dated:  April 24, 2020

Respectfully submitted,

*/s/ Leslie C. Thorne*
Leslie C. Thorne
Texas State Bar No. 24046974
leslie.thorne@haynesboone.com
HAYNES AND BOONE, LLP
600 Congress Avenue, Suite 1300
Austin, Texas 78701
Telephone:    (512) 867-8400
Telecopier:    (512)  867-8470

Ernest Martin, Jr.
Texas State Bar No. 13063300
ernest.martin@haynesboone.com
Carla Green
Texas State Bar No. 24097762
carla.green@haynesboone.com
HAYNES AND BOONE, L.L.P.
2323 Victory Ave., Suite 700
Dallas, Texas 75219
Telephone: (214) 651-5000
Telecopier: (214) 651-5940

**ATTORNEYS FOR DEFENDANT**
**XTO ENERGY, INC.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was sent to all parties of record pursuant to the ECF guidelines and the Federal Rules of Civil Procedure on this 24th day of April, 2020.

/s/ *Leslie C. Thorne*
Leslie C. Thorne