# EXHIBIT 1-E

THIS MASTER SERVICE AGREEMENT CONTAINS INDEMNIFICATION PROVISIONS, RELEASE OF LIABILITY AND ALLOCATION OF RISK.  BY EXECUTING THIS MASTER SERVICE AGREEMENT AND/OR COMMENCING THE WORK, XTO ENERGY INC. AND ITS LISTED AFFILIATES AND CONTRACTOR AGREE TO BE BOUND BY ALL OF THESE PROVISIONS.

## MASTER SERVICE AGREEMENT

THIS MASTER SERVICE AGREEMENT is made and entered into this 19th day of November, 2015, between XTO ENERGY INC. and its affiliates, BARNETT GATHERING, LLC; ENGLISH BAY PIPELINE, LLC; FAYETTEVILLE GATHERING COMPANY; MOUNTAIN GATHERING, LLC; NESSON GATHERING SYSTEM, LLC; RINGWOOD GATHERING COMPANY; TREND GATHERING, & TREATING, LLC; and TIMBERLAND GATHERING, & PROCESSING COMPANY, LLC (individually and collectively "XTO"), legal entities having their principal places of business at 810 Houston St., Fort Worth, TX 76102, and Missouri Basin Well Services, Inc. dba MBI Energy Services, Inc. & Affiliates, a North Dakota Corporation having its principal place of business at 12980 35th Street S.W. Belfield, ND 58622 ("Contractor").  XTO and Contractor are referred to herein individually as a "Party" and collectively as the "Parties."

I.    **Preamble**.  This Master Service Agreement controls and governs the Work (as defined below) performed by Contractor for XTO.  It may be used in conjunction with oral or written Work Orders between the parties.  Only the particular terms included in this Master Service Agreement that have application to the type of Work that is covered by a particular Work Order will apply.  This Master Service Agreement does not obligate XTO to order Work from Contractor and does not obligate Contractor to accept orders for Work from XTO.

II.   Definitions.

2.1   "Affiliate" means, with respect to either Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlling, controlled by, or under common control with, such Party.

2.2   "Agreement" means this Master Service Agreement and any oral or written Work Orders between the Parties.

2.3   "Contractor Group" shall mean individually or in any combination Contractor, its Affiliates, any Subcontractor of Contractor, and their respective directors, officers, employees, representatives, agents, licensees, invitees and assignees.

2.4   "Master Service Agreement" means this document standing alone.

2.5   "Site" means the location or locations at which Contractor is performing the Work for XTO.

2.6   "Subcontractor" means a party that Contractor engages to perform all or a part of the Work.  References to Contractor in this Agreement will include, where appropriate, Contractor's Subcontractors.

2.7   "Subsidiary" means, with respect to either Party, any individual, partnership, joint venture, firm, corporation, association, trust or other entity directly or indirectly controlled by such Party.

2.8   "XTO Group" shall mean individually or in any combination XTO, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at the Site, joint interest owners, joint venturers, partners, contractors and subcontractors other than

**App. 118**

Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.

2.9     "Work" means everything to be provided or performed by the Contractor Group from time to time under this Master Service Agreement, whether with or without a particular written or oral Work Order.

2.10    "Work Order" means the directions from XTO to Contractor, which may be oral (which may be followed by a writing within ten (10) days of the oral request) or written, to provide or furnish XTO with equipment (including, without limitation, equipment fabricated by the Contractor Group), material or services at a specific time, place and cost; such directions are incorporated in this Master Service Agreement by reference.

III     Conduct of Work.

3.1     **Commencement of Work.** When the terms of a Work Order for the materials, services and/or equipment desired by XTO are agreed upon, Contractor will commence furnishing same at the agreed time, and continue such operations safely, diligently and without delay, in strict conformity with the specifications and requirements contained herein and in such Work Order until complete.

3.2     **Work Standards.** All Work by the Contractor Group will be performed with due diligence, in a good, safe and workmanlike manner, using skilled, competent and experienced workers and supervisors and in accordance with good oilfield servicing or other applicable business or professional practices. All materials, equipment, supplies or manufactured articles furnished or fabricated by the Contractor Group (collectively for convenience called "Contractor Provided Equipment") in the performance of the Work will be selected and used with good oilfield or other applicable business or professional practices for their respective purposes and will be free from defects. The Work and all Contractor Provided Equipment will be covered by all implied warranties available at law unless expressly provided to the contrary by this Master Service Agreement or expressly disclaimed in a separate writing signed by an authorized representative of XTO. In addition to all rights and remedies available to XTO by law, all of which are reserved, any portion of the materials, equipment, services or Work found defective or unsuitable will be removed, replaced or corrected by Contractor with no additional cost or risk to XTO. Contractor agrees to inspect all materials and equipment furnished by XTO and will notify XTO of any apparent defects therein before using the materials and equipment. Should the Contractor Group use such materials and equipment without notifying XTO of any such defect, Contractor will be deemed to have assumed all risk and liability for any mishap that may occur in operations conducted hereunder by reason of failure or defects in such material and equipment. Contractor will not be liable for claims due solely to latent defects.

3.3     **Time and Quality.** Time and quality of work shall be the essence of this Agreement.

IV.     **Responsibilities of the Parties.**

4.1     **Contractor's Responsibilities.** Contractor, at its sole cost, risk and expense, will:

        4.1.1   Furnish the services of all personnel required to perform and complete the Work.

        4.1.2   Supply all machinery, equipment, tools, materials and expendable construction items, transportation, and supplies that are required to perform and complete the Work, unless XTO has agreed in writing to supply such materials and equipment.

4.1.3   Provide all necessary safeguards for the protection of all aspects of the Work and all persons employed directly or indirectly by the Contractor Group or third parties.

4.1.4   Obtain and provide evidence to XTO of all permits and licenses that are required to perform the Work, except for air permits and EPA permits.

4.1.5   Pay (i) any occupation or similar taxes which arise from the Work and which are required under the law or for which XTO has elected not to give the Contractor a direct pay certificate or other valid exemption certificate; (ii) all payroll taxes, all taxes measured by payrolls, all assessments or charges for social security purposes, unemployment compensation, old-age pensions or benefits, annuities or other charges that are required to be made with respect to or measured by the wages and salaries of persons employed by the Contractor Group that are imposed by or under the laws of either the United States or the State in which the Work is performed; and (iii) for all labor and materials furnished by the Contractor Group for the Work.  Contractor shall protect, defend, indemnify and hold harmless the XTO Group from and against the failure of any member of the Contractor Group to pay such taxes. Contractor agrees to require this same agreement from each of its Subcontractors and to indemnify the XTO Group for any breach or failure to obtain such agreements.

4.1.6   Immediately notify XTO of any incident arising out of or relating to the Work resulting in death or personal injury to any person or property damage or loss, including, but not limited to, environmental damages or losses, and will furnish XTO a written report within 72 hours of the incident detailing all relevant facts. Contractor will furnish XTO with a copy of all documents made by Contractor to any insurer or governmental authority regarding such accidents or occurrences.

4.1.7   Be responsible for the training, supervision and safety of all persons within the Contractor Group who are performing the Work, the Work performed and all materials, services and equipment provided by the Contractor Group or any member thereof, and any vendor or supplier of the Contractor Group incidental to the Work.

4.2   XTO's Responsibilities.  XTO will:

4.2.1   Furnish materials and equipment that XTO has agreed to furnish.

4.2.2   Provide access to the Site.

4.2.3   Provide other goods and/or services as agreed in writing by the Parties.

V   Payment and Audit Rights.

5.1   Contract Price.  XTO will pay Contractor for the Work based on the rate and terms in the Work Orders.  Unless otherwise provided in this Agreement and subject to Article IX hereof and retention rights permitted by law, payment will be due 30 days after XTO's receipt of a correct invoice and supporting documentation therefor.

5.2   Audit Rights.  Contractor will preserve documentation related to a Work Order for three years after completion of the Work Order.  XTO may audit Contractor's compliance with this Agreement and any Work Order hereunder and Contractor will provide XTO access to Contractor's documentation, personnel and facilities in support of any such audit and

will permit XTO to reproduce any of the documentation. Contractor will cause any subcontractors to preserve documentation and allow XTO to audit to the same extent. XTO will bear its own costs to perform an audit, but will not be liable for Contractor's or subcontractor's costs resulting from an audit.

VI.     **Warranties.**

6.1     **Services.** For services provided, Contractor warrants that the Work will be and has been completed in accordance with this Agreement, the applicable Work Order, and the most current applicable codes and industry standards, using its best professional efforts and in accordance with the most current generally accepted standards in the applicable industry, business or profession.

6.2     **Equipment/Materials.** For equipment and materials provided by the Contractor Group, Contractor, in addition to the other provisions hereof, warrants (i) good and merchantable title to the equipment so provided; (ii) that the equipment provided will be free from defects in material and workmanship for a period of 12 months following the date of installation; and (iii) that they will conform to applicable specifications, drawings and samples.

VII.    **Patents.** Contractor represents and warrants that the use or construction of any and all tools, equipment and other materials furnished by the Contractor Group and used in the Work does not infringe on any license or patent issued to, or applied for by, a third party.

VIII.   **Confidentiality.** Contractor will treat, and will cause the Contractor Group to treat, all information obtained in the performance of the Work as confidential, and Contractor will not, and will ensure that the Contractor Group will not, divulge such information to any person or entity without the prior written consent of XTO. Contractor will not, and Contractor will ensure that the Contractor Group will not, use any such information except in connection with the Work and will not disclose details of the Work to any third party except to those who are to perform the Work, and then only to the extent that it is required to perform the particular portion of the Work. Contractor will take, and Contractor will ensure that the Contractor Group will take, all reasonable precautions to safeguard any documents containing proprietary information. The restrictions in this Section VIII shall not apply to any information: (i) which is at the time of disclosure in, or after disclosure falls into, the public domain through no fault of Contractor or any member of the Contractor Group; (ii) which is first received by Contractor from a third party who, insofar as is known to Contractor, is lawfully in possession of such information and not in breach of any contractual, legal or fiduciary obligation to XTO or the XTO Group; and (iii) disclosure of which, upon advice of counsel, Contractor reasonably deems necessary to comply with any legal or regulatory obligation which Contractor believes in good faith it has. In the event that either Party or anyone to whom it transmits confidential information pursuant to this Agreement becomes legally required to disclose any such information, that Party shall provide the other Party with prompt written notice so that it may seek a protective order or other appropriate remedy. In the event that such protective order or other remedy is not obtained, the disclosing Party shall furnish only that portion of the confidential information which is legally required to be furnished in the opinion of the disclosing Party's counsel and no more.

IX.     **Liens.** Contractor will make timely and full payments to all workmen, materialmen and Subcontractors, insure that all members of the Contractor Group make timely and full payments to all workmen, materialmen and Subcontractors, and take all other action necessary to keep the Site and the Work free of liens. Contractor agrees to indemnify, protect, defend and hold harmless the XTO Group from and against all such charges, claims and liens unless caused by XTO's failure to pay Contractor. XTO may withhold payment of amounts due to any member of the Contractor Group under this Agreement (including the applicable Work Order and any other Work Orders) and any other contract between XTO and Contractor until XTO has been furnished with proof satisfactory to it that either all amounts have been paid or Contractor has provided for satisfactory

**App. 121**

payment. If a lien arising from the Work attaches to the Site or the Work, XTO may, at its sole option, make any payment necessary to discharge the lien, and it may offset the amount of the lien, together with damages and costs, including court costs and reasonable attorneys' fees, that it incurs because of the lien or its discharge against any payment owing or to be owed to Contractor or any other member of the Contractor Group. Contractor will furnish, on request by XTO, receipts and releases with respect to the Work that show that costs and expenses of the Work have been paid and that no claims, liens, or rights to liens exist against the XTO Group or its property. Contractor agrees to require this same agreement from each of its Subcontractors and to defend and indemnify the XTO Group for any breach of such agreements by any of its Subcontractors.

## X.    RELEASE, DEFENSE, INDEMNITY AND HOLD HARMLESS.

### 10.1    Contractor's Obligations.

10.1.1    Contractor hereby agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorneys' fees, including attorneys' fees incurred in the enforcement of this indemnity) (collectively the "Indemnifiable Claims") arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the Contractor Group, and/or loss of or damage to property or interests in property of any one or more members of the Contractor Group in any manner incident to, connected with or arising out of the performance of the Work. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, or loss of or damage to property or interests in property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the XTO Group.

10.1.2    To the extent not covered in Section 10.3, Contractor hereby further agrees to protect, release, defend, indemnify and hold the XTO Group harmless from and against any and all Indemnifiable Claims arising out of the emission, discharge or release of pollutants or substances prohibited by law, to the extent that such emission, discharge or release arises out of the sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Contractor Group, which is in any manner incident to, connected with or arises out of the performance of the Work.

10.1.3    Contractor agrees that its indemnity obligations herein will be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the XTO Group and shall provide waivers of subrogation against all members of the XTO Group. To the extent that applicable law prohibits the monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

### 10.2    XTO's Obligations.

10.2.1    XTO hereby agrees to release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising

App. 122

out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the XTO Group, and/or loss of or damage to property or interests in property of any one or more members of the XTO Group in any manner incident to, connected with or arising out of the performance of the Work. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, or loss of or damage to property or interests in property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Contractor Group.

10.2.2   To the extent not covered in Section 10.3, XTO hereby further agrees to protect, release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising out of the emission, discharge or release of pollutants or substances prohibited by law, to the extent that such emission, discharge or release arises out of the sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the XTO Group, which is in any manner incident to, connected with or arises out of the performance of the Work.

10.2.3   XTO agrees that its indemnity obligations herein will either be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the Contractor Group and shall provide waivers of subrogation against all members of the Contractor Group; or XTO may be self-insured. To the extent that applicable law prohibits monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

10.3   **Drilling of Oil or Gas Well**. Notwithstanding any provision in this Article X to the contrary (but expressly subject to Section 10.3.4 hereof) the following provisions will apply to operations involved in the drilling of an oil or gas well:

10.3.1   XTO hereby releases and agrees to defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising from pollution or contamination below the surface of the land, seabed or water, resulting from blowout, fire, cratering, seepage or any other uncontrolled flow of oil, gas or mineral substance during the performance of the Work, except to the extent such loss or damage is caused by the Contractor Group's gross negligence or willful misconduct.

10.3.2   XTO hereby releases and agrees to defend, indemnify and hold the Contractor Group harmless from and against the loss or damage (i) to any geological formation, strata or oil or gas reservoir or minerals resource beneath the surface of the land or water, (ii) for the loss of or damage to any hole(s) or well(s), and (iii) for any impairment of any property rights or other interests in or to any oil, gas or minerals resources resulting from blowout, fire, cratering or any other cause, which may result during the performance of the Work, except to the extent such loss or damage is caused by the Contractor Group's gross negligence or willful misconduct.

10.3.3   If equipment or instruments of the Contractor Group become lost in the well, XTO will either recover them without cost to the Contractor Group or pay the Contractor Group for the equipment or instruments (depreciated to

**App. 123**

date of loss); PROVIDED, HOWEVER, IF THE LOSS IS CAUSED BY THE GROSS NEGLIGENCE OR WILLFUL MISCONDUCT OF THE CONTRACTOR GROUP, XTO WILL NOT BE LIABLE TO ANY EXTENT FOR THE LOSS AND THE CONTRACTOR GROUP WILL RELEASE, DEFEND, INDEMNIFY AND HOLD HARMLESS THE XTO GROUP FROM AND AGAINST ANY LOSS, COST OR EXPENSE, INCLUDING COURT COSTS AND REASONABLE ATTORNEY'S FEES, SUFFERED OR INCURRED BY THE XTO GROUP THAT ARISES OR RESULTS THEREFROM. Contractor will be required to furnish backup documentation to support the calculation of reimbursable costs for equipment or instruments lost in the hole.

10.3.4   To the extent any provision in this Section 10.3 applicable to the drilling of an oil or gas well is in conflict with any other provision of this Article X, then such provision of this Section 10.3 will prevail, but in the event there is no such conflict the entire Article X will apply.

10.4   **SPECIAL PROVISION FOR NEW MEXICO AND WYOMING.** THE FOLLOWING PROVISION APPLIES WHERE WORK IS TO BE PERFORMED IN NEW MEXICO OR WYOMING, NOTWITHSTANDING ANY PROVISIONS IN THIS AGREEMENT TO THE CONTRARY. To the extent this Article X is governed by New Mexico or Wyoming law, then the provisions therein shall be read not to include indemnification for one's own negligence.

10.5   **SPECIAL PROVISIONS FOR LOUISIANA.** THE FOLLOWING PROVISIONS APPLY WHERE WORK IS TO BE PERFORMED IN OR OFFSHORE LOUISIANA, NOTWITHSTANDING ANY PROVISIONS IN THIS AGREEMENT TO THE CONTRARY.

10.5.1   To the extent Article X is governed by Louisiana law, then the provisions therein shall be read not to include indemnification for one's own negligence.

10.5.2   The Parties acknowledge and agree that all Work performed by Contractor and its employees pursuant to this Agreement is an integral part of and is essential to the ability of XTO to generate XTO's goods, products or services. Without limiting the foregoing, XTO and Contractor agree that XTO is and will be deemed a statutory employer of Contractor's employees for purposes of La. R.S. 23:1061(A)(3), as the same may be amended from time to time. In further consideration of the amounts to be received by Contractor pursuant to this Agreement, XTO and Contractor agree that Contractor will be responsible for the payment of all compensation benefits paid to or for the benefit of Contractor's employees. Contractor and/or Contractor's underwriters agree that they will have no right to seek and will not seek any contribution or indemnity from XTO for any compensation benefits paid by Contractor and/or Contractor's underwriters.

XI.   Insurance.

11.1   Coverages.   Subject to the provisions of Section 11.2, Contractor will secure and maintain, and will require its Subcontractors to secure and maintain, during the term of this Agreement the following insurance coverages with limits not less than the amounts specified, and with companies satisfactory to XTO who are authorized to do business in the jurisdiction where the Work is to be performed, and will furnish certificates of such insurance satisfactory to XTO before commencing the Work; provided, however, that no

**App. 124**

waiver of the provisions of this Article XI will occur to any extent merely from a failure on the part of XTO to object or complain about Contractor's failure to furnish certificates of insurance satisfactory to XTO.

11.1.1   Worker's Compensation and Employer's Liability Insurance with limits of not less than $500,000 per accident, which will fully comply with the statutory requirements of State laws as well as Federal laws, if applicable.   Such insurance must be endorsed, if applicable, to cover claims under the United States Longshore and Harbor Workers' Compensation Act, the Outer Continental Shelf Lands Act, the Jones Act and general maritime law, with an "in rem" endorsement stating that an action "in rem" will be treated as a claim against the insured "in personam."

11.1.2   Commercial General Liability Insurance INCLUDING CONTRACTUAL LIABILITY, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence, and an aggregate annual limit of not less than $2,000,000.

11.1.3   Automobile Liability Insurance covering owned, hired, and non-owned vehicles used by Contractor, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence.

11.1.4   If the Work requires the use of marine vessels or other watercraft, Contractor will carry, or require the owner of the watercraft to carry: (i) all risk hull insurance in an amount equal to the vessel's declared value and (ii) protection and indemnity insurance, including, but not limited to, collision liability, removal of debris, towing liability and coverage for Admiralty benefits and damages under the Jones Act and general maritime law, in a minimum amount of $1,000,000 combined single limit per occurrence, and that in all such insurance the "other than owner clause" will be deleted.

11.1.5   If the Work requires the use of aircraft, Contractor will carry, or require the owner of the aircraft to carry: (i) all risks hull insurance in the amount equal to the replacement value of the aircraft and (ii) bodily injury liability, including passenger liability and property damage, of not less than $10,000,000 combined single limit per occurrence.

11.2   Actual Insurance. Notwithstanding the minimum coverage specified in Sections 11.1.1-11.1.5 above, should Contractor maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which Contractor shall provide hereunder will be such larger amounts carried by Contractor (or indicated in any certificate of insurance furnished by Contractor) and not the minimums referenced in Sections 11.1.1-11.1.5 above.

11.3   Limit Adjustments. XTO may at any time upon prior written notice require Contractor to increase the limits set forth to such amounts as inflation, industry practice or other factors indicate are reasonable. The foregoing insurance requirements will apply whether or not required by any other provision of this Agreement and the limits of coverage do not alter the indemnities and allocation of responsibilities in this Agreement.

11.4   Primary Coverage and Additional Insureds. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES.   ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE

**App. 125**

NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT.     ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

11.5    Certificate of Insurance.  Contractor's insurance carrier(s) will provide, as evidence that the required insurance coverage has been obtained and maintained, a certificate of insurance reflecting the insurance requirements of this Article XI, which certificate shall be on a form approved by the Texas Department of Insurance.

No waiver of the provisions of this Article XI will be inferred from any failure on the part of XTO to object or complain about any failure of Contractor's insurance carrier to provide such certificate of insurance. Contractor shall provide XTO notice and evidence of any modification to, or extension or cancellation of, Contractor's required insurance coverage.

XII.    Independent Contractor.  Contractor will be an independent contractor with respect to the Work, and neither Contractor nor any Subcontractor, nor their respective officers, employees or agents, will be deemed the agent, representative, employee or servant of XTO. Subject to the provisions of Section 10.5.2, if applicable, Contractor and any Subcontractor will have complete and sole control over their respective employees and the details of the Work performed and the methods by which the Work is accomplished, it being understood that XTO is interested only in the results that Contractor obtains. Notwithstanding the foregoing:

    (i)    XTO retains the right to (a) review a list, in advance of the commencement of the Work, of the names the Contractor Group workers who will be performing work on an XTO location, and (b) refuse entry to or request that the Contractor Group replace any unsatisfactory worker who is or may be performing work at an XTO location.   XTO shall have the right to immediately remove from its location a worker of the Contractor Group whose behavior is unsafe or otherwise unacceptable, rude, harassing or threatening.

    (ii)    XTO shall not be precluded from asserting any borrowed employee or statutory employer defense or other defense that may exist.

    (iii)    All materials, equipment and services shall meet the approval of XTO and shall be subject to a general right of inspection.

XIII.   Compliance with Laws and XTO Regulations and Policies.

13.1    Safety.  Safe operations are of paramount importance to XTO. Accordingly, XTO has established a safety and environmental program for its own employees and requires that all members of the Contractor Group have an appropriate safety and environmental program. Contractor understands that the Work may involve danger and risk of injury, and the inherent danger is understood and assumed by Contractor.  Contractor shall have sole responsibility for the safety of the Contractor Group employees, agents, and representatives, and acknowledges and agrees that XTO has no duty to supervise the work of, or to provide a safe place to work for, the employees, agents or representatives of the Contractor Group. Contractor shall adequately instruct all its employees and those of its Subcontractors or other members of the Contractor Group in the use of safety

equipment and proper work procedures for the purpose of doing everything reasonably possible to protect against (i) personal injury or illness and (ii) damage to property or equipment. Contractor shall take all reasonable measures necessary to provide safe working conditions. Contractor shall furnish XTO promptly with a report of any and all accidents involving the Work (whether involving Contractor or the Contractor Group) and shall notify all government agencies of accidents as required by law. Contractor agrees to provide XTO with any reasonable information about any member of the Contractor Group that XTO requests for its internal use in evaluating the safety and environmental record of the Contractor Group.

13.2   **XTO Regulations and Policies.** Contractor will comply with and will cause the Contractor Group to comply with all applicable XTO rules and regulations (as revised from time to time) that relate to the safety and security of persons and property, protection of the environment, housekeeping and plant work hours, including, but not limited to, XTO's Drug, Alcohol, Firearms, Vehicle Search and Contraband Policy attached hereto as Attachment 1 and XTO's Safety, Health and Environmental Policy attached hereto as Attachment 2, both of which are incorporated by reference herein. Depending upon the scope and nature of the Work to be performed, XTO may require Contractor or the Contractor Group to execute other XTO safety policies or to complete policy questionnaires or surveys. XTO may revise, amend or alter its rules or policies or adopt new or additional rules or policies and they will become a part of this Agreement when Contractor receives a copy of them.

13.3   **Compliance with Laws.** Contractor will comply, and will cause the Contractor Group to comply, with all federal, state, tribal, and local laws, rules, regulations, ordinances, executive orders and other applicable requirements of all governmental agencies having jurisdiction over the Work which now or in the future may be (i) applicable to all Work performed hereunder or (ii) applicable to Contractor's or the Contractor Group's business, equipment or employees engaged in or in any manner connected with its performance hereunder. All of the provisions of this Agreement shall be expressly subject to all applicable laws, orders, rules and regulations of any governmental body or agency having jurisdiction over the premises, and all Work contemplated hereunder shall be conducted in conformity therewith. Any provision of this Agreement which is inconsistent with any such laws, orders, rules or regulations shall be modified so as to conform therewith, and this Agreement, as so modified, shall continue in full force and effect. For purposes of the preceding sentences, "laws, orders, rules or regulations" includes, but is not limited to, the duly-enacted and effective regulations and ordinances of any federally-recognized Indian or First Nations tribe. XTO and Contractor shall execute such documents, purchase orders and other instruments as may be reasonably required to conform with any applicable laws or orders.

13.4   To the extent that Attachment 3, Equal Employment Opportunity Provision, Certification of Non-Segregated Facilities, and Employment of Qualified Disabled Individuals and Veterans, applies to this Agreement, Contractor will abide by Attachment 3, and will ensure that the Contractor Group abides by Attachment 3.

XIV.   Miscellaneous.

14.1   **Attorneys' Fees.** In the event the Parties become involved in litigation, arbitration or mediation arising out of or related to this Agreement in which the services of an attorney or other expert are reasonably required, the prevailing Party will be fully compensated for the cost of its participation in such proceedings, including court costs, expenses and the reasonable costs incurred for attorneys' fees and experts' fees. Unless judgment goes by default, the attorneys' fee award will not be computed in accordance with any court schedule, but will be such as to fully reimburse all reasonable attorneys' fees actually incurred by the prevailing Party, regardless of the size of the judgment and regardless of

**App. 127**

whether the payment of all or a portion of such fees was contingent upon the outcome of the arbitration or litigation.

14.2    **Term.** This Master Service Agreement will be for a term of 1 year from the date hereof and from year to year thereafter until terminated. Either Party may terminate this Master Service Agreement at any time, with or without cause; provided, however that Contractor will provide 30 days prior written notice of any such termination. Any termination will not affect any rights or obligations that have accrued under this Agreement.

14.3    **Force Majeure.** A delay in or failure to perform by a Party, other than the payment of money, will not constitute a default that exposes it to liability for breach if and to the extent the delay or failure to perform is unforeseeable and is caused by an occurrence beyond the reasonable control of the Party, including, but not limited to an act of God or the public enemy; expropriation or confiscation of facilities; compliance with any order or requirement of any governmental authority that was unforeseeable; act of war, rebellion, terrorism, piracy or sabotage or damage resulting therefrom; fire, flood, storm, hurricane, tornado, explosion or accident; riots or strikes or other concerted acts of workers, whether direct or indirect; inability after diligent effort to obtain necessary licenses or permits; or any other cause, whether or not of the same class or kind as those specifically above named, which is not within the control of the Party and which, by the exercise of reasonable diligence, the Party is unable to prevent or remedy.

14.4    **Rebates.** All Work is to be performed on an arm's-length basis. Neither Contractor nor the Contractor Group will pay any commissions, salary or fees or grant any rebates or other remuneration or gratuity to any employee of XTO, any relative of an employee of XTO, or any representative or agent of XTO, other than gifts of nominal value and entertainment, meals, and social invitations that are customary and proper under the circumstances which do not place the recipient under obligation. The foregoing prohibition will not apply to the payment of salaries to employees of Contractor or the Contractor Group who are related to XTO employees, if employment of the relative is not related to XTO's business relationship with Contractor. If any employee of XTO should solicit a gift or gratuity from Contractor or the Contractor Group, Contractor agrees to notify the Controller of XTO of such act. It is further understood that failure by Contractor to comply with this policy regarding rebates may, among other remedies, result in the termination of this Agreement by XTO and may preclude any future dealings between the parties.

14.5    **Assignments and Subcontractors.** Neither Party may assign or subcontract its rights or duties under this Agreement, except to an Affiliate, without the prior written consent of the other Party. An assignment, delegation or subcontract in violation of this Section 14.5 will be void. Any consent given by a Party will not relieve the other Party of responsibility for performance of its obligations under this Agreement. Any assignee or Subcontractor of this Agreement shall expressly assume all obligations of the Party hereunder making the assignment, including, but not limited to, indemnity obligations, upon acceptance of assignment of this Agreement.

14.6    **Waiver.** The waiver by either Party of a breach or default by the other Party will not be deemed a waiver of any different or later breach.

14.7    **Conflicts.** For conflicts between or among provisions in the Master Service Agreement and any oral or written Work Order, this Master Service Agreement controls over any written or oral Work Order. It is expressly understood and agreed that no provision of any delivery ticket, invoice, confirmation of purchase order, published rate schedule or other instrument used or provided by Contractor will supersede the provision of this Master Service Agreement or any other agreement to any extent, for any purpose.

**App. 128**

14.8   Applicable Law. This Agreement will be governed by the laws of the State of Texas, excluding the Texas rules on conflicts of law. For Work performed offshore, the provisions of this Agreement shall be construed in accordance with the General Maritime Law of the United States or, if not applicable, with the law of the state applicable to the Work.

14.9   Consequential Damages. In no event will either Party be liable to the other under this Agreement for indirect, special, incidental, punitive or consequential damages, including, but not limited to, loss of profits, loss of use of assets or loss of product or facilities downtime. This Section 14.9, however, shall in no way limit or modify a Party's indemnity obligations under Article X above.

14.10   Captions. The captions used in this Agreement are for convenience only and will in no way define, limit or describe the scope or intent of this Agreement or any part thereof.

14.11   Notices. All notices and other communications required by this Agreement to be in writing will be deemed duly given to a Party two business days after such notice or other communication is sent to such Party by registered or certified mail, return receipt requested, postage prepaid, addressed to the individual and address indicated for such Party in a Work Order or such other person as a Party may designate from time to time as their representative. A Party may send a notice or other communication to the other Party using any other means of delivery, including personal delivery, facsimile, telex, ordinary mail, or electronic mail, but no such notice or other communication will be deemed given unless and until it actually is received by such other Party. A Party may change the individual and/or address for notices by giving the other Party notice of such change in the manner set forth herein.

14.12   Entire Agreement. This Master Service Agreement, together with its Attachments and any written or oral Work Order between XTO and Contractor, as the case may be, are the entire agreement between the Parties on the subject matter referred to therein and supersede all prior negotiations, agreements, discussions and correspondence. This Master Service Agreement may not be changed orally, but may be changed only by an amendment, signed by both Parties, which specifies the change, addition or deletion. An amendment that is not in writing is void. This Master Service Agreement, when executed by Contractor, supersedes any previous contracts between Cross Timbers Operating Company, Cross Timbers Production Company, or XTO and Contractor identified as a Master Service Agreement or Master Field Service Agreement.

14.13   Subsidiaries of XTO. If Contractor or an Affiliate of Contractor performs any Work for XTO or a Subsidiary of XTO and the Subsidiary has not signed a similar Master Service Agreement, then the Work performed by or for the Subsidiary shall be governed by the terms of this Agreement as if the Subsidiary had signed the same Agreement but as a contract separate and apart from this Master Service Agreement.

14.14   Severability. If any provision of this Master Service Agreement is held to be unenforceable, this Master Service Agreement will be deemed to be amended to the extent necessary to make it enforceable, or, if necessary, this Master Service Agreement will be deemed to be amended to delete the unenforceable provision or portion thereof. In the event any provision is deleted or amended, the remaining provisions will remain in full force and effect.

14.15   Use of Name and Marks. Contractor shall not use XTO's name, trade name, or trademarks, or those of any Affiliate, in any advertising or communication to the public, or make publicity releases or announcements concerning the Work Order, Services, or related activities, in any format without XTO's prior express written consent.

IN WITNESS WHEREOF, the Parties have caused this Master Service Agreement to be executed by their duly authorized representatives as of the date first above written.

**XTO ENERGY INC.**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: __Katie Baker__

Title: __Supervisor, Master Contracts__

Date: __12/8/15__

**Missouri Basin Well Services, Inc. dba MBI Energy Services, Inc. & Affiliates**

Representative: _____
(Authorized Representative Signature)

Name: Jason Homiston

Title: SVP Business Development

Date: November 19, 2015

Federal Tax I.D. # 45-0361203

**BARNETT GATHERING, LLC**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: __Katie Baker__

Title: __Supervisor, Master Contracts__

Date: __12/8/15__

**TREND GATHERING & TREATING, LLC**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: __Katie Baker__

Title: __Supervisor, Master Contracts__

Date: __12/8/15__

**ENGLISH BAY PIPELINE, LLC**
**FAYETTEVILLE GATHERING COMPANY**
**MOUNTAIN GATHERING, LLC**
**NESSON GATHERING SYSTEM, LLC**
**RINGWOOD GATHERING COMPANY**
**TIMBERLAND GATHERING & PROCESSING COMPANY**

Representative: _Katie Baker_
(Authorized Representative Signature)

Name: __Katie Baker__

Title: __Supervisor, Master Contracts__

Date: __12/8/15__

**App. 130**

THIS PAGE INTENTIONALLY LEFT BLANK

*MSA Attachment 1*

### XTO ENERGY INC.
### DRUG, ALCOHOL, FIREARM, VEHICLE SEARCH AND CONTRABAND POLICY

XTO PROHIBITS THE USE, MANUFACTURE, SALE, TRANSFER, OR POSSESSION OF ALCOHOLIC BEVERAGES, ILLEGAL AND NON-PRESCRIBED DRUGS, DRUG PARAPHERNALIA, EXPLOSIVES, FIREARMS AND OTHER WEAPONS ON ANY XTO PREMISES OR ANY WORK SITE WHERE XTO'S EMPLOYEES, CONTRACTORS, VENDORS OR SUBCONTRACTORS ARE ENGAGED.

IF PRESCRIPTION MEDICATION MUST BE BROUGHT TO ANY SUCH WORK LOCATION, THE MEDICATION MUST BE KEPT IN ITS PRESCRIPTION CONTAINER UNTIL USED. ANY USE OF A PRESCRIBED MEDICATION MUST BE IN STRICT ACCORDANCE WITH THE PRESCRIPTION. NO ONE MAY WORK ON AN XTO WORK LOCATION IF HE/SHE IS TAKING MEDICATION THAT INTERFERES WITH HIS/HER ABILITY TO PERFORM HIS/HER JOB SAFELY. THE USE OF ANY MEDICATION THAT MIGHT INTERFERE WITH AN INDIVIDUAL'S ABILITY TO PERFORM HIS/HER JOB SAFELY MUST BE REPORTED TO THE SENIOR XTO OFFICIAL ON SITE, OR, IF NO XTO OFFICIAL IS ON SITE, TO XTO'S ENVIRONMENTAL, HEALTH AND SAFETY DEPARTMENT.

ANY PERSON WHO IS FOUND DEPARTING XTO'S WORK LOCATION IN POSSESSION OF XTO OR A LANDOWNER'S PROPERTY THAT IS NOT AUTHORIZED IN WRITING FOR REMOVAL FROM XTO'S WORK LOCATION IS SUBJECT TO DISCIPLINARY ACTION, INCLUDING IMMEDIATE DISCHARGE, OR REMOVAL AND FUTURE PROHIBITION FROM THE PREMISES.

ENTRY INTO OR PRESENCE ON XTO'S JOB SITE BY ANY PERSON IS CONDITIONED UPON XTO'S RIGHT TO SEARCH THE PERSON AND PROPERTY OF ANY PERSON. AT ANY TIME, AND WITHOUT NOTICE, ANY PERSON, HIS/HER VEHICLE, OR PERSONAL PROPERTY IS SUBJECT TO SEARCH. PROPERTY MAY INCLUDE, BUT IS NOT LIMITED TO, THE FOLLOWING: WALLETS, PURSES, LOCKERS, BAGGAGE, OFFICES, DESKS, TOOL BOXES, CLOTHING, AND VEHICLES. ANY ILLEGAL CONTRABAND OR UNAUTHORIZED PROPERTY FOUND MAY BE TURNED OVER TO THE APPROPRIATE AUTHORITIES.

XTO RESERVES THE RIGHT TO REQUIRE ANY PERSON ON AN XTO LOCATION TO SUBMIT TO A DRUG TEST OR TO REQUIRE ANY CONTRACTOR, VENDOR, OR SUB-CONTRACTOR TO TEST ITS EMPLOYEES. REFUSAL TO SUBMIT TO OR FAILING A DRUG TEST WILL RESULT IN THE IMMEDIATE REMOVAL FROM THE LOCATION.

CONTRACTORS, VENDORS, OR SUB-CONTRACTORS VIOLATING THIS POLICY MAY BE SUBJECT TO AN IMMEDIATE CANCELLATION OF THEIR CONTRACT.

IN THE EVENT CONTRACTOR, VENDOR, OR SUB-CONTRACTOR ARE PERFORMING WORK SUBJECT TO DEPARTMENT OF TRANSPORTATION (DOT) REGULATIONS, SUCH PARTIES WILL SUBMIT A COPY OF THEIR ALCOHOL AND DRUG TESTING PROGRAMS FOR REVIEW BY XTO. XTO MAY USE A THIRD PARTY TO REVIEW THE PROGRAMS, AND IN THE EVENT THE PROGRAMS ARE NOT SUFFICIENT BY DOT STANDARDS, THE COST OF ANY SUBSEQUENT REVIEW FOR COMPLIANCE SHALL BE PAID BY SUCH PARTIES.

SHOULD YOU HAVE ANY QUESTIONS REGARDING THIS POLICY, PLEASE SEE YOUR XTO CONTRACT REPRESENTATIVE.

THIS PAGE INTENTIONALLY LEFT BLANK

## XTO ENERGY INC, SAFETY, HEALTH AND ENVIRONMENTAL POLICY

XTO is committed to protecting the environment and the health and safety of employees, contractors, local communities, and others who may be impacted by its business activities. XTO requires its contractors to actively participate, and to cause its affiliates, subcontractors, and other members of the Contractor Group to actively participate, in the establishment of a safe working environment as follows:

### CONTRACTOR AND THE CONTRACTOR GROUP'S RESPONSIBILITIES

♦ Perform all work in a safe, environmentally sensitive, and workmanlike manner and provide necessary safety precautions and equipment for their employees, contractors, consultants, and other personnel.

♦ Report all injuries and incidents (including property damage) immediately (including a written report within 72 hours of the accident) to the XTO supervisor or designated alternate.

♦ Report all spills and releases immediately (including a written report within 72 hours of the incident) to the XTO supervisor or designated alternate and communicate to XTO any other environmental risks or exposures.

♦ Instruct its employees in the applicable XTO standards and practices.

♦ Conduct its operations in a manner that protects human health and safety, minimize adverse environmental impacts, and mitigates unavoidable impacts on the environment.

♦ Comply with all applicable safety, health, and environmental laws and regulations, and apply responsible standards where law or regulations do not exist.

♦ Have in place an active injury and loss prevention program and advise and train line managers in safety, health, and environmental requirements.

♦ Provide its employees with adequate training in safety, health, and environmental matters, and hold each employee accountable for compliance with this policy.

♦ Provide technical and legal support to those line managers responsible for compliance with this policy.

♦ Require timely communication between employees and their supervisors regarding safety, health, and environmental issues.

♦ Require employees to communicate their concerns to management about any unresolved safety, health, and environmental risks they might have identified in the Contractor's operations.

♦ Monitor, evaluate and report performance in safety, health, and environmental protection.

♦ Provide a copy of this policy to the Contractor's contractors and notify them that they and their subcontractors will be expected to perform all work for the Contractor in compliance with this policy.

♦ Emphasize the importance of maintaining safety and environmental standards in economically-competitive situations.

**App. 134**

## CONTRACTOR AND THE CONTRACTOR GROUP'S PERSONNEL (EMPLOYEE/ SUBCONTRACTOR / CONTRACTOR / CONSULTANT) RESPONSIBILITIES:

Each employee shall demonstrate a positive attitude toward injury-prevention and environmental protection and company property. Each employee is responsible for:

- Performing their job safely, for their personal safety, the safety of fellow workers, and the protection of the environment and company property. This includes the proper use of safety equipment and strict adherence to safe work practices.

- Understanding all safety and environmental policies pertinent to their job responsibilities.

- Performing safety and environmental assessments.

- Actively participating in safety and environmental meetings.

- Reporting promptly all unsafe conditions and practices (including those of contractors), to their supervisor.

- Reporting every spill/release to their supervisor.

**App. 135**

### EQUAL EMPLOYMENT OPPORTUNITY PROVISION, CERTIFICATION OF NONSEGREGATED FACILITIES, AND EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS

The term "Contractor" as used herein shall mean the party designated as Contractor, of which this Attachment is a part. The term "Agreement," as used herein shall mean the foregoing agreement to which this Attachment is a part. This Agreement, and all activities or operations conducted by the Parties under this Agreement, are expressly subject to, and shall comply with, all laws, orders, rules, and regulations of all federal, state, and local governmental authorities having jurisdiction over the Work, including but not limited to Executive Order 11246.

1.   **EQUAL EMPLOYMENT OPPORTUNITY PROVISION.**

If the value of this Agreement exceeds $10,000, then during the performance of this Agreement, Contractor agrees as follows:

A.   The contract clause prescribed in Section 202 of Executive Order No. 11246 of September 24, 1965 (41 CFR 60-1), is incorporated by reference into this Attachment.

B.   Contractor further agrees and certifies that, if the value of this Agreement is $50,000 or more and Contractor has 50 or more employees, and is not otherwise exempt, Contractor will:

(1) Develop a written affirmative action compliance program for each of his establishments in accordance with the requirements of 41 CFR 60-1.40 and 60-2. This program shall be developed within 120 days of the commencement of a covered contract, and shall be maintained as long as required by law or regulation.

(2) File annually, complete and accurate reports on Standard Form 100, Equal Employment Opportunity Information Report EEO-1, in accordance with the requirements of 41 CFR 60-1.7, and otherwise comply with and file such other compliance reports as may be required under Executive Order 11246, as amended, and Rules and Regulations adopted thereunder.

2.   **CERTIFICATION OF NONSEGREGATED FACILITIES.**

Contractor certifies that it does not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not permit its employees to perform their services at any location under its control where segregated facilities are maintained. Contractor certifies further that it will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it will not permit its employees to perform their services at any location, under its control, where segregated facilities are maintained. Contractor agrees that a breach of this certification is a violation of the Equal Opportunity clause in this Agreement. The term "segregated facilities" means any waiting room, work areas, restrooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees which are segregated by explicit directive or are in fact segregated on the basis of race, color, religion or national origin, because of habit, local custom or otherwise. Contractor further agrees that (except where it has obtained identical certifications from proposed subcontractors for the specific time period) it will obtain identical certification from proposed subcontractors prior to the award of subcontracts exceeding $10,000 which are not exempt from the provisions of the Equal Opportunity clause; that it will retain such certifications in its files; and that it will forward the following notice to such proposed subcontractors (except where the proposed subcontractors have submitted identical certifications for the specific time period).

"NOTICE TO PROSPECTIVE VENDORS AND SUBCONTRACTORS
REQUIREMENT FOR CERTIFICATION OF NONSEGREGATED FACILITIES

A Certification of Nonsegregated Facilities, as required by 41 CFR 60-1.8, must be submitted prior to the award of any contract or subcontract exceeding $10,000 which is not exempt from the provisions of the Equal Opportunity Clause (41 CFR 60-1.4). The Certification may be submitted either for each subcontract or for all subcontracts during a period (i.e., quarterly, semi-annually or annually). (NOTE: The penalty for making false statements is prescribed in 18 (U.S.C. 1001)."

3.   **EMPLOYMENT OF QUALIFIED DISABLED INDIVIDUALS AND VETERANS.**

Contractor will not discriminate against any employee or applicant for employment because of physical or mental disability in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-471 (Section 503 of the Rehabilitation Act of 1973, as amended), any Contractor with a contract over $10,000 in value must establish an affirmative action program to employ and advance in employment qualified disabled individuals.

Contractor will not discriminate against any employee or applicant for employment because he or she is a special disabled veteran, veteran of the Vietnam era, recently separated veteran, or other protected veteran in regard to any position for which the employee or applicant for employment is qualified. To comply with 41 CFR 60-250 (Section 402 of the Vietnam Era Veterans Readjustment Act of 1974, as amended), each Contractor with a contract over $100,000 must take affirmative action to employ and advance in employment qualified special disabled veterans, recently separated veterans, veterans of the Vietnam Era, veterans who served on active duty in the Armed Forces during a war or in a campaign or expedition for which a campaign badge has been authorized; veterans who, while serving on active duty in the Armed Forces, participated in a United States military operation for which an Armed Forces Service Medal was awarded pursuant to Executive Order No. 12985; or other protected veterans, and list with appropriate local employment service offices all suitable employment openings.

The additional contract clauses prescribed in 41 CFR 60-741.4 and 60-250.4 are incorporated by reference into this Attachment.

**App. 137**



West Segment Regulatory Commission

P.O. Box 892 * Mandaree, North Dakota * 58757
Physical Address: 105 4th Avenue NE
Office: 701.759.3574 * Fax: 701.759.3574
Email: wsrcommission@hotmail.com

May 22, 2015

CORPORATIONS, CONTRACTORS, TRUCKERS, OIL FIELD RELATED WORKERS,
BUSINESSES, ETC…

Re:   **INFORMATIONAL MEETING NOTICE** – **Business, all persons & Vehicle
Registrations**
West Segment Regulatory Commission
Mandaree, North Dakota

Dear _____

     The West Segment Regulatory Commission will be holding an informational meeting for
all contractors, employers, resident members of West Segment and any other entities or
interested persons at the Water Chief Hall – which is located on Ridge Rd. - 105 4th Ave. NE
Water Chief Hall, Mandaree

     **June 30, 2015 & July 1, 2015**         **Starting at 9:00 am.  To 4:00 pm.  Both days**

     The West Segment Regulatory Commission ("WSRC") has been granted a Tribal Charter
by the Tribal Business Council of the Three Affiliated Tribes, and is fully organized as a non-
profit corporation.  It was established for purposes of monitoring and regulating business entities
and economic development activities within the West Segment community.  Pursuant to the
Charter, WSRC has the following powers:

- To establish reasonable rules and regulations for all business activities within the West
  Segment of the Mandan, Hidatsa & Arikara Nation;
- To require registration of any and all persons, corporations or other entities conducting
  business within the West Segment;
- To set reasonable registration fees, as well as reasonable civil penalty fees for non-
  compliance, such fees to be discussed with and subject to periodic review by the Tribal
  Business Council.
- To collaborate with other agencies to better enforce existing laws and regulations.

     The WSRC is in the process of establishing and implementing its rules and regulations.
Specifically, WSRC will be requiring registration of all employers, employees, and other
business entities engaged in work on the West Segment of the Mandan, Hidatsa & Arikara

Nation. Also, for safety and monitoring of truck traffic, a Vehicle Tracking and Traffic Monitoring (GPS) System will be implemented for all commercial and industrial trucks and other licensed motor vehicles that are or will be doing business in West Segment.

*It is very important that representatives of all persons, corporations or other entities doing business on the West Segment of the MHA Nation attend this meeting.* The information session will focus on the intentions of the WSRC and what will be required of all business entities, as well as vehicle registration and monitoring.

The main elements to be discussed will be safety, environmental, and community concerns, and what regulations are necessary for the WSRC to enact to address these concerns. A few of the items we will be discussing are:

- Business Registrations;
- Vehicles Transporting Hazardous Materials;
- Overweight Vehicles;
- Who is Working in West Segment;
- The Devastating Illegal Drug Problem;
- Accountability; and
- Enforcement of TERO Ordinance Requirements.

We look forward to a large turnout and a productive meeting. I thank you in advance for your attention and cooperation in this important matter.

Sincerely,

West Segment Regulatory Commission

Harriet Goodiron – General Manager

Ted Lone Fight III - Chairman of Board

Note: Disregard if you or your company doesn't work or do business on the West Segment of the Three Affiliated Tribes.  This would be the Mandaree area.