# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA
### WESTERN DISTRICT

| | | |
|---|---|---|
| BERKLEY NATIONAL INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| Plaintiff, | § | Civil Action No. 1:18-cv-195 |
| | § | |
| v. | § | |
| | § | |
| XTO ENERGY, INC., | § | |
| | § | |
| Defendant and Third-Party Plaintiff | § | |
| | § | |
| | § | |
| v. | § | |
| | § | |
| COMMERCE AND INDUSTRY INSURANCE COMPANY, TORUS NATIONAL INSURANCE COMPANY, N/K/A STARSTONE NATIONAL INSURANCE COMPANY, AND SENECA SPECIALTY INSURANCE COMPANY, | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| | § | |
| Third-Party Defendants. | § | |

## BERKLEY NATIONAL INSURANCE COMPANY'S
## MEMORANDUM OF LAW IN RESPONSE TO XTO ENERGY, INC.'S
## <u>MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Thomas C. Wright
Texas Bar No. 22059400
wright@wrightclosebarger.com
Elizabeth Rivers
Texas Bar No. 24052020
rivers@wrightclosebarger.com
Natasha N. Taylor
Texas Bar No. 24071117
taylor@wrightclosebarger.com
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056

Corey J. Quinton (#05342)
FISHER BREN & SHERIDAN, LLP
3137 32nd Avenue South, Suite 212
Fargo, ND 58103
cquinton@fisherbren.com

Susan A. Daigle (#4459)
DAIGLE RAYBURN LLC
600 Jefferson Street, Suite 1200
P. O. Box 3667
Lafayette, Louisiana 70501
susan@djrlawfirm.com

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................2

TABLE OF AUTHORITIES ...........................................................................4

SUMMARY .....................................................................................................8

STATEMENT OF FACTS ............................................................................10

ARGUMENT & AUTHORITIES ..................................................................14

I.      The Berkley Policies do not afford additional insured coverage to XTO for
        the claims in the Underlying Lawsuits............................................................14

        A.      XTO's purported additional insured status begins with analysis of
                the Berkley Policies, which incorporate the MSA's requirements
                limiting additional-insured status.............................................................14

        B.      MBI was not required to obtain additional-insured coverage for
                XTO for the types of claims in the Underlying Lawsuits.......................15

                1.      MBI did not agree to procure additional insured coverage
                        for XTO for injury to members of the XTO Group.................15

                2.      XTO released any claim that MBI obtain insurance for
                        XTO for the types of claims in the Underlying Lawsuits. .......20

        C.      There is no "liability arising out of [MBI's] operations" for the
                Underlying Lawsuits, as required for XTO to qualify as an
                additional insured.....................................................................................22

        D.      XTO does not qualify as an insured on the Umbrella Policy. ..............23

        E.      The Berkley Policies are not ambiguous. ..............................................25

II.     The Pollution Exclusion bars coverage to XTO. ............................................26

        A.      The Pollution Exclusion applies to bodily injury. ................................26

        B.      XTO has waived reliance on any exceptions to the Pollution
                Exclusion...................................................................................................27

        C.      The Hostile Fire Exception does not apply...........................................28

                1.      XTO's arguments disregard the plain language of the
                        "hostile fire" definition...........................................................29

                2.      XTO did not prove that the fire was "uncontrollable." ...........31

3.      XTO did not prove that the injuries arose out of "heat, smoke, or fumes." ..................................................................32

D.      The Contractor Exception does not apply. ...........................................33

1.      The Contractor Exception applies to MBI's liability, not XTO's. ..................................................................................33

2.      An insured can "occupy" a site by managing it on location. ....................34

3.      MBI occupied the well site. .....................................................36

E.      The Pollution Exclusion and its exceptions are not ambiguous. ...........................38

CONCLUSION ................................................................................................39

CERTIFICATE OF SERVICE ...........................................................................40

# TABLE OF AUTHORITIES

### CASES

*Aetna Ins. Co. v. Getchell Steel Treating Co.*,
   395 F.2d 12 (8th Cir. 1968) ................................................................ 32, 36

*Antrim Min., Inc. v. Pa. Ins. Guar. Ass'n*,
   436 Pa. Super. 522 (Pa. 1994) ................................................................... 35

*Aspen Ins. UK, Ltd. v. Dune Energy, Inc.*,
   400 Fed. App'x. 960 (5th Cir. 2010) ........................................................ 35

*Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*,
   256 S.W.3d 660 (Tex. 2008) ........................................................ 23, 24, 25

*Bakken Residential, LLC v. Cahoon Enters., LLC*,
   154 F. Supp. 3d 812 (D. N.D. 2015) ......................................................... 28

*Bechtel Petroleum Operations, Inc. v Continental Ins. Co.*,
   117 Cal. Rptr. 2d 399 (Cal. App. 2002) .................................................... 36

*Bernhardt v. Hartford Fire Ins. Co.*,
   648 A.2d 1047 (Md. App. Ct. 1994) .......................................................... 31

*Borsheim Builders Supply, Inc. v. Manger Ins., Inc.*,
   917 N.W.2d 504 (N.D. 2018) .................................................................... 14

*C.O. Falter, Inc. v. Crum & Forster Ins. Cos.*,
   361 N.Y.S.2d 968 (N.Y. 1974) ................................................................. 38

*Century Sur. Co. v. Hallandale Beach Ser. Station, LLC*,
   No. 10-21430-CIV, 2011 WL 13174906 (S.D. Fla. Mar. 21, 2011) ........................ 30

*Cincinnati Ins. Co. v. Becker Warehouse, Inc.*,
   635 N.W.2d 112 (Neb. 2001) .................................................................... 38

*Conley v. Gibson*,
   355 U.S. 41 (1957) .................................................................................. 28

*Davis v. LTV Steel Co., Inc.*,
   716 N.E.2d 766 (Ohio Ct. App. 1998) ....................................................... 23

*Doerr v. Mobil Oil Corp.*,
   774 So. 2d 119 (La. 2000) ........................................................................ 27

*Dresser Indus., Inc. v. Page Petroleum, Inc.*,
   853 S.W.2d 505 (Tex. 1993) ..................................................................... 21

*Enron Oil Trading & Transport Co. v. Albrook Ins. Co.*,
   132 F.3d 526 (9th Cir. 1997) .................................................................... 27

*Financial Timing Publ'ns, Inc. v. Compugraphic Corp.*,
   893 F.2d 936 (8th Cir. 1990) .................................................................... 28

*First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*,
  477 F.3d 616 (8th Cir. 2007) ..................................................................... 28

*Fisher v. Am. Family Mut. Ins. Co.*,
  579 N.W.2d 599 (N.D. 1998) .................................................................... 25

*Forbau v. Aetna Life Ins. Co.*,
  876 S.W.2d 132 (Tex. 1994) ..................................................................... 16

*Gaylord Container v. CNA Ins. Co.*,
  807 So.2d 864 (La. Ct. App. 2001) ........................................................... 27

*Gonzalez v. Mission Am. Ins. Co.*,
  795 S.W.2d 734 (Tex. 1990) ..................................................................... 20

*Great N. Ins. Co. v. Greenwich Ins. Co.*,
  No. CV-05-635, 2007 WL 2458477 (W.D. Penn. Aug. 24, 2007) .......... 30

*Greenwich Ins. Co. v John Sexton Sand & Gravel*,
  No. 1-12-1263, 2013 WL 950755 (Ill. Ct. App. Mar. 11, 2013) ............. 27

*Gregory v. Tenn. Gas Pipeline Co.*,
  948 F.2d 203 (5th Cir. 1991) ..................................................................... 35

*Hawkins Chem., Inc. v. Westchester Fire Ins. Co.*,
  159 F.3d 348 (8th Cir. 1998) ..................................................................... 38

*Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  847 F.3d 594 (8th Cir. 2017) ......................................................... 26, 27, 38

*Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*,
  No. 1:14-CV-25, 2015 WL 11143072 (D.N.D. Sept. 17, 2015) .............. 26

*Holland v. Sam's Club*,
  487 F.3d 641 (8th Cir. 2007) ..................................................................... 31

*In re Deepwater Horizon*,
  470 S.W.3d 452 (Tex. 2015) ............................................................. passim

*Indiana Lumbermens Mut. Ins. Co. v. W. Oregon Wood Prods.*,
  268 F.3d 639, 645 (9th Cir. 2001) ............................................................. 38

*Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*,
  278 F.3d 494 (5th Cir. 2002) ..................................................................... 16

*Ironshore Specialty Ins. Co. v. Aspen Underwriting, Ltd.*,
  788 F.3d 456 (5th Cir. 2015) ......................................................... 14, 24, 25

*Jones v. Francis Drilling Fluids, Ltd.*,
  642 F. Supp. 2d 643 (S.D. Tex. 2009) ....................................................... 27

*Kelley-Coppedge, Inc. v. Highlands Ins. Co.*,
  980 S.W.2d 462 (Tex. 1998) ..................................................................... 38

*Liberty Mutual Fire Ins. Co. v. Lexington Ins. Co.*,
  446 S.W.3d 835 (Tex. App.—San Antonio 2014, no pet.) .......... 35, 36, 38

*McPhee v. Tufty*,
   623 N.W.2d 390 (N.D. 2001) .................................................................. 30

*Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*,
   16 S.W.3d 418 (Tex. App.—Waco 2000, pet denied) ....................................... 30, 31

*Midwest Family Mut. Ins. Co. v. Wolters*,
   No. A11-181, 2011 WL 3654498 (Minn. Ct. App. Aug. 22, 2011) ................... 31, 38

*Moayedi v. Interstate 35/Chisam Rd., L.P.*,
   438 S.W.3d 1 (Tex. 2014) ..................................................................... 16

*Nascimento v. Preferred Mut. Ins. Co.*,
   513 F.3d 273 (1st Cir. 2008) .................................................................. 35

*Nationwide Mut. Ins. Cos. v. Lagodinski*,
   683 N.W.2d 903 (N.D. 2004) ........................................................... passim

*Noble Energy Inc. v. Bituminous Cas. Co.*,
   529 F.3d 642 (5th. Cir. 2008) ........................................... 27, 29, 30, 38

*NuStar Energy, L.P. v. Diamond Offshore Co.*,
   402 S.W.3d 461 (Tex. App.—Houston [14th Dist.] 2013, no pet.) ..................... 16

*Owners Ins. Co. v. Singh*,
   1999 WL 976249 (Ohio Ct. App. Sept. 21, 1999) ...................................... 32

*Perkins Hardwood Lumber Co. v. Bituminous Cas. Corp.*,
   378 S.E.2d 407 (Ga. App. Ct. 1989) ...................................................... 38

*Pioneer Exploration, LLC v. Steadfast Ins. Co.*,
   767 F.3d 503 (5th Cir. 2014) ................................................................ 35

*Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*,
   976 F.2d 1037 (7th Cir. 1992) ......................................................... 26, 27

*Roberge v. Hannah Marine Corp.*,
   No. 96-1691, 1997 WL 468330 (6th Cir. Aug. 13, 1997) ............................ 28

*Schmid v. Fireman's Fund Ins. Co., Inc.*,
   97 F. Supp. 2d 967 (D. Minn. 2000) ...................................................... 31

*Star Ins. Co. v. Continental Resources, Inc.*,
   89 F. Supp. 3d 1014 (D. N.D. Feb. 24, 2015) ......................................... 23

*Tow v. Gemini Ins. Co.*,
   No. 12-36187, 2015 WL 5965600 (Bankr. S.D. Tex. Oct. 9, 2015) ............... 34

*U.S. Fidelity & Guar. Co. v. B&B Oil Well Serv., Inc.*,
   910 F. Supp. 1172 (S.D. Miss. 1995) ................................................. 35, 38

*UPS Worldwide Forwarding, Inc. v. Simplex Leasing, Inc.*,
   No. 3:12–cv–75, 2013 WL 12085472 (D. N.D. Feb. 7, 2013) ........................ 28

*Varano v. Protection Mut. Fire Ins. Co.*,
   61 Pa. D. & C. 600 (Com. Pl. 1948) ...................................................... 32

*W. Am. Ins. Co. v. Hopkins*,
  No. CA 3108, 1994 WL 559005 (Oh. Ct. App. 1994)................................................... 29, 32, 38

*Wallerstein v. Spirt*,
  8 S.W.3d 774 (Tex. App.—Austin 1999, no pet.) ........................................................... 21, 22

*Wisness v. Nodak Mut. Ins. Co.*,
  806 N.W.2d 146 (N.D. 2011) ....................................................................................... 29, 30, 32

**STATUTES**

TEX. CIV. PRAC. & REM. CODE § 127.001 .................................................................................. 16

**RULES**

FED. R. CIV. P. 8 ......................................................................................................................... 27

## SUMMARY

XTO moves for summary judgment on the issues of its insured status on the Berkley Policies, and on application of the Pollution Exclusion.  Notably, the parties briefed the Pollution Exclusion almost verbatim for Berkley's own Motion for Summary Judgment, which, if granted, would dispose of all claims between Berkley and XTO without ever needing to reach the issue of XTO's insured status. The Court can and should dismiss this case based on Berkley's Motion alone.

XTO is entitled to summary judgment neither on insured status, nor regarding the Pollution Exclusion.[1]  Missouri Basin Well Services, Inc. ("MBI") and XTO Energy, Inc. ("XTO") worked under a Master Service Agreement ("MSA").  Berkley's CGL Policy incorporates the minimum requirements and other limitations from the MSA: "Furthermore, the insurance provided will not exceed . . .  [t]he coverage, terms, and/or limits required by said written contract or written agreement." [Doc. 74-1 at 10–11] Furthermore, the Umbrella Policy extends additional insured coverage "not beyond any limitation imposed under any written contract or written agreement." [Doc. 74-2 at 11 (emphasis added)]  The Umbrella Policy also

---

[1]   It is important to clarify on what issues XTO is and is not moving.  Despite the title in XTO's motion ("The Berkley Policies Provide Coverage to XTO for the Lawsuits"), XTO has not moved on entitlement to coverage under the Berkley Policies.  In its motion for partial summary judgment, XTO is only moving on Berkley's claims and affirmative defenses that:

  1.  XTO does not qualify as an additional insured because

      (a)  the MSA required MBI to obtain no such coverage,

      (b)  the MSA released MBI from all claims related to XTO's indemnity obligation, including any insurance requirements, and

      (c)  XTO's liability did not arise out of MBI's operations, as required by the Policies; and

  2.  XTO's claim is excluded by the Berkley Policies' pollution exclusion.

[Doc. 111 at 10]  XTO is not moving for summary judgment on Berkley's claims and affirmative defenses that (1) XTO's contractors are not additional insureds [Docs. 23 ¶ 102; 54 ¶¶ 25, 27]; (2) even if XTO were an additional insured, it would have no coverage for the Underlying Lawsuits due to the Berkley Policies' contractual liability exclusions [Docs. 23 ¶ 105; 54 ¶ 28]; and all Berkley's other claims and affirmative defenses that XTO is not entitled to coverage under the Berkley Policies for the Underlying Lawsuits.  [Docs. 23 ¶ 106–108, 110–13; 54 ¶ 29–31]

cannot provide broader coverage than the CGL Policy. [Doc. 74-2 at 10]  Together, both Berkley Policies incorporate the limitations of the MSA.  The MSA, in turn, did *not* require MBI to name XTO as an additional insured on its policies for a claim for which XTO itself assumed liability and agreed to indemnify MBI. Importantly, XTO agreed to indemnify MBI for injuries to the XTO Group—including workers in the Underlying Lawsuits—and to obtain its own insurance applying on a primary basis to support that indemnity. XTO broadly released MBI from any and all liability for such claims. Because MBI did not agree to name XTO as an additional insured for the types of claims in the Underlying Lawsuits, and because the Berkley Policies only extend additional insured coverage to the extent "required" by the MSA, XTO is not an additional insured for the Underlying Lawsuits. At the very least, XTO is not an additional insured on the Umbrella Policy because the MSA only required MBI to obtain $1,000,000 in CGL coverage (and still not to cover XTO's own indemnity obligations) but no excess coverage whatsoever.

Additionally, the Pollution Exclusion does apply, and XTO has not met its burden to show otherwise. XTO concedes the underlying injuries were caused by release of pollutants. [Doc. 109 at 20][2] Despite this, XTO asserts the Pollution Exclusion cannot apply because it only applies to "environmental-type harms." Though North Dakota has no such requirement, the explosion of an oil and gas well is the quintessential example of environmental-type harm.

XTO also alleges two unpleaded exceptions to the Pollution Exclusion apply: the Hostile Fire Exception and the Contractor Exception—both raised by surprise for the first time in XTO's motion and response to Berkley's motion, and thus waived. Moreover,  these exceptions do not apply. The Hostile Fire Exception reinstates coverage only for bodily injury "arising out of heat, smoke, or fumes from a hostile fire." The workers were not injured by "heat, smoke, or fumes,"

---

[2]    All citations to the Court's file refer to the ECF file-stamped pagination.

nor was explosion of the Ryan Well a "hostile fire." The Contractor Exception reinstates coverage only for the named insured—not XTO. It also does not apply when any insured has "occupied" the site. Berkley's named insured, MBI, occupied the Ryan Well site because its employee, Carson Dokken, was the highest-ranking supervisor on location.

The Court should therefore deny XTO's Motion for Partial Summary Judgment.

## STATEMENT OF FACTS

Berkley refers the Court to the Statement of Facts as set forth in its Motion for Summary Judgment.  [Doc. 73 at 7–17]

### *The MSA*

As further background, Berkley's named insured, MBI and XTO entered into a MSA defining their legal obligations for their work on the Ryan Well.  In relevant part, the MSA states:

II.   Definitions.

. . . .

2.8   "XTO Group" shall mean individually or in any combination XTO, its Affiliates, co-owners or co-lessees (whether of a fee, lease, mineral lease or otherwise) at the Site, joint interest owners, joint venturers, partners, contractors and subcontractors other than Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.

. . . .

X.   RELEASE, DEFENSE, INDEMNITY AND HOLD HARMLESS

. . . .

10.2   XTO's Obligations.

10.2.1 XTO hereby agrees to release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the XTO Group, and/or loss of or damage to property or interests in property of any one or more members of the XTO

10

Group in any manner incident to, connected with or arising out of the performance of the Work. This obligation is without regard to the cause or causes of such physical or mental injury, illness, death, or loss of or damage to property or interests in property and includes, but is not limited to, Indemnifiable Claims resulting from any sole, gross, joint or concurrent negligence, willful misconduct, strict liability, or other act and/or omission of any one or more members of the Contractor Group.

. . . .

10.2.3 XTO agrees that any indemnity obligations herein will either be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the Contractor Group and shall provide waivers of subrogation against all members of the Contractor Group; or XTO may be self-insured. To the extent that the applicable law prohibits monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law.

XI.   <u>Insurance.</u>

11.1   <u>Coverages</u>  Subject to the provisions of Section 11.2, Contractor will secure and maintain, and will require its Subcontractors to secure and maintain, during the term of this Agreement the following insurance coverages with limits not less than the amounts specified, and with companies satisfactory to XTO who are authorized to do business in the jurisdiction where the Work is to be performed, and will furnish certificates of such insurance satisfactory to XTO before commencing the Work; provided, however, that no waiver of the provisions of this Article XI will occur to any extent merely from a failure on the part of XTO to object or complain about Contractor's failure to furnish certificates of insurance satisfactory to XTO.

. . . .

11.1.2  Commercial General Liability Insurance INCLUDING CONTRACTUAL LIABILITY, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence, and an aggregate annual limit of not less than $2,000,000.

. . . .

11.4   <u>Primary Coverage and Additional Insured.</u>  ALL INSURANCE AND COVERAGES LISTED IN THIS ARTICLE XI WILL

11

EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCE OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT. ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED. ALL OF THE CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

. . . .

14.8   <u>Applicable Law</u>.  This Agreement will be governed by the laws of the State of Texas, excluding the Texas rules on conflicts of law. . . . [Doc. 74-3]

***The Berkley Policies***

Berkley issued Energy Commercial General Liability policy no. EGL001672010 to MBI, effective April 13, 2016–17, with a $1,000,000 liability limit per occurrence (the "CGL Policy"). Berkley also issued Energy Commercial Umbrella Liability policy no. EUL001670910 to MBI, effective April 13, 2016–17, with a $25,000,000 liability limit per occurrence (the "Umbrella Policy").

Relevant to XTO's additional insured arguments, the CGL Policy states:

**I.   <u>NAMED INSUREDS AND INSUREDS</u>**

. . . .

**B.  Insureds**

Each of the following is an **INSURED** with respect to the coverages set forth in Section II.A. Bodily Injury and Property Damage Liability, Section II.C. Personal and Advertising Injury Liability, and Section II.D. Medical Payments of this policy:

1.  **Additional Insured:**

Any person or organization with whom **YOU** agree in a written contract or written agreement to add as an Additional Insured on your policy or to provide liability insurance for, but only with respect to liability arising out of **YOUR** operations or liability arising out of premises owned by or rented to **YOU**.

In addition, the written contract or written agreement requiring **YOU** to include a person or organization as an Additional Insured must be in effect during the policy period and executed before the **BODILY INJURY**, **PROPERTY DAMAGE**, or **PERSONAL AND ADVERTISING INJURY** occurred. Furthermore, the insurance provided will not exceed the lesser of:

a.  The coverage, terms, and/or limits of this policy; or

b.  The coverage, terms, and/or limits required by said written contract or written agreement. [Doc. 74-1 at 10]

Relevant to XTO's additional insured arguments, the Umbrella Policy states:

**I.  COVERAGES**

**A.  Coverage A – Excess Follow Form Liability Insurance**

Subject to all of the terms and conditions applicable to Coverage A – Excess Follow Form Liability Insurance, **WE** will pay on behalf of the **INSURED**, those damages or **POLLUTION CLEAN UP COSTS** covered by this policy in excess of the total applicable limits of **UNDERLYING INSURANCE**. With respect to Coverage A, the terms and conditions of **UNDERLYING INSURANCE** are made a part of this policy, except with respect to:

1.  Any contrary provision contained in this policy; or

2.  Any provision in this policy for which a similar provision is not contained in **UNDERLYING INSURANCE**.

With respect to the exceptions stated above, nothing contained therein will serve to make this policy broader than the **UNDERLYING INSURANCE**.

. . . .

**III. NAMED INSUREDS AND INSUREDS**

**A.  Coverage A – Excess Follow Form Liability Insurance**

With respect to Coverage A – Excess Follow Form Liability Insurance, the following persons and organizations qualify as an **INSUREDS**:

1.  The NAMED INSURED shown on the Declaration Page; and

2.  Other persons or organization qualifying as an INSURED in
    UNDERLYING INSURANCE, but not beyond any limitation imposed
    under any written contract or written agreement. [Doc. 74-2 at 11]

ARGUMENT & AUTHORITIES

**I.   The Berkley Policies do not afford additional insured coverage to XTO for the
claims in the Underlying Lawsuits.**

The burden to establish insured status lies with XTO.  *Forsman v. Blues, Brews & Bar-B-Ques, Inc.*, 903 N.S.2d 524, 531 (N.D. 2017).  XTO has not and cannot meet that burden.

**A.   XTO's purported additional insured status begins with analysis of the
Berkley Policies, which incorporate the MSA's requirements limiting
additional-insured status.**

An insurer's contractual agreement with an insured is the policy.  Therefore, the coverage
analysis necessarily begins with the insurance policy, and only references an underlying contract
as directed by the policy.  *See Borsheim Builders Supply, Inc. v. Manger Ins., Inc.*, 917 N.W.2d
504, 511 (N.D. 2018) (beginning with the policy's definition of "insured contract" before
analyzing the MSA); *Ironshore Specialty Ins. Co. v. Aspen Underwriting, Ltd*., 788 F.3d 456,
460 (5th Cir. 2015) ("[O]ur analysis of . . . coverage 'necessarily begins with the four corners of
the policies,' not the service contract.").

Here, in extending additional insured coverage, the Berkley Policies incorporate the
minimum requirements and other limitations from the MSA: "Furthermore, the insurance
provided will not exceed . . . [t]he coverage, terms, and/or limits required by said written
contract or written agreement." [Doc. 74-1 at 10–11] And the Umbrella Policy extends additional
insured coverage "not beyond any limitation imposed under any written contract or written
agreement." [Doc. 74-2 at 11]  It further states that "nothing contained therein will serve to make
this policy broader than the" CGL Policy. [Doc. 74-2 at 10]

14

By stating that additional insured status "will not exceed" the "coverage, terms, and/or limits required" by the underlying contract, the CGL Policy incorporates the MSA's own restrictions on XTO's additional insured status.  [Docs. 23 ¶¶ 100–01; 54 ¶¶ 23–24]  *See In re Deepwater Horizon*, 470 S.W.3d 452, 468 (Tex. 2015) ("A contract may reasonably be construed as extending the insured's additional-insured status only to the extent of the risk the insured agreed to assume.").  In other words, XTO must meet the requirements in both the CGL Policy and the MSA to qualify as an additional insured. The Umbrella Policy imposes the same additional-insured limitations as the CGL Policy, and further states that it will provide "no broader" coverage than the CGL Policy. As shown below, the MSA *did not* require MBI name XTO as an additional insured for personal injury claims of the XTO Group—the claims in the Underlying Lawsuits.  As a result, XTO does not qualify as an additional insured on the Berkley Policies.

**B.     MBI was not required to obtain additional-insured coverage for XTO for the types of claims in the Underlying Lawsuits.**

**1.     MBI did not agree to procure additional insured coverage for XTO for injury to members of the XTO Group.**

XTO asserts that the MSA does not limit XTO's additional insured status to claims  for which MBI contractually assumed responsibility.  [Doc. 111 at 22–25]  Instead, XTO urges this Court to view paragraph 11.4 of the MSA, which requires MBI to provide XTO with additional insured coverage on a primary basis, in isolation. [Doc. 74-3 ¶ 11.4]  But under the MSA, XTO must release, defend, indemnify, and hold MBI harmless from all personal injury claims of the "XTO Group." [Doc. 74-3 ¶¶ 10.2.1, 10.1.1 (defining "indemnifiable claims")]  XTO concedes that the workers injured in the explosion were members of the XTO Group. [Doc. 7 ¶ 14] Paragraph 10.2.3 of the MSA requires XTO—not MBI—to obtain insurance applying on a primary basis to cover that indemnity obligation. [Doc. 74-3 ¶¶ 10.2.3]

**The MSA provisions must be construed together**. Under Texas law,[3] paragraphs 11.4 and 10.2.3—which require different parties to obtain insurance for XTO, and each on a primary basis—must be read together to ascertain the parties' intent.   *See Moayedi v. Interstate 35/Chisam Rd., L.P.*, 438 S.W.3d 1, 7 (Tex. 2014).[4] Texas rules of contract interpretation strive to reconcile individual provisions in context with the whole contract:

> A contract is not necessarily ambiguous simply because some sections arguably conflict. This is because the parties may choose to set out a general rule in one provision and exceptions to that rule in other provisions. Thus, "[t]o the extent of any conflict, specific provisions control over more general ones."

*NuStar Energy, L.P. v. Diamond Offshore Co.*, 402 S.W.3d 461, 466 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (internal citations omitted).  This "is but an application of [Texas's] long-established rule that '[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.'"  *Forbau v. Aetna Life Ins. Co.,* 876 S.W.2d 132, 134 (Tex. 1994); *see Int'l Turbine Servs., Inc. v. VASP Brazilian Airlines*, 278 F.3d 494, 497 (5th Cir. 2002) ("[C]ourts must examine and consider the entire writing and give effect to all provisions such that none are rendered meaningless.").

MSA paragraph 11.4, which requires additional insured coverage for XTO applying on a primary basis, references "liabilities and obligations assumed by contractor [MBI]." MSA paragraph 10.2.3 requires XTO to obtain its own insurance, *also* applying on a primary basis, to support XTO's indemnity obligations—including injury claims of the XTO Group. Read together, the MSA requires MBI to name XTO as an additional insured for those claims in which MBI has assumed liability, *but not* for those claims in which XTO has assumed liability.

---

[3]   The parties agree that Texas law applies to interpretation of the MSA, whereas North Dakota law applies to interpretation of the Berkley Policies.  The MSA contains a choice-of-law provision stating that the MSA "will be governed by the laws of the State of Texas."  [Doc. 74-3 ¶ 14.8]

[4]   This is the same under North Dakota law.  *See Forsman*, 903 N.S.2d at 530 ("The whole of a contract is to be taken together to give effect to every part, and each clause is to help interpret the others.").

XTO also asserts that the indemnity and additional-insured requirements in the MSA are entirely distinct because they "appear in entirely separate sections of the MSA."  [Doc. 111 at 23]  But the Texas Supreme Court rejected this same argument in *Deepwater*, when BP argued that "the Drilling Contract's indemnity and insurance provisions are separate and independent." *Deepwater*, 470 S.W.3d at 467.  The court explained:

> [S]imply because the duties to indemnify and maintain insurance may be separate and independent does not prevent them from also being congruent; that is, a contract may reasonably be construed as extending the insured's additional-insured status only to the extent of the risk the insured agreed to assume. . . . Because the scope of Transocean's duty to indemnify governs the scope of Transocean's duty to insure BP, we decline BP's request to ignore the indemnity obligation when construing the Drilling Contract.

*Id*. at 468.  The location of the obligations does not matter.  What matters is whether the policy incorporates limitations in the underlying contract—as the Berkley Policies do—and whether the underlying contract limits the required additional-insured coverage—as the MSA does.  *See id*. at 463. The plain language of the MSA when read as a whole defies XTO's arguments.

**The parties intended the MSA to apply as Berkley asserts**. Under Texas law—which XTO chose to apply to the MSA—XTO must support its own indemnity obligation with insurance in order to enforce MBI's knock-for-knock indemnity obligation.  *See Deepwater*, 470 S.W.3d at 456 & n.5 (explaining knock-for-knock indemnity clauses that are standard in the oil and gas industry).  The Texas Oilfield Anti-Indemnity Act, or TOAIA, applies to any "agreement pertaining to a well for oil, gas, or water or to a mine for a mineral," which includes "an agreement to render services in connection with a well drilled to produce or dispose of oil, gas, other minerals or water."  TEX. CIV. PRAC. & REM. CODE § 127.001(1), (4).  The MSA is therefore governed by TOAIA.  TOAIA renders oilfield indemnity obligations *void*, with specific exceptions.  *Id.* § 127.003.  One such exception is for a "mutual indemnity obligation":

> an indemnity obligation in an agreement pertaining to a well for oil, gas, or water . . . in which the parties agree to indemnify each other and each other's

contractors and their employees against loss, liability, or damages arising in connection with bodily injury, death, and damage to property of the respective employees, contractors or their employees, and invitees of each party arising out of or resulting from the performance of the agreement.

*Id.* §§ 127.001(3), 127.005. A "mutual" obligation can be enforced up to the amount of liability insurance each party agrees to obtain to support its indemnity obligation. *Id.* § 127.005(b). To trigger the exception, MBI agreed to support its indemnity obligation with insurance, and XTO agreed to support its indemnity obligation with insurance. [Doc. 74-3 ¶¶ 10.1.3, 10.2.3] If, as XTO asserts, MBI had to obtain insurance on behalf of XTO to support XTO's indemnity obligation, TOAIA would void the MSA's indemnity clauses. That obviously was not XTO's, nor the parties', intent. [*See* Doc. 74-3 ¶ 10.2.3 ("To the extent that the applicable law prohibits monetary limits of insurance required or the indemnities voluntarily assumed hereunder, the requirements will automatically be revised to conform, to the maximum extent permitted, with applicable law."). The parties intended the MSA to—and the MSA does—require XTO to insure its own indemnity obligations, including the injuries in the Underlying Lawsuits.

**XTO's case law is distinguishable**. XTO cites *Evanston v. ATOFINA*, 256 S.W.3d 660 (Tex. 2008), for the proposition that "the subcontractor's duty to indemnify and its duty to name the contractor as an additional insured were two separate and distinct obligations under the contract." [Doc. 111 at 23] And yes, under *that contract*, the duties were separate. The MSA between XTO and MBI is different, and like every contract, must be interpreted in its own right.

Moreover, in *Deepwater Horizon*, the Fifth Circuit Court of Appeals questioned the reach of *ATOFINA* by certifying the following question to the Texas Supreme Court:

Whether [*ATOFINA*] compels a finding that BP is covered for the damages at issue, because the language of the umbrella policies alone determines the extent of BP's coverage as an additional insured if, and so long as, the additional insured and indemnity provisions of the Drilling Contract are "separate and independent"?

470 S.W.3d 452, 460 (Tex. 2015).  In *Deepwater*, BP had a written contract with Transocean that required Transocean to name BP as an additional insured on each of its policies for liability assumed by Transocean in the contract.  *Id*. at 457.  Transocean's CGL policy granted additional-insured coverage to any entity to whom Transocean was "obliged" "where required" by contract to provide CGL coverage.  *Id*. at 457–58.  Under their contract, Transocean agreed to indemnify BP for above-surface pollution, and BP agreed to indemnify Transocean for sub-surface pollution.  *Id*. at 456.  The issue was whether BP qualified as an additional insured on Transocean's CGL policy for *sub*-surface pollution from the Deepwater Horizon oil spill—for which BP had contractually assumed liability.  The Texas Supreme Court held that BP was not an additional insured for sub-surface pollution.  *Id*. at 468.  The court explained the outcome differed from *ATOFINA* because the ATOFINA contract required unlimited additional insured coverage, and more importantly, the policy itself did not incorporate any contractual limits:[5]

> Contrary to any suggestion otherwise, the foregoing authority cannot be interpreted as excluding from consideration restrictions on the scope of additional-insured coverage contained in a contract that has been incorporated into the terms of an insurance policy.  Rather, this authority affirms the principle that we must consider the terms of an underlying contract to the extent the policy language directs us to do so.

*Id*. at 464.

**XTO's arguments promote an unreasonable reading of the MSA**.  Reading paragraphs 10.2.2, 10.2.3, and 11.4 as MBI proposes results in an absurd conflict: The MSA cannot require XTO and MBI both to provide insurance coverage to XTO, and both on a primary basis, for the

---

[5]  The policy in *ATOFINA* did not limit coverage to that required by contract: "a person or organization for whom [the insured has] agreed to provide insurance as is afforded by this policy; but that person or organization is an insured only with respect to operations performed by you or on your behalf, or facilities owned or used by you."  *Deepwater*, 470 S.W.3d. at 461.  The CGL Policy, by contrast, does incorporate the underlying contract's limits: coverage "will not exceed" the "coverage, terms, and/or limits required by said written contract or written agreement."  [Doc. 74-1 at 10]  As discussed in section I.A. above, coverage analysis starts with the policy.

underlying claims.  A contract interpretation "inconsistent with other provisions of the contract is, as a matter of law, unreasonable." *Deepwater*, 470 S.W.3d at 466 ("BP's construction of the contract is not reasonable because it is . . . inconsistent with other provisions in the Drilling Contract . . . ."). XTO's interpretation creates a conflict and is therefore unreasonable.  To avoid the conflict, the more general section (paragraph 11.4) on insurance must yield to the specific section addressing the exact scenario of the Underlying Lawsuits: XTO agreeing to insure its own indemnity obligation for personal injury claims of XTO Group members (paragraph 10.2.3).

Berkley's interpretation is reasonable and results in no conflict between MSA paragraphs 10.2.3 and 11.4. The Court should adopt the reasonable interpretation that resolves the would-be conflict within the MSA.  *See id.* at 464 ("Disagreement about a [contract's] meaning does not create an ambiguity if there is only one reasonable interpretation.").

**If there is an ambiguity, the Court must adopt the interpretation favoring MBI.**  If the Court concludes there is *more than one* reasonable interpretation, then the MSA contains an ambiguity. *See id.* at 468. Under Texas law, a contractual ambiguity is resolved as a matter of law against the drafter—in this case, XTO. *Gonzalez v. Mission Am. Ins. Co.*, 795 S.W.2d 734, 737 (Tex. 1990). [Ex. A , RFA 2] As a result, if the Court finds one reasonable interpretation benefiting XTO and another benefiting MBI, under Texas law, the Court must adopt interpretation benefiting MBI to resolve the ambiguity.

### 2. XTO released any claim that MBI obtain insurance for XTO for the types of claims in the Underlying Lawsuits.

In the MSA, XTO "agrees to release, defend, indemnify and hold [MBI] harmless from and against any and all Indemnifiable Claims arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the XTO Group," including the injured workers in the Underlying Lawsuits. [Doc. 74-3 ¶ 10.2.1] "Indemnifiable Claims" are

"any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorneys' fees, including attorneys' fees incurred in the enforcement of this indemnity)." [Doc. 74-3 ¶ 10.1.1]  Based upon this broad language, XTO's release—which is separate from its indemnity obligation—encompasses a relinquishment of any obligation MBI had to procure insurance for XTO for the released claims (though as explained above, MBI never had such an obligation because that interpretation results in an irreconcilable conflict within the MSA).

Unlike an indemnity, a release is an all-encompassing extinguishment of claims between parties to an agreement:

> A release extinguishes a claim or cause of action as would a prior judgment and is an absolute bar to any suit on the released matter. . . . A release extinguishes any actual or potential claims the releasor may have against the releasee without regard to third parties. In contrast, an indemnity does not apply to claims between the parties to the agreement.

*Wallerstein v. Spirt*, 8 S.W.3d 774, 779–80 (Tex. App.—Austin 1999, no pet.) (internal citations omitted); *see Dresser Industries, Inc. v. Page Petroleum, Inc*., 853 S.W.2d 505 (Tex. 1993). By releasing MBI from all claims "arising out of, without limitation," personal injury and death of the underlying injured workers, XTO unequivocally released any alleged obligation to provide XTO additional insured coverage arising out of such claims.

XTO asserts that the release applies to MBI, but not to Berkley. [Doc. 111 at 21]  Again, Berkley's obligations are defined by the Policies.  While the release runs from XTO to MBI, the Berkey CGL Policy defines who qualifies as an additional insured, and it is dependent upon MBI's obligations under the MSA. XTO relies on the CGL Policy's "Additional Insured" section for its coverage argument, so it cannot then ignore the section's limitations: "the insurance provided will not exceed . . . the coverage, terms, and/or limits required by said written contract." [Doc. 74-1 at 10–11]  MBI did not agree to name XTO as an additional insured for the released

claims, and the Berkley Policies incorporate that limitation.  XTO is not an additional insured for liability arising from the released claims, such as those in the Underlying Lawsuits.

XTO cites *Getty Oil Co. v. Insurance Company of North America*, and again *ATOFINA*, for the proposition that "additional insured provisions are not limited to the scope of indemnity obligations in the same contract."  [Doc. 111 at 21]  The Texas Supreme Court's holding was not nearly so broad.  *See Deepwater*, 470 S.W.3d. at 464 (discussing both *Getty* and *ATOFINA*: "Contrary to any suggestion otherwise, the foregoing authority cannot be interpreted as excluding from consideration restrictions on the scope of additional-insured coverage contained in a contract that has been incorporated into the terms of an insurance policy.").  Moreover, *Getty* and *ATOFINA* address indemnity obligations, not releases; the legal effect of each is quite different.  *See Wallerstein*, 8 S.W.3d at 779–80.

Because XTO released MBI for the claims in the Underlying Lawsuits, including any obligation to name XTO as an additional insured for such claims, and because the Berkley Policies incorporate that limitation, XTO is not an additional insured for the Underlying Lawsuits.

**C.     There is no "liability arising out of [MBI's] operations" for the Underlying Lawsuits, as required for XTO to qualify as an additional insured.**

XTO can only be an insured under the CGL Policy "with respect to liability arising out of [MBI's] operations." [Doc. 74-1 at 10]  XTO asserts that this phrase does not restrict additional-insured coverage to situations of vicarious liability. [Doc. 111 at 29]  However, with both XTO and MBI being defendants in the Underlying Lawsuits, XTO could have no liability "arising out of [MBI's] operations" because the factfinder would have assessed MBI's *own* liability arising from MBI's operations.  While XTO presents the majority position on this issue, some states have concluded that when the purported additional insured is an underlying co-defendant with

the named insured, there is no additional insured coverage. *See, e.g., Davis v. LTV Steel Co., Inc.*, 716 N.E.2d 766, 769 (Ohio Ct. App. 1998). Because North Dakota courts have not yet addressed the issue, and because the minority position is more persuasive based on a clear reading of the policy language, this Court should hold that XTO cannot have "liability arising out of [MBI's] operations" since MBI was an underlying defendant.

### D.     XTO does not qualify as an insured on the Umbrella Policy.

Even if XTO qualifies as an additional insured on the CGL Policy—which it does not— XTO still would not qualify as an additional insured on the Umbrella Policy. [Docs. 23 ¶¶ 100–01, 104; 54 ¶¶ 23–24] This Court previously addressed a similar issue. In *Star Insurance Co. v. Continental Resources, Inc.*, Star conceded that Continental was an additional insured on its umbrella policy. However, Star argued that Continental was only entitled to $1,000,000 in coverage under its umbrella policy, rather than the full $5,000,000 umbrella limit. 89 F. Supp. 3d 1014, 1022 (D. N.D. Feb. 24, 2015). The umbrella policy limited an additional insured to "the amount of insurance required by the contract," and the contract required Star's named insured to procure $2,000,000 in coverage for Continental ($1,000,000 of which was satisfied by the primary policy). *Id.* The Court concluded that, as an additional insured, Continental was only entitled to $1,000,000 under the umbrella policy and not the full limit.[6] *Id.*

In *ATOFINA*, the CGL policy added ATOFINA as an insured "but only with respect to liability arising out of [the named insured's] ongoing operations performed for [ATOFINA], but in no event for [ATOFINA's] sole negligence." *ATOFINA*, 256 S.W.3d at 667 n.24. The

---

[6]  The Court went on to hold that Continental was ultimately entitled to $6,000,000 total from Star—but not as an additional insured. *Id.* at 1022–23. The Court held that Star's named insured had an unlimited obligation to indemnify Continental, and Star covered its named insured's indemnity obligation. *Id.* In other words, Continental was entitled to only $1,000,000 as an additional insured on the umbrella policy, but Continental was the recipient of the remaining umbrella limits because Star still had to cover its named insured's indemnity owed to Continental. MBI is not a party to this case, and MBI has no indemnity obligation to XTO for injuries to the XTO Group, so coverage to MBI for indemnity to XTO is not an issue in this case.

umbrella policy then stated that additional insured status "will be no broader that the 'underlying insurance' except for this policy's Limit of Insurance."  Because the umbrella policy could be no broader than underlying insurance, the Texas Supreme Court held coverage under the umbrella policy "is limited and excludes losses caused by ATOFINA's sole negligence."  *Id*. at 667.

Relying on *ATOFINA* and more recent Texas Supreme Court opinions, the Fifth Circuit in *Ironshore* extended this holding to policy limits.  In *Ironshore*, the excess policy afforded additional insured coverage to the extent named insured Basic was "obliged" by written contract. *Ironshore*, 788 F.3d at 458. In the written contract, Basic agreed to obtain $4,000,000 in excess liability insurance for Endeavor. *Id*. The Fifth Circuit held because Basic was only "obliged" to obtain $4,000,000 in excess coverage, Endeavor was limited to $4,000,000 in coverage under Basic's excess policy, and not the full limits that Basic had actually acquired.  *Id*. at 463.

In this case, the Umbrella Policy provides additional insured status "not beyond any limitation imposed under any written contract or written agreement." [Doc. 74-2 at 11] Just as in *ATOFINA*, the Umbrella Policy further states that "nothing contained therein will serve to make this policy broader than the" CGL Policy, which in turn limits additional insured coverage to the "coverage, terms, and/or limits required by said written contract or written agreement." [Docs. 74-1 at 10; 74-2 at 10] The coverage, terms, and limits required under the MSA is "Commercial General Liability Insurance including contractual indemnity, with minimum limits of liability for injury, death, or property damage of $1,000,000 combined single limit per occurrence, and an aggregate annual limit of not less than $2,000,000." [Doc. 74-3 ¶ 11.1.2] The MSA does not require MBI to procure or provide to XTO any CGL limits above $1,000,000, nor does the MSA

require MBI to provide excess coverage at all.[7]   Therefore, even if XTO qualified as an additional insured on the CGL Policy (which it does not), the CGL Policy would limit XTO to the $1,000,000 in coverage required by the MSA, and the Umbrella Policy would incorporate that limit so as not to broaden coverage—resulting in XTO's having $0 limits under the Umbrella Policy. *See ATOFINA*, 256 S.W.3d at 667; *Deepwater*, 470 S.W.3d at 462 ("because the underlying CGL policy excluded losses caused by ATOFINA's sole negligence, we held that limitation also applied to the excess policy."). Moreover, the Umbrella Policy independently restricts coverage to "any limitation imposed" by the MSA, reinforcing the $1,000,000 limit in CGL coverage alone.   As a result, even if XTO could qualify as an additional insured on the CGL Policy, it would have no such entitlement under the Umbrella Policy.

## E.   The Berkley Policies are not ambiguous.

North Dakota courts "will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage."   *Nationwide Mut. Ins. Cos. v. Lagodinski*, 683 N.W.2d 903, 907 (N.D. 2004). "[W]hen the language of an insurance policy is clear and explicit, the language should not be strained in order to impose liability on the insurer." *Fisher v. Am. Family Mut. Ins. Co.*, 579 N.W.2d 599, 602 (N.D. 1998). An insurance provision is only ambiguous if it is capable of at least two reasonable interpretations. [Doc. 111 at 31] However, XTO has failed to present *any* different reasonable interpretations of Berkley Policies' "insured" provisions.   Moreover, additional insured provisions like those in the Berkley Policies are standard in commercial liability policies.   Despite this prevalence, Berkley has been unable to

---

7   The "Actual Insurance" paragraph in the MSA is not controlling.   As explained by the Texas Supreme Court in *ATOFINA* and *Deepwater* and emphasized again by the Fifth Circuit in *Ironshore*, coverage starts with the policy and only references the underlying contract as directed by the policy.   *See ATOFINA*, 256 S.W.3d at 664; *Deepwater*, 470 S.W.3d at 460; *Ironshore*, 788 F.3d at 460. The CGL Policy limits additional-insured coverage to the "limits required" by the MSA, and the MSA only "required" $1,000,000 in CGL insurance. That MBI afterward procured more insurance than the MSA required is irrelevant; the "required" amount remains $1,000,000 of CGL, and CGL alone.

locate any North Dakota cases holding an additional-insured provision ambiguous, nor has XTO identified any. The Berkley Policies' additional insured provisions are unambiguous.

## II.      The Pollution Exclusion bars coverage to XTO.

### A.      The Pollution Exclusion applies to bodily injury.

XTO concedes that the release of pollutants caused the injuries. [Doc. 111 at 32] This should end the inquiry. *See Nationwide*, 683 N.W.2d at 907 (North Dakota Supreme Court "will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage."). But XTO claims that "courts across the country" hold similar exclusions apply only to "environmental-type harms."[8] [Doc. 111 at 9] XTO's invitation for a cross-country tour is unwarranted.

First, the Berkley Policies have no "environmental" requirement, and North Dakota does not interject one. XTO instead implies that pollution can only cause property damage ("environmental-type *harm*"), not bodily injury—an implication contradicted by the Policies:

> BODILY INJURY or PROPERTY DAMAGE arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of POLLUTANTS . . . . [Doc. 74-1 at 22]

The Pollution Exclusion plainly applies to bodily injury, as this Court and the Eighth Circuit have already held. *See Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, No. 1:14-CV-25, 2015 WL 11143072, at *9 (D.N.D. Sept. 17, 2015); *Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 847 F.3d 594, 599–600 (8th Cir. 2017); see also *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1042 (7th Cir. 1992) ("the pollution exclusion clause therein restricts coverage for liability arising from both property damage *and personal injury*") (emphasis added)).

---

[8]   Most of the cases XTO cites concern whether the released substance qualifies as a "pollutant" outside North Dakota law. [Doc. 111 at 33–36] That inquiry is unnecessary here, and the cases are therefore irrelevant.

To support its argument, XTO cites multiple cases applying Louisiana law. [Doc. 111 at 34–36] But Louisiana is a minority state that specifically applies pollution exclusions to "environmental pollution" only. *See Doerr v. Mobil Oil Corp.*, 774 So. 2d 119, 127–28 (La. 2000). North Dakota has never read such a restriction into the pollution exclusion.

Second, **this case involves an oil and gas well explosion**! Quintessential environmental-type harm. This is not the situation some courts have discussed in which the exclusion could apply to "injuries resulting from everyday activities gone slightly, but not surprisingly, awry." *Pipefitters,* 976 F.2d at 1043–44. Moreover, the cases XTO relies on are unhelpful here. All four cases[9] apply the law of states that, unlike North Dakota, rewrite the exclusion to require environmental harm. Furthermore, the *Enron* court took no issue with the explosion, having determined under an incredibly different exclusion that the accidental injection of a lesser-valued commodity into a crude pipeline was not "contamination." 132 F.3d at 530. [Doc. 111 at 36–37] Courts not reading an environmental harm component into the exclusion have held the exclusion does apply to explosions involving pollutants. *See, e.g., Noble Energy Inc. v. Bituminous Cas. Co.*, 529 F.3d 642, 648 (5th. Cir. 2008).

Because the Pollution Exclusion does not apply, XTO's motion must be denied.

### B.     XTO has waived reliance on any exceptions to the Pollution Exclusion.

When an insurance exclusion applies, the insured has the burden to establish an exception. *Hiland*, 847 F.3d at 601. This is different than the exclusion itself not applying; an exception reinstates coverages after an exclusion takes coverage away. Application of an exception to an exclusion is thus an affirmative defense to coverage that the insured must plead.

---

[9]     *Enron Oil Trading & Transport Co. v. Albrook Ins. Co.*, 132 F.3d 526, 530 (9th Cir. 1997); *Jones v. Francis Drilling Fluids, Ltd.*, 642 F. Supp. 2d 643, 665 (S.D. Tex. 2009); *Gaylord Container v. CNA Ins. Co.*, 807 So.2d 864 (La. Ct. App. 2001); *Greenwich Ins. Co. v John Sexton Sand & Gravel*, No. 1-12-1263, 2013 WL 950755, ¶ 25 (Ill. Ct. App. Mar. 11, 2013) (unpub. op.) (concluding explosions are not traditional environmental harm).

*Roberge v. Hannah Marine Corp.*, No. 96-1691, 1997 WL 468330, at *3 (6th Cir. Aug. 13, 1997) ("An affirmative defense, under the meaning of Fed. R. Civ. P. 8(c), is a defense that does not negate the elements of the plaintiff's claim, but instead precludes liability even if all of the elements of the plaintiff's claim are proven.").

XTO neither pleaded nor disclosed reliance on any exception to the Pollution Exclusion prior to its MSJ and MSJ Response, to Berkley's surprise.  FED. R. CIV. P. 8(c). [*See* Doc. 7 ¶¶ 33–37, XTO's affirmative defenses] At minimum, XTO owed "fair notice" of this defense to Berkley, *see Conley v. Gibson*, 355 U.S. 41 (1957),[10] but XTO gave no notice at all. As XTO itself concedes, an affirmative defense not pleaded is waived. [Doc. 102 at 44–45]

The Eighth Circuit's narrow exception allows a party to rely on its unpleaded affirmative defense *only* when the party previously disclosed the affirmative defense. *See, e.g., First Union Nat'l Bank v. Pictet Overseas Tr. Corp.*, 477 F.3d 616, 622 (8th Cir. 2007); *Financial Timing Publ'ns, Inc. v. Compugraphic Corp.*, 893 F.2d 936, 944 n.9 (8th Cir. 1990). Here, XTO gave no such prior notice, so the exception does not apply.

The Court should therefore hold that XTO has waived any exceptions to the Pollution Exclusion. *See* FED. R. CIV. P. 8(c)(1); *Bakken Residential, LLC v. Cahoon Enters., LLC*, 154 F. Supp. 3d 812, 844 (D. N.D. 2015) (finding affirmative defense waived absent pleading in the answer or timely motion to amend).

### C.      The Hostile Fire Exception does not apply.

The Pollution Exclusion does not apply to "bodily injury or property damage arising out of heat, smoke, or fumes from a hostile fire"—the Hostile Fire Exception. [Doc. 74-1 at 33] XTO fails to prove that the Hostile Fire Exception "restores coverage" to XTO. *Nationwide, 683*

---

[10]    *See UPS Worldwide Forwarding, Inc. v. Simplex Leasing, Inc*., No. 3:12–cv–75, 2013 WL 12085472, at *3 (D. N.D. Feb. 7, 2013) (adopting the heightened *Twombly* standard as the more cautious approach).

N.W.2d at 907 (insured bears burden to prove exception). Because XTO has failed to satisfy its burden, and the Hostile Fire Exception simply does not apply, XTO's motion must be denied.

### 1.  XTO's arguments disregard the plain language of the "hostile fire" definition.

A "hostile fire" is "one which becomes uncontrollable or breaks out from where it was intended to be." [Doc. 74-1 at 33] XTO claims that "becomes uncontrollable" can mean a fire that is uncontrollable from its inception—obliterating the word "becomes."[11] A fire must pre-exist in order to "become" uncontrollable. *See Noble Energy Inc.*, 529 F.3d at 648 ("A 'hostile fire' is not defined to mean 'sudden and accidental.'"); *W. Am. Ins. Co. v. Hopkins*, No. CA 3108, 1994 WL 559005, at *4 (Oh. Ct. App. 1994) (holding pollutants had to emanate from a fire that becomes uncontrollable and therefore "hostile"). Under North Dakota law, the Court will not "strain the definition of an undefined term to provide coverage for the insured," *Wisness v. Nodak Mut. Ins. Co.*, 806 N.W.2d 146, 148 (N.D. 2011), yet that is exactly what XTO proposes this Court do.

In *Noble Energy, Inc. v. Bituminous Casualty Co.*, the Fifth Circuit concluded that the pollution exclusion barred coverage for a claim involving a fireball explosion. 529 F.3d at 648. The court determined that the "hazardous chemicals" and "combustible vapors" were released, causing an explosion and fire and falling within the pollution exclusion. *Id*. at 647. The Fifth Circuit rejected the insured's argument that the hostile fire exclusion restored coverage. *Id*. at 648. The court—citing the Ninth Circuit's opinion in *Indiana Lumbermens*—held:

> Appellants' position misses the mark. The hostile-fire exception applies only if a *pre-existing* fire *causes* the pollution. Here, the reverse occurred: The pollutant

---

[11]  The second part of the "hostile fire" requires the fire to "break[] out from where it was intended to be." [Doc. 74-1 at 33] XTO has not presented any evidence or arguments that there was supposed to be a fire where the explosion occurred on the day the plaintiffs in the Underlying Lawsuits were injured. Thus, the second part of the hostile fire definition is inapplicable to this case and requires no analysis.

> itself directly caused the fire at the BLSR facility, not vice versa, so the hostile-fire exception cannot apply.

*Id.* In other words, the word "becomes" requires a pre-existing fire to "become" uncontrollable, and that fire must cause the pollutants. Here, as in *Noble Energy*, the pollutants—the hydrocarbons—caused the explosion.

XTO rejects the Fifth and Ninth Circuits' opinions and instead asks this Court to follow miscellaneous federal district and state court opinions. Those courts ignore the word "becomes" and focus on the word "uncontrollable," determining that the fire is "uncontrollable" immediately after breaking out.[12] These interpretations render "becomes" meaningless, which the North Dakota Supreme Court has rejected.[13] "Become" is defined as "to come into existence," "to come to be," or "to undergo change or development." Become, Merriam-Webster, https://www.merriam-webster.com/dictionary/become. The words used in the "hostile fire" definition require the change of an existing fire from controllable to one "which becomes" uncontrollable. XTO's manipulation of the definition is impermissible under North Dakota law. *See Wisness*, 806 N.W.2d at 148 ("We will not strain the definition of an undefined term to provide coverage for the insured").

---

[12]   *See, e.g.*, *Century Sur. Co. v. Hallandale Beach Ser. Station, LLC*, No. 10-21430-CIV, 2011 WL 13174906, at*3 (S.D. Fla. Mar. 21, 2011) ("[A]s the defendants point out, nothing in the language indicates that there must have been a pre-existing, controlled fire. And the fire in the state-court complaint was uncontrollable, and so it must have "become" an uncontrollable fire ***somehow***.") (emphasis added); *Great N. Ins. Co. v. Greenwich Ins. Co.*, No. CV-05-635, 2007 WL 2458477 (W.D. Penn. Aug. 24, 2007) ("The phrase 'becomes uncontrollable' will be construed to include both controllable fires that subsequently become uncontrollable and fires that are uncontrollable from their inception."); *Mid-Continent Cas. Co. v. Safe Tire Disposal Corp.*, 16 S.W.3d 418 (Tex. App.—Waco 2000, pet denied) (noting the insured claimed the phrase "hostile fire" included any "accidental" or "unintended" fire).

[13]   *See, e.g.*, *McPhee v. Tufty*, 623 N.W.2d 390, 398–99 (N.D. 2001) ("If we were to accept the McPhees' construction of the exception to the exclusion, the exclusion would be rendered meaningless and coverage would exist in all cases in which the named insured could be held liable for another's negligence while driving a vehicle owned by or furnished for the regular use of a family member, despite the express exclusion of coverage for the "use of . . . [a]ny vehicle, other than 'your covered auto,' which is . . . owned by . . . or . . . furnished or available for the regular use of any 'family member.'" We construe insurance contracts as a whole to give meaning and effect to each clause, if possible.").

This case undisputedly does not involve pollution from a *pre-existing* fire which became uncontrollable.[14] The fire and explosion at the Ryan Well described in the Underlying Lawsuits was not the result of any *pre-existing fire*, so the Hostile Fire Exception does not apply.

### 2.    XTO did not prove that the fire was "uncontrollable."

Many courts have considered the definition of "control" and the proof needed to demonstrate the "uncontrollable" requirement in the "hostile fire" definition. *See, e.g.*, *Midwest Family Mut. Ins. Co. v. Wolters*, No. A11-181, 2011 WL 3654498, at *5 (Minn. Ct. App. Aug. 22, 2011); *Mid-Continent Cas. Co.,* 16 S.W.3d at 422; *Schmid v. Fireman's Fund Ins. Co*., *Inc.,* 97 F. Supp. 2d 967, 972 (D. Minn. 2000) ("In the context of a fire, **an uncontrollable fire is one that a person cannot contain, guide, or extinguish**.") (emphasis added).

In *Bernhardt v. Hartford Fire Insurance Co.*, the court analyzed plaintiff's contention that damages were caused by fumes from a hostile fire. 648 A.2d 1047, 1049 (Md. App. Ct. 1994). The court concluded the plaintiff failed to prove the Hostile Fire Exception: "There is simply no evidence or proffer that the fire in the furnace became 'uncontrollable' or '[broke] out from where it was intended to be.'" *Id.*   Here, XTO's conclusory statements that the fire was uncontrollable is no evidence. *See Holland v. Sam's Club*, 487 F.3d 641, 644 n.5 (8th Cir. 2007) ("Such general, conclusory, and cursory statements are not sufficient."). Contrary to XTO's bare allegations, Joe Guillan extinguished the fire himself using the "safeties," as designed. [Docs. 74-4 at 18; 74-16 at 9 (34–35); 74-27 at 65 (248)] Thus the fire was controllable from inception, and was in fact controlled and extinguished, within twenty seconds. [Docs. 74-4 at 18; 74-27 at 65 (248)] Additionally, no underlying plaintiffs pleaded that the fire was uncontrollable—a

---

[14]   For purposes of defense, all underlying plaintiffs pleaded that the fire was sudden, not pre-existing.  [Doc. 74-17 ¶ 31; 74-18 ¶ 10; 74-19 ¶ 35; 74-20 ¶ 38; 74-21 ¶ 28]

requirement for XTO to establish the exception for defense.[15] Because the fire was not "uncontrollable," there was no "hostile fire" as defined by the Berkley Policies, and the Hostile Fire Exception does not apply.

### 3.    XTO did not prove that the injuries arose out of "heat, smoke, or fumes."

XTO argues the Hostile Fire Exception must apply because the explosion caused the injuries alleged in the Underlying Lawsuits. But the exception applies only to "bodily injury . . . arising out of *heat, smoke, or fumes from* a hostile fire." [Doc. 74-1 at 33 (emphasis added)] XTO would omit this, altering the exception to: "bodily injury or property damage from a hostile fire."[16] Under North Dakota law, the courts "will not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes coverage." *See Wisness*, 806 N.W.2d at 148.

In *Owners Insurance Co. v. Singh*, the court noted "if the term hostile fire was interpreted as including the entire combustion process, then the language contained in the subject insurance policy covering all injuries resulting from heat, smoke or fumes *from* a hostile fire (emphasis added) would be redundant." No. 98-CA-108, 1999 WL 976249, at *4 (Ohio Ct. App. Sept. 21, 1999). The court further explained that the insured needed to prove that the carbon monoxide fumes resulted *from* a hostile fire. *Id*. The insured must show the injuries arose from "heat, smoke, or fumes" from a hostile fire, and not from the fire itself. *See Getchell*, 395 F.2d at 17 n.7 (fire must precede explosion for recovery); *W. Am. Ins. Co.*, 1994 WL 559005, at *4 ("damage was not caused by heat, smoke, or fumes, but rather from combustion by fire"); *Varano v. Protection Mut. Fire Ins. Co.*, 61 Pa. D. & C. 600, 605–06 (Com. Pl. 1948) ("there can be no

---

[15]    [*See* Docs. 74-17, 74-18, 74-19, 74-20, 74-21]  Underlying plaintiffs actually characterized the fire as having short duration—a "flash fire."  [Docs. 74-19 ¶35; 74-20 ¶ 38; 74-21 ¶ 28]  Plaintiffs also pleaded that Guillen shut the frac valve to stop the fire.  [Doc. 74-20 ¶ 45]

[16]    [Doc. 111 at 41 ("[W]hile Berkley fails to acknowledge the hostile fire exception, Berkley does not dispute an explosion and fire caused the injuries.")]

recovery for loss or damage occurring by explosion, unless fire ensues or a hostile fire preceded the explosion").

In this case, no worker was injured by heat, smoke, or fumes from a fire. Three were very unfortunately injured by actually catching on fire, and the other two were not burned.[17] Consequently, the exception is inapplicable, and the Pollution Exclusion bars coverage.

### D.    The Contractor Exception does not apply.

XTO's attempt to reinstate coverage via the Contractor Exception—which XTO mistakenly characterizes as the "additional insured exception"—fails. The exception gives back coverage only (1) to the named insured, (2) when the named insured lacks control over the site and is thus in an inferior position to avoid a release of pollutants, or even know about those risks, on someone else's property, and (3) when the named insured is in a contractual relationship with the property owner such that the owner itself has been added as an additional insured to the policy. [74-1 at 22–23] XTO does not satisfy the elements of the Contractor Exception because XTO is not the named insured, and because named insured MBI *did* control or "occupy" the well site. Because the Pollution Exclusion applies, XTO's motion must be denied.

### 1.    The Contractor Exception applies to MBI's liability, not XTO's.

The Contractor Exception reinstates pollution coverage for bodily injury "for which YOU may be held liable."  [Doc. 74-1 at 23] Defined term "you" means the named insured, MBI.

---

[17]    Richard Maheu, working on the snubbing deck directly above the blowout, was thrown down a flight of stairs, on fire, suffering burns to the majority of his body. [Docs. 74-4 at 18; 74-20 ¶ 40–41; 74-27 at 65 (247)] Daniel Pavon's foot caught in the stairs and he was engulfed in flames, also suffering significant burns over the majority of his body. [Docs. 74-4 at 18; 74-21 ¶ 29; 74-27 at 65 (247–48)] Justin Pyle, in the basket or Genie man lift, was on fire and suffered burns to his face and body. [Doc. 74-4 at 18; 74-15 at 21 (83–84)]  The underlying plaintiffs did not plead what specifically caused Justin Pyle's injuries, so XTO cannot meet its burden to establish the exception for defense.  [Doc. 74-18 ¶ 11] John Stassinos fell 26 feet from the snubbing basket, resulting in his death. [Doc. 74-4 at 18; 74-27 at 65 (248)]  The underlying plaintiffs did not plead what specifically caused John Stassinos's death, so XTO cannot meet its burden to establish the exception for defense.  [Doc. 74-17 ¶¶ 15, 31] Joseph Guillen was not burned.  He sued for emotional, not physical, damages. [Docs. 74-4 at 18; 74-20 ¶¶ 45–46]

[Doc. 74-1 at 37] This exception can never apply to reinstate liability coverage for XTO.

XTO relies on an unpublished bankruptcy court opinion from the Southern District of Texas, in which no party presented the court with an accurate explanation of the exception. [Doc. 111 at 44]  In *Tow v. Gemini Insurance Co.*, site owner ATP sought coverage as an additional insured under contractor Greystar's policy for bodily injury to Greystar's employee caused by pollutants. No. 12-36187, 2015 WL 5965600 (Bankr. S.D. Tex. Oct. 9, 2015) (mem. op.) Because Greystar was contractually required to indemnify ATP for the accident, ATP asserted Greytar "may be held liable" contractually.  *Id*. at *9.  Here, underlying plaintiffs were not employees of MBI, so MBI's contractual liability is not at issue. More importantly, Greystar incorrectly argued that it "could be held liable" if it were named as an underlying defendant. *Id*. The court agreed because Greystar failed to present the correct meaning of the exception: the exception only applies to "bodily injury . . . for which YOU may be held liable"—the named insured's liability.

The exception's purpose is to reinstate coverage for the named insured when the named insured lacks control over the site and is thus in an inferior position to avoid a release of pollutants, or even know about those risks, on someone else's property.  As the Insurance Services Office explained, the exception "is added to provide coverage to the named insured." [Doc. 133-1 at 12] Thus, the Contractor Exception cannot apply to XTO. For this reason alone, the Contractor Exception does not apply, and coverage for XTO is precluded by the Pollution Exclusion.

### 2.      An insured can "occupy" a site by managing it on location.

Furthermore, the Contractor Exception only applies if no other insured "occupied" the site—and here, MBI occupied the site. In its Motion, XTO has washed over the occupation

element of the Contractor Exception in just one sentence, with no factual or legal support: "[T]he Ryan Well was not owned, occupied, rented or borrowed by Missouri Basin."[18] [Doc. 111 at 43] That conclusory sentence does not satisfy XTO's burden.  *See Nationwide,* 683 N.W.2d at 907.

Though "occasional, limited work performed by a subcontractor . . . at a well site operated and controlled by another" does not amount to occupancy, "one need not have an ownership interest in property in order to be considered an occupant of the property." *U.S. Fidelity & Guar. Co. v. B&B Oil Well Serv*., *Inc*., 910 F. Supp. 1172, 1178 (S.D. Miss. 1995). Courts that have analyzed the term "occupy" in this exception have found it connotes some element of—though not exclusive—control. *See Pioneer Exploration, LLC v. Steadfast Ins. Co*., 767 F.3d 503, 513–14 (5th Cir. 2014) (oil and gas company with only mineral lease "occupied" surface estate because right to mine minerals gave access/control over surface); *Aspen Ins. UK, Ltd. v. Dune Energy, Inc.,* 400 Fed. App'x. 960 (5th Cir. 2010) (per curiam) (holding same); *Nascimento v. Preferred Mut. Ins. Co.*, 513 F.3d 273, 278 (1st Cir. 2008) (holding insured "occupied" underground storage tank on adjacent land as sole user); *Antrim Min., Inc. v. Pa. Ins. Guar. Ass'n*, 436 Pa. Super. 522, 530 (Pa. 1994) (insured's mining of surface constituted occupation/ ownership though pollution was underground); *Gregory v. Tenn. Gas Pipeline Co*., 948 F.2d 203, 207 (5th Cir. 1991) (city "occupied" lake by maintaining lake and water levels).

In *Liberty Mutual Fire Insurance Co. v. Lexington Insurance Co*., 446 S.W.3d 835 (Tex. App.—San Antonio 2014, no pet.), CHEP USA assumed a lease of property from Total Warehousing, and Total Warehousing managed CHEP's operations at the premises. *Id*. at 838. After a Total Warehousing employee struck a structural support column with a forklift, causing significant damage to the premises, coverage turned on whether Total Warehousing "occupied"

---

[18]   XTO further states that "Berkley does not appear to contend otherwise"—quite the assumption when XTO never pleaded or disclosed the exception as an affirmative defense.

the premises under the pollution exclusion. *Id*. at 838, 842. The Texas court of appeals held that "occupy" "comprises (1) a continued physical presence on the premises, and (2) control of the premises for the insured's own benefit," rejecting the argument that occupation requires "exclusive control over the premises." *Id*. at 843–44. The court concluded:

> . . . Total had a contractual right to be on the premises to conduct its business operations as the tenant's (CHEP's) agent. As CHEP's agent, Total exercised CHEP's possessory rights to the premises.

*Id*. at 845. Because Total Warehousing generally controlled the premises as CHEP's agent, the court held that "Total occupied the premises." *Id*. at 845; *see also Bechtel Petroleum Operations, Inc. v Continental Ins. Co*., 117 Cal. Rptr. 2d 399, 419 (Cal. App. 2002), *superseded on different grounds*, 47 P.3d 224 ("no difficulty concluding that contractors and subcontractors continuously performing operations at various areas of a site over a period of years have 'occupied' the 'premises, site or location'").

### 3.      MBI occupied the well site.

Just as in *Liberty Mutual*, and similar to many of the cases above, MBI occupied the well site through Carson Dokken. Dokken, a completion foreman, was the highest-ranking official on the well site.[19] Though Dokken underplayed his authority to OSHA,[20] OSHA classified him as the highest-ranking of the XTO managers, explaining that "[s]ubcontractors at the worksite regarded the company representative as the highest ranking XTO official at the well pad and did not make any significant decisions regarding well operations without the input and consent of the

---

[19]   [Doc. 74-4 at 7; 74-10 at 4 (11)] Dokken reported to Bryan Lien, who was on vacation during this accident. [Doc. 74-10 at 4 (11), 16–17 (60–61)] Regardless, Bryan Lien was not normally at the well site; instead, when he wasn't on vacation, Dokken "would communicate with him on what was transpiring on location." [Doc. 86-9 at 10 (24)] He did not appear at the well site even on a monthly basis. [Doc. 74-27 at 14 (44)]

[20]   [Doc. 86-6 at 7 (10) (Q: "Do you call yourself a consultant or a company man? What do you—" A: . . . "Everyone just calls me Carson actually. I don't call myself anything, so –"); *id*. at 34 (120) (doesn't necessarily consider himself in charge because he doesn't "really dictate what those guys do"); *id*. at 42 (149 (salary of $222–280K for his supervisory position)]

company representative" and "universally regarded as the voice of XTO at the worksite." [Doc. 74-4 at 7, 24]

Dokken was routinely on the well site [Doc. 74-4 at 23; 74-27 at 16 (52); 86-6 at 13 (36)], providing "constant" "day-to-day direction," inspecting the work, and even training other supervisors on the job. [Doc. 74-27 at 14 (42), 20 (67); 86-6 at 13 (36) (communicating "all day long"); 86-10 at 16 (58)] The "company men" on site—Tom Jones and Alan Kolden—"were limited in their ability to resolve critical issues stemming for production and completion operations" and instead took direction from Dokken. [Doc. 74-4 at 23; 74-27 at 12 (34)] While Jones and Kolden took 12-hour shifts, Dokken was on duty "24/7" for supervision of just this well site—no other projects. [Doc. 86-6 at 11 (27–28)] As a result of his supervision of the worksite, some workers actually assumed Dokken worked for XTO.[21] When Dokken announced a surprise drug test the day before the blowout, the company man on duty carried out Dokken's instructions without question. [Doc. 74-27 at 44–46 (164–69)]  The drug test and other high-level decisions ultimately remained with XTO, though they would "discuss it as a team." [Doc. 74-4 at 23–24; 74-10 at 30–31 (115–17); 86-6 at 14 (38), 15 (44)] But Dokken—not XTO personnel— was the one physically on the site, making recommendations to XTO, and carrying out these decisions for the Well. [Doc. 86-6 at 39 (138–39)]

Although Dokken needed authority from XTO to order the crew to kill the Ryan Well, on the day of the blowout, Dokken did not need approval to instruct the crew to attempt to snub out of the hole rather than kill the Ryan Well. [Doc. 74-4 at 21; 74-27 at 60 (225–26), 75 (285); 86-9 at 14 (43), 21 (68)] The underlying plaintiffs likewise pleaded that while XTO retained ultimate control over work on the Well, Dokken was the senior supervisor actually at the site, he owed

---

[21]   [Doc. 86-10 at 16 (58), 26 (99)]

37

enhanced duties including oversight and operational decisions on location, and MBI employed Dokken. [Docs. 74-17 ¶¶ 24–27, 63; 74-18 ¶ 10; 74-20 ¶¶ 14, 27, 106; 74-21 ¶¶ 10, 16]

Courts have rejected a transitory presence and "plaintiff's occasional trip to the premises to make minor improvements" as satisfying the term "occupy," instead finding that occupation implies a "continued" physical presence on the premises. *B&B Oil*, 910 F. Supp. at 1178, *C.O. Falter, Inc. v. Crum & Forster Ins. Cos.,* 361 N.Y.S.2d 968, 974 (N.Y. 1974); *Kelley-Coppedge, Inc. v. Highlands Ins. Co*., 980 S.W.2d 462, 446 n.1, 467 (Tex. 1998); *Liberty Mutual*, 446 S.W.3d at 842–43. Dokken supplied just that—the regular physical embodiment of XTO authority on the well site. He was regarded as the voice of XTO, and his authority on site was not questioned. Because Dokken exercised control over the well site with his continued presence, MBI "occupied" the well site within the meaning of the Contractor Exception. As a result, the exception does not apply, and the Berkley Policies' Pollution Exclusion precludes coverage.

### E. The Pollution Exclusion and its exceptions are not ambiguous.

This Court, the Eighth Circuit, and "'majority of state and federal jurisdictions have held that absolute pollution exclusions are unambiguous as a matter of law.'" *Hiland*, 847 F.3d at 598.[22] Courts have likewise held the exclusion's Hostile Fire Exception[23] and Contractor Exception[24] unambiguous as a matter of law. This Court should follow suit, as North Dakota courts "will not rewrite a contract to impose liability on an insurer if the policy unambiguously

---

[22] *See Cincinnati Ins. Co. v. Becker Warehouse, Inc.,* 635 N.W.2d 112, 118 (Neb. 2001) (collecting cases from multiple jurisdictions holding that "absolute pollution exclusions are unambiguous as a matter of law and, thus, exclude coverage for all claims alleging damage caused by pollutants").

[23] *See Midwest Family Mut. Ins. Co.*, 2011 WL 3654498, at *5; *W. Am. Ins. Co.*, 1994 WL 559005, at *3; *Perkins Hardwood Lumber Co. v. Bituminous Cas. Corp.*, 378 S.E.2d 407 (Ga. App. Ct. 1989)*; see also Hawkins Chem., Inc. v. Westchester Fire Ins. Co.,* 159 F.3d 348, 355 (8th Cir. 1998) (affirming a Minnesota district court's opinion that a Hostile Fire Exception required an insurer to defend its insured); *Noble Energy, Inc.*, 529 F.3d at 648 (analyzing the exception); *Indiana Lumbermens Mut. Ins. Co. v. W. Oregon Wood Prods.,* 268 F.3d 639, 645 (9th Cir. 2001) (holding exception inapplicable based on plain language).

[24] *Kelley-Coppedge*, 908 S.W.2d at 464 (finding no ambiguity in the occupancy element of the Contractor Exception); *Liberty Mutual*, 446 S.W.3d at 844 (same).

precludes coverage." *Nationwide*, 683 N.W.2d at 907. Nor has XTO presented *any* different reasonable interpretations of these provisions. As a result, the Court should apply the plain language of the Pollution Exclusion to preclude both defense and indemnity coverage to XTO.

## CONCLUSION

For the reasons above, the Court should deny XTO's Motion for Partial Summary Judgment.


Respectfully submitted,

*/s/ Thomas C. Wright*

Thomas C. Wright
Texas Bar No. 22059400
wright@wrightclosebarger.com
Elizabeth Rivers
Texas Bar No. 24052020
rivers@wrightclosebarger.com
Natasha N. Taylor
Texas Bar No. 24071117
taylor@wrightclosebarger.com
WRIGHT CLOSE & BARGER, LLP
One Riverway, Suite 2200
Houston, Texas 77056
(713) 572-4321
(713) 572-4320 (facsimile)

Corey J. Quinton (#05342)
FISHER BREN & SHERIDAN, LLP
3137 32nd Avenue South, Suite 212
Fargo, ND 58103
cquinton@fisherbren.com

Susan A. Daigle (#4459)
DAIGLE RAYBURN LLC
600 Jefferson Street, Suite 1200
P. 0. Box 3667
Lafayette, Louisiana 70501
susan@djrlawfirm.com
Telephone: 337-234-7000
Facsimile: 337-237-0344

**ATTORNEYS FOR BERKLEY**
**NATIONAL INSURANCE COMPANY**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of this document was served on all counsel of record in this case, identified below, on July 10, 2020, electronically through the electronic case filing system of the court:

| | |
|---|---|
| Joel A. Flom (#04469)<br>Jessica M. Rydell (#07801)<br>1703 – 32nd Avenue South<br>Fargo, ND 58103<br>(701) 280-1880 (facsimile)<br>joel@flomlaw.com<br>jessica@flomlaw.com<br><br>ATTORNEYS FOR COMMERCE AND<br>INDUSTRY INSURANCE COMPANY<br><br>Mark A. Solhein<br>Richard W. Bale<br>Larson · King, LLP<br>30 East 7th Street, Suite 2800<br>St. Paul, MN 55101<br>(651) 312-6618 (facsimile)<br>msolheim@larsonking.com<br>rbale@larsonking.com<br><br>ATTORNEY FOR STARSTONE NATIONAL<br>INSURANCE COMPANY | Leslie C. Thorne<br>Texas Bar No. 24046974<br>HAYNES AND BOONE, LLP<br>600 Congress, Suite 1300<br>Austin, Texas 78701<br>(512) 867-8470 (facsimile)<br>leslie.thorne@haynesboone.com<br><br>Ernest Martin, Jr.<br>Texas Bar No. 13063300<br>Carla Green<br>Texas Bar No. 24097762<br>HAYNES AND BOONE, LLP<br>2323 Victory Avenue, Suite 700<br>Dallas, Texas 75219<br>(214) 651-5940 (facsimile)<br>ernest.martin@haynesboone.com<br>carla.green@haynesboone.com<br><br>ATTORNEYS FOR XTO ENERGY, INC. |

*/s/ Elizabeth H. Rivers*
Elizabeth H. Rivers