IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

| | | |
|---|---|---|
| BERKLEY NATIONAL INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| XTO ENERGY, INC., | ) | Civil No. 1:18-CV-00195-DLH-CSM |
| | ) | |
| Defendant, Counter-Plaintiff and Third-Party Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| BERKLEY NATIONAL INSURANCE COMPANY, | ) | |
| | ) | |
| Counter-Defendant, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| COMMERCE AND INDUSTRY INSURANCE COMPANY, et al. | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

**THIRD-PARTY DEFENDANT CIIC'S MEMORANDUM AND
STATEMENT OF UNCONTESTED FACTS IN OPPOSITION TO
XTO'S MOTION FOR SUMMARY JUDGMENT**

Joel A. Flom (#04469)
Jessica M. Rydell (#07801)
FLOM LAW OFFICE, P.A.
1703 32nd Avenue South,
Fargo, ND 58103
Tel.: (701) 280-2300

Laura Besvinick
Florida Bar Number: 391158
STROOCK & STROOCK & LAVAN LLP
200 South Biscayne Blvd.
Suite 3100
Miami, FL 33131
Tel.: (305) 358-9900

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ............................................................................................. 1

STATEMENT OF MATERIAL FACTS ................................................................ 2

    THE CIIC POLICY ....................................................................................... 2

    THE BERKLEY POLICIES ............................................................................ 6

    THE MASTER SERVICES AGREEMENT ...................................................... 8

    THE ACCIDENT .......................................................................................... 10

    THE UNDERLYING LAWSUITS ................................................................... 14

    THE DEMANDS FOR COVERAGE ............................................................... 19

ARGUMENT .................................................................................................. 21

    I.    The Summary Judgment Standard. ..................................................... 21

    II.    The Principles of Insurance Policy Construction. .................................. 21

    III.    The Pollution Exclusion in the CIIC Policy Unambiguously Bars XTO's Claim for Coverage. [Affirmative Defense ¶ 57] ..................................... 22

        A.    The Pollution Exclusion in the CIIC Policy Is Unambiguous as a Matter of Law. ........................................................................... 22

        B.    The Pollution Exclusion in the CIIC Policy is Not Limited to "Environmental-Type Harms" Based on the Plain Language of the CIIC Policy. .................................................................................... 23

        C.    The Pollution Exclusion in the CIIC Policy Applies to the Bodily Injury Claims at Issue Resulting from the Explosion and Fire Because They "Arose Out of" the Release of Gas from the Ryan Well. ..................... 28

        D.    The Cases Cited By XTO Do Not Warrant Disregarding the Plain Language of the Pollution Exclusion in the CIIC Policy. ..................... 29

    IV.    The Exception to the Pollution Exclusion in the CIIC Policy Does Not Apply Because XTO Cannot Show that the Accident Was Reported Within 21 Days. ......... 31

V.      The Pollution Exclusion in the CIIC Policy Governs Because the CIIC Policy
        "Follows Form" to the Underlying Berkley Policy "Subject to" the Terms,
        Definitions, Conditions and Exclusions of the CIIC Policy. ........................................33

VI.     XTO and its Contractors Are Not Entitled To Additional Insured Coverage for
        the Settlement payments that XTO Made. [Affirmative Defenses ¶¶ 50, 51 &
        53] ..................................................................................................................................37

        A.      XTO is Not Entitled to Additional Insured Coverage for the Settlement
                Payments It Made. [CIIC's Affirmative Defenses ¶¶ 50 & 53]............................37

        B.      XTO's Contractors Are Not Additional Insureds. [CIIC Affirmative
                Defense ¶ 51]. .......................................................................................................39

CONCLUSION...............................................................................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Acuity v. North Cent. Video LLLP*,
  No.1:05-CV-010, 2007 WL 1356919 (D.N.D. May 7, 2007) ..........................................28, 29

*Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*,
  387 F. Supp. 3d 663 (M.D. La. 2019)......................................................................................34

*Atl. Mut. Ins. Co. v. McFadden*,
  595 N.E.2d 762 (Mass. 1992) ...........................................................................................26, 30

*Bell Lumber & Pole Co. v. U.S. Fire Ins. Co.*,
  60 F.3d 437 (8th Cir. 1995) .....................................................................................................33

*Belt Painting Corp. v. TIG Ins. Co.*,
  795 N.E.2d 15 (N.Y. 2003).................................................................................................26, 30

*Bernhardt v. Hartford Fire Ins. Co.*,
  648 A.2d 1047 (Md. Ct. Spec. App. 1994).......................................................................27, 28

*Bituminous Cas. Corp. v. Sand Livestock Sys., Inc.*,
  728 N.W.2d 216 (Iowa 2007)...................................................................................................28

*Certain Underwriters at Lloyd's London v. C.A. Turner Const. Co.*,
  112 F.3d 184 (5th Cir. 1997)...................................................................................................27

*Cincinnati Ins. Co. v. Becker Warehouse, Inc.*,
  635 N.W.2d 112 (Neb. 2001)..................................................................................................28

*City of Salina, Kan. v. Maryland Cas. Co.*,
  856 F. Supp. 1467 (D. Kan. 1994)..........................................................................................24

*Continental Western Ins. Co. v. Dam Bar*,
  478 N.W.2d 373 (N.D. 1991) ..................................................................................................21

*Davison v. City of Minneapolis*,
  490 F.3d 648 (8th Cir. 2007) ..................................................................................................21

*Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*,
  711 So. 2d 1135 (Fla. 1998)....................................................................................................27

*Doe Run Res. Corp. v. Lexington Ins. Co.*,
  719 F.3d 868 (8th Cir. 2013) ..................................................................................................31

*Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*,
 132 F.3d 526 (9th Cir. 1997) ...............................................................25

*Enron. Sokoloski v. Am. W. Ins. Co.*,
 980 P.2d 1043 (Mont. 1999).........................................................25, 26, 30

*Essex Ins. Co. v. Tri-Town Corp.*,
 863 F. Supp. 38 (D. Mass. 1994) .........................................................30

*Federated Rural Elec. Ins. Corp. v. Certain Underwriters at Lloyd's*,
 293 Fed. Appx. 539 (9th Cir. 2012)........................................................36

*Gaylord Container Corp. v. CNA Ins. Companies*,
 807 So. 2d 864 (La. Ct. App. 2001).......................................................31

*Gilbane Bldg. Co./TDX Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*,
 97 N.E.3d 711 (N.Y. 2018)....................................................................40

*Hiland Partners GP Holdings, LLC, et al. v. National Union Fire Insurance Co.
 of Pittsburg, P.A.*,
 847 F.3d 594 (8th Cir. 2017) ...........................................23, 24, 29, 30, 32

*Insituform Techs., Inc. v. Am. Home Assur. Co.*,
 566 F.3d 274 (1st Cir. 2009)................................................................35

*Johnson Controls, Inc. v. London Market*,
 784 N.W.2d 579 (Wis. 2010).................................................................36

*Keggi v. Northbrook Property and Cas. Ins. Co.*,
 13 P.3d 785 (Ariz. 2000)..........................................................26, 29, 30

*Kent Farms, Inc. v. Zurich Ins. Co.*,
 969 P.2d 109 (Wash Ct. App. 1998) .....................................................29

*Mackinnon v. Truck Ins. Exchange*,
 73 P.3d 1205 (Cal. 2003) ...............................................................26, 31

*In re Matter of Complaint of Settoon Towing, LLC*,
 720 F.3d 268 (5th Cir. 2013) ................................................................33

*Motorists Mut. Ins. Co. v. RSJ, Inc.*,
 926 S.W.2d 679 (Ky. Ct. App. 1996) ................................................27, 31

*N. Star Mut. Ins. v. Ackerman*,
 940 N.W.2d 857 (N.D. 2020) ................................................................24

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. CBI Indus., Inc.*,
 907 S.W.2d 517 (Tex. 1995)................................................................25

iv

*Nationwide Mut. Ins. Companies v. Lagodinski,*
    683 N.W.2d 903 (N.D. 2004) .................................................................21, 25, 31

*Nautilus Ins. Co. v. Jabar,*
    188 F.3d 27 (1st Cir. 1999)...........................................................................26, 30

*Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.,*
    976 F.2d 1037 (7th Cir. 1992) .....................................................................23, 30

*Quadrant Corp. v. Am. States Ins. Co.,*
    110 P.3d 733 (Wash. 2005)................................................................................30

*Regional Bank of Colorado, N.A. v. St. Paul Fire and Marine Ins. Co.,*
    35 F.3d 494 (10th Cir. 1994) .......................................................................26, 31

*State Farm Fire & Cas. Co. v. Dantzler,*
    852 N.W.2d 918 (Neb. 2014)..............................................................................28

*Swank Enterprises, Inc. v. United Fire and Cas. Co.,*
    No. CV 19-179-M-DWM, 2020 WL 1685746 (D. Mont. Apr. 7, 2020)...............26

*Tile Shop Holdings, Inc. v. Allied World Nat'l Assurance Co.,*
    No. Civ 17-776, ADM/TNL, 2019 WL 2357044 (D. Minn. June 4, 2019)...........35

*United Fire & Cas. Com. Co. v. Titan Contractors Serv., Inc.,*
    751 F.3d 880 (8th Cir. 2014) .............................................................................28

*United Nat. Ins. Co. v. Hydro Tank, Inc.,*
    497 F.3d 445 (5th Cir. 2007), *opinion amended on denial of reh'g*, 525 F.3d
    400 (5th Cir. 2008)......................................................................................35, 36

*UnitedHealth Grp. Inc. v. Columbia Cas. Co.,*
    941 F. Supp. 2d 1029 (D. Minn. 2013) ...............................................................35

*W. Am. Ins. Co. v. Tufco Flooring E., Inc.,*
    409 S.E.2d 692 (N.C. 1991), *overruled by Gaston Cty. Dyeing Mach. Co. v.*
    *Northfield Ins. Co*, 524 S.E.2d 558 (N.C. 2000).............................................27, 30

*Weaver v. Royal Ins. Co. of Am.,*
    674 A.2d 975 (N.H. 1996) ..................................................................................31

*Ziegelmann v. TMG Life Ins. Co.,*
    607 N.W.2d 898 (N.D. 2000) ....................................................................21, 24, 31

**Statutes**

Fed. R. Civ. P. 56..................................................................................................21

Third-Party Defendant Commerce and Industry Insurance Company ("CIIC") respectfully submits this memorandum of law and statement of undisputed facts in opposition to the motion for partial summary judgment of Third-Party Plaintiff XTO Energy, Inc. ("XTO"). For the reasons set forth below, XTO's Motion should be denied.

## INTRODUCTION

This is an action for insurance coverage in which the material facts are not in dispute. Third-Party Plaintiff XTO was the owner and lease operator of a producing oil and gas well in North Dakota (the "Ryan Well"). On or about June 18, 2016, an explosion and fire occurred at the well due to the escape of oil and gas under pressure during a "snubbing" operation (the "Accident"). The Accident resulted in one death and several serious injuries and led to multiple lawsuits against XTO and a number of its contractors, including Missouri Basin Well Service, Inc. ("MBI") (collectively, the "underlying lawsuits").

Berkley National Insurance Company ("Berkley") provided primary and first-layer excess coverage, and CIIC provided second-layer excess coverage, to MBI. XTO demanded coverage for the underlying lawsuits from Berkley and CIIC, and Berkley and CIIC denied coverage. XTO subsequently settled the underlying lawsuits on behalf of all defendants and now sues Berkley and CIIC for coverage. As it relates to this motion, XTO claims that CIIC breached the CIIC Policy by failing to reimburse XTO for the amounts it paid to settle the lawsuits.

On March 4, 2020, CIIC moved for summary judgment on the limited grounds that the pollution exclusion in the CIIC Policy bars XTO's claim for coverage. XTO filed this motion on April 24, 2020, seeking to dismiss four of CIIC's affirmative defenses contained in paragraphs 50, 51, 53 and 57 of CIIC's Amended Answer to XTO's Third-Party Complaint [Doc. 55] (the "CIIC Answer"). The challenged defenses assert that: (1) "XTO does not qualify as an additional insured," (2) "XTO's contractors do not qualify as additional insureds," (3) "the

1

coverage provided by CIIC's Policy is no broader than the coverage provided by [the Berkley policy]," and (4) "XTO's claims are barred by the pollution exclusion in CIIC's policy."  CIIC Answer, ¶¶ 50, 51, 53 and 57.  Based on the facts and governing law, CIIC's defenses are proper.

As discussed below, there is no additional insured coverage for either XTO or its contractors that would require CIIC to reimburse XTO for the amounts it paid in settlement.  And even if, *arguendo*, XTO's reimbursement claim were covered, the Pollution Exclusion in the CIIC Policy would exclude such coverage.  The Pollution Exclusion bars coverage for injuries arising out of the escape of "pollutants," and XTO itself concedes i) that "gases" were "released" from the Ryan Well and (ii) that the "gases" that were "released" from the Ryan Well are "pollutants" as defined by the Pollution Exclusion in the CIIC Policy.  *See* XTO Memorandum of Law [Doc. 116] ("XTO Mem.") at 16 ("XTO does not dispute whether the gases released from the Ryan Well are pollutants.").  Despite the plain language of the Pollution Exclusion and notwithstanding the undisputed facts concerning the cause of the Accident, XTO argues that it is entitled to partial summary judgment.  For the reasons set forth below, the Court should deny XTO's motion (and should separately grant CIIC's motion).

## STATEMENT OF MATERIAL FACTS[1]

## THE CIIC POLICY

1.      CIIC issued a Commercial Umbrella Liability Policy to MBI with policy number 24238279 for the policy period April 13, 2016  to April 13, 2017 (the "CIIC Policy"). The CIIC Policy contained a $25,000,000.00 limit of insurance. [CIIC Policy].

2.      The CIIC Policy provides:

---

[1]      The evidence on which CIIC relies in opposition to XTO's motion is contained in the Appendix previously-filed with the Court at D.E. 86 in connection with CIIC's own Motion for Summary Judgment.

### I.   INSURING AGREEMENT – COMMERCIAL UMBRELLA LIABILITY

A. We will pay on behalf of the **Insured** those sums in excess of the **Retained Limit** that the **Insured** becomes legally obligated to pay as damages by reason of liability imposed by law because of **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** to which this insurance applies or because of **Bodily Injury** or **Property Damage** to which this insurance applies assumed by the **Insured** under an **Insured Contract**.

The amount we will pay for damages is limited as described in Section IV. Limits of Insurance.
. . . .

### IV. LIMITS OF INSURANCE

A. The Limits of Insurance shown in Item 3. of the Declarations and the rules below state the most we will pay for all damages under this policy regardless of the number of:

1. Insureds;
2. claims made or Suits brought;
3. persons or organizations making claims or bringing Suits; or
4. coverages provided under this policy.
. . . .

### VII. DEFINITIONS
. . . .
Z. **Retained Limit** means:

1. the total applicable limits of **Scheduled Underlying Insurance** and any applicable **Other Insurance** providing coverage to the Insured; or
2. the **Self-Insured Retention** applicable to each **Occurrence** that results in damages not covered by **Scheduled Underlying Insurance** or any applicable **Other Insuranc**e providing coverage to the **Insured**.

[CIIC Policy].

3.      The CIIC Policy lists the following policies as "Scheduled Underlying Insurance": Energy Commercial General Liability insurance policy with policy number EGL001672010 (the "Berkley CGL Policy") and Energy Commercial Umbrella Liability insurance policy with policy number EUL001670910 (the "Berkley Umbrella Policy"), both

issued by The Berkley National Insurance Company ("Berkley") to MBI for the policy period April 13, 2016 to April 13, 2017 (collectively, the "Berkley Policies"). The Berkley CGL Policy contained a $1,000,000 limit of insurance, and the Berkley Umbrella Policy contained a $25,000,000 limit of insurance.

4. The CIIC Policy contains the following pollution exclusion endorsement:

**Commercial Umbrella Liability Policy with CrisisResponse®**
**Time Element Pollution**
**Self-Insured Retention Endorsement**

This policy is amended as follows:

**Section V. EXCLUSIONS**, Paragraph Q. **Pollution** is deleted in its entirety and replaced by the following:

Pollution

This insurance does not apply to:

1. Any **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time;
. . . .

However, Paragraph 1 of this exclusion will not apply to **Bodily Injury** or **Property Damage** arising out of any discharge, dispersal, seepage, migration, release or escape of **Pollutants** that meets all of the following conditions:

   i. It was abrupt and neither expected nor intended by the **Insured**. This condition does not apply to a non-routine incident where such discharge, dispersal, seepage, migration, release or escape of **Pollutants** was a result of an attempt by the Insured to mitigate or avoid a discharge, dispersal, seepage, migration, release or escape of **Pollutants** that was itself abrupt and neither expected nor intended by the **Insured** and where substantial third party **Bodily Injury** or **Property Damage** could have occurred;

   ii. It commenced on a demonstrable, specific date during the **Policy Period**;

4

    iii. Its commencement became known to the **Insured** within (7) calendar days;

    iv. Its commencement was reported in writing to us within (21) calendar days of becoming known to the **Insured**; and

    v. Reasonable effort was expended by the **Insured** to terminate the discharge, dispersal, seepage, migration, release or escape of **Pollutants** as soon as conditions permitted.

. . . .

All other terms, definitions, conditions, and exclusions of this policy remain unchanged.

[CIIC Policy, Endorsement (the "Pollution Exclusion")].

5.    The CIIC Policy defines "Pollutants" as: "any solid, liquid, gaseous or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed." [CIIC Policy, VII. Definitions, W.].

6.    The CIIC Policy has the following contractual liability exclusion endorsement:

**Commercial Umbrella Liability Policy With CrisisResponse®
Contractors' Limitation Endorsement**

This policy is amended as follows:

**Section V. EXCLUSIONS** is amended to include the following additional exclusions:

**Contractors**

This insurance does not apply to:

. . . .

6. Any liability assumed by the **Insured** under any contract or agreement.

However, if insurance for **Bodily Injury** or **Property Damage** assumed by the **Insured** under any contract or agreement is provided by **Scheduled Underlying Insurance**:

    c. exclusion 6. above will not apply; and

d.  coverage under this policy for such **Bodily Injury** or **Property Damage** will follow the terms, definitions, conditions and exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**, Limits of Insurance, premium and all other terms, definitions, conditions and exclusions of this policy. Provided, however, that coverage provided by this policy will be no broader than the coverage provided by **Scheduled Underlying Insurance**.

**Section VII. DEFINITIONS, M. Insured,** Paragraph 7. is deleted in its entirety and replaced by the following:

7. Any person or organization, other than the **Named Insured**, included as an additional insured in the policies listed in **Scheduled Underlying Insurance** however:

a.  coverage will not be broader than is available to such person or organization under such **Scheduled Underlying Insurance**; and

b.  the coverage granted by this provision does not apply to any liability which results solely from the acts or omissions of such person or organization.

[CIIC Policy, Endorsement].

## THE BERKLEY POLICIES

7.  The Berkley CGL Policy provides:

**I.  NAMED INSUREDS AND INSUREDS**

. . . .

**B. Insureds**

Each of the following is an **INSURED** with respect to the coverages set forth in Section II.A. Bodily Injury and Property Damage Liability, Section II. C. Personal and Advertising Injury Liability, and Section II. D. Medical Payments of this policy:

**1.  Additional Insured:**

Any person or organization with whom **YOU** agree in a written contract or written agreement to add as an Additional Insured on **YOUR** policy or to provide liability insurance for, but only with respect to liability arising out of **YOUR** operations or liability arising out of premises owned by or rented to **YOU**.

. . . .

**II.  COVERAGES AND DUTY TO DEFEND**

6

### A. Bodily Injury and Property Damage Liability

**WE** will pay the amounts that an **INSURED** becomes legally obligated to pay as damages because of **BODILY INJURY** or **PROPERTY DAMAGE** caused by an **OCCURRENCE** to which this policy applies.

[Berkley CGL Policy]

8.    The Berkley CGL Policy contains the following exclusion:

### VII.   EXCLUSIONS
. . . .

### B. Bodily Injury and Property Damage Liability Exclusion

In addition to those Exclusions listed above in Section VII.A., the following Exclusions apply to Section II.A. Bodily Injury and Property Damage Liability;

This policy does not apply to:

. . . .

### 2.   Contractual Liability:

**BODILY INJURY** or **PROPERTY DAMAGE** for which the **INSURED** is obligated to pay damages by reason of the assumption of liability in a contract or agreement.

This Exclusion does not apply to liability for damages:

    a.  That the **INSURED** would have in the absence of the contract or agreement; or

    b.  Assumed in a contract or agreement that is an **INSURED CONTRACT**, provided the **BODILY INJURY** or **PROPERTY DAMAGE** occurs after the execution of the contract or agreement.

[Berkley CGL Policy].

9.    The Berkley CGL Policy contains the following definitions:

### IX.    DEFINITIONS
. . . .

**INSURED** means a person or organization qualifying as an INSURED in Section I. Named Insureds And Insureds.

**INSURED CONTRACT** means:

a. That part of any written contract or written agreement pertaining to **YOUR** business under which **YOU** assume the liability of another party to pay for **BODILY INJURY** or **PROPERTY DAMAGE** to a third person or organization. ….

. . . .

**YOU** means the **NAMED INSURED(S)**

**YOUR** means belonging to the **NAMED INSURED**.

[Berkley CGL Policy].

## THE MASTER SERVICES AGREEMENT

10.     MBI entered into a master services agreement ("MSA") with XTO, wherein MBI,

as "Contractor," agreed to perform certain work as a contractor for XTO. [MSA].

11.     The MSA defines the following terms:

**II.     Definitions.**

2.3     "Contractor Group" shall mean individually or in any combination Contractor, its Affiliates, any Subcontractor of Contractor, and their respective directors, officers, employees, representatives, agents, licensees, invitees and assignees.

2.8     "XTO Group" shall mean individually or in any combination XTO, its Affiliates, co-owners or co-lessees … at the Site, joint interest owners, joint ventures, partners, contractors and subcontractors other than Contractor or its Subcontractors and all of their respective directors, officers, employees, representatives, agents, licensees and invitees.

[MSA].

12.     The MSA set forth the following obligations of MBI and XTO:

**X.     RELEASE, DEFENSE, INDEMNITY AND HOLD HARMLESS.**

**10.1     Contractor's Obligations.**

10.1.1 Contractor hereby agrees to release, defend, indemnify and hold the XTO Group harmless from and against any and all claims, demands, and causes of action of every kind and character (including without limitation, fines, penalties, remedial obligations, court costs and reasonable attorneys' fees, including attorneys' fees incurred in the enforcement of this indemnity) (collectively the "Indemnifiable Claims") arising out of, without limitation, any

8

physical or mental injury, illness and/or death of any one or more members of the Contractor Group . . . .

10.1.3 Contractor agrees that its indemnity obligations herein will be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the XTO Group and shall provide waivers of subrogation against all members of the XTO Group. ….

**10.2    XTO's Obligations.**

10.2.1 XTO hereby agrees to release, defend, indemnify and hold the Contractor Group harmless from and against any and all Indemnifiable Claims arising out of, without limitation, any physical or mental injury, illness and/or death of any one or more members of the XTO Group, and/or loss of or damage to property or interests in property of any one or more members of the XTO Group in any manner incident to, connected with or arising out of the performance of the Work. ….

10.2.3 XTO agrees that its indemnity obligations herein will either be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the Contractor Group and shall provide waivers of subrogation against all members of the Contractor Group; or XTO may be self-insured. ….

**XI.    Insurance.**

11.1    Coverages.   Subject to the provisions of Section 11.2, Contractor will secure and maintain, and will require its Subcontractors to secure and maintain, during the term of this Agreement the following insurance coverages with limits not less than the amounts specified and with companies satisfactory to XTO who are authorized to do business in the jurisdiction where the Work is to be performed, and will furnish certificates of such insurance satisfactory to XTO before commencing the Work; provided, however, that no waiver of the provision of this Article XI will occur to any extent merely from a failure on the party of XTO to object or complain about Contractor's failure to furnish certificates of insurance satisfactory to XTO.

11.1.2 Commercial    General    Liability    Insurance    INCLUDING CONTRACTUAL LIABILITY, with minimum limits of liability for injury, death or property damage of $1,000,000 combined single limit per occurrence, and an aggregate annual limit of not less than $2,000,000.

11.2    <u>Actual Insurance</u>. Notwithstanding the minimum coverages specified in Sections 11.1.1 – 11.1.5 above, should Contractor maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which Contractor shall provide hereunder will be such larger amounts carried by Contractor (or indicated in any certificate of insurance furnished by Contractor) and not the minimums referenced in Sections 11.1.1 – 11.1.5 above.

11.4    <u>Primary Coverage and Additional Insureds</u>. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSRUANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP. THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT. ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED. ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

[MSA].

## **THE ACCIDENT**

13.    XTO is a producer of oil and natural gas in North Dakota. XTO controlled and managed the Ryan Well, located eight miles east of Watford City, North Dakota.  At the Ryan Well, XTO engaged in an operation known as "snubbing." [XTO Third-Party Complaint, ¶ 47].

14.    XTO has described "snubbing" as the process whereby "a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the [well] hole." [*Id.* at ¶ 49].

15.     On June 18, 2016, while in the process of completing the snubbing operation, the completion crew at the Ryan Well discovered a problem downhole, and attempted to determine whether the problem was due to a hole in the pipe, a missing bottom hole assembly ("BHA"), or some other cause. *Id.* The completion crew continued to remove the tube from the well resulting in an explosion and fire, killing and severely injuring several workers (the "Accident"). *Id.*

16.     The Occupational Safety and Health Administration promptly investigated the Accident and summarized its findings in a detailed report. [Occupational Safety and Health Administration ("OSHA") Citation and Notification of Penalty (the "OSHA Citation")].

17.     Multiple contractors of XTO were involved in the Accident. MBI employed a foreman, Carson Dokken; Most Wanted Well Service, LLC ("Most Wanted") performed the snubbing operation; Sherwood Enterprises, Inc. ("Sherwood") operated the rig as part of the snubbing process; Petroleum Experience, Inc. ("Petroleum Experience") employed a site supervisor, Allan Kolden; Badlands Consulting, LLC ("Badlands") employed a supervisor, Thomas Jones, and a foreman, Ethan Bailey; KLX Energy Services, LLC ("KLX") operated the "downhole" tools; and Weatherford U.S. L.P. and Weatherford International, LLC (collectively, "Weatherford") provided and operated the pipe. [OSHA Citation].

18.     OSHA summarized the events leading up to the Accident as follows:

After the realization that the BHA was still connected to the last joint, the crew could deduce with some certainty that there was a hole or breach in the pipe. Still unclear about the location of a hole, or holes, the crew continued to remove pipe from the well. The crew was actively searching for a hole at this point. <u>A hole approximately 1.75 inches in diameter was exposed above the annular BOP, resulting in gases and fluids spewing from the well at 1,000 psi.</u> At this point, well control was lost. The snubbing operator reversed the direction of the snubbers and moved the hole beneath the bag.

Those involved in the operation began to have a discussion about the next steps to take when the joint with the BHA shot out of the hole and the well erupted. <u>This was a full well blowout with gases and fluids escaping the well at approximately</u>

<u>1000 psi. The BHA likely contacted other metal when it was shot out and immediately ignited the well fluids and gases.</u> The rig floor was engulfed with flames.

[OSHA Citation (emphasis added)].

19.     OSHA identified five parties killed or injured in the Accident: John Stassinos, a Genie man lift operator, employed by Most Wanted; Justin Pyle, a snubbing supervisor employed by Most Wanted; Chad Maheu a floor hand, employed by Most Wanted; Daniel Pavon, a rig operator, employed by Sherwood; and Joe Guillen, a rig supervisor, employed by Sherwood. Stassinos was killed in the Accident, and the others were injured. [OSHA Citation].

20.     During the course of the OSHA investigation, many employees of XTO and its contractors testified that the source of the injury-causing fire was the release of gas into the atmosphere. Clifford Dahl, an employee of XTO and the superintendent at the Ryan Well, stated:

> Q. Okay. What happened after the pipe dropped?
> **A. The well blew out and BOPs were closed, which would be a few minutes or a few seconds, I don't know. I wasn't there, so I can't tell you how long it was.**
> …
> Q. What was your reaction when you heard that, Cliff?
> **A. Concern.**
> Q. Why?
> **A. With a release of hydrocarbons, you know, it's -- there's some safety concerns. People could be hurt. There again, there's the spill that has to be taken care of.**

[Cliff Dahl Interview Sworn Statement to OSHA, dated November 9, 2016, 82:5–24 ("Dahl Statement")].

21.     Carson Dokken, an employee of contractor MBI and a foreman, stated:

> Q. Why is that bad practice?
> **A. Because you would be bleeding gas off to the atmosphere.**
> Q. So you had not only an environmental concern, but you also had potential ignition sources?
> **A. Correct.**

[Carson Dokken Interview Sworn Statement to OSHA, dated November 2, 2016, 84:25, 85:1-16 ("Dokken Statement")].

22.    Nicholas Brown, a field supervisor at the Ryan Well stated: "There was a gas release. We saw it; came out from underneath the snubbing floor. And they pushed it back down because they found out it's a hole in the tubing, obviously." [Nicholas Brown Interview Statement to OSHA dated July 18, 2017, 4:2-5 ("Brown Statement")].

23.    Tom Jones, a site supervisor employed by Badlands, stated:

KM: Okay. All right. So as far as the -- as far as the source of the fuel, potentially, you had that -- you had that pipe that came out that had the hole in it, so you could have natural gas, right, coming out of the pipe? Is that possible?
**TJ: Wellbore fluids, yes.**
KJ: And the fluids?
**TJ: Oil and gas.**
…
KM: … It was hissing or you could hear gases escape -- and I guess liquids, too, right? Or just gases?
**TJ: Gases and (indiscernible)**
KM: Gases and some liquids come out.

[Tom Jones Interview Statement to OSHA dated June 21, 2017, 23:9-15 ("Jones June 2017 Statement")].

24.    Jones also stated: "You know, everything kind of happened so fast that it's hard recalling what I saw, I guess. I just remember the – you know, the hole coming above the bag and it was releasing and I yelled snub down, snub down, you know, and within just 30 seconds the explosion happened." [Tom Jones Sworn Interview Statement to OSHA dated November 2, 2016, 88:3-8 ("Jones November 2016 Statement")].

25.    Justin Pyle, an injured party who worked as a snubber for Most Wanted, stated the following:

JC: So what would have been the best plan of action at that point, Justin?

**JP: Well, it would have been -- the best plan of action would have been to never get to that point and had a dead well. Obviously, we didn't. So like I said, we shoved both our snubbers, and what we were going to -- the process that I've done -- like I said, I've done this before. The process is to bring that hole up above the annular and, basically, it's going to blow for a few seconds and bleed off the gas and oil, and then you can try to snub it back, finish snubbing it up. That's basically the only option we had.**

[Justin Pyle Interview Statement to OSHA dated July 18, 2017, 92:17-25, 93:1-9 ("Pyle Statement")].

26.     Joseph Guillen, an injured party and member of the well servicing crew for Sherwood stated:

KM: Yeah, it was -- and it was the gas that was burning.
**JG: Yeah, I didn't see any oil. It was a gas head from being shut in. I mean, the gas is lighter than everything else. So if you shut in a well for four hours, the gas is all going to rise to the top, above the oil, above the fluid, above everything else.**
KM: Right.
**JG: So it was only gas.**

[Joseph Guillen Interview Statement to OSHA dated August 2, 2016, 37:3-7 ("Guillen Statement")].

## THE UNDERLYING LAWSUITS

27.     On or about September 14, 2016, Daniel Pavon sued XTO and Weatherford in Harris County, Texas, Case No. 201661844-7 (the "Pavon Lawsuit"). During the course of the case, many employees of XTO and its contractors testified consistent with the witness statements provided to OSHA.

28.     Nicholas Brown, a field supervisor at the Ryan Well, stated:

Q. What are the dangers of snubbing out if you don't know if it is a problem with the mill or a hole?
**A. Exactly what happened, pretty much. If you don't know where the hole is exactly, you're gonna pull and it pulls to atmosphere and you're gonna have a gas release and that's pretty dangerous because if you have gas release, there's only so far – you have to pull up quite a ways to be able to shut the master valve in.**

14

. . . .

Q. Describe for me what actually happened then?

**A. They pulled up, there was a release of gas, came out the side, then [an employee of Weatherford] shoved in back down – well, [an employee of Weatherford] didn't shove it back down, I guess it was pretty much the snubbing unit would have pushed it back down. They pushed it back down and then they stopped, then you could see them talking with each other about what to do and then while they were talking, another release happened and you could see the gas shooting out and then I saw it ignite, we, me our crew, saw it ignite and then it shot back towards the snubbing unit.**

[Nicholas Brown Deposition Transcript dated May 9, 2017, 38:10-17, 54:11-21 ("Brown Deposition")].

29.    Edward Kleinsasser, an operator for Sherwood, stated:

Q. What did you see?

**A. I saw them snub it out, snub the hole past the bag and it started blowing, snubbed it right back down.**

Q. When you say it started blowing, it started blowing gas?

**A. Yes.**

Q. And how long was it from when they snubbed it out and the hole was exposed to when they snubbed it back down, how long did that take?

**A. Seconds. Snubbed it out, seen there was a hole and snubbed it right back down.**

Q. Okay. Could you visually see the hole or you just knew that's what was going on?

**A. I couldn't visually see. I just heard it.**

Q. Okay. You heard a noise?

**A. Yes.**

Q. And what noise did you hear?

**A. Sound of gas blowing.**

[Edward Kleinsasser Deposition Transcript dated April 26, 2017, 97:9-25, 99:1-2 ("Kleinsasser Deposition")].

33.    Daniel Dickout, a well supervisor for Colter Energy, stated:

Q. Was there anything that you heard specifically or that you saw that indicated to you that another release was going on?

**A. I mean, it kind of happened all at once, the second one, there wasn't any warning or anything before that. It just happened and there was a release of gas. You could see it shoot out the side of the basket there and then it pretty well caught fire instantly.**

15

[Daniel Dickout Deposition Transcript dated May 9, 2017, 28:20-25, 29:1-2 ("Dickout Deposition")].

34.    Lyman Yazzie, a well supervisor for Colter Energy, stated:

Q. Explain to me what you saw or heard whenever the hole was exposed the first time?
**A. I heard this really loud like blowout or something, you know, like a loud gas release and I looked over and then it got quiet and I heard the rig running and then they pushed the last pipe down hole, you know, I really didn't think anything of it at the time.**
Q. So the noise that you heard was a loud gas release?
**A. Yes.**
Q. And you looked over and how long did that gas release in terms of time, how long did it occur?
**A. Not very long. Maybe five seconds, five to ten seconds.**
Q. Okay. And when you looked over at the well, could you see anything that identified that a gas release was going on as well?
**A. Yes. I seen, you know, the pressure coming out and blowing out of there**.
Q. Where was it in relation to the rig?
**A. It was like right above the snubbing basket?**
Q. So you could tell that there was gas coming out above the snubbing basket at that point?
**A. Yeah.**
Q. Okay. You said that you think that it went for five to ten seconds?
**A. Maybe less. Yeah it wasn't very long at all.**
Q. And then you said you saw the pipe actually get shoved down back in?
**A. Yes.**
Q. How did you know that that's what happened?
**A. That the pipe was shoved back in? The rig went down and then I seen the blocks go down and I heard the brake handle go off and I think that's when they just kind of stopped to see what they were going to do.**
Q. And after you heard the blocks and the brake handle, what kind of timeline went by before the next that that you heard that something wrong was occurring?
**A. It was probably a minute, I'm guessing.** . . . .
Q. So the minute of time goes by. You don't see any changes or hear any changes on the rig floor or the snubbing unit and the next thing that you hear is a gas release again?
**A. Yeah. It was just that gas release?**
Q. And you said it started and it just got louder and louder. Give me a timeline from start as it's getting louder until you say that you saw the pipe blow out?
**A. I didn't see actually see pipe blow out, but I heard all the gas pressure and it louder and louder. It was probably like maybe 10-15 seconds of gas release and then I thought they were just trying to bleed it off or something**. . .

16

[Lyman Yazzie Deposition Transcript dated May 9, 2017, 38:1-25, 39:1-15, 40:17-25, 41:1-17

("Yazzie Deposition")].

     35.     Ociel Rodriguez, an operator at the well site for Weatherford, stated:

Q. Okay. Why don't you describe for me what you saw as the snubbing crew lifted the last joint of pipe out?
**A. They were on the last joint and they were coming out slow, like very slow, and then it got to a certain point where you can hear like a big hissing sound like very loud. Everything happened like consistently. Like you hear they're coming out and it was like a big (noise) and then all of a sudden at that second you hear a bang, boom and then like everything there just you could see the flames and then after that like the fire expands wide in the air.**
…
Q. Okay. At that time the first thing that you recall was hearing this loud noise?
**A. Correct.**
Q. And it was a hissing noise, a gas noise?
**A. Yeah.**

[Ociel Rodriguez Deposition Transcript dated May 10, 2017, 35:11-22 ("Rodriguez

Deposition")].

     37.     Cole Carveth, an operations engineer for XTO, stated:

Q. And when you – when you have exposed pressure, what can happen? Give me some things that can happen to human beings and the environment.
**A. There's usually a release of some kind and a lot of things can happen. None of them good.**
Q. And can you confirm for us that – that everybody with any involvement with this well who worked for XTO knew the well was producing natural gas at the time?
**A. Yes. The wells always produce natural gas to begin with.**
Q. Right. So you're getting flowback reports and you're measuring the amount of gas coming back, right?
**A. Oil, gas and water.**
Q. And you can confirm for us that the oil and the gas that could possibly come out of that hole is flammable?
**A. Yes.**
Q. Right?
**A. It's natural gas.**

[Cole Carveth Deposition Transcript dated October 11, 2017, 92:10-25, 94:1-14 ("Carveth Deposition")].

38.     Justin Pyle stated:

Q. You saw the hole come up?
**A. Yes.**
Q. And you personally witnessed the gas coming out of the hole?
**A. Yes, I did.**
. . . .
Q. Okay. But somehow gas escaped from the hole in that tubing, got to the atmosphere and caught on fire?
**A. Yes.**

[Justin Pyle Deposition Transcript dated April 20, 2017, 93:19-23, 100:17-25, 101:1-5 ("Pyle Deposition")].

39.     On or about May 22, 2017, Chad Maheu and Joseph Guillen sued XTO, Badlands, Petroleum Experience, KLX, Weatherford, and MBI in the United States District Court for the District of North Dakota, Case No. 1:17-CV-102 (the "Maheu Lawsuit"). [Maheu Complaint].

40.     The Maheu Amended Complaint alleged:

Under the orders of Defendants XTO, MBI, Dokken, Badlands, Jones, Petroleum Experience, and Kolden, the Most Wanted and SEI crews proceeded with the snubbing and pulling-out-of-the-hole operations. <u>When the final joint of tubing was being pulled out of the stack under high pressure, a hole in the final joint, was exposed, and allowed uncontrolled pressures, fluids and gases through the hole and into the atmosphere.</u>

[Maheu Amended Complaint, ¶ 38 (emphasis added)].

41.     On or about July 6, 2017, the heirs of Stassinos sued XTO, Badlands, Petroleum Experience, KLX, Weatherford, and MBI in the United States District Court for the District of North Dakota, Case No. 1:17-CV-00138 (the "Stassinos Lawsuit"). [Stassinos Complaint].

42.     The Stassinos Amended Complaint alleged:

As the work continued, XTO, and/or other Defendants, upon information and belief, ordered and directed Sherwood and Most Wanted to remove the final joint of the pipe from the Well under pressure. <u>That joint could not be safely removed under pressure given its length, the condition of the bottom hole assembly, and because the joint of tubing had a hole in it and could not contain the highly pressurized, dangerous natural gas.</u>

[Stassinos Amended Complaint, ¶ 30 (emphasis added)].

The Defendant Weatherford Entities supplied the tubing at the XTO Well Site A piece of it had a hold in it, was defective, and failed. <u>When the piece of tubing with the hole reached the surface, the pressurized gas escaped and the explosion and fire followed.</u>

*Id.* at ¶ 30 (emphasis added).

<u>The tubing and other products were defective and unreasonably dangerous because of a hole that existed or developed in the tubing and/or other products which caused pressurized gas to escape when the tubing reached the surface and resulted in an explosion and fire.</u>

*Id.* at ¶ 78 (emphasis added).

43.     On or about July 10, 2018, Justin Pyle and Danial Pavon were granted leave to intervene in the Maheu Lawsuit. [Order].

44.     On or about September 7, 2018, Justin Pyle was granted leave to intervene in the Stassinos Lawsuit. [Order].

## THE DEMANDS FOR COVERAGE

45.     On or about January 31, 2018, MBI provided notice of the Maheu Lawsuit to CIIC. [ACORD General Liability Notice of Occurrence/Claim].

46.     On or about February 16, 2018, MBI tendered the Maheu Lawsuit to XTO, seeking defense and indemnification pursuant to the MSA. [MBI Maheu Tender Letter].

47.     On or about February 16, 2018, MBI tendered the Stassinos Lawsuit to XTO, seeking defense and indemnification pursuant to the MSA. [MBI Stassinos Tender Letter].

48. On or about June 29, 2018, XTO wrote to Berkley and CIIC to place the insurers on notice of the Accident and "to demand defense and indemnity on behalf of XTO and its contractors." [XTO Tender Letter]. Specifically, XTO asserted that "XTO and the Contractors [Badlands Consulting, Petroleum Experience, Weatherford, and KLX] [were] additional insureds under [MBI's insurance policies]." *Id.* XTO demanded that "Berkley defend and indemnify XTO and the Contractors for all claims raised in the Stassinos and Maheu Lawsuits." *Id.* In addition, XTO provided "notice to both Berkley and [CIIC] that the Berkley Umbrella Policy and the [CIIC] Policy may be involved." *Id.*

49. On or about July 24, 2018, XTO conditionally accepted MBI's tender of defense and indemnity in the Stassinos and Maheu Lawsuits. [XTO MBI Acceptance Letter]. Although XTO "conditionally accepted" MBI's tender, XTO also advised MBI that "pursuant to Section 11.4 of the MSA, MBI's insurers [were] ultimately responsible for defending and indemnifying XTO, MBI, and all other members of the XTO Group." *Id.*

50. On or about September 28, 2018. Berkley denied XTO's demand for defense and indemnity under its policies. [Berkley Denial Letter].

51. On or about October 5, 2018, CIIC denied XTO's demand for coverage, consistent with Berkley's denial. [CIIC Denial Letter].

52. Thereafter, XTO settled all of the claims in the Maheu and Stassinos Lawsuits on behalf of XTO, all of its contractors (including MBI) and their insurers (except Berkley and CIIC).

53. On or about November 7, 2018, XTO filed a Third-Party Complaint against CIIC and the other insurers. XTO alleged three counts against CIIC: Count 1–Breach of Contract;

Count 3–Breach of the Common Law Duties of Good Faith and Fair Dealing; and Count 4–

Statutory Claim for Unfair Claim Settlement Practices. [XTO's Third-Party Complaint].

## **ARGUMENT**

### I.   **The Summary Judgment Standard.**

Summary judgment is only appropriate when the evidence shows the absence of any

material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

56(a).  In determining whether XTO, as movant, has met its burden, the Court must view the

facts and inferences to be drawn therefrom in a light most favorable to CIIC, the non-moving

party.  *See, e.g., Davison v. City of Minneapolis*, 490 F.3d 648, 654 (8th Cir. 2007).  On a motion

for summary judgment, the Court may, after notice and an opportunity to be heard, grant

summary judgment to the nonmovant. Fed. R. Civ. P. 56(f)(1).

### II.   **The Principles of Insurance Policy Construction**.

"Determining the legal effect of an insurance contract … is generally a question of law

for a court to decide." *Continental Western Ins. Co. v. Dam Bar*, 478 N.W.2d 373, 374 (N.D.

1991). The court looks first to the language of the insurance contract; "if the policy language is

clear on its face, there is no room for construction." *Ziegelmann v. TMG Life Ins. Co.*, 607

N.W.2d 898, 900 (N.D. 2000).  Thus, the court "will not rewrite a contract to impose liability on

an insurer if the policy unambiguously precludes coverage." *Id.* Although the court "construes

exclusionary provisions strictly," it will "not automatically construe every insurance exclusion

against an insurer and in favor of coverage for the insured." *Nationwide Mut. Ins. Companies v.

Lagodinski*, 683 N.W.2d 903, 907 (N.D. 2004). In short, the court " will not rewrite a contract to

impose liability on an insurer if the policy unambiguously excludes coverage." *Id.*

### III. The Pollution Exclusion in the CIIC Policy Unambiguously Bars XTO's Claim for Coverage. [Affirmative Defense ¶ 57]

The Pollution Exclusion in the CIIC Policy states that insurance does not apply to:

> Any **Bodily Injury**, **Property Damage** or **Personal Injury and Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of **Pollutants** anywhere at any time.

[CIIC Policy].  CIIC denied coverage to XTO on various grounds, including this Pollution Exclusion.  App. Ex. 27 [CIIC Denial Letter].

XTO's claim for coverage for the Stassinos and Maheu Lawsuits falls squarely within this Pollution Exclusion. (i) There was a "release" of oil or gas. (ii) Oil and gas are "pollutants" as defined by the CIIC Policy. (iii) The injuries at issue in the Stassinos and Maheu Lawsuits "arose out of" the "release" of oil or gas from the Ryan Well. (iv) No exception to the Pollution Exclusion applies. Because the Pollution Exclusion bars coverage for the Stassinos and Maheu Lawsuits, XTO is not entitled to summary judgment of coverage in the face of this exclusion. To the contrary, the undisputed facts and settled principles of law demonstrate that the exclusion applies and that no coverage exists as a matter of law.[2]

### A. The Pollution Exclusion in the CIIC Policy Is Unambiguous as a Matter of Law.

In its Memorandum, XTO states that it "does not dispute whether the gases released from the Ryan Well are pollutants." *See* XTO Mem. at 16.  Thus, XTO concedes both that "the gases" were "released" from the Ryan Well and that "the gases" are "Pollutants" as defined by the Pollution Exclusion in the CIIC Policy.  "Instead, XTO argues that the pollution exclusion in the CIIC Policy applies only to environmental-type harms, not bodily injury from an explosion." *Id.*

---

[2]    The parties' cross-motions for summary judgment concerning the effect of the CIIC Pollution Exclusion demonstrate the absence of material factual disputes as to the cause and nature of the Accident resulting in the injuries  for which recovery is sought.

For the reasons set forth below, the Court should reject this argument and apply the plain language of the CIIC Policy.

### B. The Pollution Exclusion in the CIIC Policy is Not Limited to "Environmental-Type Harms" Based on the Plain Language of the CIIC Policy.

Contrary to XTO's assertion, the Pollution Exclusion in the CIIC Policy is not limited to "environmental-type harms."[3] The language of the Pollution Exclusion is plain and unambiguous and it makes no reference to "environmental-type harms." As set forth in CIIC's Memorandum, the CIIC Policy excludes coverage for "[a]ny **Bodily Injury** … arising out of the actual … discharge, dispersal seepage, migration, release or escape of **Pollutants**." Pollutants, in turn, are defined as "any solid, liquid, gaseous or thermal irritant or contaminant."

Although XTO makes a cursory argument that the Pollution Exclusion in the CIIC Policy is ambiguous, XTO Mem. at 37-38, XTO fails to identify a single allegedly ambiguous word or phrase in the CIIC Policy. Moreover, XTO concedes that the gases that were "released" from the Ryan Well, causing the explosion, were "pollutants" as defined by the CIIC Policy, so XTO is in

---

[3]   XTO assumes, but does not establish, that the bodily injury claims at issue are not "environmental-type harms." There is substantial reason to question XTO's assumption. The undisputed facts show that the release of gas from the Ryan Well into the atmosphere lead to the explosion and fire that resulted in the bodily injury claims at issue. *See, e.g.,* App. Ex. 5 at 84:25-85:11 (testimony of MBI foreman Carson Dokken that "bring[ing] the hole above the bag," as happened here, is "bad practice …. [b]ecause you would be bleeding gas off into the atmosphere."); *id.* (confirming the existence of an "environmental concern" and "potential ignition."). The OSHA Citation similarly concluded that the Accident resulted from the "release[e of] pressurized well gas and fluid into the work area" which exposed employees to "flammable well gases." App. Ex. 3 at 7, 38, 47. The release of flammable gases into the atmosphere is just the kind of "environmental" incident traditionally recognized as "pollution."

Likewise, the Accident did not incidentally involve a substance that happened to be a "pollutant." *Pipefitters Welfare Educ. Fund v. Westchester Fire Ins. Co.*, 976 F.2d 1037, 1043 (7th Cir. 1992) (distinguishing "bodily injuries suffered by one who slips and falls on the spilled contents of a bottle of Drano, [and] bodily injury caused by an allergic reaction to chlorine in a public pool"). Rather, as the Eighth Circuit recognized, the resulting explosion "directly related to the nature of the contaminant." *Hiland Partners GP Holdings, LLC, et al. v. National Union Fire Insurance Co. of Pittsburg, P.A.*, 847 F.3d 594, 600 (8th Cir. 2017).

no position to argue that either term is ambiguous. In any event, the law is clear.  As the Eighth

Circuit recognized in *Hiland Partners GP Holdings, LLC, et al. v. National Union Fire*

*Insurance Co. of Pittsburg, P.A.*, 847 F.3d 594 (8th Cir. 2017), under North Dakota law, the

words "irritant" and "contaminant" have common dictionary definitions that include oil, gasoline

and other petroleum products, which are "flammable, volatile, and explosive." *Id.* at 599. "North

Dakota courts consider dictionaries to be 'good source[s] to determine the plain, ordinary

definition of an undefined term.'" *Id.* (quoting *Hanneman v. Cont'l W. Ins. Co.*, 575 N.W.2d

445, 451 (N.D. 1998)).  Applying this law, "the gases" that were "released" from the Ryan Well

were plainly "pollutants." As a matter of North Dakota law, where "the policy language is clear

on its face, there is no room for construction." *Ziegelmann*, 607 N.W.2d at 900. The court "will

not rewrite a contract to impose liability on an insurer if the policy unambiguously precludes

coverage," nor will the court "strain the definition of an undefined term to provide coverage for

the insured." *Id.*; *accord N. Star Mut. Ins. v. Ackerman*, 940 N.W.2d 857, 861 (N.D. 2020)

(same). Moreover, as the Eighth Circuit noted in *Hiland*, "the 'majority of state and federal

jurisdictions have held that absolute pollution exclusions [like the Pollution Exclusion in the

CIIC Policy] are unambiguous as a matter of law.'" *Hiland*, 847 F.3d at 598 (citing *Church Mut.*

*Ins. Co. v. Clay Ctr. Christion Church*, 746 F.3d 375, 380 (8th Cir. 2014) (quoting *Cincinnati*

*Ins. Co. v. Becker Warehouse, Inc.*, 635 N.W.2d 112, 118 (Neb. 2001)) (collecting cases holding

that "absolute pollution exclusions are unambiguous as a matter of law and, thus, exclude

coverage for all claims alleging damage caused by pollutants").[4]

---

[4]     Other courts have made the same observation.  *See, e.g., City of Salina, Kan. v. Maryland*
*Cas. Co.*, 856 F. Supp. 1467, 1476 (D. Kan. 1994) ("Courts faced with the absolute exclusion
generally have concluded that it is unambiguous and excludes coverage for all claims alleging
damage caused by pollutants.") (collecting cases); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA v.*
*CBI Indus., Inc.*, 907 S.W.2d 517, 522 (Tex. 1995) (observing that "[m]ost courts which have

Because the Pollution Exclusion in the CIIC Policy is clear on its face and the words "environmental-type harms" do not appear anywhere in the CIIC Policy, there is no basis for the Court to look beyond the plain language of the Pollution Exclusion to limit its reach to "environmental-type harms," as XTO invites this Court to do. Indeed, doing so would be contrary to North Dakota law, as an analysis of the cases on which XTO places primary reliance shows. XTO relies on *Enron Oil Trading & Transp. Co. v. Walbrook Ins. Co.*, 132 F.3d 526 (9th Cir. 1997), a Ninth Circuit decision applying Montana law. In *Enron*, the Court concluded that Montana courts would hold the pollution exclusion at issue was limited to "environmental-type harms," based on the "reasonable expectations" doctrine. *Id.* at 530-31. "The doctrine of reasonable expectations is an interpretive tool employed by courts which considers the experience and knowledge of the insured when purchasing insurance." *Lagodinski*, 683 N.W.2d at 911. Notably, however, North Dakota "has expressly declined to adopt the doctrine of reasonable expectations." *Id.* "Additionally, [the] Court would have to determine the language of the policy [was] sufficiently ambiguous in order to apply the doctrine." *Id.* Here, however, XTO has failed to identify any ambiguity in the CIIC Policy to warrant application of the doctrine (even if North Dakota recognized it, which it does not).

Moreover, the pollution exclusion at issue in *Enron*, in contrast to the pollution exclusion at issue in this case, did not define the term "pollution." After *Enron*, the Montana Supreme Court, asked to interpret a pollution exclusion that defined the term "pollutants," declined to limit the exclusion to "environmental-type harms," specifically distinguishing *Enron*. *Sokoloski v. Am. W. Ins. Co.*, 980 P.2d 1043, 1044-45 (Mont. 1999). Where, as here, "pollutants" is a defined term, the unambiguous language of the policy controls and there is no reason to resort to

---

examined the same or substantially similar absolute pollution exclusions have concluded that they are clear and unambiguous") (collecting cases).

the doctrine of "reasonable expectations" to interpret it. *See Swank Enterprises, Inc. v. United Fire and Cas. Co.*, No. CV 19-179-M-DWM, 2020 WL 1685746 (D. Mont. Apr. 7, 2020) (applying Montana law and concluding that *Sokoloski*, not *Enron*, controlled the outcome where, as here, "pollutants" is a defined term).

The majority of the cases on which XTO relies for its "environmental-type harms" interpretation apply some version of the "reasonable expectations" doctrine expressly rejected by North Dakota. *See, e.g., Regional Bank of Colorado, N.A. v. St. Paul Fire and Marine Ins. Co.*, 35 F.3d 494 (10th Cir. 1994) (applying "reasonable expectations" doctrine recognized by Colorado law to limit scope of pollution exclusion); *Nautilus Ins. Co. v. Jabar*, 188 F.3d 27, 28–29 (1st Cir. 1999) ("Maine courts have also found policy language ambiguous 'if an ordinary person in the shoes of an insured would not understand that the policy did not cover claims such as those brought.'") (citation omitted); *Mackinnon v. Truck Ins. Exchange*, 73 P.3d 1205 (Cal. 2003) (given the "reasonable expectation" of coverage by the insured, coverage will be found "unless the pollution exclusion conspicuously, plainly and clearly apprises the insured that certain acts of ordinary negligence, such as the spraying of pesticides in this case, will not be covered") (citing *Regional Bank*); *Belt Painting Corp. v. TIG Ins. Co.*, 795 N.E.2d 15, 20 (N.Y. 2003) (declining to recognize an unlimited pollution exclusion which would contradict "the reasonable expectations of a businessperson"); *Keggi v. Northbrook Property and Cas. Ins. Co.*, 13 P.3d 785 (Ariz. 2000) (applying "reasonable expectations" doctrine to limit scope of pollution exclusion under Arizona law); *Atl. Mut. Ins. Co. v. McFadden*, 595 N.E.2d 762, 764 (Mass. 1992) ("When construing language in an insurance policy, we 'consider what an objectively reasonable insured, reading the relevant policy language, would expect to be covered'") (citation omitted); *Motorists Mut. Ins. Co. v. RSJ, Inc.*, 926 S.W.2d 679, 682 (Ky. Ct. App. 1996) (finding

ambiguity in pollution exclusion, not on its face, but because "we are convinced that an ordinary business person would not apprehend the provision as excluding coverage for the type of damage incurred through an unexpected leak in a vent pipe."); *W. Am. Ins. Co. v. Tufco Flooring E., Inc.*, 409 S.E.2d 692, 698 (N.C. 1991), *overruled by Gaston Cty. Dyeing Mach. Co. v. Northfield Ins. Co*, 524 S.E.2d 558 (N.C. 2000) ("A reasonable person in the position of Tufco would have understood claims such as Perdue's to be covered.").

As set forth above, North Dakota has expressly rejected the "reasonable expectations" doctrine.  Accordingly, it is highly likely that a North Dakota court, if asked to construe the Pollution Exclusion in the CIIC Policy, would apply the CIIC Policy as written, looking no further than the clear and unambiguous language.  This federal court should follow the North Dakota rules of insurance policy construction and do the same.

Moreover, contrary to the impression that XTO attempts to create with its string cite, XTO Mem. at 18-20, the majority of courts to consider the question have found absolute pollution exclusions to be unambiguous and declined to engraft an "environmental-type harms" limitation on them where no such limitation appears in the policy language.  *See generally Deni Assocs. of Fla., Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So. 2d 1135, 1137 & n. 2 (Fla. 1998) (recognizing that a "substantial majority of these courts have concluded that the pollution exclusion is clear and unambiguous so as to preclude coverage for all pollution related liability" and noting "more than 100 cases from 36 other states which have applied the plain language of the pollution exclusion clause to deny coverage"); *see also Certain Underwriters at Lloyd's London v. C.A. Turner Const. Co.*, 112 F.3d 184, 188 (5th Cir. 1997) (rejecting environmental harm limitation to pollution exclusion) (Texas law); *Bernhardt v. Hartford Fire Ins. Co.*, 648 A.2d 1047, 1051 (Md. Ct. Spec. App. 1994) (rejecting argument that pollution exclusion should

be limited to "industrial" or "industry-related" harm); *Bituminous Cas. Corp. v. Sand Livestock Sys., Inc*., 728 N.W.2d 216, 221 (Iowa 2007) (finding pollution exclusion unambiguous and rejecting "environmental" limitation, as "the plain language of the exclusions at issue here makes no distinction between 'traditional *environmental* pollution' and injuries arising from normal business operations")(emphasis added); *State Farm Fire & Cas. Co. v. Dantzler*, 852 N.W.2d 918 (Neb. 2014) (finding absolute pollution clause to be unambiguous); *Cincinnati Ins. Co.,* 635 N.W.2d at 120  (finding pollution exclusion to be unambiguous and declining to "look beyond the 'bare words of the exclusion' in order to limit the exclusion to traditional environmental damage"); *United Fire & Cas. Com. Co. v. Titan Contractors Serv., Inc.*, 751 F.3d 880, 886 (8th Cir. 2014) (finding pollution exclusion to be unambiguous) (Missouri law).

> **C.    The Pollution Exclusion in the CIIC Policy Applies to the Bodily Injury Claims at Issue Resulting from the Explosion and Fire Because They "Arose Out of" the Release of Gas from the Ryan Well.**

In addition to arguing that the Pollution Exclusion in the CIIC Policy does not apply because the exclusion applies to "environmental-type harms" only, XTO argues that the Pollution Exclusion does not apply because the bodily injury claims at issue resulted from the explosion and fire caused by the release of gas from the Ryan Well.  The Court should reject XTO's attempt to create an "explosion" exception to the exclusion.

"North Dakota applies the 'causal connection test' when construing the phrase 'arising out of' in an insurance policy."  *Acuity v. North Cent. Video LLLP*, No.1:05-CV-010, 2007 WL 1356919, at *10 (D.N.D. May 7, 2007), citing *Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co.*, 658 N.W.2d 363, 371 (N.D. 2003). "As explained by the North Dakota Supreme Court, the causal connection test is broad and comprehensive in scope." *Id.* "The causal relationship need not constitute the proximate cause;" although "[a] remote connection  … will not satisfy the test." *Id*. Here, the undisputed facts show that the release of gas or oil from the Ryan Well was

the immediate cause of the explosion and fire that resulted in the bodily injury claims at issue, meeting the "causal connection" test.

Moreover, *Hiland*, decided under North Dakota law, is directly contrary to XTO's "explosion" exception argument.   In *Hiland*, the court concluded that condensate, another hydrocarbon product, was a "contaminant [and thus a 'pollutant'] due to its flammable, volatile, and explosive properties."   847 F.3d at 600.   The court continued: "because [the] injuries were the result of an explosion, the nature of the harm here is directly related to the nature of the contaminant."  *Id.*   The same analysis applies here.   The gas released from the Ryan Well is a "pollutant" precisely because it is "flammable, volatile and explosive;" it defies logic to suggest that when a "pollutant" causes the very harm the risk of which makes it a "pollutant" in the first place, the resulting injury would not be encompassed by the Pollution Exclusion.

### D.   The Cases Cited By XTO Do Not Warrant Disregarding the Plain Language of the Pollution Exclusion in the CIIC Policy.

In support of its argument that an "environmental-type harms" limitation applies, XTO cites 17 cases.   None of the cases were decided under North Dakota law and all of the cases were decided before *Hiland*.  *See* XTO Mem. at 17-21.   As set forth above, the majority of the cases are inapposite because they are based on the "reasonable expectations" doctrine rejected by North Dakota.   But XTO's reliance on the cases it cites is also misplaced for other reasons.

For example, several cases cited by XTO concern the definition of "pollutant." *See, e.g., Kent Farms, Inc. v. Zurich Ins. Co*., 969 P.2d 109, 111 (Wash Ct. App. 1998) (whether diesel fuel used in farm operations was within definition of "pollutant" when used as intended); *Keggi*, 13 P.3d at 790 (whether water-borne bacteria was within definition of "pollutant"); *Tufco., Inc*., 409 S.E.2d at 698 (whether flooring materials used in normal business operations was within definition of "pollutant").   Here, of course, there is no question that the gas released from the

Ryan Well was a "pollutant" under the CIIC Policy.  XTO has conceded as much.  Moreover, the *Hiland* court, applying North Dakota law, found that hydrocarbon condensate, because it is "flammable, volatile, and explosive," was a "pollutant."  The gas released by the Ryan Well in this case is no different.

Other cases cited by XTO – decided under the state law of Washington, Montana and Massachusetts – have been superseded by cases finding absolute pollution exclusions to be unambiguous.  *See, e.g., Quadrant Corp. v. Am. States Ins. Co.*, 110 P.3d 733, 742 (Wash. 2005) (finding pollution exclusion to be unambiguous and rejecting insured's argument that exclusion applied only to "traditional environmental pollution"); *Sokoloski v. Am. W. Ins. Co.*, 980 P.2d 1043, 1044 (Mont. 1999) (rejecting argument that the term "'pollutant' is an environmental term of art which applies only to discharges of pollution into the environment from sources outside the home"); *Essex Ins. Co. v. Tri-Town Corp.*, 863 F. Supp. 38, 41 (D. Mass. 1994) (finding absolute pollution exclusion to be unambiguous and holding that discharge of carbon monoxide from Zamboni falls within the absolute pollution exclusion).  XTO fails to note this later, contrary authority.

Finally, XTO relies on cases that involve, as the *Pipefitters* court put it, "injuries resulting from everyday activities gone slightly, but not surprisingly, awry."  976 F.2d at 1044.  *See, e.g., Koloms*, 687 N.E.2d at 82 (release of carbon monoxide from a broken furnace); *Nautilus*, 188 F.3d at 28–29 (inhalation of fumes from roof-repair products that were used properly); *Belt Painting*, 795 N.E.2d at 20 (ordinary paint or solvent fumes); *McFadden*, 595 N.E.2d at 764 (residential lead-based paint); *Weaver v. Royal Ins. Co. of Am.*, 674 A.2d 975, 978 (N.H. 1996) (lead paint dust); *Reg'l Bank of Colorado*, 35 F.3d at 494 (carbon monoxide emitted from faulty residential wall heater); *MacKinnon*, 73 P.3d at 1205 (pesticide exposure from landlord's

extermination efforts); *RSJ, Inc.*, 926 S.W.2d at 682 (carbon monoxide emitted from leaking vent stack).  These cases stand in sharp contrast to this case, in which the release of a pollutant (gas) from the Ryan Well into the atmosphere resulted in a catastrophic explosion and fire.

To be sure, there is a divergence among the courts regarding whether absolute pollution exclusions are unambiguous and enforceable as written. Under Louisiana law, for example, pollution exclusions exclude coverage for "environmental pollution only." *Gaylord Container Corp. v. CNA Ins. Companies*, 807 So. 2d 864, 872 (La. Ct. App. 2001). Ultimately, this Court will have to determine whether North Dakota would impute an "environmental-type harms" limitation into a pollution exclusion that is clear on its face. The cases relied on by XTO are either inapposite, as discussed above, or adhere to a position that is incompatible with North Dakota law. Overriding the broad, unqualified scope of the pollution exclusion in the CIIC Policy to incorporate a substantive "environmental-type harms" limitation that the parties did not choose to incorporate themselves would represent a significant departure from North Dakota's established principles of contract interpretation, and this federal court should not do it. *See, e.g., Ziegelmann*, 607 N.W.2d at 900 ("We look first to the language of the insurance contract, and if the policy language is clear on its face, there is no room for construction.") (citing *Martin v. Allianz Life Ins. Co.*, 573 N.W.2d 823 (N.D. 1998)); *Lagodinski*, 683 N.W.2d at 907 (court will "not automatically construe every insurance exclusion against an insurer and in favor of coverage ...."); *cf. Doe Run Res. Corp. v. Lexington Ins. Co.*, 719 F.3d 868, 875–76 (8th Cir. 2013) ("courts may not 'create an ambiguity in order to distort the language of an unambiguous policy, or, in order to enforce a particular construction which it might feel is more appropriate.'") (quoting *Rodriguez v. Gen. Accident Ins. Co. of Am.*, 808 S.W.2d 379, 382 (Mo.1991)).

### IV.   The Exception to the Pollution Exclusion in the CIIC Policy Does Not Apply Because XTO Cannot Show that the Accident Was Reported Within 21 Days.

XTO also relies on the exception to the Pollution Exclusion in the CIIC Policy (XTO Mem. 22), but that exception restores coverage for injuries arising out the release of Pollutants, if and only if "*all* of the following conditions [listed in the Pollution Exclusion]" are met. [CIIC Policy, Endorsement 26] (emphasis added). XTO does not dispute that one of the conditions is that the release of Pollutants be "reported in writing to [CIIC] within (21) calendar days of becoming known to the Insured." Likewise, XTO does not dispute that this condition was *not* met. *See* XTO Mem. 22. The undisputed facts, show that notice was not given to CIIC for *two years*.[5] As a consequence, the exception cannot apply to restore coverage.

Instead, XTO tries to recharacterize CIIC's argument that XTO failed to meet the conditions for the exception to apply as a "late notice" *defense*. XTO then argues that CIIC waived the defense and that CIIC failed to show prejudice, as required to sustain a "late notice" defense. *See, e.g.,* XTO Mem. at 22-28. XTO is wrong as a matter of law and the Court should reject its argument.

Here again, *Hiland* is directly on point. As set forth in *Hiland*, under North Dakota law, "[t]he insured … carries the burden to prove the applicability of 'an exception to the exclusion in order to benefit from coverage.'" 847 F.3d at 601 (quoting *Lagodinski*, 683 N.W.2d at 907). *See also Bell Lumber & Pole Co. v. U.S. Fire Ins. Co.*, 60 F.3d 437, 441 (8th Cir. 1995) (recognizing that it is not the carriers' burden to prove that an exception does not apply, but rather the insured's burden to prove that an exception does apply). Here, XTO has not even attempted to carry its burden to show that the Accident was reported to CIIC within 21 days. Indeed, the only

---

[5]     Although XTO argues that it did not learn about the terms of the CIIC Policy until approximately two years after the Accident (XTO Mem. at 22, fn. 11), it does not and cannot dispute that *MBI*, the named insured, was well aware of the policy's terms yet failed to provide notice within 21 days as required. Notably, XTO did not even provide notice within 21 days after it learned about the terms of the CIIC Policy. According to XTO, it obtained the CIIC Policy on June 4, 2018, but did not give notice to CIIC until June 29, 2018. [XTO Tender letter].

facts in the record are directly to the contrary.

Where, as here, there is no genuine issue of material fact regarding the XTO's failure to demonstrate the applicability of an exception to a pollution exclusion, XTO is not entitled to summary judgment and, to the contrary, CIIC is entitled to judgment as a matter of law. *See, e.g., Bell Lumber*, 60 F.3d at 441 (recognizing that insurers are entitled to summary judgment if there are no genuine issues of material fact "as to the non-applicability" of an exception to a pollution exclusion). XTO's argument simply misses the point. Just as CIIC bears the burden to demonstrate the applicability of the Pollution Exclusion to bar coverage, so does XTO bear the burden to demonstrate the applicability of the exception to the Pollution Exclusion to restore coverage. XTO's failure to carry its burden has the effect of leaving the Pollution Exclusion in place. It does not create a "late notice" defense that must be asserted by CIIC. In any event, CIIC timely apprised XTO that the Pollution Exclusion in the CIIC Policy barred coverage for the bodily injury claims at issue. Statement of Material Facts, ¶¶47 & 50. For the same reason, no showing of prejudice is required under these circumstances. The conditions necessary for the exception to apply are "conditions precedent" to coverage and XTO's failure to show that the conditions were satisfied "preclude[s] recovery, regardless of whether prejudice is shown." *In re Matter of Complaint of Settoon Towing, LLC*, 720 F.3d 268, 278 (5th Cir. 2013) (citation omitted) (holding that "non-compliance prevents the exception to the exclusion from taking effect in the first instance, meaning the pollution exclusion remains in effect" "regardless of prejudice"); *see also Apollo Energy, LLC v. Certain Underwriters at Lloyd's, London*, 387 F. Supp. 3d 663, 677 (M.D. La. 2019) (same).

## V.   The Pollution Exclusion in the CIIC Policy Governs Because the CIIC Policy "Follows Form" to the Underlying Berkley Policy "Subject to" the Terms, <u>Definitions, Conditions and Exclusions of the CIIC Policy.</u>

In an effort to avoid application of the absolute Pollution Exclusion in the CIIC Policy, XTO argues that the pollution exclusion in the underlying Berkley policy applies because the CIIC Policy "follows form" to the underlying Berkley policy and that certain exceptions to the pollution exclusion in the underlying Berkley policy apply to restore coverage. *See* XTO Mem. 28-38.   XTO is wrong.   The Pollution Exclusion in CIIC's own Policy governs whether the bodily injury claims at issue are excluded from coverage under that Policy.

According to XTO, by virtue of Endorsement 11 to the CIIC Policy – a "follow form" Commercial General Liability Limitation Endorsement (the "CGL Endorsement") – the terms, condition and exclusions of the underlying Berkley policy, including its pollution exclusion, supersede the terms, conditions and exclusions of the CIIC Policy, including CIIC's own Pollution Exclusion.   In essence, XTO argues that where an excess policy "follows form," the provisions of the excess policy are replaced by the terms, definitions, conditions and exclusions of the underlying policy and the provisions of the excess policy do not apply.   See XTO Mem. at 28 ("By endorsing its Policy with a follow-form provision, the CIIC Policy adopts, independently of its time element exception, both the hostile fire exception and the additional insured exception found in the Berkley Primary Policy.").   XTO misreads the CGL Endorsement.

The CGL Endorsement clearly states that the CIIC Policy "will follow the terms, definitions, conditions and exclusions of [the underlying Berkley policy] *subject to* the … terms, definitions, conditions and exclusions of [the CIIC Policy]."   [CIIC Policy, Endorsement 11 (emphasis added)]. The CGL Endorsement further states that "coverage provided by this policy will be no broader than the coverage provided by Scheduled Underlying Insurance" and that "[a]ll other terms, definitions, conditions and exclusions remain unchanged." *Id*. In short, the CGL Endorsement provides that the CIIC Policy will "follow" the Berkley policy where the

Berkley policy provides narrower coverage, but otherwise, the "terms, definitions, conditions and exclusions" of the CIIC Policy will apply.

Courts interpreting "follow form" provisions routinely hold that where the provisions of a follow-form excess policy differ from the provisions of an underlying policy, the provisions of the excess policy control over the conflicting terms of the underlying policy. *See, e.g., Tile Shop Holdings, Inc. v. Allied World Nat'l Assurance Co.*, No. Civ 17-776, ADM/TNL, 2019 WL 2357044, at *5 (D. Minn. June 4, 2019) (holding that broader exclusion in "follow form" excess policy controlled over narrower exclusion in primary policy); *UnitedHealth Grp. Inc. v. Columbia Cas. Co*., 941 F. Supp. 2d 1029, 1053 (D. Minn. 2013) (holding that excess policies that follow form "'except … with respect to any provisions to the contrary contained in this Policy…'" provide the coverage described in the primary policy's endorsement, "but only insofar as the … Endorsement is consistent with the other terms of the policies; where there is a conflict, the … Endorsement is 'trumped' by the conflicting provisions" in the excess policies); *accord Insituform Techs., Inc. v. Am. Home Assur. Co.*, 566 F.3d 274, 278 (1st Cir. 2009) (recognizing that "'follow form' is a loose term" that does not provide coverage identical to primary coverage where excess policy "has a lengthy set of coverage provisions and exclusions of its own"); *United Nat. Ins. Co. v. Hydro Tank, Inc.*, 497 F.3d 445, 453 (5th Cir. 2007) (declining to find that exclusion contained in umbrella policy's contractor liability endorsement "impliedly neutralize[d] all other specific exclusions to coverage"), *opinion amended on denial of reh'g*, 525 F.3d 400 (5th Cir. 2008).

XTO does not appear to dispute this settled law. Thus, XTO concedes that the pollution exclusion in the underlying Berkley policy applies only "to the extent it does not conflict with CIIC's pollution exclusion." *See* XTO Mem. at 29. Instead, XTO argues that there is no conflict

between the CIIC Policy and the underlying Berkley policy and that the exceptions to the pollution exclusion in the Berkley policy therefore apply – despite the fact that no such exceptions exist in the CIIC Policy.

XTO's argument is nonsensical and the Court should reject it. The fact that the pollution exclusion in the underlying Berkley policy has exceptions that operate to restore coverage that are not found in the Pollution Exclusion in the CIIC Policy is the very definition of a conflict between the two policies. Were the exceptions to the pollution exclusion in the underlying Berkley policy to apply, as XTO argues, the pollution exclusion in the underlying Berkley policy would not exclude coverage. At the same time, the Pollution Exclusion in the CIIC Policy, which has no similar exceptions, would remain in full force and effect and exclude coverage. There can be no more substantial conflict. And, as XTO concedes, because it must, where there is a conflict with the underlying Berkley policy that would result in broader coverage, the "terms, definitions, conditions and exclusions" of the CIIC Policy control.[6]  Insofar as XTO's arguments regarding the exceptions to the pollution exclusion in the underlying Berkley policy are concerned, this Court is respectfully referred to Berkley's response to XTO's argument regarding the exceptions

---

[6]     The cases cited by XTO are inapposite.  In *Federated Rural Elec. Ins. Corp. v. Certain Underwriters at Lloyd's*, 293 Fed. Appx. 539 (9th Cir. 2012), the court considered whether an exclusion for "earth movement" in an excess policy excluded coverage for a sinkhole collapse. Because the excess policy followed form to the primary policy "unless it provided otherwise," and the excess policy did not define "earth movement," the court "imported" the definition of "earth movement" from the primary policy into the excess policy.  *Id*. at 541. Similarly, in *Johnson Controls, Inc. v. London Market*, 784 N.W.2d 579 (Wis. 2010), the court imported the duty to defend from an umbrella policy into an excess umbrella policy that followed form "except as otherwise provided herein" and was silent regarding the duty to defend.  *Id*. at 587-88. Here, in contrast, the CGL Endorsement clearly states that the CIIC Policy "follows" the Berkley policy "subject to" the terms, definitions, conditions and exclusions of the CIIC Policy – in other words, the CIIC Policy controls in the event of any conflict with the underlying Berkley policy that could be construed to provide broader coverage.  Moreover, in this case, both the underlying Berkley policy and the CIIC Policy have pollution exclusions and their terms are different.  In contrast to the cases on which XTO relies, there is no "gap" in the CIIC Policy to be filled by the underlying Berkley policy; rather the policies have different and conflicting exclusions.

issue, which is set forth at pages 27-38 of Berkley's Memorandum of Law in Response to XTO's

Motion for Partial Summary Judgment.  (D.E. 143).[7]

## VI. XTO and its Contractors Are Not Entitled To Additional Insured Coverage for the Settlement payments that XTO Made. [Affirmative Defenses ¶¶ 50, 51 & 53]

As set forth above, XTO settled the Stassinos and Maheu Lawsuits on behalf of itself, its

contractors (including MBI), and their insurers (with the exception of Berkley and CIIC).  XTO's

Third-Party Complaint alleges that it is entitled to "reimbursement for the amounts it paid to

settle the Lawsuits." [Third-Party Complaint, ¶¶73, 98]. XTO seeks partial summary judgment

dismissing CIIC's affirmative defenses that "XTO does not qualify as an additional insured" (*Id.*,

¶50) and "XTO's contractors do not qualify as additional insureds." (*Id.*, ¶51). XTO Mem. 3.

For the reasons set forth below, the Court should deny XTO's motion.

### A. XTO is Not Entitled to Additional Insured Coverage for the Settlement Payments It Made. [CIIC's Affirmative Defenses ¶¶ 50 & 53]

In its Memorandum, XTO argues "if XTO is an additional insured under the Berkley

policies, it is also an additional insured under the CIIC Policy," and "fully incorporates … by

reference" that portion of its Motion for Partial Summary Judgment against Berkley addressing

the additional insured issue. XTO Mem. at 16. No additional argument is offered regarding CIIC.

Accordingly, the Court is respectfully referred to Berkley's response to XTO's argument

regarding the additional insured issue, which is set forth at pages 14-25 of Berkley's

Memorandum of Law in Response to XTO's Motion for Partial Summary Judgment. (D.E. 143)

---

[7]     Contrary to XTO's argument, CIIC's incorporation of Berkley's defenses in its Amended Answer is not an admission that Berkley's policy language supplants its own.  *See* XTO Mem. at 29-30.  Because CIIC's coverage can be "no broader" than Berkley's, any successful defense to coverage that Berkley may assert inures to CIIC's benefit.  XTO's attempted reliance on Section V. Exclusions, Paragraph Q. Pollution is equally unavailing.  *See* XTO Mem. at 29.  It is undisputed that the CIIC Policy was modified by Endorsement No. 26 and that Section V. Exclusions, Paragraph Q. Pollution was "deleted in its entirety and replaced by" the Pollution Exclusion at issue.

Even if the Court were to conclude that XTO was an "additional insured," XTO would still not be entitled to additional insured coverage to obtain reimbursement for the payments it made to settle the Stassinos and Maheu Lawsuits based on the contractual liability exclusion in the Berkley CGL Policy. The Berkley CGL Policy, to which the CIIC Policy follows form, excludes coverage for injury "for which the INSURED is obligated to pay damages by reason of the assumption of liability in a contract or agreement," unless the liability is one:

   a. That the Insured would have in the absence of the contract or agreement; or
   b. Assumed in a contract or agreement that is an **INSURED CONTRACT**, provided the **BODILY INJURY** or **PROPERTY DAMAGE** occurs after the execution of the contract or agreement.

[Berkley CGL Policy, VII.B.2].

The Berkley CGL Policy further defines "INSURED CONTRACT" as "[t]hat part of any written contract or written agreement pertaining to YOUR business under which YOU assume the liability of another party." [Berkley CGL Policy, IX (INSURED CONTRACT)]. Importantly, "YOU" means "the NAMED INSURED(S)" and "YOUR" means "belonging to the NAMED INSURED(S)." [Berkley CGL Policy, IX (YOU) & (YOUR)]. The Named Insured is MBI. [Berkley CGL Policy, I.A. (Named Insureds) (emphasis added)]. XTO is not a Named Insured.

Because it "follows form" to the Berkley CGL Policy, the CIIC Policy excludes from coverage contractual liability, but provides an exception to the exclusion solely for agreements pertaining to *MBI*'s business in which *MBI* assumes the liability of another. By its terms, the Berkley CGL Policy does not remove from the scope of the contractual liability exclusion agreements pertaining to *XTO*'s business in which *XTO* assumes the liability of another. XTO's claim that "the Berkley policies provide coverage for Missouri Basin's contractual obligation to indemnify XTO under the MSA" (XTO Berkley Mem. 19) is directly contrary to the clear and

unambiguous language of the Berkley CGL Policy set forth above. Under the Berkley CGL Policy, coverage for contractual liability extends to MBI only, not to any contractual indemnification obligation that XTO may have undertaken (or paid).  XTO simply ignores this critical policy language.

Here, XTO accepted the tender of defense and indemnification from MBI and its other contractors pursuant to the Master Services Agreements and it made the settlement payments pursuant to its contractual indemnification obligations.[8] XTO's reimbursement claim thus falls squarely within the contractual liability exclusion in the Berkley CGL Policy. Because the exception to the exclusion is limited to the Named Insured, MBI, only, it does not apply to restore coverage for XTO's reimbursement claim here.[9] As a result, CIIC's affirmative defenses are valid and should not be stricken.

**B.     XTO's Contractors Are Not Additional Insureds. [CIIC Affirmative Defense ¶ 51].**

Although XTO moves for partial summary judgment in its favor on CIIC's affirmative defense that "XTO's contractors do not qualify as additional insureds," it actually makes no argument in this regard. In any event, the plain and unambiguous language of the Berkley CGL Policy shows that XTO's contractors are *not* additional insureds because MBI did enter into a contract or agreement "with" them.

---

[8]     As set forth above, the Master Services Agreement ("MSA") between MBI and XTO provided, among other things, that XTO would "release, defend, indemnify and hold [MBI] harmless from and against" any claims arising out of injuries suffered by any member of the XTO Group (as defined by the MSA). [MSA, ¶10.2.1] Similar indemnification provisions exist in XTO's Master Services Agreements with its other Contractors.  *See, e.g.,* Doc. No. 98 at 123-142 of 385 [Master Services Agreement between XTO and Badlands Consulting LLC].

[9]     XTO does not allege that it had an obligation to settle the Stassinos and Maheu Lawsuits on behalf of its contractors "in the absence of" the Master Services Agreements. Consequently, exception a. to the contractual liability exclusion also does not apply.

The Berkley CGL Policy provides that the following are "additional insureds:" "Any person or organization *with* whom **YOU** agree in a written contract or written agreement to add as an Additional Insured on **YOUR** policy or to provide liability insurance for, but only with respect to liability arising out of **YOUR** operations or liability arising out of premises owned by or rented to **YOU**." [Berkley CGL Policy (emphasis added)]. "You" is defined in the Berkley Policy as the Named Insured, i.e., MBI. *Id*.

Here, MBI entered into an agreement *with* XTO only; MBI did *not* enter into an agreement *with* any of XTO's *contractors*. As a consequence, XTO's contractors (on whose behalf XTO settled) are *not* additional insureds under the Berkley or CIIC Policies and the claims against those contractors in the underlying lawsuits are not covered. *See Gilbane Bldg. Co./TDX Constr. Corp. v. St. Paul Fire & Marine Ins. Co.*, 31 N.Y. 3d 131, 135 (N.Y. 2018) ("Here, the 'with' can only mean that the written contract must be 'with' the additional insured.… [T]he endorsement's meaning is plain and unambiguous.").

## **CONCLUSION**

For the foregoing reasons, the Court should deny XTO's motion in its entirety.

Respectfully submitted,

**STROOCK & STROOCK & LAVAN LLP**

200 South Biscayne Blvd.
Suite 3100
Miami, FL 33131
Tel.: (305) 358-9900

By:    /s/ Laura Besvinick
        Laura Besvinick
        Florida Bar Number: 391158

        and

By:    /s/ Joel A. Flom
        Joel A. Flom (#04469)
        Jessica M. Rydell (#07801)
        joel@flomlaw.com
        jessica@flomlaw.com

*Attorneys for Third Party Defendant*
*Commerce and Industry Insurance Company*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on July 27, 2020, I electronically filed the foregoing document with the Clerk of Court using the Court's CM/ECF system.  Copies of the foregoing document will be served upon interested counsel either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

By:     /s/ Laura Besvinick                    
            Laura Besvinick, Esq.