# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Berkley National Insurance Company, | ) |
| | ) |
| Plaintiff, | ) |
| | ) **ORDER ON MOTIONS FOR** |
| vs. | ) **SUMMARY JUDGMENT AND** |
| | ) **CROSS-MOTIONS FOR** |
| XTO Energy, Inc., | ) **PARTIAL SUMMARY JUDGMENT** |
| | ) |
| Defendant, and | ) |
| Third-Party Plaintiff, | ) Case No. 1:18-cv-195 |
| | ) |
| vs. | ) |
| | ) |
| Commerce and Industry Insurance | ) |
| Company, Torus National Insurance | ) |
| Company n/k/a StarStone National | ) |
| Insurance Company, and Seneca | ) |
| Specialty Insurance Company, | ) |
| | ) |
| Third-Party Defendants. | ) |

Before the Court are three motions for summary judgment (Doc. Nos. 72, 81, and 84) and three motions for partial summary judgment (Doc Nos. 101, 110, and 115) filed by the parties in this declaratory judgment action. The motions have been fully briefed and are ripe for consideration.

The first set of motions is between Berkley National Insurance Company ("Berkley"), and XTO Energy, Inc. ("XTO"). Berkley filed a motion for summary judgment against XTO on February 5, 2020. See Doc. No. 72. XTO filed a response in opposition to Berkley's motion on April 24, 2020. See Doc. No. 109. Berkley filed a reply brief June 5, 2020. See Doc. No. 133. XTO filed a motion for partial summary judgment against Berkley on April 24, 2020. See Doc. No. 110. Berkley filed a response in opposition on July 10, 2020. See Doc. No. 143. XTO filed a reply brief on August 14, 2020. See Doc. No. 159.

The second set of motions is between XTO, as third-party plaintiff, and Commerce and Industry Insurance Company ("Commerce"), third-party defendant.  Commerce filed a motion for summary judgment against XTO on March 4, 2020.  <u>See</u> Doc. No. 84.  XTO filed a response in opposition to the motion on April 24, 2020.  <u>See</u> Doc. No. 114.  Commerce filed a reply brief on June 29, 2020.  <u>See</u> Doc. No. 140.  XTO filed a motion for partial summary judgment on April 24, 2020. <u>See</u> Doc. No. 115.  Commerce filed a response in opposition to the motion on July 27, 2020. <u>See</u> Doc. No. 151.  XTO filed a reply brief on August 31, 2020.  <u>See</u> Doc. No. 162.

The final set of motions are between XTO, as third-party plaintiff, and third-party defendant Torus National Insurance Company n/k/a StarStone National Insurance Company ("StarStone").  StarStone filed a motion for summary judgment against XTO on March 2, 2020.  <u>See</u> Doc. No. 81.  XTO filed a response in opposition on April 22, 2020.  <u>See</u> Doc. No. 97.  StarStone filed a reply brief on May 20, 2020.  <u>See</u> Doc. No. 130.  XTO filed a motion for partial summary judgment against StarStone on April 22, 2020.  <u>See</u> Doc. No. 101.  StarStone filed a response in opposition to the motion on May 20, 2020.  <u>See</u> Doc. No. 128.  XTO filed a reply brief on June 10, 2020.  <u>See</u> Doc. No. 134.

## I.    <u>BACKGROUND</u>

This declaratory judgment action involves contract and insurance claims stemming from an explosion and fire that occurred on June 18, 2016, at an oil and gas well located in western North Dakota.  The action is brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.  The amount in controversy far exceeds $75,000.  Jurisdiction is based upon diversity of citizenship.  28 U.S.C. § 1332.

### A.     THE PARTIES

Plaintiff Berkley National Insurance Company is an Iowa corporation.  Its principal place of business is Urbandale, Iowa.  Berkley issued primary and umbrella policies to Missouri Basin Well Services Inc. ("Missouri Basin").

Defendant and third-party plaintiff XTO Energy Inc. is a Delaware corporation with its principal place of business in Fort Worth, Texas.  XTO owned and operated the oil and gas well where the explosion and fire occurred.

Third-party defendant Commerce and Industry Insurance Company is a New York corporation with its principal place of business in New York.  Commerce issued a second layer umbrella policy to Missouri Basin.

Third-party defendant Torus National Insurance Group, n/k/a StarStone National Insurance Company, is a Delaware corporation with its principal place of business in New Jersey.  StarStone issued an umbrella policy to Badlands Consulting, LLC ("Badlands").

Third-party defendant Seneca Specialty Insurance Group is a Delaware corporation with its principal place of business in New York.  Seneca issued a primary policy to Badlands.  The claims between Seneca and XTO have been settled.

### B.     THE INCIDENT

On June 18, 2016, an explosion and fire occurred at the Ryan 14X-09E oil and gas well ("Ryan Well") near Watford City, North Dakota.  XTO was the owner and lease operator of the Ryan Well.  XTO retained Sherwood Enterprises, LLC, and Most Wanted Well Service, LLC, to provide snubbing services at the Ryan Well.  XTO retained Missouri Basin and Badlands to provide "company man" services at the Ryan Well.

3

Prior to the explosion and fire, XTO contractors at the Ryan Well encountered a down-hole problem whereby the drill was not making progress in milling out a frac plug.  Rather than kill the well, a decision was made to snub out the hole.  Snubbing is a process whereby a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the wellhole.  Snubbing is a specialized operation used when the pipe string is pressurized and the weight of the pipe alone is insufficient to keep the pipe in the wellhole.  A snubbing unit is employed to prevent the pressurized pipe string from being shot out of the wellhole.

On the morning of June 18, 2016, the crews were snubbing out the last length of pipe when a hole in the side of the pipe string was exposed, resulting in the release of gas and other wellbore fluid into the atmosphere.  Workers observed a hole in the pipe and gas coming out of the hole.  The snubber, John Stassinos, then shoved the portion of the pipe with a hole in it back beneath the annular bag to seal off the wellbore from the atmosphere.  However, within a few seconds the final section of pipe rocketed out of the well and into the air along with oil, gas, and wellbore fluid resulting in an explosion and fire.

The explosion and fire resulted in the death of John Stassinos and severe burn injuries to Justin Pyle and Chad Maheu, all employees of Most Wanted Well Service.  Daniel Pavon, who was employed by Sherwood Enterprises, also suffered severe burns.  Joe Guillen, another Sherwood Enterprises employee, suffered severe emotional distress and post-traumatic stress disorder.  No employees of Missouri Basin or Badlands were injured.

### C.   THE UNDERLYING LAWSUITS

Two lawsuits, both of which were filed in the District of North Dakota, resulted from the incident: Mary Stassinos et al. v. XTO Energy Inc. et al.; case no. 1:17-cv-138, filed on July 6, 2017,

and <u>Richard Maheu et al. v. XTO Energy Inc. et al.</u>; case no. 1:17-cv-102, filed on May 22, 2017, ("Underlying Lawsuits"). The Underlying Lawsuits named XTO, Missouri Basin, Badlands and others as defendants.

On October 12, 2018, all defendants in the Underlying Lawsuits and their insurance carriers participated in a mediation with the plaintiffs. At that mediation or shortly thereafter, XTO was able to secure settlements with all of the plaintiffs. The total amount of the settlements exceeds the total limits of the Berkley, Commerce, Seneca and StarStone policies. Berkley, Commerce, Seneca, and StarStone are aware of the amounts paid in settlement of the Underlying Lawsuits. The defense costs of XTO and others have been paid by two carriers, Arch Insurance Company and St. Paul Fire & Marine Insurance, which are not involved in this lawsuit.

Several carriers for other defendants in the Underlying Lawsuits, or for contractors who were otherwise involved, tendered their full limits of coverage toward the settlements. Berkley and Commerce did not participate in the mediation or contribute to the settlement. Seneca and StarStone participated in the mediation and each agreed to tender their limits of coverage ($1 million from Seneca and $5 million from StarStone), on the condition the parties could litigate or arbitrate the coverage issues later and that Seneca and StarStone could recoup their limits if a court or arbitrator determined their policies do not afford coverage.

### D.   THE MASTER SERVICE AGREEMENTS

XTO retained contractors Missouri Basin and Badlands to perform certain services at the Ryan Well. Missouri Basin and Badlands entered separate master service agreements ("MSAs") with XTO to govern their contractual rights, responsibilities, and obligations for the work they performed. <u>See</u> Doc. Nos. 86-3 and 83-1. XTO entered into similar or identical MSAs with its other

contractors: Sherwood Enterprises; Most Wanted Well Service (Doc. No. 74-3); Petroleum Experience, Inc.; Weatherford International, LLC; and KLX Energy Services, LLC/KLX Energy Holdings, LLC.

The MSAs contain "knock-for-knock" indemnity obligations which both parties agreed to support with insurance.  See Doc. No. 86-3, pp. 5-7 and 83-1, pp. 5-7.  In the "knock-for-knock" indemnity provisions, Missouri Basin and Badlands agreed to indemnify XTO from claims brought against XTO by their employees and subcontractors, and XTO agreed to indemnify Missouri Basin and Badlands for claims brought against them by XTO's employees and subcontractors who were not affiliated with Missouri Basin and Badlands.

XTO has acknowledged the terms of the MSAs require it to defend and indemnify Missouri Basin and Badlands in the Underlying Lawsuits.  The MSAs obligated XTO to "release, defend, indemnify and hold [Missouri Basin and Badlands] harmless" while requiring Missouri Basin and Badlands to name XTO as an additional insured on all their insurance policies.  See ¶ 10.2.1 and 11.4  The MSAs required Missouri Basin and Badlands to secure and maintain commercial general liability policies with coverage of at least $1 million per occurrence to support the indemnity obligation.  See ¶ 11.1.2.  The MSAs also contain an "actual insurance" provision in paragraph 11.2, which addresses situations where the contractor obtains more insurance than the required minimum.

Paragraph 11.2 provides as follows:

Actual Insurance. Notwithstanding the minimum coverage specified in Sections 11.1.1-11.1.5 above, should Contractor maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which Contractor hereunder will be such larger amounts carried by Contractor (or indicated in any certificate of insurance furnished by Contractor) and not the minimums referenced in Sections 11.1.1-11.1.5 above.

Paragraph 11.4, which addresses XTO's status as an additional insured, provides as follows:

> Primary Coverage and Additional Insureds. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP.  THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT.  ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED.  ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

See Doc Nos. 83-1, ¶ 11.4 and 86-3, ¶ 11.4 (all caps in original).  The MSAs are governed by Texas law.  See ¶ 14.8

### E.    THE INSURANCE POLICIES

Several insurance carriers participated in the defense and/or settlement of the Underlying Lawsuits, but only the policies issued by four carriers are relevant to the instant case: (1) Berkley and Commerce, who issued policies to Missouri Basin, and (2) Seneca and StarStone, who issued policies to Badlands.  XTO seeks coverage from the insurers of Missouri Basin and Badlands (Berkley, Commerce, Seneca, and StarStone) as an additional insured.

### 1.    The Berkley Policies

Missouri Basin was insured by Berkley through two policies.  The first Berkley policy bears Policy Number EGL001672010 and is a primary-level commercial general liability policy ("Berkley Primary Policy").  See Doc. No. 74-1.  The Berkley Primary Policy was issued to Missouri Basin,

effective from April 13, 2016, to April 13, 2017, and has a $1 million per occurrence limit and aggregate limits of $2 million.  The second Berkley policy issued to Missouri Basin bears Policy Number EUL001670910 and is an umbrella policy ("Berkley Umbrella Policy,").  See Doc. No. 74-2.  The Berkley Umbrella Policy has a limit of $25 million per occurrence.  The Berkley policies provide liability coverage for damages the insured must pay because of bodily injury caused by a covered occurrence.  See Doc. No. 74-1, p. 12.

### 2.      The Commerce Policies

Commerce provided second-layer umbrella coverage to Missouri Basin.  Commerce issued Commercial Umbrella Policy No. 24238279 to Missouri Basin on April 28, 2016, with effective dates of April 13, 2016, to April 13, 2017.  See Doc. No. 117-9.  The Commerce policy has a $25 million limit that is secondary to both the Berkley Primary Policy and the Berkley Umbrella Policy.

### 3.      The Seneca Policy

Seneca Specialty Insurance Company issued commercial general liability policy no. SPP 0031807 (effective January 20, 2016 to January 20, 2017), to Badlands.  The Seneca policy has limits of $1 million for each occurrence and $2 million in aggregate.  See Doc. No. 83-20.

### 4.      The Torus/StarStone Policy

Torus (now known as StarStone) issued a commercial umbrella liability policy (policy no. 82068H152ALI) to Badlands with a $5 million limit.  See Doc. No. 83-19, p. 2.  The policy, which is secondary to the Seneca policy, was in effect from October 14, 2015, to October 14, 2016.

F.    **COVERAGE DEMANDS**

The explosion and fire at the Ryan Well occurred on June 18, 2016. The Underlying Lawsuits were commenced in May and July 2017. On January 31, 2018, Missouri Basin provided notice of one of the Underlying Lawsuits to Commerce. See Doc. No. 86-24. On February 16, 2018, Missouri Basin tendered both the Underlying Lawsuits to XTO. See Doc. No. 74-22. On May 24, 2018, Badlands tendered both the Underlying Lawsuits to XTO. See Doc. No. 86-26, pp. 67-69.

On June 29, 2018, XTO sent a letter to Berkley and Commerce demanding defense and indemnity for itself and its contractors as additional insureds in connection with the Underlying Lawsuits. See Doc. No. 74-23. On July 24, 2018, XTO conditionally accepted Missouri Basin's tender of defense and indemnity in the Underlying Lawsuits. See Doc. No. 74-24.

On September 28, 2018, Berkley denied coverage to XTO. See Doc. No. 74-25. In doing so, Berkley stated the MSA provides that XTO's insurance must be primary; XTO assumed all responsibility for the claims in the Underlying Lawsuits; XTO released Missouri Basin, and its insurers, from any liability; XTO was not an additional insured; and the pollution exclusion precluded coverage. Commerce denied coverage to XTO on October 5, 2018, citing many of the same reasons as set forth by Berkley. See Doc. No. 117-11.

On July 27, 2018, XTO sent demand letters to Seneca and StarStone demanding defense and indemnity for itself and its contractors in connection with the Underlying Lawsuits. See Doc. No. 107-9. On August 20, 2018, Seneca denied coverage based upon the pollution exclusion in its policy. StarStone denied coverage on October 9, 2018, also based upon the pollution exclusion in its policy. See Doc. No. 83-17.

### G.     THE INSTANT LITIGATION

Berkley initiated this lawsuit on September 28, 2018.  See Doc. No. 1.  Berkley seeks a declaration that it has no obligation to defend or indemnify XTO or its contractors for the claims made in the Underlying Lawsuits.  Berkley alleges in its complaint that XTO and its contractors do not qualify as additional insureds under its policies.  See Doc. No. 54, ¶¶ 22-26.  Berkley also alleges XTO's insurance applies on a primary basis, and the pollution exclusion in the Berkley Primary Policy precludes coverage.  See Doc. No. 54, ¶¶29 and 32.

In its counterclaim, XTO contends it is an additional insured under the policies issued by Berkley, Commerce, StarStone, and Seneca.  See Doc. No. 7, ¶¶ 54-60.  XTO further claims each of the policies provide coverage for the type of bodily injury alleged in the Underlying Lawsuits and for which insurance coverage was procured.  See Doc. No. 7, ¶ 61.  XTO has brought claims for breach of contract, declaratory judgment, breach of common law duties of good faith and fair dealing, and a statutory claim for unfair claim settlement practices against Berkley and Commerce. See Doc. No. 7, ¶¶ 68-90.  XTO seeks a declaratory judgment regarding coverage against StarStone. See ¶¶ 91-94.  XTO's claims against Seneca have been settled.  See Doc. No. 67.


## II.     STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine if the evidence

would allow a reasonable jury to return a verdict for the non-moving party.  Id.  The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact. Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial. Id.; Fed. R. Civ. P. 56(c)(1).  If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate. Matsushita, 475 U.S. at 587.

### III.  <u>LEGAL DISCUSSION</u>

The Court will address the motions pending between XTO and Berkley first, and then address the motions pending between XTO and Commerce, and XTO and StarStone, respectively. It is undisputed that North Dakota law applies to the Berkley and Commerce policies, Montana law applies to the Seneca and StarStone policies, and Texas law applies to the master service agreements.

A.     **XTO and BERKLEY MOTIONS**

It is undisputed an explosion and fire at the Ryan Well caused the injuries alleged in the Underlying Lawsuits.  Berkley contends in its motion for summary judgment that the pollution exclusion in the Berkley Primary Policy precludes coverage for the claims in the Underlying Lawsuits and invalidates XTO's counterclaims.  XTO disputes these contentions.

XTO contends in its motion for partial summary judgment that the Court should grant it summary judgment on Berkley's contentions/affirmative defenses that: (1) the "release" language in the indemnification provision of the MSA between XTO and Missouri Basin acted to release Missouri Basin from naming XTO as an additional insured under its policies; (2) the MSA did not require Missouri Basin to provide additional insured coverage; (3) XTO is not an additional insured because XTO's liability did not arise out of Missouri Basin's operations; (4) the pollution exclusion in the Berkley Primary Policy preclude coverage.

1.     **ADDITIONAL INSURED STATUS**

XTO contends that it should be granted summary judgment on Berkley's claims and affirmative defenses that XTO does not qualify as an additional insured on the policies Berkley issued to Missouri Basin because: (1) the MSA did not require Missouri Basin to provide additional insured coverage; (2) the MSA released Missouri Basin from all claims, including the requirement that XTO be named as an additional insured; and (3) XTO's liability did not arise out of Missouri Basin's operations.  It is undisputed that XTO was obligated by the MSA to defend and indemnify Missouri Basin.

a.     **MSA Requirements**

Berkley argues the MSA does not require Missouri Basin to provide additional insured coverage to XTO because Missouri Basin did not have a contractual obligation to indemnify XTO against the underlying claims.  XTO maintains the MSA obligates Missouri Basin to add XTO as an additional insured on all insurance policies, and therefore provide coverage.  The parties disagree as to how Texas law applies to the insurance and indemnity provisions in the MSA.

The Berkley Primary Policy includes an additional insured provision which provides that additional insureds include "any person or organization with whom YOU agree in a written contract or written agreement to add as an Additional Insured on your policy."  See Doc. No. 74-1, p. 10.  The MSA contains just such a requirement. See Doc No. 86-3, ¶ 11.4.  The Berkley Primary Policy requires Berkley to defend its insureds against claims potentially falling within coverage: "We will have the right and Duty to Defend the **INSURED**, including without limitation, to appoint counsel to represent the **INSURED** against any **CLAIM** or **SUIT** seeking damages…to which this policy applies." See Doc. No. 74-1, p. 13.  The term "insured" includes both the named insured and additional insured.  See Doc. No. 74-1, p. 10.  It is undisputed that XTO must meet the requirements of both the MSA and Berkley policies in order to qualify as an additional insured.  It is also undisputed that the Berkley policies incorporate the requirements and limitations of the MSA.

The MSA between XTO and Missouri Basin contains "knock-for-knock" indemnity obligations which both parties agreed to support with insurance.  See Doc. No. 86-3, pp. 5-7.  In the "knock-for-knock" indemnity provisions, Missouri Basin agreed to indemnify XTO from claims brought against XTO by Missouri Basin's employees and subcontractors, and XTO agreed to indemnify Missouri Basin for claims brought against Missouri Basin by XTO's employees and subcontractors who were not affiliated with Missouri Basin.  In the MSA, Article X details the

indemnity obligations of each party, while Article XI details the insurance obligations.  See Doc. No. 86-3, pp.8-10.

Paragraph 10.2.3 is found in Article X of the MSA which is entitled "Release, Defense, Indemnity and Hold Harmless."  Paragraph 10.2.3 provides "XTO agrees that its indemnity obligations herein will either be supported by insurance with at least the minimum amounts provided in Article XI, which insurance will be primary to any other insurance provided by or available to any one or more members of the Contractor Group . . ."  See Doc. No. 86-3, p. 7.

Paragraph 11.4 is found in Article XI of the MSA which is entitled "Insurance."  Paragraph 11.4  provides as follows:

> Primary Coverage and Additional Insureds.   ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES.  ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP.  THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT.  **ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED**.  ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

See Doc Nos. 86-3, ¶ 11.4 (all caps in original) (emphasis added).

Berkley contends paragraphs 10.2.3 and 11.4 of the MSA are in conflict because they require both XTO and Missouri Basin to obtain insurance for XTO, and each on a primary basis.  Berkley argues  the two paragraphs can be reconciled if they are read to mean Missouri Basin must name XTO as an additional insured for only those claims over which Missouri Basin assumed liability, but not for those claims over which XTO assumed liability.  Critically, XTO contends that under

14

Texas law,  the rights and obligations set forth in paragraphs 10.2.3 and 11.4 of the MSA are separate and independent and do not conflict.

Several Texas Supreme Court cases provide guidance on the interpretation of contracts involving dueling insurance and indemnity obligations.  In *Getty Oil Co. v. Ins. Co. of N. Am.*, 845 S.W.2d 794 (Tex. 1992), Getty Oil entered into a contract to purchase chemicals from NL Industries for its oil production and exploration operations.  Id. at 796.  The contract included both indemnity and insurance provisions.  Id. at 797.  The insurance provision stated, "[a]ll insurance coverages carried by Seller (NL), whether or not required hereby (the contract), shall extend to and protect" Getty.  Id.  An employee of an independent contractor working for Getty was subsequently killed in an accident when a barrel of NL's chemical exploded.  Id.  A jury found that Getty was solely responsible for the accident.  Id.  Thereafter, Getty sought insurance coverage from NL's insurers but they denied coverage.  Id at 797-98.  NL's insurers asserted Getty was not an additional insured and the insurance and indemnity provisions in the contract were prohibited by the Texas Oilfield Anti-Indemnity Statute.  Id. at 797–98.  The Texas Supreme Court determined the anti-indemnity statute did not apply because the indemnity provision was supported by its own insurance requirement which was separate from and in addition to the additional insured provision which required NL to extend coverage to Getty.  Id. at 804.  The Texas Supreme Court explained that the additional insured provision, which required NL to extend insurance coverage to Getty "whether or not required [by the other provisions of the contract]," does not support the indemnity obligation, which had its own insurance requirement, but rather is a separate obligation.  Id.

In *Evanston Ins. Co. v. ATOFINA Petrochemicals, Inc.*, 256 S.W.3d 660 (Tex. 2008), the Texas Supreme Court reaffirmed the principle that insurance and indemnity provisions in the same contract can give rise to separate and independent obligations.  The case involved a contract wherein

15

Triple S Industrial Corp. agreed to perform work at an ATOFINA refinery under a service contract that contained separate indemnity and insurance provisions.  Id. at 662.  Triple S agreed to indemnify ATOFINA for all injuries and property losses except those that were attributable to ATOFINA's own negligence, misconduct, or strict liability.  Id.  Triple S also agreed to obtain commercial general liability insurance and excess insurance and to name ATOFINA as an additional insured on the policies.  Id. at 663.  When a Triple S employee drowned at the refinery his survivors filed a wrongful death action against Triple S and ATOFINA.  Id.  ATOFINA demanded coverage from Triple S' insurers as an additional insured, but the excess insurer denied coverage.  Id.  The excess insurer argued that ATOFINA was not covered because in the contract's indemnity provision ATOFINA agreed not to seek indemnification for losses resulting from its own negligence.  Id.  In rejecting the insurer's argument, the Texas Supreme Court noted ATOFINA was not seeking indemnity from Triple S, but rather indemnification from the excess insurer as an additional insured.  Id. at 664.  The critical language in the underlying service contract required "that ATOFINA 'shall be named as additional insured in each of [Triple S's] policies.'"  Id. at 670.  Relying upon its prior decision in *Getty Oil*, the Texas Supreme Court held "it is unmistakable" that this language created a "separate and independent" obligation to insure, which was not affected by "ATOFINA's agreement to forego *contractual* indemnity for its own negligence."  Id.  The Texas Supreme Court went on to note that "[w]e disapprove the view that this kind of additional insured requirement fails to establish a separate and independent obligation for insuring liability."  Id.

In *Deepwater Horizon*, the Texas Supreme Court analyzed an additional insured provision containing limiting language that was not present in either *Getty* or *ATOFINA*.  The case involved an offshore drilling contract between oil-field developer BP and drilling-rig owner Transocean, that contained both indemnity and additional insured provisions.  In re Deepwater Horizon, 470 S.W.3d

16

452, 456–57 (Tex. 2015).  The drilling rig exploded and sank killing eleven workers and causing severe environmental damage.  Id. at 456.  In the drilling contract, BP and Transocean agreed to a "knock-for-knock" allocation of risk.  Id.  Among the indemnity provisions in the drilling contract, "Transocean agreed to indemnify BP for above-surface pollution regardless of fault, and BP agreed to indemnify Transocean for all pollution risk Transocean did not assume, i.e., subsurface pollution." Id.  The additional insured provision stated that BP and its affiliates shall be named "as additional insureds in each of [Transoceans] policies . . . for liabilities assumed by [Transocean] under the terms of [the Drilling] contract." Id. at 457.  After the drilling rig exploded and sank, BP demanded coverage from Transocean's insurers.  Id. at 456.  While the insurers did not dispute that BP was an additional insured, they denied coverage and sought a declaration that BP would not be entitled to additional insured coverage for subsurface-pollution claims which BP expressly assumed in the drilling contract.  Id.  The Texas Supreme Court, after noting that it must look to the terms of the underlying contract when the insurance policy so instructs, concluded that BP was not entitled to coverage for such claims, as it read the additional insured provision in the drilling contract to impose "a limitation on the general insurance obligation that is coterminous with all of Transocean's contractual indemnity obligations." Id. at 464–65.  Thus, the Texas Supreme Court held that BP was only an additional insured as to above-surface liabilities Transocean assumed in the drilling contract, and was not an additional insured for the subsurface liabilities BP assumed in the drilling contract. Id. at 467.

Rejecting BP's argument that the drilling contract's indemnity and additional insured provisions were "separate and independent," the Texas Supreme Court explained that "BP's argument conflates duty with scope." Id. at 468.  While the duties to indemnify and insure may be separate and independent that does not prevent them from being read in harmony because "a

contract may reasonably be construed as extending the insured's additional-insured status only to the extent of the risk the insured agreed to assume." Id. at 468.  Such was the case in *Deepwater Horizon* because the contract "required Transocean to name BP as an additional insured only for the liability Transocean assumed under the contract." Id.

Applying the principles set forth in *Getty*, *ATOFINA*, and *Deepwater Horizon*, the Court finds XTO's interpretation of the MSA to be correct.  The insurance obligations in the MSA are not tied to the indemnity obligations.  They are separate and independent.  Paragraph 11.4 does not limit the insurance obligation to claims over which Missouri Basin assumed liability like the additional insured clause did in *Deepwater Horizon*.  As the Fifth Circuit has pointed out in a similar case "a requirement that one party maintain insurance in support of its obligations related to a particular contingency does not preclude a requirement that the other party also maintain insurance to cover the same contingency." ExxonMobil Corp. v. Elec. Reliability Servs., Inc., 868 F.3d 408, 418 (5th Cir. 2017) (noting the Texas Supreme Court has long held that indemnity and insurance provisions in a contract may impose separate and independent obligations).

The Texas Oilfield Anti-Indemnity Act does not apply because it does not prevent parties to an indemnity agreement from obtaining additional insurance which does not support the indemnity obligation.  See Getty Oil, 845 S.W.2d at 804-05.  It should be noted that paragraph 11.4 in the MSA is the only provision in the contract printed entirely in capital letters.  Obviously, the parties placed great importance on it.  And while Article X mentions insurance along with the other obligations of the parties to the contract, another entire article (Article XI) is devoted entirely and specifically to insurance.  It is Article XI that provides the details and is the more specific of the two when it comes to insurance.  Paragraph 11.4 clearly states, without any limiting language, that "ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND

18

TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES."  The Court finds as a matter of law that the MSA does not limit XTO's additional insured status to claims for which Missouri Basin assumed responsibility under the MSA.  The Court further finds that XTO is an additional insured under the Berkley policies.

Berkley's contention that XTO is not covered under the umbrella policy because the umbrella policy coverage is limited to claims "not beyond any limitation imposed under any written contract or written agreement" also fails.  See Doc. No. 74-2, p. 11.  Underlying contracts can limit the amount of coverage, but the language of the MSA in this case contains no such limiting language.  See Star Insurance Co. v. Continental Resources, 89 F. Supp. 3d 1014 (D.N.D. Feb. 24, 2015); Ironshore Specialty Insurance Co. v. Aspen Underwriting, 788 F.3d 456 (5th Cir. 2015).  In this case, the MSA clearly states XTO is covered "TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES."  Thus, the Court finds as a matter of law that XTO is covered to the full amount of the Berkley insurance policies including any excess or umbrella policies.

### b.   **Release**

Berkley points out in its amended complaint that, pursuant to Section 10.2.1 of the MSA between XTO and Missouri Basin, XTO agreed to release Missouri Basin from and against any and all indemnifiable claims, defined as "any and all claims, demands, and causes of action of every kind and character arising out of, without limitation, injury to or death of employees of XTO's contractors."  See Doc. No. 54 at 11.  Berkley contends the release language in the MSA extends to and includes any claim by XTO that the MSA obligates Missouri Basin to name the XTO Group

19

as an additional insured on the insurance policies it obtained from Berkley.  Berkley cites no case law to support this novel argument.  The Court finds Berkley's contention the release language in the MSA operates to release Missouri Basin from other obligations in the <u>very same contract</u>, including the obligation to name XTO as an additional insured, to be unpersuasive.  Such an interpretation would upend fundamental principles of contract interpretation.  Nothing in the release provision found in paragraph 10.2.1 indicates Missouri Basin need not satisfy its obligation to name XTO as an additional insured as provided for in paragraph 11.4.  <u>See</u> Doc. No. 86-3.  These are separate provisions in separate paragraphs of the MSA.  Berkley's construction of the contract would allow the release to swallow all of the other provisions of the contract.  The Court finds as a matter of law that the "release language" in the MSA does not release Missouri Basin from its obligation to name XTO as an additional insured under the Berkley insurance policies.

### c.    "<u>Arising Out Of</u>"

Berkley next contends XTO is not an additional insured because the Berkley policies afford additional insured status only with respect to liability "arising out of" Missouri Basin's operations.  Berkley equates "arising out of" with vicarious liability.  With both XTO and Missouri Basin being defendants in the underlying lawsuits, Berkley contends XTO's liability does not "arise out of" Missouri Basin's operations.  XTO argues that Berkley construes the policy far too narrowly and takes a minority position among the courts which have addressed the issue.  XTO also correctly points out the plaintiffs in the Underlying Lawsuits did not allege XTO was vicariously liable for the negligence of Missouri Basin.

The Berkley Primary Policy provides that XTO is an "Additional Insured . . . with respect to liability arising out of [Missouri Basin's] operations or liability arising out of premises owned by

or rented to [Missouri Basin]."  See Doc. No. 74-1, p. 10.  Berkley admits its vicarious liability argument is the minority position but contends it is the more persuasive position.  Berkley predicts North Dakota, which has not addressed the issue, would adopt it.  In support of its contention that when a purported additional insured is a co-defendant in the underlying personal injury action with the named insured there is no additional insured coverage, Berkley cites one case, *Davis v. LTV Steel Co., Inc.*, 716 N.E.2d 766, 769 (Ohio Ct. App. 1998).

XTO cites a line of cases which have held that in the absence of clear policy language, an additional insured's coverage is not limited to instances of vicarious liability for the negligence of the named insured because to do so would read a limitation into the policy which is not supported by the plain language of the policy.  Lancaster v. Ferrell Paving, 397 S.W.3d 606, 617 (Tenn. Ct. App. 2011); ATOFINA, 256 S.W.3d at 666; Am. Cas. Co. v. General Star Indem. Co., 125 Cal. App. 4th 1510, 1526 (Cal. Ct. App. 2005).  These cases require only a causal relationship between the event and the operations rather than legal causation.  They also note the broad nature of the phrase "arising out of" and note that if the intent was to limit coverage to vicarious liability only, language clearly doing so could have been included in the policy.

The Court has carefully considered all of the cases cited by the parties and finds the line of cases cited by XTO, which have established the majority position, to be more persuasive.  "North Dakota applies the 'causal connection test' when construing the phrase 'arising out of' in an insurance policy."  Acuity v. North Cent. Video LLLP, No.1:05-CV-010, 2007 WL 1356919, at *10 (D.N.D. May 7, 2007) (citing Grinnell Mut. Reinsurance Co. v. Center Mut. Ins. Co., 658 N.W.2d 363, 371 (N.D. 2003)).  "As explained by the North Dakota Supreme Court, the causal connection test is broad and comprehensive in scope."  Id.  "The causal relationship need not constitute the proximate cause;" although "[a] remote connection … will not satisfy the test."  Id.  In this case a

causal relationship is clearly present and no limiting language is included in the policy. While it does not appear North Dakota has addressed the precise vicarious liability question presented here, the Court predicts North Dakota would adopt the majority position given its construction of the phrase "arising out of" in other contexts. See Fisher v. Am. Fam. Mut. Ins. Co., 579 N.W.2d 599, 602 (N.D. 1998) (noting exclusions from broad coverage must be must be clear and ambiguities are construed against the insurer); Forsman v. Blues, Brews & Bar-B-Ques, Inc., 903 N.W.2d 524, 532 (2017) (noting "arising out of" in an insurance policy typically means causally connected rather than proximately caused). The Court concludes as a matter of law that the liability alleged in the Underlying Lawsuits arose out of Missouri Basin's operations and thus XTO is an additional insured.

## 2.   THE BERKLEY POLLUTION EXCLUSION

The Berkley Primary Policy includes a pollution exclusion, the relevant portions which provide as follows:

**VII.   EXCLUSIONS**
* * *
**B. Bodily Injury and Property Damage Liability Exclusions**

In addition to those Exclusions listed above in Section VII.A., the following Exclusions apply to Section II.A.  Bodily Injury and property Damage Liability;

This policy does not apply to:
* * *
**13. Pollution:**

    a.   **BODILY INJURY** or **PROPERTY DAMAGE** arising out of or resulting from the actual, alleged, or threatened discharge, dispersal, seepage, migration, release, or escape of **POLLUTANTS**:

**(1)** At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any **INSURED**. However, this Subparagraph (1) does not apply to:
\*\*\*

**(b)** **BODILY INJURY** or **PROPERTY DAMAGE** for which **You** may be held liable, if **YOU** are a contractor and the owner or lessee of such premises, site, or location has been added to **Your** policy as an Additional Insured with respect to **Your** ongoing operations performed for that Additional Insured at that premises, site, or location; and such premises, site, or location is not and never was owned or occupied by, or rented or loaned to, any **Insured**, other than that Additional Insured;

**(c)** **BODILY INJURY** or **PROPERTY DAMAGE** arising out of heat, smoke, or fumes from a **HOSTILE FIRE**;

## IX.    DEFINITIONS

**BODILY INJURY** means physical injury, sickness, or disease sustained by a person, including death resulting from any of these at any time. **BODILY INJURY** includes mental anguish or other mental injury to that person sustaining physical injury.

**HOSTILE FIRE** means one which becomes uncontrollable or breaks out from where it was intended to be.
\*\*\*
**POLLUTANTS** means as any solid, liquid, gaseous, or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals, and **WASTE**.

See Doc. No. 74-1, pp. 16, 20, 22-23, 32, 33, and 35. The Berkley Umbrella Policy incorporates the pollution exclusion, and the exceptions thereto, from the Berkley Primary Policy. See Doc. No. 74-2, p. 10. Relevant to the pollution exclusion arguments of the parties, the Court must address whether the pollution exclusion applies only to environmental-type harms, and whether any exceptions to the pollution exclusion apply to restore coverage.

It is undisputed the oil and gas released during the incident in question are "pollutants" as defined in the Berkley Primary Policy. Nor is there any dispute the injuries sustained by the plaintiffs in the Underlying Lawsuits resulted from the release of these "pollutants" which caught fire and exploded. XTO contends the pollution exclusion in the Berkley policies only applies to

23

environmental pollution or harm, and not bodily injury from an explosion.  That argument is unpersuasive.

While pollution exclusions have been the subject of considerable litigation around the country, the North Dakota Supreme Court has not had occasion to construe a pollution exclusion. Accordingly, the Court must predict how the North Dakota Supreme Court would resolve the issue. Progressive N. Ins. Co. v. McDonough, 608 F.3d 388, 390 (8th Cir. 2010).  Under North Dakota law, insurance policies are construed like any other contract.  Nationwide Mut. Ins. Cos. v. Lagodinski, 683 N.W.2d 903, 907 (N.D. 2004).  The goal is to give effect to the mutual intention of the parties.  The Court must first look to the language of the policy and, if it is clear, there is no room for construction.  Id.  Undefined terms are given their plain and ordinary meaning.  Id. Insurance policies are regarded as contracts of adhesion with ambiguity resolved in favor of the insured.  Id.  The Court must not strain the definition of an undefined term or rewrite an unambiguous policy to provide coverage.  The policy must be construed as a whole, giving meaning and effect to each clause, if possible.  Id. at 907.  Exclusions from coverage must be clear and explicit and are strictly construed against the insurer.  Id.  The Court must not rewrite the contract to find coverage where the exclusion unambiguously excludes coverage.  Id.

In this case, the pollution exclusion clearly states that "bodily injury" from the release of "pollutants" is excluded from coverage.  The plain language of the policy ends the inquiry.  XTO cites no case law from North Dakota in support of its argument.  The Court believes it is unlikely the North Dakota Supreme Court would be willing to rewrite the exclusion so as to limit its application to environmental-type harms only.  The case law from other jurisdictions cited by XTO which limits various pollution exclusions to environmental-type harms is unpersuasive in light of the North Dakota Supreme Court's instruction that it "will not rewrite a contract to impose liability

24

on an insurer if the policy unambiguously precludes coverage." <u>Lagodinski</u>, 683 N.W.2d at 907. The Eighth Circuit Court of Appeals has recognized that most state and federal courts which have addressed the issue have found absolute pollution exclusions, such as the one at issue in this case, to be unambiguous as a matter of law. <u>Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA</u>, 847 F.3d 594, 599–600 (8th Cir. 2017). The Court sees no ambiguity and finds the Berkley pollution exclusion in question applies to the bodily injury claims in the Underlying Lawsuits. Thus, coverage is not available to XTO <u>unless</u> one of the exceptions applies to restore coverage. The Court will consider the exceptions next.

### a.      **The Pollution Exclusion Exceptions**

XTO contends that even if the pollution exclusion applies, the contractor/additional insured exception and the hostile fire exception restore coverage. Berkley maintains neither exception applies and XTO has waived the exceptions.

### i.      **Waiver**

Berkley argues the exceptions to the pollution exclusion in its policy are affirmative defenses which must be pled. Berkley further contends XTO did not plead these affirmative defenses and therefore has waived them.

Berkley cites an unpublished Sixth Circuit case, *Roberge v. Hannah Marine Corp.*, No. 96-1691, 1997 WL 468330, at *3 (6th Cir. Aug. 13, 1997), for the proposition that an exception to an exclusion which restores insurance coverage is an affirmative defense which must be pled by an insured defending a declaratory judgment action brought by the insurer. *Roberge* is a Jones Act case applying admiralty law and makes no mention of insurance, exclusions, or exceptions. It is clear

an exclusion is an affirmative defense an insurer must plead.  17A Couch on Ins. § 254:12 (3d ed. 2020).  However, there appears to be little, if any, case law directly addressing the precise question presented here - whether an exception to an exclusion which restores coverage is an affirmative defense which must be pled by an insured who is defending a declaratory judgment action brought by the insurer.  In the typical case, the insured is often the plaintiff who has sued the insurer for the wrongful denial of coverage.  Roles have been somewhat reversed in this declaratory judgment action.  But as the Court will explain, even if XTO should have raised the exception as an affirmative defense in its answer, the Court need not find XTO has waived the issue.

In North Dakota, the insurer has the burden to prove the applicability of a policy exclusion while the insured has the burden to prove the applicability of an exception to the exclusion which would restore coverage.  Hiland Partners, 847 F.3d at 601.  Generally, the failure to plead an affirmative defense results in a waiver of the defense, however, amendments to the pleadings are to be freely given when justice so requires.  Kambeitz v. Acuity Ins. Co., 772 N.W.2d 632, 636 (N.D. 2009).  A party who has failed to plead an affirmative defense would, absent a showing of prejudice, likely be permitted to amend its answer to  plead the defense before trial, and a motion for summary judgment which raises the issue would likely be treated as a pleading which raises the issue.  Id.; Thomas v. St. Luke's Health Sys., Inc., 869 F. Supp. 1413, 1429 (N.D. Iowa 1994). Berkley does not contend it has been prejudiced by the alleged failure to plead the pollution exclusion exceptions in this case.  The entire insurance policy is at issue, including the pollution exclusion and its exceptions, which are an integral part thereof.  The Court would grant XTO leave to amend its answer under these circumstances.

However, XTO correctly points out that it raised the exception in its counterclaim when it stated "Berkley . . . knowingly misrepresented that certain exceptions to the pollution exclusion

contained in the Berkley Policy . . . apply . . . and improperly relied upon a distorted reading of the pollution exclusion to deny their obligations." See Doc. No. 7, ¶ 89. (emphasis added). This reference is sufficient to put Berkley on notice that XTO would rely on the pollution exclusion exceptions. Obviously, Berkley was aware of the issue when it filed its motion. The Court finds that XTO did not waive any defense related to the exceptions to the pollution exclusion.

### ii.   Contractor/Additional Insured Exception

XTO contends the contractor/additional insured exception to the pollution exclusion acts to restore coverage. Berkley argues that the exception does not apply because it only restores coverage for the named insureds and not for additional insureds. Berkley also argues the exception does not apply because Missouri Basin "occupied" the wellsite. The exception provides as follows:

However, this Subparagraph (1) (the pollution exclusion) does not apply to:

* * *

> **(b)** **BODILY INJURY** or **PROPERTY DAMAGE** for which **You** may be held liable, if **YOU** are a contractor and the owner or lessee of such premises, site, or location has been added to **Your** policy as an Additional Insured with respect to **Your** ongoing operations performed for that Additional Insured at that premises, site, or location; and such premises, site, or location is not and never was owned or occupied by, or rented or loaned to, any **Insured**, other than that Additional Insured;

See Doc. No. 74-1, p. 23.

If all the prerequisites of the pollution exclusion exception are satisfied then the pollution exclusion does not apply, and coverage is restored. It is undisputed that Missouri Basin is the named insured, Missouri Basin was hired by XTO to perform work at the wellsite, XTO is the owner and lessee of the wellsite, XTO is listed as an additional insured, and Missouri Basin was a defendant in the Underlying Lawsuits.

Berkley's argument that the exception only restores coverage to the named insured and does not restore coverage to an additional insured is unsupported by any case law, contrary to the applicable policy language, and unconvincing. The above exception makes reference to "YOU" and "Your policy." The policy defines "YOU" as "the named insured." See Doc. No. 74-1, p. 37. Berkley suggests the word "YOU" in the exception means coverage is only restored for the named insured. However, when all of the policy language is taken into consideration, the most reasonable interpretation of the exception is that it negates the pollution exclusion and restores policy coverage to all insureds. Nowhere does the exclusion say it only restores coverage to the named insured. Rather, the exclusion says simply that if the exception applies "this Subparagraph (1) does not apply."

The policy applies to provide the named insured and any additional insureds with coverage, and it is only if an exclusion applies that the policy does not apply. Section II.A states "We will pay the amounts that an INSURED becomes legally obligated to pay . . ." See Doc. No. 74-1, p. 12. In Section VII., which lists all exclusions to coverage, it states the exclusions apply to Section II.A and that "[t]his policy does not apply to:" and then the policy goes on to list numerous exclusions including the pollution exclusion found in subparagraph 13. See Doc. No. 74-1, p. 16. (emphasis added). The pollution exclusion states, before listing the exceptions which restore coverage, "[h]owever, this Subparagraph (1) does not apply to." Subparagraph (1) is the pollution exclusion in question. The exception defines when coverage is restored, not to whom it is restored. Section VII, which sets forth the exclusions, defines when the "policy does not apply." If an exception applies then the pollution exclusion does not apply, the policy applies, and Berkley is required to "pay the amounts an INSURED becomes legally obligated to pay." It is clear that both Missouri Basin and XTO are insureds under the terms of the policy. See Doc. No. 74-1, p. 10.

28

If the intent of Berkley was otherwise, then they have themselves to blame for drafting such a confusing and ambiguous exclusion.  Ambiguous insurance policy provisions should be resolved in favor of the insured so as to preserve coverage.  Fisher, 579 N.W.2d at 602 (exclusions from coverage must be clear and explicit and are strictly construed against the insurer); Scottsdale Ins. Co. v. Tri-State Ins. Co., 302 F. Supp. 2d 1100, 1107 (D.N.D. 2004) ("[a]ny ambiguity or reasonable doubt as to the meaning of an insurance policy is strictly construed against the insurer and in favor of the insured").  A reasonable person reading this exclusion would be entirely justified in concluding the exclusion restored coverage for all insureds and not merely the named insured. Berkley suggests the Court consider an insurance industry circular to shed light on the intended meaning of the exception but parol evidence should not be used to construe policy language.  See Sellie v. N. Dakota Ins. Guar. Ass'n, 494 N.W.2d 151, 157 (N.D. 1992).

The only case law cited by either party generally supports the idea the exception restores coverage for all insureds.  See Tow v. Gemini Ins. Co., No. 12-36187, 2015 WL 5965600 (Bankr. S.D. Tex. Oct. 9, 2015).  Berkley contends the court in Tow misunderstood the additional insured exception.  The policy in Tow included an identical additional insured exception as that found in the Berkley policies.  Id. at *8.  The developer, ATP, sought additional insured coverage under its subcontractor Greystar's policy.  The court found the additional insured exception applied because (1) Greystar, the named insured, was a contractor, (2) Greystar could be held liable, and (3) ATP was named as an additional insured under Greystar's policy.  Id. at *9.  The court did not restrict coverage to just Greystar.  Rather, the court found the exception applied to restore coverage to the additional insured, ATP.  Id.  In so holding, the court in Tow noted "the exclusion exception could have stated with a great deal more clarity that it applied only if [the subcontractor] was a named

defendant, if indeed that was the parties' intent."  Id.  At a minimum, *Tow* demonstrates this exclusion is ambiguous and subject to more than one reasonable interpretation.

In addition, Berkley argues Missouri Basin "occupied" the well site and therefore the exception does not apply.  See Doc. No. 74-1, p. 10.  The policy does not define the word "occupied" or "occupy."  North Dakota applies "the plain, ordinary meaning" to an undefined, nontechnical, terms in an insurance policy.  Hanneman v. Cont'l W. Ins. Co., 575 N.W.2d 445, 450–51 (N.D. 1998).  Dictionaries are considered "good source[s] to determine the plain, ordinary definition of an undefined term."  Id. at 451.  Occupy means "to take or hold possession or control." Merriam-Webster.com, https://www.merriam-webster.com/dictionary/occupy (last visited Jan. 29, 2021).  Occupied means to take or hold possession.  Dictionary.com, https://www.dictionary.com/browse/occupied (last visited Jan. 29, 2021).

Courts addressing similar issues of whether a site was "occupied" in the context of an insurance policy have focused on the contractor's presence and control at the site and required more than a transient non-possessory relation to the site.  A contractor does not "occupy" a premises simply because it is present and performing work there.  Kelley-Coppedge v. Highlands Ins., 980 S.W.2d 462, 465-66 (Tex. 1998) (finding occupy means "to keep or hold for use").  Though "occasional, limited work performed by a subcontractor . . . at a well site operated and controlled by another" does not amount to occupancy, "one need not have an ownership interest in property in order to be considered an occupant of the property."  U.S. Fidelity & Guar. Co. v. B&B Oil Well Serv., Inc., 910 F. Supp. 1172, 1178 (S.D. Miss. 1995) (applying Mississippi law, finding occasional limited work performed by a subcontractor at a wellsite operated and controlled by another was not occupancy).  Courts that have analyzed the term "occupy" in this context have found it connotes some element of presence and control.  Liberty Mutual Fire Ins. v. Lexington Ins., 446 S.W.3d 835,

844 (Tex. App. 2014) (finding "occupy" requires a continued physical presence and control of the premises for the insured's own benefit); Pioneer Exploration, LLC v. Steadfast Ins. Co., 767 F.3d 503, 513–14 (5th Cir. 2014) (applying Louisiana law, holding oil and gas company with a mineral lease "occupied" surface estate because its right to explore for and produce minerals gave it access to and control over the surface); Aspen Ins. UK, Ltd. v. Dune Energy, Inc., 400 Fed. App'x 960, 963 (5th Cir. 2010) (unpublished per curiam opinion holding mineral lessee "occupied" the wellsite where oil leak occurred because it actually occupied the site and had the right to occupy all the land covered by the lease); Nascimento v. Preferred Mut. Ins. Co., 513 F.3d 273, 278 (1st Cir. 2008) (applying Massachusetts law, holding insured "occupied" underground storage tank on adjacent land as its sole user); Gregory v. Tenn. Gas Pipeline Co., 948 F.2d 203, 207 (5th Cir. 1991) (under Louisiana law, city "occupied" lake it created where it owned a large portion of the lake bed, and maintained and used the lake and its waters for drinking water).

In this case XTO was the lease operator, owner/lessee of the minerals, and controlled the property. Missouri Basin's[1] contact at the well was through it employee, Carson Dokken, who was to provide "company man" or completion foreman management services at the Ryan Well. There is little question XTO was in control of the Ryan Well and all activity that occurred at the site was done for the benefit of XTO. The OSHA violation worksheet makes it clear that XTO "exerted daily control over the worksite." See Doc. No. 74-4, p. 23. "XTO exercised significant control of the worksite and dictated all manner of work activity at those well sites." See Doc. No. 74-4, p. 24. "XTO had to approve all significant decisions regarding well operations." See Doc. No. 74-4, p. 24. XTO provided Dokken with an office at XTO's headquarters in Williston, North Dakota. See

---

[1]Sometimes referred to as Yankee Consulting, LLC which Missouri Basin acquired.

Doc. No. 74-4, p. 23.  Missouri Basin and the other consulting firms retained by XTO "are more like temporary labor employment agencies, handling matters related to payroll and benefits, rather than managing day-to-day work activities and contract assignments."  <u>See</u> Doc. No. 74-4, p. 23.  "The consulting companies were not involved in the management of the wellsite, nor did they have any input with regard to decisions made at the wellsite."  <u>See</u> Doc. No. 74-4, p. 23.

It appears Missouri Basin was simply performing work at the wellsite on behalf of and for the benefit of XTO.  The gravamen of occupancy is control.  The record reveals XTO rather than Missouri Basin was in control of the Ryan Well.  Under these circumstances, and given Missouri Basin's lack of control over the wellsite, the Court concludes as a matter of law that Missouri Basin did not "occupy" the wellsite as that term is used in the Berkley policies.  Thus, the Court concludes as a matter of law that the contractor/additional insured exception applies and operates to restore coverage for XTO.

### iii.  <u>Hostile Fire Exception</u>

The parties also disagree over whether the hostile fire exception to the pollution exclusion applies to restore coverage.  The hostile fire exception restores coverage for "bodily injury or property damage arising out of heat, smoke, or fumes from a hostile fire."  <u>See</u> Doc. No. 74-1, p. 23. "Hostile fire means one which becomes uncontrollable or breaks out from where it was intended to be."  <u>See</u> Doc. No. 74-1, p. 33.  Berkley contends the fire must pre-exist before it becomes uncontrollable, this fire was not uncontrollable, and the burn injuries sustained by the workers onsite were not caused by heat.  XTO asserts the hostile fire exception is ambiguous.  It is undisputed that an explosion and fire at the Ryan Well severely injured several workers.

Berkley first argues the fire must pre-exist in order to become "uncontrollable." In other words, the word "becomes uncontrollable" in the definition of hostile fire requires there first be a controllable fire before the fire becomes uncontrollable. In addition Berkley contends the fire at the Ryan Well was controllable. In support of these contentions, Berkley cites two cases. Noble Energy Inc. v. Bituminous Cas. Co., 529 F.3d 642, 648 (5th Cir. 2008) (finding the hostile fire exception only applies if there is a pre-existing fire); Ind. Lumbermens Mut. Ins. Co. v. W. Oregon Wood Prods., Inc., 268 F.3d 639, 644–45 (9th Cir. 2001) (finding the lack of an allegation in the complaint that the fire became uncontrollable meant the hostile fire exception did not apply). *Noble Energy* and *Ind. Lumbermens* are notable for their lack of explanation as to why the hostile fire exception requires a pre-existing fire.

XTO cites a line of cases which have found the hostile fire exception applies to restore coverage. Century Sur. Co. v. Hallandale Beach Serv. Station, No. 10-cv-21430, 2011 WL 13174906, * 2 (S.D. Fla. Mar. 21, 2011) (rejecting *Noble Energy* and holding that the hostile fire exception applied to restore coverage for an explosion.); Mid-Continent Cas. Co. v. Safe Tire Disposal Corp., 16 S.W.3d 418, 422 (Tex. App. 2000) (finding hostile fire exception ambiguous and thus it applied to restore coverage); Great Northern Ins. Co. v. Greenwich Ins. Co., No. 05-cv-635, 2007 WL 2458477, at *11 (W.D. Penn. Aug. 24, 2007), vacated in part on other grounds, Great Northern Ins. Co. v. Greenwich Ins. Co., 2008 WL 2048354, at *2 (W.D. Penn. May 12, 2008) (finding hostile fire definition ambiguous such that it must be construed in favor of coverage and holding the term "becomes uncontrollable" to include both "controllable fires that subsequently become uncontrollable and fires that are uncontrollable from their inception,"); Am. Star Ins. Co. v. Grice, 854 P.2d 622, 627-28 (Wash. 1993) (holding hostile fire exception was ambiguous and construing the term in favor of coverage).

The Court has reviewed every case cited by the parties and finds the line of cases cited by XTO to be more persuasive than those cited by Berkley.  The hostile fire exception in the policy makes no mention of a "pre-existing" fire requirement.  The Court agrees with the holdings in *Great Northern*, *Hallandale*, *Safe Tire*, and *Grice* that the term "hostile fire" is ambiguous.  In North Dakota, any ambiguity in an insurance contract must be strictly construed against the insurer and in favor of coverage.  Finstad v. Steiger Tractor, Inc., 301 N.W.2d 392, 398 (N.D. 1981).  Exclusions must be clear and explicit or they will be strictly construed against the insurer.  Fisher v. Am. Family Mut. Ins. Co., 579 N.W.2d 599, 602 (1998).  Suffice it to say the hostile fire exception is less than clear and explicit in the Berkley policies at issue.  A fire that "becomes uncontrollable" can be reasonably construed to include both controllable fires which become uncontrollable <u>and</u> fires which are uncontrollable from their inception.  Great Northern, 2007 WL 2458477 at *12.

Berkley's suggestion that the fire at the Ryan Well was controllable is nonsensical and illogical.  The fire in this case, just like the fire at the natural gas well in *Great Northern*, was never intended to exist.  2007 WL 2458477 at *11.  The Ryan Well exploded in a fireball which engulfed several workers and severely burned those persons.  The sequence of events which led to the pipe rocketing out of the wellhole, an explosion, and fire were near instantaneous.  The fire was certainly not under control when the workers were injured.  Schmid v. Fireman's Fund Ins. Co., Inc., 97 F. Supp. 2d 967, 972 (D. Minn. 2000) (holding uncontrollable means incapable of being controlled and a fire incapable of being controlled is usually burning in a manner different than intended).  The Court finds as a matter of law that the fire which injured the workers in the Underlying Lawsuits was "uncontrollable."

Berkley's argument that the severe burn injuries suffered by the workers were not caused by heat because the workers were "injured by actually catching on fire" belongs in the pantheon of absurd legal advocacy.  See Doc. No. 143, p. 33.  No citation is necessary for the elemental proposition that a burn is caused by heat.  The Court concludes as a matter of law that the hostile fire exception in the Berkley policies is triggered and operates to restore coverage to XTO.

### B.  XTO and COMMERCE MOTIONS

The Court now turns to the motions pending between XTO and Commerce.  The named insured on the Commerce umbrella policy is Missouri Basin.  See Doc No. 117-9, p. 3.  The Commerce umbrella policy is excess to the Berkley policies.  Commerce refused to provide a defense or indemnity for XTO related to the Underlying Lawsuits.  Commerce maintains XTO is not an additional insured and the pollution exclusion in its policy bars coverage.  XTO maintains it is an additional insured and was wrongfully denied coverage.  It is undisputed the Commerce policy is governed by North Dakota law.

### 1.  Additional Insured Status of XTO

Commerce contends that XTO is only insured to the extent it is an additional insured under the Berkley policies.  The Commerce policy covers "any person or organization…included as an additional insured under [the Berkley Policies]."  See Doc No. 117-9, p. 23.  Therefore, if XTO is an additional insured under the Berkley Policies, it is also an additional insured under the Commerce Policy.  The Court has determined that XTO is an additional insured under the Berkley policies.  See Section III.A.1.a *supra*.  Thus, XTO is also an additional insured under the Commerce policy.

Commerce argues that the contractual liability exclusion in paragraph VII.B.2 of the Berkley Primary Policy applies.  This proposition  is unsupported by any case law and is unpersuasive.  The Berkley Primary Policy, to which Commerce contends its policy follows form, excludes coverage for injury "for which the **INSURED** is obligated to pay damages by reason of the assumption of liability in a contract or agreement," unless the liability is one:

> a.  That the Insured would have in the absence of the contract or agreement; or

> b.  Assumed in a contract or agreement that is an **INSURED CONTRACT**, provided the **BODILY INJURY** or **PROPERTY DAMAGE** occurs after the execution of the contract or agreement.

See Doc. No. 74-1, p. 21.

XTO was sued directly for its own negligence.  Thus, the exclusion has no application because XTO does not seek insurance coverage for obligations it assumed in a contract, but rather for direct claims of tort liability brought against it.  See Borsheim Builders Supply, Inc. v. Manger Ins., Inc., 917 N.W.2d 504, 512 (N.D. 2018) (analyzing identical contractual liability exclusion and holding that the exclusion did not apply because the claims against the additional insured were direct claims of tort liability).

## 2.  **Commerce Pollution Exclusion**

The Commerce policy includes a time element pollution exclusion, which Commerce contends bars coverage.  XTO maintains the pollution exclusion in the Commerce policy applies only to environmental-type harms.  The exclusion provides as follows:

**Pollution**

This insurance does not apply to:

1. Any **Bodily Injury** or **Property Damage** or **Personal Injury** and **Advertising Injury** arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of Pollutants anywhere at any time;

\*\*\*

However, Paragraph 1 of this exclusion will not apply to **Bodily Injury** or **Property Damage** arising out of any discharge, dispersal, seepage, migration, release or escape of **Pollutants** that meets all of the following conditions:

    i.   It was abrupt and neither expected nor intended by the **Insured**…

    ii.   It commenced on a demonstrable, specific date during the Policy Period;

    iii.   Its commencement became known to the **Insured** within (7) calendar days;

    iv.   Its commencement was reported in writing to us within (21) calendar days of becoming known to the **Insured**; and

    v.   Reasonable effort was expended by the Insured to terminate the discharge, dispersal, seepage, migration, release, or escape of **Pollutants** as soon as conditions permitted.

See Doc. No. 117-9, p. 69.

XTO contends the pollution exclusion in the Commerce policy only applies to environmental-type harms. The Court has considered and rejected this argument in relation to the Berkley policies. See Section III.A.2 *supra*. The same analysis applies to the Commerce pollution exclusion. The Court finds the Commerce pollution exclusion applies and the exclusion is not expressly limited to environmental-type harms. However, the Court must also consider whether the time element exception to the pollution exclusion restores coverage.

### a.    <u>Time Element Exception to Polllution Exclusion</u>

XTO contends that even if the Commerce pollution exclusion applies, the time element exception to the pollution exclusion operates to restore coverage. Commerce maintains the

exception does not apply.  The Commerce policy includes a time element exception to its pollution exclusion that restores coverage for claims that meet five criteria.  The five criteria are: (i) the underlying incident was "abrupt and neither expected nor intended;" (ii) the incident occurred during the policy period; (iii) the insured became aware of the incident within seven days of its occurrence; (iv) the incident was reported in writing to Commerce within twenty-one (21) days of becoming known to the insured; and (v) the insured made reasonable efforts to address the situation.

Commerce does not dispute that conditions (i), (ii), (iii), and (v) are satisfied.  Rather, Commerce contends condition (iv), which requires that notice be given within 21 days of the incident, was not satisfied and thus the 21-day time element exception does not operate to restore coverage.  XTO admits notice was not given within 21 days of the incident.  However, XTO maintains that, applying North Dakota law, Commerce waived the right to disclaim coverage and has failed to demonstrate prejudice.

The incident at the Ryan Well occurred on June 18, 2016.  XTO first obtained a copy of the Commerce policy on June 4, 2018.  XTO requested a defense and indemnity from Commerce on June 29, 2018.  See Doc. No. 74-23.  Commerce denied coverage in a letter dated October 5, 2018.  See Doc. No. 117-11.  In its denial letter, Commerce made no mention of a lack of timely notice.  Commerce raised the late notice for the first time during the discovery process.

North Dakota law "abhors a forfeiture" of insurance coverage.  Hasper v. Center Mut. Ins. Co., 723 N.W.2d 409, 415 (N.D. 2006).  The denial of coverage based upon a lack of prompt notice works a forfeiture of coverage that is unfair to the insured absent a showing of "actual prejudice" by the insurer.  Id.  The North Dakota Century Code provides that the "[d]elay in the presentation to an insurer of notice or proof of loss is waived if the delay is caused by any act of the insurer, or if the insurer fails to make a prompt and specific objection."  N.D.C.C. § 26.1-32-09.  Citing a prior

38

version of this statute, the North Dakota Supreme Court noted that "[t]here is substantial authority in support of the proposition that a beneficiary's ignorance of the existence of an insurance policy, which is not due to his own negligence or fault, excuses his failure to provide notice of claim to the insurer within the time period set by the policy." Finstad v. Steiger Tractor, Inc., 301 N.W.2d 392, 395 (N.D. 1981).

Finstad involved a group accident indemnity insurance policy for employees injured while working for Steiger Tractor which contained a 20-day notice provision. Id. at 394. Finstad was injured in a workplace accident on July 12, 1975, but did not become aware of the policy until November 1978, and filed a notice of claim shortly thereafter. Id. The trial court granted the insurer's motion for summary judgment based on a lack of timely notice. Id. at 397. Acknowledging the public policy against forfeitures, the North Dakota Supreme Court reversed. Id. at 398. The North Dakota Supreme Court concluded that the failure to provide timely notice of a claim as required by the terms of the insurance policy will result in a forfeiture only if the insurer can demonstrate such a failure resulted in appreciable prejudice to the insurer. Id. at 398.

It is well-established in North Dakota that "an insurer which denies liability on specified grounds may not subsequently attempt to deny liability on different grounds." D.E.M. v. Allickson, 555 N.W.2d 596, 599 (N.D. 1996); Selective Way Ins. Co. v. CSC Gen. Contractors, Inc., No. 20-1855, 2021 WL 1555260, at *2 (8th Cir. Apr. 21, 2021) (district court erred in looking beyond issues raised in a denial letter to determine coverage). In Allickson, the insurer had raised a number defenses to coverage in its pre-suit letters to the insured, but none of the defenses pertained to notice. Id. at 597–599. Rejecting the insurer's attempt to raise a notice defense after the underlying case had been settled, the North Dakota Supreme Court noted it had "long recognized an insurer which

disclaims liability on one ground, thereby misleading claimants to their prejudice, may be estopped from raising other grounds for denying liability." Id. at 600.

Commerce fails to address Section 26.1-32-09, *Finstad*, or *Allickson* in its motion or in it response to XTO's motion. Commerce also fails to show, or even address, how it was prejudiced by the alleged lack of timely notice. Instead, Commerce relies on <u>*Hiland Partners GP Holdings v. Nat'l Union Fire Ins. Co.*</u>, 847 F.3d 594, 601 (8th Cir. 2017) and cases from other jurisdictions which are not controlling since North Dakota law applies to Commerce's policy. *Hiland* is not on point as it did not involve  consideration of Section 26.1-32-09 or a discussion of prejudice. Id.; <u>Hiland Partners GP Holdings, LLC v. Nat'l Union Fire Ins. Co.</u>, No. 1:14-CV-25, 2015 WL 11143072, at *9 (D.N.D. Sept. 17, 2015). The Court finds as a matter of law that Commerce has failed to demonstrate prejudice and has waived its ability to avoid coverage based upon a lack of timely notice. Thus, the time element exception applies to restore coverage in favor of XTO.

### b.    "Follow Form" Provision

XTO also contends that the "follow form" provision in the Commerce policy means it has adopted the Berkley pollution exclusion, including the hostile fire and additional insured exceptions, into its policy resulting in a restoration of coverage in favor of XTO. Commerce maintains the Berkley pollution exclusion conflicts with the Commerce pollution exclusion and thus the Berkley pollution exclusion does not apply. XTO maintains the two pollution exclusions do not conflict.

A "follow form" provision refers to the common practice in umbrella policies of providing coverage on a secondary basis which "follows" the substance of the coverage provided by the primary insurer. <u>Insituform Techs., Inc. v. Am. Home Assur. Co.</u>, 566 F.3d 274, 278 (1st Cir. 2009). Typically, a "follow form" excess policy is relatively brief and incorporates many, if not all, of the

provisions of the primary policy.  Johnson Controls, Inc. v. London Mkt., 784 N.W.2d 579, 587

(Wis. 2010).  A stand alone excess policy is typically a longer independent contract which does not

follow the terms of the primary policy.  Id. at 587, n. 7.  However, as the First Circuit Court of

Appeals has pointed out, "'follow form' is a loose term" and "follow form" excess policies do not

necessarily provide coverage that is identical to the primary policy.  Insituform Techs., Inc., 566

F.3d at 278.

In this case, the Commerce policy is actually lengthier than either of the Berkley policies so

it is not your typical "follow form" excess policy.  Nevertheless, both XTO and Commerce agree

the Berkley pollution exclusion applies only to the extent it does not conflict with the Commerce

pollution exclusion.  See UnitedHealth Grp. Inc. v. Columbia Cas. Co., 941 F. Supp. 2d 1029, 1053

(D. Minn. 2013) (finding two policies can only "follow form" insofar as they do not conflict).  The

Court agrees that if the policies conflict, the Berkley policy must yield to the Commerce policy.

The Commerce follow form provision provides as follows:

> Coverage under this policy will follow the terms, definitions, conditions and
> exclusions of **Scheduled Underlying Insurance**, subject to the **Policy Period**,
> Limits of Insurance, premium and all other terms, definitions, conditions and
> exclusions of this policy.  Provided, however, that coverage provided by this policy
> will be no broader than the coverage provided by **Scheduled Underlying Insurance**.

See Doc. No. 117-9, p. 51.  It is undisputed the Berkley policies are listed in the schedule of

underlying insurance.  The Court has determined that both exceptions to the Berkley pollution

exclusion apply to restore coverage in favor of XTO under the Berkley policies.  The Court has also

determined that the time element exception in the Commerce policy applies to restore coverage in

favor of XTO under the Commerce policy.

In this case we have two pollution exclusions with very different exceptions that restore

coverage.  XTO contends both pollution exclusions and their exceptions can be harmonized and both

should be considered.   Commerce argues the two pollution exclusions conflict and only the Commerce pollution exclusion applies.  The Court finds Commerce's reading of the "follow form" provision to be the more reasonable of the two.

It would be highly unusual and confusing for an insurance policy to have two different pollution exclusions.  In such a situation an exception to one exclusion may apply to restore coverage while the exception in the second pollution exclusion may not apply.  Such a situation, while not present in this case as the Court has determined all the exceptions apply to restore coverage, would certainly create a conflict.  The "follow form" provision itself states it is "subject to" the terms and conditions of the Commerce policy.  See Doc. No. 117-9, p. 51.  The Court reads this to mean the Commerce policy applies when both policies address the same issue.  As a result, the Court finds the Commerce policy controls and the Berkley pollution exclusion and its exceptions have not been incorporated into the Commerce policy, and thus do not restore coverage in favor of XTO.  UnitedHealth Grp. Inc., 941 F. Supp. 2d at 1053.  Nevertheless, XTO is still provided coverage by the Commerce policy because the time element exception to the pollution exclusion operates to restore coverage to XTO.

### 3.    N.D.C.C. § 26.1-04-03(9)

In Count 4 of its third-party complaint, XTO alleges a statutory claim for unfair claim settlement practices in violation Section 26.1-04-03(9) of the North Dakota Century Code. Commerce contends the Court should grant it summary judgment dismissing Count 4 because Commerce was not "without just cause" in denying coverage to XTO, and XTO has failed to allege, much less show, that Commerce engaged in any prohibited conduct "with a frequency indicating

a general business practice."  Commerce also contends there is no private right of action under N.D.C.C. § 26.1-04-03(9).

Whether Commerce acted without just cause is open to debate since the Court has determined the Commerce pollution exclusion does not operate to foreclose coverage.  However, there has been no evidence presented of multiple acts of misconduct by Commerce.  To state a statutory claim for unfair claim settlement practices, XTO must show that Commerce acted "without just cause" and "with a frequency indicating a general business practice." N.D.C.C. § 26.1-04-03(9).  "Section 26.1-04-03(9) specifically requires that the proscribed acts be 'performed with a frequency indicating a general business practice' to constitute an unfair claim settlement practice." Volk v. Wis. Mortg. Assur. Co., 508 N.W.2d 40, 45 (N.D. 1991).  "[A] single alleged act of misconduct [does] not constitute an actionable claim" under Section 26.1-04-03(9). Estvold Oilfield Servs., Inc. v. Hanover Ins. Co., No. 1:17-cv-016, 2018 WL 1996453, at *5 (D.N.D. Apr. 27, 2018).

In this case, XTO has alleged only that Commerce violated Section 26.1-04-03(9) in connection with the claim at issue.  See Doc. 7 at ¶ 88.  XTO has not alleged any other prohibited conduct or that any such prohibited conduct occurred "with a frequency indicating a general business practice."  See Doc. 7 at ¶ 88.  Nor has XTO produced any evidence in response to Commerce's motion for summary judgment demonstrating multiple instances of misconduct by Commerce which would constitute a "general business practice."  Because a "single alleged act of misconduct" is insufficient to state a claim for a violation of Section 26.1-04-03(9), summary judgment in favor of Commerce as to Count 4 of XTO's third-party complaint is warranted.  Having determined XTO's claim under Section 26.1-04-03(9) fails as a matter of law, the Court need not decide whether a private right of action exists under Section 26.1-04-03(9). See Volk, 508 N.W.2d at 45.

**C.**    **XTO and StarStone Motions**

The Court now turns to the motions pending between XTO and StarStone.  The named insured on the StarStone umbrella policy is Badlands.  See Doc No. 83-19, p. 2.  The StarStone umbrella policy is secondary to the Seneca policy.  The claims between XTO and Seneca have been settled.  StarStone maintains XTO is not an additional insured and the pollution exclusion in its policy bars coverage.  XTO maintains it is an additional insured and the pollution exclusion does not apply.  It is undisputed that the StarStone and Seneca policies are governed by Montana law.

**1.**    **Additional Insured Status of XTO**

StarStone contends its policy does not afford additional insured coverage to XTO because XTO was not required to indemnify Badlands.  The StarStone policy incorporates the terms of the MSA which require that additional insured coverage be extended to XTO.  See Doc. No. 83-19, pp. 21-22.  The Seneca policy does the same.  See Doc. No. 83-20, p. 33.  XTO's liability in the Underlying Lawsuits was caused, at least in part, by the actions of Badlands' employees.

The Court has already determined that XTO is an additional insured under the Berkley and Commerce policies, and the MSA between XTO and Missouri Basin.  See Sections III.A.1. and III.B.1 *supra*.  The MSA between XTO and Badlands is identical to the MSA between XTO and Missouri Basin.  See Doc. Nos. 83-1 and 86-3.  The analysis is the same.  Badlands' insurance obligations are not tied to the indemnity obligations in the MSA.  These are two entirely separate obligations.  The MSA does not limit XTO's additional insured status to only indemnifiable claims.  The Court concludes as a matter of law that XTO is an additional insured under the Seneca and StarStone policies.

StarStone makes one additional argument regarding paragraph 11.5 of the MSA. This paragraph, which pertains to certificates of insurance and the language to be included therein, provides as follows:

> Certificate of Insurance. Contractor's insurance carrier(s) will provide, as evidence that the required insurance coverage has been obtained and maintained, a certificate of insurance and declaration sheet reflecting the amount of any deductibles and stating substantially as follows:·
>
> "It is hereby agreed that the XTO Group (as defined in that certain Master Service Agreement  between XTO and Contractor (the "Agreement")) are Additional Insureds under this Policy and  underwriters expressly waive any and all rights of subrogation that they might otherwise have  against any of the XTO Group."
>
> "The insurance provided to the XTO Group hereunder affords coverage for all liabilities (including  liabilities assumed by contract) arising from or related to operations or work performed under this Agreement, but only as to those claims and liabilities which Contractor has assumed under this Agreement. Underwriters agree that this insurance will be considered primary, and not excess or contributing insurance, in relation to any other policies or self-insurance programs carried by or on behalf of any of the XTO Group."

See Doc. No. 83-1, ¶ 11.5.

StarStone contends the language requiring a certificate of insurance controls over all other terms of the MSA and precludes coverage because no Badlands employees sued XTO. The contention is curious because paragraph 11.5 is a recordkeeping provision that sets forth the language to be included in the certificate of insurance provided by the insurance carrier, and does not impose obligations upon the parties to the MSA. StarStone cites no case law to support its contention that a certificate of insurance limits coverage. It is widely understood that certificates of insurance do not create coverage or other legal obligations and are "not a part of the contract of, or necessary to, the insurance." SLA Prop. Mgmt. v. Angelina Cas. Co., 856 F.2d 69, 73 (8th Cir. 1988) (rejecting a "scope of coverage" argument based on a "certificate of insurance"); 3 Couch on Ins. § 40:31 (3d. ed. 2020) (a certificate of insurance does not create coverage or legal obligations

between the insurer and the certificate holder). The certificate of insurance clause in paragraph 11.5 is not the operative clause.

Although ignored by StarStone, paragraph 11.4 speaks directly to the additional insured status of XTO, and is the operative provision. Paragraph 11.4, which is entitled "Primary Coverage and Additional Insureds," states in plain language and in all capital letters, that "ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE INCLUDING EXCESS OR UMBRELLA INSURANCES" See Doc. No. 83-1, p. 8. Paragraph 11.4 goes on to say "ALL OF CONTRACTORS LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED." See Doc. No. 83-1, p. 8. The MSA clearly states that XTO is an additional insured as to all insurance obtained and to the full amount of that insurance. The separate obligation in paragraph 11.4 to name XTO as an additional insured on all insurance policies obtained by Badlands clearly demonstrates that Badlands agreed to provide XTO with direct coverage for liability caused by Badlands' acts or omissions and not just for indemnifiable claims under the MSA. The Court concludes as a matter of law that XTO is an additional insured under the Seneca and StarStone policies.

## 2. Texas Oilfield Anti-Indemnity Act

StarStone argues the Texas Oilfield Anti-Indemnity Act ("TOAIA") limits mutual indemnity obligations to the dollar amount of insurance the parties agreed to provide. XTO contends StarStone has waived the right to rely upon the TOAIA by failing to plead it as an affirmative defense. XTO also maintains the TOAIA does not apply to additional insured provisions.

46

The Court expressly finds no waiver has occurred. The Eighth Circuit allows a party to raise an affirmative defense for the first time in a motion for summary judgment, especially where the adverse party has notice of the defense and would not be prejudiced. See First Union Nat. Bank v. Pictet Overseas Tr. Corp. Ltd., 477 F.3d 616, 622 (8th Cir. 2007). StarStone gave notice of its intent to raise the defense in a supplemental reservation of rights letter dated January 9, 2020, which was approximately two months before StarStone filed its motion for summary judgment. See Doc. No. 107-24. XTO is well aware of the TOAIA and has not suggested it was unfairly surprised or prejudiced by StarStone raising the issue in its motion for summary judgment. XTO addressed the issue in its own motion for partial summary judgment. The Court finds no prejudice and deems the issue fairly raised.

Nonetheless, the Court has already considered and rejected the argument that the TOAIA limits coverage. See Section III.A.1 *supra*. The TOAIA does not apply because it does not prevent parties to an indemnity agreement from obtaining additional insurance which does not support the indemnity obligation. See Getty Oil, 845 S.W.2d at 804-05. The MSA between XTO and Badlands contains separate indemnity (¶¶ 10.1.3 and 10.2.3) and additional insured (¶ 11.4) provisions which are not tied to one another. The TOAIA only pertains to indemnity agreements and not to additional insured provisions. Id. at 794. The Court concludes that the TOAIA does not limit the coverage available to XTO under the StarStone policy.

### 3.  **Starstone and Seneca Pollution Exclusions**

StarStone also argues the pollution exclusions in the Seneca and StarStone policies bar coverage. The StarStone policy is excess to the Seneca policy. StarStone also contends coverage is barred because the Seneca pollution exclusion applies and the StarStone policy has a "not for

47

broader coverage" provision that limits coverage available to an additional insured to that afforded by the underlying insurance. XTO contends the pollution exclusions in the Seneca and StarStone policies apply only to environmental-type harms and do not apply to the bodily injuries sustained in this case. XTO also maintains the hostile fire exception in the StarStone policy restores coverage. As for StarStone's "not for broader coverage" argument, XTO contends the provision does not apply because the hostile fire exception in the StarStone policy changed the policy to broaden coverage and the "not for broader coverage" provision is ambiguous.

It is undisputed that Montana law applies to the Seneca and StarStone policies. Under Montana law, the language of the policy governs if it is clear and explicit. Duensing v. Traveler's Cos., 849 P.2d 203, 206 (Mont. 1993). The policy must be read as a whole. Farmers All. Mut. Ins. Co. v. Holeman, 961 P.2d 114, 119 (Mont. 1998). "Any ambiguity in an insurance policy must be construed in favor of the insured and in favor of extending coverage." Travelers Cas. & Sur. v. Ribi Immunochem Rsch., 108 P.3d 469, 474 (Mont. 2005) Ambiguity exists when the policy, taken as a whole, is reasonably subject to two different interpretations. Id. It is the insurer's burden to prove that an exclusion in its policy precludes coverage. Id. at 476. The insured bears the burden of proving that an exception to an exclusion applies. Id. "Exclusions must be narrowly and strictly construed because they are 'contrary to the fundamental protective purpose of an insurance policy.'" Newman v. Scottsdale Ins. Co., 301 P.3d 348, 355 (Mont. 2013) (quoting Farmers Union Mut. Ins. Co. v. Oakland, 825 P.2d 554, 556 (Mont. 1992)). Because exclusions are contrary to the fundamental purpose of the policy, they are frequently subject to challenge for ambiguity or inconsistency. Id.

### a.    <u>Bodily Injury or Environmental Harm</u>

The Court, applying North Dakota law, has considered and rejected XTO's argument that a pollution exclusion only applies to environmental-type harms in relation to the Berkley policies. <u>See</u> Section III.A.2 *supra*.  The same analysis applies to the Seneca and StarStone pollution exclusions which the Court finds are not limited to environmental-type harms.  The application of Montana law does not change the analysis.  The Court does not believe the Montana Supreme Court would limit  pollution exclusions to environmental-type harms.  <u>See</u> <u>Swank Enterprises, Inc. v. United Fire & Cas. Co.</u>, No. CV 19-179, 2020 WL 1685746, at *5 (D. Mont. Apr. 7, 2020); <u>see also</u> <u>Sokoloski v. Am. W. Ins. Co.</u>, 980 P.2d 1043, 1045 (Mont. 1999).

### b.    <u>StarStone Hostile Fire Exception</u>

XTO contends the hostile fire exception to the StarStone pollution exclusion operates to restore coverage.  The Court has considered this contention in relation to the Berkley policies and found the hostile fire exception to be ambiguous.  <u>See</u> Section III.A.2.a.iii *supra*.  The hostile fire exceptions in the Berkley and StarStone polices are identical.  <u>See</u> Doc. Nos. 83-19, p. 44 and 74-1, pp. 23, 33.  The same analysis applies to the Berkley and StarStone hostile fire exceptions under Montana law.  The hostile fire exception is ambiguous and thus must be construed in favor of the insured.  The Court finds as a matter of law that the hostile fire exception in the StarStone policy operates to restore coverage in favor of XTO.

### c.    <u>"Not for Broader Coverage"</u>

The parties dispute the meaning of the definition of "Insured" found in the StarStone policy. The disputed provision provides as follows:

**I.**    **Insured** means:

  **7.**    Any person or organization, other than the **Named Insured**, included as an additional insured under **underlying insurance**, <u>but not for broader coverage than would be afforded under such **underlying insurance**</u>.

  If coverage provided to the additional insured is required by a contract or agreement. the most we will pay on behalf of the additional insured is:

  **a.**    The amount of the insurance required by the contract, less any amounts payable by any **underlying insurance**; or

  **b.**    The limits of insurance of this Policy

  whichever is less; provided that if the amount of insurance required by the contract is wholly within the limits of the **underlying insurance**, no coverage will be afforded under this Policy to the additional insured.

<u>See</u> Doc. No. 83-19, p. 22 (underlining added).

Montana courts have not had occasion to interpret policy language such as this. The parties offer very different readings. StarStone contends this language limits coverage available to an additional insured to the coverage provided by the underlying insurance. The underlying insurance is the Seneca policy. While the pollution exclusion in the StarStone policy contains a hostile fire exception which restores coverage, the pollution exclusion in the Seneca policy does not have a hostile fire exception. Thus, according to StarStone, there can be no coverage under the StarStone policy because there is no coverage under the Seneca policy, and if coverage were afforded it would be broader than the coverage under the underlying Seneca policy.

XTO contends the hostile fire exception modified the StarStone policy by providing broader coverage than the Seneca policy. Otherwise, XTO maintains, the inclusion of a pollution exclusion with a hostile fire exception in the StarStone policy is meaningless. XTO points out that the

StarStone pollution exclusion starts with the phrase "[t]he policy is amended as follows."  <u>See</u> Doc. No. 83-19, p. 44.  In addition, the hostile fire exception restores coverage for "any insured."  <u>See</u> Doc. No. 83-19, p. 44.  Policy endorsements generally supersede and control over conflicting terms in the main policy.  <u>Mesa Operating Co. v. Cal. Union Ins. Co.</u>, 986 S.W.2d 749, 754 (Tex. App. 1999); 2 Couch on Ins. § 21:22 (3rd ed. 2020).  The term "broader coverage" is not defined in the policy.

Both Starstone and XTO offer plausible but conflicting interpretations of the disputed language and the hostile fire exception.  The few courts that have addressed the issue have offered differing opinions as to the meaning of the disputed language.  <u>See</u> <u>ATOFINA</u>, 256 S.W.3d at 667-68 (finding no broader coverage provision meant umbrella policy coverage cannot extend beyond what the underlying policy provides); <u>Veto v. Am. Family Mut. Ins. Co.</u>, 815 N.W.2d 713, 717-19 (Wis. Ct. App. 2012) (rejecting the argument that the no broader coverage language in umbrella policy incorporates all the terms of the underlying policy).

StarStone's reading of the definition of "Insured" would render the pollution exclusion and the hostile fire exception meaningless.  It is difficult to understand how a phrase contained in the definition of a policy term could have been intended to have such a sweeping effect.  As the Court discussed above, such an intent is usually accomplished by a stand alone "follow form" provision.  <u>See</u> Section III.B.3.b. *supra*.  The StarStone policy does not contain a "follow form" provision.  StarStone drafted the policy and chose to include it in a pollution exclusion with a hostile fire exception that provides broader coverage than is provided for in the Seneca policy.  The Court does not believe that a reasonable person reading the StarStone policy would understand the "not for broader coverage" language was meant to incorporate all of the terms of the Seneca policy and render the pollution exclusion and hostile fire exception in the StarStone policy ineffectual.  The

meaning of the disputed language is unclear and susceptible to multiple interpretations.  Veto, 815

N.W.2d at 717-18 (noting the no broader language was vague and subject to multiple interpretations

including that the monetary value of the coverage was reduced).  As the Court noted above in

reference to the "follow form" provision in the Commerce policy, two policies can only "follow

form" insofar as they do not conflict.  UnitedHealth Grp. Inc., 941 F. Supp. 2d at 1053.  The Seneca

and StarStone pollution exclusions clearly conflict.  Even if the disputed language was treated as

a "follow form" provision, the Seneca pollution exclusion would yield to the StarStone pollution

exclusion.

An endorsement must take precedence over conflicting provisions in the main body of the

policy.  Mesa Operating Co., 986 S.W.2d at 754.  Any ambiguity must be construed in favor of the

insured and in favor of extending coverage.  Travelers Cas. & Sur., 108 P.3d at 474.  Consequently,

the Court finds as a matter of law that the disputed language is ambiguous and construes it against

StarStone and in favor of XTO.  As a result, the Court concludes as a matter of law that XTO is

entitled to full coverage under the StarStone policy.


### 4.    Policy Caps

StarStone argues that in those situations where additional insured coverage is required by

contract, the StarStone policy caps additional insured coverage to the amount of insurance required

by the underlying contract, and if that amount is within the limits of the primary insurance, no

coverage is afforded by the StarStone umbrella policy.  StarStone maintains the amount of insurance

required by the MSA is $1,000,000, and thus the StarStone policy is not implicated by the XTO

claim for coverage because the Seneca primary policy provides $1,000,000 in coverage.  XTO

contends the "Actual Insurance" provision in the MSA sets the minimum insurance required as the

actual amount of insurance maintained by Badlands.  The StarStone umbrella policy has a limit of $5,000,000.

The StarStone policy provides that the most it will pay on behalf of an additional insured is "the amount of insurance required by the underlying contract, less any amount payable by any underlying insurance."  See Doc. No. 83-19, p. 22.  The underlying contract is the MSA between XTO and Badlands.  The MSA requires a minimum of $1,000,000 in coverage to support the indemnity obligation.  See Doc. No. 83-1, ¶ 11.1.2.  However, the MSA also contains an "Actual Insurance" provision which provides that "notwithstanding the minimum coverages . . . should the Contractor maintain . . . insurance in amounts greater than the minimum, then the actual insurance which the Contractor shall provide hereunder will be such larger amounts."  See Doc. No. 83-1, ¶ 11.1.5.  Further, the MSA requires that "ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE INCLUDING EXCESS OR UMBRELLA INSURANCES" See Doc. No. 83-1, ¶ 11.4.  Thus, the amount required by the plain language of the MSA is the full amount of all insurance maintained.  The Court concludes as a matter of law that XTO is entitled to full coverage up to the limits of the applicable StarStone policy or policies.

## IV.    CONCLUSION

Accordingly, Berkley's motion for summary judgment as to XTO (Doc No. 72) is **DENIED** and XTO's motion for partial summary judgment against Berkley (Doc. No. 110) is **GRANTED**. Commerce's motion for summary judgment as to XTO (Doc No. 84) is **GRANTED IN PART AND DENIED IN PART** as explained**,** and XTO's motion for partial summary judgment against

53

Commerce (Doc. No. 115) is **GRANTED**.  Starstone's motion for summary judgment as to XTO (Doc No. 81) is **DENIED** and XTO's motion for partial summary judgment against Starstone (Doc. No. 101) is **GRANTED**.

The Court **ORDERS** and **DECLARES** as a matter of law the following:

(1.)   XTO is an additional insured under both the Berkley Primary and Berkley umbrella policies.  Although the Berkley pollution exclusion does apply to bar coverage for bodily injuries in the Underlying Lawsuits, both the contractor/additional insured exception <u>and</u> the hostile fire exception are triggered and operate to restore coverage to XTO.

(2.)   XTO is an additional insured under the Commerce policy.  Although the Commerce pollution exclusion does apply to bar coverage for bodily injuries in the Underlying Lawsuits, the time element exception operates to restore coverage to XTO.  In addition, XTO's claim against Commerce under Section 26.1-04-03(9) fails as a matter of law.

(3.)   XTO is an additional insured under the StarStone policy.  Although the pollution exclusion in the StarStone policy does apply to bar coverage for bodily injuries in the Underlying Lawsuits, the hostile fire exception in the StarStone policy is triggered and operates to restore coverage to XTO.  Therefore, XTO is entitled to coverage up to the full limits of the StarStone policy.

**IT IS SO ORDERED**.

Dated this 3rd day of May, 2021.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court