**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | | |
|---|---|---|
| Berkley National Insurance Company, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | **ORDER ON CROSS MOTIONS** |
| vs. | ) | **FOR SUMMARY JUDGMENT AND** |
| | ) | **PARTIAL SUMMARY JUDGMENT** |
| XTO Energy, Inc., | ) | |
| | ) | |
| Defendant, and | ) | |
| Third-Party Plaintiff, | ) | Case No. 1:18-cv-195 |
| | ) | |
| vs. | ) | |
| | ) | |
| Commerce and Industry Insurance | ) | |
| Company, Torus National Insurance | ) | |
| Company n/k/a StarStone National | ) | |
| Insurance Company, and Seneca | ) | |
| Specialty Insurance Company, | ) | |
| | ) | |
| Third-Party Defendants. | ) | |

Before the Court are three motions for summary judgment (Doc. Nos. 216, 248, and 250) and one motion for partial summary judgment (Doc No. 253) filed by the parties in this declaratory judgment action. The motions have been fully briefed and are ripe for consideration.

The first set of motions is between XTO Energy, Inc. ("XTO"), as third-party plaintiff, and Commerce and Industry Insurance Company ("Commerce"), third-party defendant. XTO filed a motion for summary judgment on November 28, 2022. See Doc. No. 216. Commerce filed a response in opposition to the motion on January 20, 2023. See Doc. No. 221 and 288. XTO filed a reply brief on March 2, 2023. See Doc. No. 231. Commerce filed a motion for summary judgment against XTO on January 26, 2024. See Doc. No. 248. XTO filed a response in opposition to the motion on March 8, 2024. See Doc. No. 262. Commerce filed a reply brief on April 19,

1

2024.  See Doc. No. 272.  For the reasons set forth below, the Court grants in part and denies in part both motions.

The second set of motions are between XTO, as third-party plaintiff, and third-party defendant Torus National Insurance Company n/k/a StarStone National Insurance Company ("StarStone").  StarStone filed a motion for summary judgment against XTO on January 26, 2024.  See Doc. No. 250.  XTO filed a response in opposition on March 8, 2024.  See Doc. No. 263.  StarStone filed a reply brief on April 19, 2024.  See Doc. No. 273.  XTO filed a motion for partial summary judgment against StarStone on January 26, 2024.  See Doc. No. 254.  StarStone filed a response in opposition to the motion on March 8, 2024.  See Doc. No. 261.  XTO filed a reply brief on April 19, 2024.  See Doc. No. 271.  For the reasons set forth below, the Court grants XTO's motion and denies StarStone's motion.

## I.    BACKGROUND

This declaratory judgment action involves contract and insurance claims stemming from an explosion and fire that occurred on June 18, 2016, at an oil and gas well located in western North Dakota.  The action is brought pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201 et seq.  The amount in controversy far exceeds $75,000.  Jurisdiction is based upon diversity of citizenship.  28 U.S.C. § 1332.  The Court previously issued an order on three motions for summary judgment and three motions for partial summary judgment which resolved many of the issues in the case.  See Doc. No. 190.  The only parties remaining to the action are XTO, Commerce, and StarStone.

### A.    THE PARTIES

Plaintiff Berkley National Insurance Company (Berkley) is an Iowa corporation.   Its principal place of business is Urbandale, Iowa.  Berkley issued primary and umbrella policies to Missouri Basin Well Services Inc. ("Missouri Basin").  The claims by Berkley against XTO have been settled.

Defendant and third-party plaintiff XTO Energy Inc. is a Delaware corporation with its principal place of business in Fort Worth, Texas.  XTO owned and operated the oil and gas well where the explosion and fire occurred.

Third-party defendant Commerce and Industry Insurance Company is a New York corporation with its principal place of business in New York.  Commerce issued a second layer umbrella policy to Missouri Basin.

Third-party defendant Torus National Insurance Group, n/k/a StarStone National Insurance Company, is a Delaware corporation with its principal place of business in New Jersey.  StarStone issued an umbrella policy to Badlands Consulting, LLC ("Badlands").

Third-party defendant Seneca Specialty Insurance Group is a Delaware corporation with its principal place of business in New York.  Seneca issued a primary policy to Badlands.  The claims between Seneca and XTO have been settled.

### B.    THE INCIDENT

On June 18, 2016, an explosion and fire occurred at the Ryan 14X-09E oil and gas well ("Ryan Well") near Watford City, North Dakota.  XTO was the owner and lease operator of the Ryan Well.  XTO retained Sherwood Enterprises, LLC, and Most Wanted Well Service, LLC, to provide snubbing services at the Ryan Well.  XTO retained Missouri Basin and Badlands to provide

"company man" services at the Ryan Well.

Prior to the explosion and fire, XTO contractors at the Ryan Well encountered a down-hole problem whereby the drill was not making progress in milling out a frac plug.  Rather than kill the well, a decision was made to snub out the hole.  Snubbing is a process whereby a machine grabs the tubing and pulls it out a little at a time while maintaining pressure in the wellhole.  Snubbing is a specialized operation used when the pipe string is pressurized and the weight of the pipe alone is insufficient to keep the pipe in the wellhole.  A snubbing unit is employed to prevent the pressurized pipe string from being shot out of the wellhole.

On the morning the incident occurred, the crews were snubbing out the last length of pipe when a hole in the side of the pipe string was exposed, resulting in the release of gas and other wellbore fluid into the atmosphere.  Workers observed a hole in the pipe and gas coming out of the hole.  The snubber, John Stassinos, then shoved the portion of the pipe with a hole in it back beneath the annular bag to seal off the wellbore from the atmosphere.  However, within a few seconds the final section of pipe rocketed out of the well and into the air along with oil, gas, and wellbore fluid resulting in an explosion and fire.

The explosion and fire resulted in the death of John Stassinos and severe burn injuries to Justin Pyle and Chad Maheu, all employees of Most Wanted Well Service.  Daniel Pavon, who was employed by Sherwood Enterprises, also suffered severe burns.  Joe Guillen, another Sherwood Enterprises employee, suffered severe emotional distress and post-traumatic stress disorder.  No employees of Missouri Basin or Badlands were injured.

Following the incident, the U.S. Department of Labor, Occupational Safety and Health Administration ("OSHA"), conducted an investigation.  On December 15, 2016, OSHA cited Most Wanted Well Service, for two serious violations, Sherwood Enterprises for one "serious" violation,

and XTO for one "serious" violation in relation to the incident.  See Doc. Nos. 288-3, 288-4, and 288-5.

### C.   THE UNDERLYING LAWSUITS

Two lawsuits, both of which were filed in the District of North Dakota, resulted from the incident: Mary Stassinos et al. v. XTO Energy Inc. et al.; case no. 1:17-cv-138, filed on July 6, 2017, and Richard Maheu et al. v. XTO Energy Inc. et al.; case no. 1:17-cv-102, filed on May 22, 2017, ("Underlying Lawsuits").  The Underlying Lawsuits named XTO, Missouri Basin, Badlands and others as defendants.

On October 12, 2018, all defendants in the Underlying Lawsuits and their insurance carriers participated in a mediation with the plaintiffs that lasted two days.  At that mediation or shortly thereafter, XTO was able to secure settlements with all of the plaintiffs on behalf of itself and all the other defendants.  The total amount of the settlements ($123,550,000) far exceeds the total limits of the Berkley, Commerce, Seneca and StarStone policies.  XTO paid $96.55 million toward the settlement while  six insurance carriers contributed a total of $27 million.  StarStone contributed $5 million but seeks reimbursement in this lawsuit.  The record does not reveal the terms of the settlement between Berkley and XTO.  The defense costs of XTO and the other defendant in the Underlying Lawsuits were paid, at least in part, by Arch Insurance Company and St. Paul Fire & Marine Insurance, which are not involved in this lawsuit.

Several carriers for other defendants in the Underlying Lawsuits, or for contractors who were otherwise involved, tendered their full limits of coverage toward the settlements.  Berkley and Commerce attended the mediation but did not actively participate and did not contribute to the settlement.  Berkley filed the instant action approximately two weeks before the mediation was held.

See Doc. No. 1.  Seneca and StarStone participated in the mediation and each agreed to tender their limits of coverage ($1 million from Seneca and $5 million from StarStone), on the condition the parties could litigate or arbitrate the coverage issues later and that Seneca and StarStone could recoup their limits if a court or arbitrator determined their policies did not afford coverage.

### D.      THE MASTER SERVICE AGREEMENTS

XTO retained contractors Missouri Basin and Badlands to perform certain services at the Ryan Well.  Missouri Basin and Badlands entered into separate master service agreements ("MSAs") with XTO to govern their contractual rights, responsibilities, and obligations for the work they performed.  See Doc. Nos. 86-3 and 83-1.  XTO entered into similar or identical MSAs with its other contractors: Sherwood Enterprises; Most Wanted Well Service (Doc. No. 74-3); Petroleum Experience, Inc.; Weatherford International, LLC; and KLX Energy Services, LLC/KLX Energy Holdings, LLC.

The MSAs contain "knock-for-knock" indemnity obligations which both parties agreed to support with insurance.  See Doc. No. 86-3, pp. 5-7 and 83-1, pp. 5-7.  In the "knock-for-knock" indemnity provisions, Missouri Basin and Badlands agreed to indemnify XTO from claims brought against XTO by their employees and subcontractors, and XTO agreed to indemnify Missouri Basin and Badlands for claims brought against them by XTO's employees and subcontractors who were not affiliated with Missouri Basin and Badlands.

XTO has acknowledged the terms of the MSAs require it to defend and indemnify Missouri Basin and Badlands in the Underlying Lawsuits.  The MSAs obligated XTO to "release, defend, indemnify and hold [Missouri Basin and Badlands] harmless" while requiring Missouri Basin and Badlands to name XTO as an additional insured on all their insurance policies.  See ¶ 10.2.1 and

11.4  The MSAs required Missouri Basin and Badlands to secure and maintain commercial general liability policies with coverage of at least $1 million per occurrence to support the indemnity obligation.  See ¶ 11.1.2.  The MSAs also contain an "actual insurance" provision in paragraph 11.2, which addresses situations where the contractor obtains more insurance than the required minimum.

Paragraph 11.2 provides as follows:

Actual Insurance. Notwithstanding the minimum coverage specified in Sections 11.1.1-11.1.5 above, should Contractor maintain on a general, blanket, comprehensive or similar basis any insurance, including but not limited to excess liability insurance or contractual liability insurance, in amounts greater than such minimums, then the actual insurance which Contractor hereunder will be such larger amounts carried by Contractor (or indicated in any certificate of insurance furnished by Contractor) and not the minimums referenced in Sections 11.1.1-11.1.5 above.

Paragraph 11.4, which addresses XTO's status as an additional insured, provides as follows:

Primary Coverage and Additional Insureds. ALL INSURANCE POLICIES AND COVERAGES LISTED IN THIS ARTICLE XI WILL EXTEND TO AND PROTECT THE XTO GROUP TO THE FULL EXTENT AND AMOUNT OF SUCH COVERAGE, INCLUDING EXCESS OR UMBRELLA INSURANCES. ALL INSURANCE POLICIES LISTED IN THIS ARTICLE XI WILL BE PRIMARY TO, AND RECEIVE NO CONTRIBUTION FROM, ANY OTHER INSURANCE OR SELF-INSURANCE PROGRAMS MAINTAINED BY OR ON BEHALF OF OR BENEFITING THE XTO GROUP.  THE LIMITS AND COVERAGES OF THE INSURANCES OBTAINED BY CONTRACTOR WILL IN NO WAY LIMIT THE LIABILITIES OR OBLIGATIONS ASSUMED BY CONTRACTOR UNDER THIS AGREEMENT.  ALL OF CONTRACTOR'S LIABILITY INSURANCE POLICIES WILL NAME THE XTO GROUP AS AN ADDITIONAL INSURED.  ALL OF CONTRACTOR'S INSURANCE POLICIES WILL CONTAIN A WAIVER ON THE PART OF THE INSURER, BY SUBROGATION OR OTHERWISE, OF ALL RIGHTS AGAINST THE XTO GROUP.

See Doc Nos. 83-1, ¶ 11.4 and 86-3, ¶ 11.4 (all caps in original).  The MSAs are governed by Texas law.  See ¶ 14.8

E.    **THE INSURANCE POLICIES**

Several insurance carriers participated in the defense and/or settlement of the Underlying Lawsuits, but only the policies issued by four carriers are relevant to the instant case: (1) Berkley and Commerce, who issued policies to Missouri Basin, and (2) Seneca and StarStone, who issued policies to Badlands.  The Court previously determined that XTO is an additional insured under the policies issued by Berkley, Commerce, and StarStone to Missouri Basin and Badlands.  See Doc. No. 190.  Because the Commerce policy is excess to the Berkley primary and umbrella policies and the StarStone policy is excess to the Seneca policy, certain provisions in the Berkley and Seneca policies are important to understand the coverage available under the Commerce and StarStone policies.

1.    **The Berkley Policies**

Missouri Basin was insured by Berkley through two policies.  The first Berkley policy bears Policy Number EGL001672010 and is a primary-level commercial general liability policy ("Berkley Primary Policy").  See Doc. No. 74-1.  The Berkley Primary Policy was issued to Missouri Basin, effective from April 13, 2016, to April 13, 2017, and has a $1 million per occurrence limit and aggregate limits of $2 million.  The second Berkley policy issued to Missouri Basin bears Policy Number EUL001670910 and is an umbrella policy ("Berkley Umbrella Policy,").  See Doc. No. 74-2.  The Berkley Umbrella Policy has a limit of $25 million per occurrence.  The Berkley policies provide liability coverage for damages the insured must pay because of bodily injury caused by a covered occurrence.  See Doc. No. 74-1, p. 12.

### 2. **The Commerce Policies**

Commerce provided second-layer umbrella coverage to Missouri Basin. Commerce issued Commercial Umbrella Policy No. 24238279 to Missouri Basin on April 28, 2016, with effective dates of April 13, 2016, to April 13, 2017. See Doc. No. 117-9. The Commerce policy has a $25 million limit that is secondary to both the Berkley Primary Policy and the Berkley Umbrella Policy.

### 3. **The Seneca Policy**

Seneca Specialty Insurance Company issued commercial general liability policy no. SPP 0031807 (effective January 20, 2016 to January 20, 2017), to Badlands. The Seneca policy has limits of $1 million for each occurrence and $2 million in aggregate. See Doc. No. 83-20.

### 4. **The Torus/StarStone Policy**

Torus (now known as StarStone) issued a commercial umbrella liability policy (policy no. 82068H152ALI) to Badlands with a $5 million limit. See Doc. No. 83-19, p. 2. The policy, which is secondary to the Seneca policy, was in effect from October 14, 2015, to October 14, 2016.

### F. **COVERAGE DEMANDS**

The explosion and fire at the Ryan Well occurred on June 18, 2016. The Underlying Lawsuits were commenced in May and July 2017. On January 31, 2018, Missouri Basin provided notice of one of the Underlying Lawsuits to Commerce. See Doc. No. 86-24. On February 16, 2018, Missouri Basin tendered both the Underlying Lawsuits to XTO. See Doc. No. 74-22. On May 24, 2018, Badlands tendered both the Underlying Lawsuits to XTO. See Doc. No. 86-26, pp. 67-69.

On June 29, 2018, XTO sent a letter to Berkley and Commerce demanding defense and indemnity for itself and its contractors as additional insureds in connection with the Underlying Lawsuits.  See Doc. No. 74-23.  On July 24, 2018, XTO conditionally accepted Missouri Basin's tender of defense and indemnity in the Underlying Lawsuits.  See Doc. No. 74-24.

On September 28, 2018, Berkley denied coverage to XTO.  See Doc. No. 74-25.  In doing so, Berkley stated the MSA provides that XTO's insurance must be primary; XTO assumed all responsibility for the claims in the Underlying Lawsuits; XTO released Missouri Basin, and its insurers, from any liability; XTO was not an additional insured; and the pollution exclusion precluded coverage.  Commerce denied coverage to XTO on October 5, 2018, citing the need to exhaust the Berkley policy limits, XTO was not an additional insured under the policy, and the pollution exclusion as the basis for declining coverage.  See Doc. No. 117-11.

On July 27, 2018, XTO sent demand letters to Seneca and StarStone demanding defense and indemnity for itself and its contractors in connection with the Underlying Lawsuits.  See Doc. No. 107-9.  On August 20, 2018, Seneca denied coverage based upon the pollution exclusion in its policy.  StarStone denied coverage on October 9, 2018, also based upon the pollution exclusion in its policy.  See Doc. No. 83-17.

### G.    THE INSTANT LITIGATION

Berkley initiated this lawsuit on September 28, 2018.  See Doc. No. 1.  Berkley sought a declaration that it has no obligation to defend or indemnify XTO or its contractors for the claims made in the Underlying Lawsuits.  Berkley alleges in its complaint that XTO and its contractors do not qualify as additional insureds under its policies.  See Doc. No. 54, ¶¶ 22-26.  Berkley also alleged XTO's insurance applies on a primary basis, and the pollution exclusion in the Berkley

Primary Policy precludes coverage.  See Doc. No. 54, ¶¶29 and 32.  Berkley is no longer a party to the action having settled its claims against XTO in November of 2023.  See Doc. Nos. 242 and 243.

In its counterclaim, XTO contends it is an additional insured under the policies issued by Berkley, Commerce, StarStone, and Seneca.  See Doc. No. 7, ¶¶ 54-60.  XTO further claims each of the policies provide coverage for the type of bodily injury alleged in the Underlying Lawsuits and for which insurance coverage was procured.  See Doc. No. 7, ¶ 61.  XTO brought claims for breach of contract, declaratory judgment, breach of common law duties of good faith and fair dealing, and a statutory claim for unfair claim settlement practices against Berkley and Commerce.  See Doc. No. 7, ¶¶ 68-90.  XTO seeks a declaratory judgment regarding coverage against StarStone.  See Doc. No. 7, ¶¶ 91-94.  XTO's claims against Seneca have been settled.  See Doc. No. 67.

## II.   STANDARD OF REVIEW

Summary judgment is appropriate when the evidence, viewed in a light most favorable to the non-moving party, indicates that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law.  Davison v. City of Minneapolis, 490 F.3d 648, 654 (8th Cir. 2007); see Fed. R. Civ. P. 56(a).  Summary judgment is not appropriate if there are factual disputes that may affect the outcome of the case under the applicable substantive law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  An issue of material fact is genuine if the evidence would allow a reasonable jury to return a verdict for the non-moving party.  Id.  The purpose of summary judgment is to assess the evidence and determine if a trial is genuinely necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

The Court must inquire whether the evidence presents a sufficient disagreement to require the submission of the case to a jury or whether the evidence is so one-sided that one party must

prevail as a matter of law.  Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 832 (8th Cir. 2005).  The moving party bears the responsibility of informing the court of the basis for the motion and identifying the portions of the record which demonstrate the absence of a genuine issue of material fact.  Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011).  The non-moving party may not rely merely on allegations or denials in its own pleading; rather, its response must set out specific facts showing a genuine issue for trial.  Id.; Fed. R. Civ. P. 56(c)(1).  If the record taken as a whole and viewed in a light most favorable to the non-moving party could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial and summary judgment is appropriate.  Matsushita, 475 U.S. at 587.

III.    **LEGAL DISCUSSION**

The Court will address the motions pending between XTO and Commerce and then turn to the motions pending between XTO and StarStone.

A.    **XTO and COMMERCE MOTIONS**

XTO moves for summary judgment on its breach of contract claim (Count 1) against Commerce.  Commerce moves for summary judgment on XTO's claims for common law and statutory bad faith (Counts 3 and 4).  The Court has previously determined that XTO is an additional insured under the Commerce umbrella policy and the pollution exclusion did not apply.  See Doc. No. 190.

1.      **XTO's Motion for Summary Judgment**

a.      **Breach of Contract**

It is undisputed the Commerce policy is a valid contract governed by North Dakota law.  See Doc. No. 288-1, p. 22.  In the wake of the Court's prior ruling that XTO is entitled to coverage as an additional insured, XTO seeks summary judgment on its breach of contract claim and Commerce's remaining affirmative defenses.  Commerce resists the motion contending several conditions precedent preclude the grant of summary judgment including XTO's failure to exhaust all other insurance coverage, failure to allocate the settlement amounts between covered claims and non-claims, and the amount of the settlement was unreasonable.

i.      **North Dakota Insurance Law**

As the parties agree the Commerce policy is governed by North Dakota law, the Court begins with a review of some basic principles of North Dakota insurance law.  Determining the legal effect of an insurance contract, including whether any ambiguity exists, is generally a question of law for a court to decide.  Sellie v. N. D. Ins. Guar. Ass'n, 494 N.W.2d 151, 156 (N.D. 1992).  "Ambiguity exists when good arguments can be made for either of two contrary positions as to the meaning of the term in the document."  Id.

> A term in an insurance policy should be construed to mean what a reasonable person in the position of the insured would think it meant.  Limitations or exclusions from broad coverage must be clear and explicit.  When the language of an insurance policy is clear and explicit, the language should not be strained in order to impose liability on the insurer.  However, any ambiguity or reasonable doubt as to the meaning of an insurance policy is strictly construed against the insurer and in favor of the insured.  If the language in an insurance contract will support an interpretation which will impose liability on the insurer and one which will not, the former interpretation will be adopted.  Exclusions from broad coverage in an insurance policy are strictly construed against the insurer.  An exception to an exclusion from broad coverage results in coverage.

13

Fisher v. Am. Fam. Mut. Ins. Co., 579 N.W.2d 599, 602 (N.D. 1998) (internal citations and quotations omitted).  The insured bears the burden of demonstrating coverage exists while the insurer bears the burden of establishing the applicability of exclusions.  Forsman v. Blues, Brews & Bar-B-Ques, Inc., 903 N.W.2d 524, 531 (N.D. 2017).  The insured bears the burden of demonstrating he falls within an exception to an exclusion in order to benefit from coverage. Nationwide Mut. Ins. Companies v. Lagodinski, 683 N.W.2d 903, 907 (N.D. 2007).

> An insurer's duty to defend is broader than its duty to indemnify and is determined by the injured claimant's allegations.  An insurer's duty to defend and duty to indemnify its insured are two separate and distinct contractual obligations, and are determined by applying different standards.  Regarding the duty to defend, an insurer does not have a duty to defend unless there is a possibility of coverage contained in the allegations of the claimant's complaint.
>
> When several claims are made against the insured in the underlying action, the insurer has a duty to defend the entire lawsuit if there is potential liability or a possibility of coverage for any one of the claims.  Any doubt about whether a duty to defend exists must be resolved in favor of the insured.  Even when an insurer has rightfully denied coverage, the insurer's duty may be revived by the insured's new allegations that possibly bring the claim within the scope of the policy's provisions. While the duty to defend focuses on the complaint's allegations, the duty to indemnify generally is determined by the actual result in the underlying action.

Forsman v. Blues, Brews & Bar-B-Ques, Inc., 903 N.W.2d 524, 535-36 (N.D. 2017) (internal citations and quotations omitted).  "An insurer has a duty to act fairly and in good faith in dealing with its insured, including a duty of fair dealing in paying claims, providing defenses to claims, negotiating settlements, and fulfilling all other contractual obligations."  Hartman v. Est. of Miller, 656 N.W.2d 676, 680 (N.D. 2003).  Where a claim may potentially come within the scope of the policy and the insurer does not avail itself of its right to seek an immediate declaratory judgment to determine coverage, "the insurance company's refusal to defend at the outset of the controversy  is a decision it makes at its own peril."  Tibert v. Nodak Mut. Ins. Co.,  816 N.W.2d 31, 44-45 (N.D. 2012).  "Only if there is no possibility of coverage is the insurer relieved of its duty to defend."  Id.

at 43.  "Any doubt about whether a duty to defend exists must be resolved in favor of the insured."

Id. at 42.  "An insurer which denies coverage, refuses to defend, and abandons its insured leaves the

entire control and conduct of the litigation with its insured and forfeits its right to prior notice of the

settlement."  D.E.M. v. Allickson, 555 N.W.2d 596, 602 (N.D. 1996).


### ii.    **Waiver**

XTO contends Commerce failed to plead allocation and the reasonableness of the settlement

amount as affirmative defenses and thus has waived them.  Commerce maintains allocation and

reasonableness of the settlement amount are conditions precedent rather than affirmative defenses

that need not be pled.

Rule 8 of the Federal Rules of Civil Procedure requires affirmative defenses to be pled and

the failure to do constitutes a waiver.  Crutcher v. MultiPlan, Inc., 22 F.4th 756, 765 (8th Cir. 2022);

see also Leet v. City of Minot, 721 N.W.2d 398, 402 (N.D. 2006).  However, if an "affirmative

defense is raised in the trial court in a manner that does not result in unfair surprise, technical failure

to comply with Rule 8(c) is not fatal."  Crutcher, 22 F.4th at 766.  The Court has carefully reviewed

Commerce's Amended Answer (Doc. No. 55) and agrees with Commerce that its amended answer

is sufficient to preserve the issues.  In its amended answer, Commerce cites the contractual liability

exclusion and the voluntary payment provision in its policy as affirmative defenses.  See Doc. No.

55, ¶¶ 52 and 55.  The concepts are closely related to allocation and the reasonableness of the

settlement amount.  So it should come as no surprise to XTO that Commerce would raise the issues

on summary judgment.  XTO does not contend and has not shown any prejudice from the alleged

pleading deficiency.  Nor has XTO cited any case law from North Dakota or the Eighth Circuit

Court of Appeals to support its contention that allocation and the reasonableness of the settlement

amount have not been adequately pled.  The Court concludes as a matter of law that these issues have not been waived.

### iii.    Exhaustion of other Coverage

Commerce contends XTO must exhaust the Berkley policies before seeking coverage from Commerce as a second layer excess carrier.  Berkley and XTO settled in November of 2023, after the briefing was completed on the XTO's motion summary judgment as to Commerce.  The parties did not request leave to submit additional briefing after XTO and Berkley settled.  The total amount of the settlement for the Underlying Lawsuits was $123,550,000.  XTO contributed $96,550,000 toward the settlement while several insurers, other than Berkley and Commerce, contributed $27,000,000.  XTO contributed far more than the $26,000,000 in available coverage under the Berkley policies.  Indeed, XTO paid far more than the combined limits ($51,000,000) of both the Berkley and Commerce policies.  Thus, Commerce's exhaustion argument fails in light of the settlement between Berkley and XTO.  See Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1454 (3d Cir. 1996) (applying the widely-followed rule that "settlement with the primary insurer functionally "exhausts" primary coverage and therefore triggers the excess policy"); Archer Daniels Midland v. Aon Risk Servs., Inc. of Minn., No. CIV.97-2185, 1999 WL 34818933, at *5 (D. Minn. Feb. 25, 1999) (applying the same rule under Minnesota law).  The Court concludes as a matter of law that XTO has exhausted all available coverage and the Commerce policy has been triggered.

### iv.    Reasonableness of the Settlement Amount

The Court has already determined that XTO is covered by the Commerce policy.  Commerce argues that XTO has failed to demonstrate the amount of the settlement is reasonable.

16

Notably, Commerce has made no attempt to explain why it believes the settlement amount is not reasonable. XTO contends the burden is on Commerce to show the amount of the settlement was unreasonable and there is a presumption of reasonableness because Commerce denied coverage, refused to participate in the settlement negotiations, and wholly abandoned XTO. Three issues present themselves. First, what test is to be applied to judge the reasonableness of the settlement. Second, is the burden of proof on the insured or the insurer. Lastly, is the settlement amount presumptively reasonable.

In this case, the insurer (Commerce) denied coverage, abandoned the insured (XTO), and refused to participate in the two-day mediation with a private mediator which produced the settlement despite having a representative observing the proceedings. The North Dakota Supreme Court has not directly addressed the issues presented in this case regarding the reasonableness of the settlement.

Commerce contends North Dakota would apply the same test for reasonableness and place the burden on the insured in this case that it applies when deciding whether a *Miller-Shugart* settlement is reasonable. The test for reasonableness of a *Miller-Shugart* settlement is whether a reasonable and prudent person in the insured's shoes would have accepted the settlement. Allickson, 555 N.W.2d at 603; Fisher v. Am. Family Mut. Ins., Co., 579 N.W.2d 599, 607 (N.D. 1998). In a *Miller-Shugart* settlement the burden is on the insured to show the settlement is reasonable. Allickson, 555 N.W.2d at 602-03. The question is one of fact to be decided by the trial judge but is not conducted by holding the very trial the settlement obviated. Id. at 602-03.

However, it is undisputed that the settlement in this case was not a *Miller-Shugart* type settlement. In a *Miller-Shugart* settlement a stipulated judgment entered against the insured that is only collectible against the insurer, and the insured is not exposed to any personal liability. The

reason the burden is on the insured to show a *Miller-Shugart* settlement is reasonable is that in a *Miller-Shugart* settlement the insured "would have been quite willing to agree to anything as long as the plaintiff promised them full immunity." Miller v. Shugart, 316 N.W.2d 729, 735 (Minn. 1982). The insured takes a "passive, disinterested role" in a *Miller-Shugart* settlement. Id. at 735. Such a settlement cannot be considered the product of an adversarial process and, as a result, the burden is on the insured to demonstrate the settlement is reasonable.

The *Miller-Shugart* line of cases Commerce relies upon are inapposite. The amount of the settlement in this case ($123,550,000) far exceeded the amount of all available coverage ($78,000,000). XTO's exposure, even if it collected all available insurance would be $45,550,000. With Berkley and Commerce denying coverage and refusing to participate in any way, XTO paid $96,550,000 out of its own pocket to settle the cases, albeit with the hope of recovering $26,000,000 in coverage from Berkley and $25,000,000 from Commerce. Since XTO took a very active role in the settlement of the Underlying Lawsuits, and the amount of the settlement was well in excess to the total available insurance, the *Miller-Shugart* rationale for placing the burden of proof on the insured fails. XTO was certainly not disinterested in the outcome of the settlement having exposed itself to a minimum of $45,550,000 in liability. The mediation was adversarial. Consequently, the Court finds Commerce's contention that the North Dakota Supreme Court would follow this line of reasoning unpersuasive.

Rather, the Court predicts the North Dakota Supreme Court would follow the lead of the Minnesota Supreme Court in *Butler Bros. v. Am. Fid. Co.*, 139 N.W. 355, 355 (Minn. 1913). In *Butler*, the insured entered into a settlement of a wrongful death action after being abandoned by the insurer which denied coverage and refused to provide a defense. Id. at 163. After paying for its own defense and the amount of the settlement, the insured filed a lawsuit against the insurer for breach

of contract.  Id.  The Minnesota Supreme Court held that when an insurer abandons the insured and the insured settles the case before trial, the settlement is presumptively reasonable and the burden is on the insurer to prove the amount of the settlement was unreasonable.  Id. at 359.  The Minnesota Supreme Court reasoned that to require otherwise would require the insured to "establish his own negligence" and this would incentivize trial rather than settlement which is against public policy. Id. at 360.  A contrary rule "does not appeal to our idea of equity or law" said the court.  Id. Tellingly, the Minnesota Supreme Court distinguished *Butler* in its seminal opinion in *Miller v. Shugart*, 316 N.W.2d at 735 noting the insurer in *Butler* had abandoned the insured.

The *Butler* case is in keeping with the public policy in North Dakota to "encourage settlements and to discourage litigation."  Nelson v. Johnson, 599 N.W.2d 246, 251 (N.D. 1999). It is also in keeping with the admonition of the North Dakota Supreme Court that "the insurance company's refusal to defend at the outset of the controversy is a decision it makes at its own peril." Tibert,  816 N.W.2d at 44-45.  Further, "an insurer has a duty to act fairly and in good faith in dealing with its insured."  Hartman v. Estate of Miller, 656 N.W.2d 676, 679 (N.D. 2003).  The Court finds *Butler* persuasive and predicts the North Dakota Supreme Court would follow it.

Other jurisdictions have followed a similar line of reasoning.  See HM Int'l, L.L.C. v. Twin City Fire Ins. Co., 13 F.4th 356, 361 (5th Cir. 2021) (noting "insurers that breach their duty to defend cannot challenge the reasonableness of the settlement amount" and the possibility of being liable for a settlement if the insurer does not ultimately cover it is an adequate incentive to make a fair settlement); Draggin' Y Cattle Co., Inc. v. Junkermier, Clark, Campanella, Stevens, P.C., 439 P.3d 935, 940–41 (Mont. 2019) (noting that when an insurer abandons its insured a pretrial "stipulated settlement is presumed reasonable and the burden is on the insurer to rebut that presumption"); Truck Ins. Exch. v. Vanport Homes, Inc., 58 P.3d 276, 284 (Wash. 2002) (holding

19

that when an insurer wrongfully fails to defend a subsequent settlement is presumptively reasonable and the burden is on the insurer to show otherwise because to hold otherwise would incentivize an insurer to breach its policy and discourage settlement); U.S. Auto. Ass'n v. Hartford Ins. Co., 468 So. 2d 545, 547 (Fla. Dist. Ct. App. 1985) (reciting the "general rule is that if an insurance company refuses to assume its contractual obligation and defend its insured, then it cannot challenge the reasonableness of a settlement made with the injured party" absent a showing of bad faith, collusion, or fraud).

Commerce has submitted no evidence and does not meaningfully contend, that the settlement amount, which the law presumes to be reasonable under the circumstances, was unreasonable.  The Court concludes that the facts in the record establish, as a matter of law, that the amount of the settlement was reasonable.  The Court agrees with XTO that the settlement amount was reasonable given the nature of the horrific burn injuries suffered by the two lead plaintiffs and the death of a third plaintiff.  In addition, Commerce was present at the mediation but refused to participate and made no contemporaneous objection to the amount of the settlement.  XTO settled the Underlying Lawsuits knowing the settlement amount far exceeded the available insurance limits even if it was successful in a coverage action.  See HM Int'l, L.L.C. v. Twin City Fire Ins. Co., 13 F.4th 356, 361 (5th Cir. 2021) (noting the possibility of being liable for a settlement if the insurer does not ultimately cover it is an adequate incentive to make a fair settlement).  "A judgment rendered upon a stipulation of settlement should be held to be presumptive evidence of the liability of the insured and the amount thereof."  Butler, 139 N.W.2d at 359.  Whether a reasonable and prudent person  in the defendant's position would have approved the settlement is a question "best understood and weighed by a trial judge."  Alton M. Johnson Co. v. M.A.I. Co., 463 N.W.2d 277, 279 (Minn. 1990).

Commerce's contention that it was a simple excess carrier with no duty to defend such that

the settlement amount cannot be presumptively reasonable against it is not entirely accurate and certainly not persuasive.  The Court has already determined that XTO was covered by the Commerce policy.  It is true the Commerce policy is excess to the Berkley policies.  However, the Commerce policy provides Commerce "will have the right and duty to defend any Suit against the Insured."  See Doc. No. 117-9, p. 6, ¶ III(A).  That duty arose when the amount of the settlement exceeded the Berkley policy limits during the two-day mediation which settled the Underlying Lawsuits.  Having abandoned its insured, Commerce must bear the consequences of its actions which result in a presumption of reasonableness attaching to the settlement amount.

The settlement amount was far in excess of the available insurance coverage resulting in significant exposure to XTO and thus negating any possible contention of collusion or bad faith.  There is no suggestion in the record that XTO did not act in good faith in the settlement of the Underlying Lawsuits which involved the death of one worker and two workers who suffered horrific burn injuries necessitating long stays in a burn unit.  Another worker suffered less severe burn injuries and a fifth worker suffered emotional distress and post-traumatic stress disorder.  There were also claims for loss of consortium.  The risk of going to trial cannot be understated.  The multiple insurance carriers and their representatives that did participate in the mediation session approved the settlement amount.  There is no evidence in the record to suggest the settlement amount was unreasonable.  Nor is there any evidence of collusion or bad faith.  The settlement was the result of an adversarial process in which Commerce chose not to participate.  On this record, which is devoid of any suggestion of fraud or collusion, the Court concludes as a matter of law that the amount of the settlement was reasonable.

### v.        **Allocation and the Contractual Liability Exclusion**

Commerce also argues that XTO has failed to allocate the settlement between covered and uncovered claims and thus XTO is not entitled to summary judgment on its breach of contract claim. XTO maintains the burden is on Commerce to allocate the settlement amount because Commerce refused to participate in the mediation despite its representative being present and made no request for allocation of the settlement amount at the time of the mediation.

It is clear and undisputed that North Dakota law applies to the Commerce policy. Neither party has cited any North Dakota case law which addresses the allocation issue and the Court has not been able to locate any North Dakota case law directly on point. In the absence of controlling law, the Court's obligation is to predict how the North Dakota Supreme Court would decide the issue. Bockelman v. MCI Worldcom, Inc., 403 F.3d 528, 531 (8th Cir. 2005). Both parties cite cases that apply Minnesota law and correctly point out that North Dakota often looks to Minnesota law when construing insurance contracts and settlement agreements. See Brock v. Jim Hipner, LLC, No. 4:15-cv-84, 2017 WL 384285, at *11 (D.N.D. Jan. 25, 2017). The Court agrees with the parties that North Dakota would likely look to Minnesota law for guidance on the allocation issue.

It is undisputed the Commerce policy only applies to covered claims. Thus, the contractual liability exclusion has no application because XTO does not seek insurance coverage for obligations it assumed in a contract, but rather for direct claims of tort liability brought against it. See Borsheim Builders Supply, Inc. v. Manger Ins., Inc., 917 N.W.2d 504, 512 (N.D. 2018) (analyzing identical contractual liability exclusion and holding that the exclusion did not apply because the claims against the additional insured were direct claims of tort liability); Doc No. 190, p. 36. The primary issue is who bears the burden on the issue of allocation.

This case presents the situation where an excess insurer (Commerce) denied coverage,

22

abandoned the insured, and refused to participate in a mediation which resulted in a settlement involving multiple plaintiffs and defendants. The amount of the settlement ($123,550,000) was well in excess of the total possible amount of insurance coverage ($78,000,000). The insured (XTO) contributed $96,550,000 with several other insurers supplying the balance. XTO and the primary insurer (Berkley) settled in November of 2023 for an undisclosed amount. Despite having attended the mediation and being aware of the terms of the settlement, Commerce never requested or suggested an allocation of the settlement amount would be necessary or appropriate. Under these circumstances, should XTO bear the burden of allocating the settlement between covered and non-covered claims or should that burden fall on Commerce? The Court concludes Commerce should not be permitted to profit from its failure to satisfy its minimal duty of requesting allocation.

Under Minnesota law, the insured generally has the burden of proving allocation of damages between covered and non-covered claims by a preponderance of the evidence, but that burden may shift to the insurer if certain conditions are met. Remodeling Dimensions, Inc. v. Integrity Mut. Ins. Co., 819 N.W.2d 602, 618 (Minn. 2012); RSUI Indem. Co. v. New Horizon Kids Quest, Inc., No. CV 16-28, 2021 WL 1224096, at *8 (D. Minn. Apr. 1, 2021).

In *Remodeling*, the insurer accepted the defense of a claim under a reservation of rights and represented the insured in an arbitration proceeding. Remodeling, 819 N.W.2d at 609. The arbitration award was not allocated between covered and non-covered claims and the insurer refused to indemnify the insured. Id. The insured paid the arbitration award and sued its insurer for breach of contract. Id. One issue on appeal was who bore the burden as to allocation. The Minnesota Supreme Court noted that when the insurer controls the defense it has a duty to inform the insured of its interest in an allocated award. Id. at 617. The duty is conditioned on the insured being able to demonstrate that allocation was available, the insurer had the opportunity to request allocation,

and the insured was prejudiced by the lack of notice in that the insurer lost the opportunity to request allocation.  Id.  When the insurer fails to provide such notice, "the burden shifts to the insurer to prove by a preponderance of the evidence that some part of the award is attributable to a noncovered claim."  Id. at 618.  The Minnesota Supreme Court explained that its decision to impose such a duty was based on principles of estoppel which prohibit prejudice to the insured caused by the insurer's conduct and the insurer's duty to act in good faith toward its insured.  Id.  The Minnesota Supreme Court also noted the duty was not onerous.

Notably, North Dakota also imposes a duty of good faith on insurers and looks to equitable principles in allocating coverage between multiple policies.  See Hartman v. Estate of Miller, 656 N.W.2d 676, 679 (N.D. 2003) ("An insurer has a duty to act fairly and in good faith in dealing with its insured."); Houser v. Gilbert, 389 N.W.2d 626, 630 (N.D. 1986) ("noting that when there are multiple coverages, the policies should be construed equitably in light of the particular facts of the case).  While Remodeling involved an unallocated arbitration award, the Eighth Circuit Court of Appeals has noted the analysis in Remodeling also applies to unallocated jury awards and unallocated settlements and to primary as well as excess insurance carriers.  RSUI Indem. Co. v. New Horizon Kids Quest, Inc. (RSUI Indemnity I), 933 F.3d 960 (8th Cir.2019) (remanding to the district court to determine whether the insured or insurer bore the burden on allocation).

On remand from the Eighth Circuit (RSUI Indemnity I) to determine in the first instance whether the insured or the insurer bore the burden on allocation of the jury award, the district court concluded the burden would be on the insurer.  RSUI Indem. Co. v. New Horizon Kids Quest, Inc. (RSUI Indemnity II), No. 16-CV-00028, 2021 WL 1224096, at *8 (D. Minn. Apr. 1, 2021).  The district court found the insurer, an excess carrier, had a duty to notify the insured of its desire for allocation because the insurer owed the insured a duty of good faith, the insurer knew its policy,

24

notification prevents prejudice, and the duty is not onerous.  Id.  The district court further explained that allocation was permissible under the Minnesota Rules of Civil Procedure, the insurer had the opportunity to request allocation, and the insured was prejudiced because it was unable to request allocation from the jury.  Id. at 9.

In this case, all of the relevant factors favor shifting the allocation burden from XTO to Commerce.  First, the case law from Minnesota and the Eighth Circuit Court of Appeals  make it clear that Commerce, as an excess insurer, had a duty to notify XTO of its interest in having the settlement award allocated between covered and non-covered claims.  See RSUI I, 933 F.3d at 966 (recognizing that *Remodeling's* allocation analysis applies to excess carriers who do not control the defense); RSUI II, 2021 WL 1224096, at *8-9 (applying the *Remodeling* analysis to an excess carrier).  Second, no rules prevented allocation of the mediated settlement.  Third, it is undisputed that Commerce did not request allocation despite being aware of the Underlying Lawsuits. Commerce had ample opportunity prior to the mediation to request allocation.  Commerce representatives attended the mediation and could have requested allocation at that time as well but failed to do so.  To make such a request would not have been difficult and Commerce offers no rationale for why it did not do so.  See Remodeling, 819 N.W.2d at 619 ("the duty to notify is not onerous").  Fourth, XTO was unaware of Commerce's desire for allocation at the time of the October 2018 mediation.  A *post hoc* allocation of the settlement award will be exceedingly difficult so long after the fact as the settlement involved numerous claims and multiple parties.  XTO is clearly prejudiced by Commerce's untimely demand for allocation.  The Court concludes as a matter of law that all of the all the *Remodeling* conditions have been satisfied and the burden of proof on allocation has shifted from XTO to Commerce.  Commerce has not presented any evidence on the issue of allocation in response to XTO's motion for summary judgment and it would be nearly

impossible for them to do so in the absence of any record of the proceedings.  Because Commerce failed to make a timely request for allocation and has failed to present any evidence whatsoever on the issue in response to XTO's motion for summary judgment, the Court concludes as a matter of law that XTO is entitled to summary judgment.

### b.   Commerce's Other Affirmative Defenses

XTO also seeks summary judgment on Commerce's remaining affirmative defenses including the contractual liability exclusion, exhaustion, consent and voluntary payment, and expected or intended injury.  Most of these affirmative defenses have been addressed in the discussion above concerning XTO's motion for summary judgment on its breach of contract claim except for the expected or intended injury defense which Commerce has abandoned.  See Doc. No. 288-1, p. 43, n. 14.  The contractual liability exclusion does not apply because, as the Court has previously determined, XTO only seeks coverage for its own direct liability and Commerce did not deny coverage on this basis.  See Doc. No. 190, p. 36; D.E.M. v. Allickson, 555 N.W.2d 596, 599 (N.D. 1996) (explaining that an insurer which denies coverage on one ground may not later attempt to deny coverage on different grounds).  Commerce has failed to make any meaningful argument regarding its voluntary payment affirmative defense which fails in light of Commerce's abandonment of XTO and refusal to participate in the mediation which lead to settlement.  See Milbank Mut. Ins. Co., v. Wentz, 352 F.2d 592, 600 (8th Cir. 1965) (applying North Dakota law and concluding when an insurer refuses to defend, the insured may make a good faith settlement without losing the right to recover under the policy).  Thus, XTO is entitled to summary judgment on all of Commerce's remaining affirmative defenses.

**2.**   **Commerce's Motion for Summary Judgment**

Commerce moves for summary judgment on Counts Three and Four of XTO's third-party complaint.  Count Three is XTO's claim for breach of the common law duty of good faith and fair dealing as it relates to XTO's claim for coverage under the Commerce umbrella policy.  Count Four is XTO's statutory claim for unfair settlement practices in violation of N.D.C.C. § 26.1-04-03(9).

**a.**   **Good Faith and Fair Dealing**

XTO alleges that Commerce breached the covenant of good faith and fair dealing by failing to investigate XTO's claim, denying XTO's claim without a reasonable basis, and failing to participate in the settlement of the Underlying Lawsuits despite the fact that the claims were clearly covered by the policies.  See Doc. No. 7, ¶¶ 83 and 84.  Commerce maintains it had no duty to participate in settlement negotiations and its denial of coverage was fairly debatable.

Commerce also contends XTO has no expert testimony to support its claim.  However, it is well-established that an insured is not required to offer expert testimony to establish bad faith in the handling of an insurance claim.  See 17A Couch on Insurance § 252:25 (noting "expert testimony is not generally required to establish bad faith or other improper handling of a claims"); see also DeChant v. Monarch Life Ins. Co., 200 Wis. 2d 559, 578-79 (Wis. 1996) (holding the insured was not required to introduce expert testimony to establish a bad faith claim).

"An insurer has a duty to act fairly and in good faith in its contractual relationship with its policyholders."  Fetch v. Quam, 623 N.W.2d 357, 361 (N.D. 2001).  The duty to defend requires an insurer to defend an action against its insured "if the allegations in the complaint give rise to potential liability or a possibility of coverage under the insurance policy."  Schultze v. Cont'l Ins. Co., 619 N.W.2d 510, 513 (N.D. 2000).  "The gravamen of the test for bad faith is whether the

insurer acts unreasonably in handling an insured's claim." Fetch, 623 N.W.2d at 361. "Ordinarily, an insurer has a duty to defend an underlying action against its insured if the allegations in the complaint give rise to potential liability or a possibility of coverage under the insurance policy." Id. at 362. An insurer "acts unreasonably by failing to compensate the insured for a loss covered by the policy, unless the insurer has a proper cause for refusing payment." Id. "[A]s a matter of law, an insurance company is not guilty of bad faith for denying a claim when the claim is fairly debatable or if there is a reasonable basis for denying the claim or delaying payment." Id. at 364. Whether an insurer acts in bad faith is ordinarily a question of fact. Hartman v. Estate of Miller, 656 N.W.2d 676, 681 (N.D. 2003). The insurer is presumed to know the law. Id. The failure to resolve coverage issues through a declaratory judgment action and requiring the insured to bring an action to resolve coverage issues may be evidence of bad faith. Id. at 683.

In this case, the Court has determined that XTO is an additional insured under the Commerce umbrella policy, coverage exists, and Commerce has breached the contract. The incident occurred on June 18, 2016. The Underlying Lawsuits were filed in May and July of 2017. Missouri Basin, which was insured by Commerce, tendered the Underlying Lawsuits to XTO on February 16, 2018. XTO learned of the Commerce policy on June 4, 2018. XTO demanded coverage from Commerce as an additional insured on June 29, 2018. Commerce denied coverage on October 5, 2018, based upon the pollution exclusion. The mediation which resulted in the settlement of the Underlying Lawsuits was held on October 12-13, 2018. Berkley filed the instant lawsuit on September 28, 2018. The Court found XTO was an additional insured under the Commerce policy and the pollution exclusion did not apply due to the application of the time element exception in August of 2021. Berkley settled its dispute with XTO in November of 2023.

The Court has carefully reviewed the entire record and agrees with Commerce that there is

not sufficient evidence of bad faith for this claim to go forward.  Commerce was a second-layer excess carrier and the primary carrier (Berkley) also denied coverage based upon the pollution exclusion.  Commerce's reliance on the pollution exclusion to deny coverage was not unreasonable under the circumstances and whether the pollution exclusion applied was fairly debatable.  In summary, there is not sufficient evidence to support a claim of bad faith or lack of fair dealing in the handling of the claim.

**b.**   **N.D.C.C. § 26.1-04-03(9)**

In Count Four of its third-party complaint, XTO alleges a statutory claim for unfair claim settlement practices in violation Section 26.1-04-03(9) of the North Dakota Century Code.  Commerce contends the Court should grant it summary judgment dismissing Count Four because Commerce was not "without just cause" in denying coverage to XTO, and XTO has failed to allege, much less show, that Commerce engaged in any prohibited conduct "with a frequency indicating a general business practice."  Commerce also contends there is no private right of action under N.D.C.C. § 26.1-04-03(9).

To state a statutory claim for unfair claim settlement practices, XTO must show that Commerce acted "without just cause" and "with a frequency indicating a general business practice." N.D.C.C. § 26.1-04-03(9).  "Section 26.1-04-03(9) specifically requires that the proscribed acts be 'performed with a frequency indicating a general business practice' to constitute an unfair claim settlement practice." Volk v. Wis. Mortg. Assur. Co., 508 N.W.2d 40, 45 (N.D. 1991).  "[A] single alleged act of misconduct [does] not constitute an actionable claim" under Section 26.1-04-03(9). Estvold Oilfield Servs., Inc. v. Hanover Ins. Co., No. 1:17-cv-016, 2018 WL 1996453, at *5 (D.N.D. Apr. 27, 2018).

XTO has alleged only that Commerce violated Section 26.1-04-03(9) in connection with the claim at issue.  See Doc. 7 at ¶ 88.  XTO has not alleged any other prohibited conduct or that any such prohibited conduct occurred "with a frequency indicating a general business practice."  See Doc. 7 at ¶ 88.  Nor has XTO produced any evidence in response to Commerce's motion for summary judgment demonstrating multiple instances of misconduct by Commerce which would constitute a "general business practice."  Because a "single alleged act of misconduct" is insufficient to state a claim for a violation of Section 26.1-04-03(9), summary judgment in favor of Commerce as to Count Four of XTO's third-party complaint is warranted.  Having determined XTO's claim under Section 26.1-04-03(9) fails as a matter of law, the Court need not decide whether a private right of action exists under Section 26.1-04-03(9).  See Volk, 508 N.W.2d at 45.

### B.   XTO and STARSTONE MOTIONS

The Court now turns to the motions pending between XTO and StarStone.  Starstone contributed its policy limits ($5,000,000) to the settlement under a reservation of rights and now seeks a declaration of non-coverage despite the Court's prior finding that XTO is an additional insured under the StarStone policy.  The named insured on the StarStone umbrella policy is Badlands.  See Doc No. 83-19, p. 2.  The StarStone umbrella policy is secondary to the Seneca policy, which had a $1,000,000 policy limit.  The claims between XTO and Seneca, which contributed its $1,000,000 policy limits to the settlement, have been settled.  It is undisputed that the StarStone and Seneca policies are governed by Montana law.

The Court previously determined, in an amended order dated August 25, 2021, that XTO is an additional insured under the Seneca and StarStone policies; Texas Oilfield Anti-Indemnity Act does not limit the coverage available to XTO under the StarStone policy; the Starstone and Seneca

pollution exclusions did not preclude coverage; and XTO is entitled to full coverage under the StarStone policy. See Doc. No. 190. Insofar as StarStone contends XTO is not an additional insured under the StarStone policy, the Court declines the invitation to revisit the issue. The time for any motion to reconsider has long since past and any arguments that could have been raised in opposition to the motions ruled upon in the Court's prior order are deemed waived. The Court reiterates that "XTO's liability in the Underlying Lawsuits was caused, at least in part, by the actions of Badland's employees" and "[t]he Court concludes as a matter of law that XTO is an additional insured under the Seneca and StarStone policies." See Doc. No. 190, p. 43.

Because it is undisputed that Montana law applies to the Seneca and StarStone policies, the Court will start with some basic principles of Montana insurance law. Under Montana law, the language of the policy governs if it is clear and explicit. Duensing v. Traveler's Cos., 849 P.2d 203, 206 (Mont. 1993). The policy must be read as a whole. Farmers All. Mut. Ins. Co. v. Holeman, 961 P.2d 114, 119 (Mont. 1998). "Any ambiguity in an insurance policy must be construed in favor of the insured and in favor of extending coverage." Travelers Cas. & Sur. v. Ribi Immunochem Rsch., 108 P.3d 469, 474 (Mont. 2005) Ambiguity exists when the policy, taken as a whole, is reasonably subject to two different interpretations. Id.

It is the insurer's burden to prove that an exclusion in its policy precludes coverage. Id. at 476. The insured bears the burden of proving that an exception to an exclusion applies. Id. "Exclusions must be narrowly and strictly construed because they are 'contrary to the fundamental protective purpose of an insurance policy.'" Newman v. Scottsdale Ins. Co., 301 P.3d 348, 355 (Mont. 2013) (quoting Farmers Union Mut. Ins. Co. v. Oakland, 825 P.2d 554, 556 (Mont. 1992)). Because exclusions are contrary to the fundamental purpose of the policy, they are frequently subject to challenge for ambiguity or inconsistency. Id.

"The duty to defend arises when a complaint against an insured alleges facts which, if proved, would result in coverage." Tidyman's Mgmt. Servs. Inc. v. Davis, 330 P.3d 1139, 1149 (Mont. 2014). The duty to defend is "independent from and broader than the duty to indemnify created by the same insurance contract." Id. "Unless there exists an unequivocal demonstration that the claim against an insured does not fall within the insurance policy's coverage, an insurer has a duty to defend." Id. "Where an insurer refuses to defend its insured, it does so at its peril." Id. "An insurer who breaches the duty to defend is liable for the full amount of the judgment, including amounts in excess of policy limits." Id. When an insurer denies coverage on one ground it waives all other grounds. See Newman, 301 P.3d at 360.

### 1.    **EXHAUSTION**

StarStone contends that XTO has failed to establish that the StarStone policy's insuring agreement provides coverage to XTO for the Underlying Lawsuits because XTO has not shown that the settlement amount exceeds the amount of the retained limit. XTO maintains the settlement amount far exceeds retained limit. StarStone's contention is unpersuasive.

The StarStone policy provides that StarStone "will pay on behalf of the Insured the ultimate net loss in excess of the retained limit which the insured becomes legally obligated to pay." See Doc. No. 83-19, p. 4. The retained limit is defined as the "total applicable limits of underlying insurance and any applicable other insurance providing coverage to the insured." See Doc. No. 83-19, p. 26. It is undisputed that StarStone's policy limits of $5,000,000 are secondary to the Seneca $1,000,000 policy limit.

StarStone contends that under the definition of retained limit, XTO is required to exhaust not only the Seneca Policy, but all other insurance policies available to XTO before the StarStone policy

is obligated to respond.  The contention is unpersuasive.  The MSA between XTO and Badlands (StarStone's named insured) provides that all of the insurance provided by Badlands would be "primary to, and receive no contribution from, any other insurance or self-insurance programs maintained by or on behalf of or benefitting XTO."  See Doc. No. 112-6, pp. 9-10, ¶ 11.4.  Therefore, the only insurance policy that needs to be exhausted to trigger coverage is the Seneca policy.  However, even if StarStone is correct, that XTO was required to exhaust all "other insurance" before the StarStone Policy is triggered, such exhaustion occurred.

The claims between XTO and Seneca have been settled.  The total amount of the settlement for the Underlying Lawsuits was $123,550,000.  See Doc. Bos. 288-10, 288-11, 288-12, 288-13, 288-14, and 288-15.  XTO contributed $96,550,000 toward the settlement while several insurers, other than Berkley and Commerce, contributed $27,000,000.  This $27,000,000 included $1,000,00 from Seneca and $5,000,000 from StarStone, who made their contributions under a reservation of rights.  XTO contributed far more than the $1,000,000 in available coverage under the Seneca policy.  Indeed, XTO paid far more than the combined limits ($78,000,000) of all the available insurance from Berkley, Commerce, Seneca, StarStone and others.

In addition, StarStone's exhaustion argument fails in light of the settlement between Seneca and XTO.  See Koppers Co. v. Aetna Cas. & Sur. Co., 98 F.3d 1440, 1454 (3d Cir. 1996) (applying the widely-followed rule that "settlement with the primary insurer functionally 'exhausts' primary coverage and therefore triggers the excess policy"); Archer Daniels Midland v. Aon Risk Servs., Inc. of Minn., No. CIV.97-2185, 1999 WL 34818933, at *5 (D. Minn. Feb. 25, 1999) (applying the same rule under Minnesota law).  Berkley and XTO have also settled and the Court has ruled in favor of XTO on its claims against Commerce.  The settlement amount of $123,550,000 far exceeds the retained limit, which is the $1 million Seneca Policy and $77 million in available "other insurance"

33

available in the case.  The Court concludes as a matter of law that XTO has exhausted all available coverage and the StarStone policy has been triggered.

## 2.    THE CONTRACTUAL LIABILITY EXCLUSION

StarStone contends that the contractual liability exclusions in the Seneca and StarStone policies bar coverage for XTO because its liability was assumed by contract from Badlands in the Master Service Agreement.  Notably, StarStone did not cite the contractual liability exclusion in its denial of coverage letter.  See Newman, 301 P.3d at 360 (noting that when an insurer denies coverage on one ground it waives all other grounds); See Doc. No. 83-17.  XTO maintains the contractual liability exclusion does not apply because XTO is seeking coverage for its own direct liability, which is clearly covered by the StarStone policy.  The Court agrees with XTO.

The contractual liability exclusion in the StarStone Policy provides as follows: "This insurance does not apply to any liability, damage, loss, cost or expense; For which any insured assumed liability under a contract or agreement."  See Doc. No. 83-19, pp. 7-8.  The Seneca contractual liability exclusion provides: "This insurance does not apply to: 'Bodily injury' or 'property damage' for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement."  See Doc. No. 83-20, p. 17.

However, the Court has already ruled that Commerce's almost identical contractual liability exclusion did not apply.  See Doc. No. 190, p. 36.  Specifically, the Court found that

> XTO was sued directly for its own negligence.  Thus, the exclusion has no application because XTO does not seek insurance coverage for obligations it assumed in a contract, but rather for direct claims of tort liability brought against it. See Borsheim Builders Supply, Inc. v. Manger Ins., Inc., 917 N. W.2d 504, 512 (N.D. 2018) (analyzing identical contractual liability exclusion and holding that the exclusion did not apply because the claims against the additional insured were direct claims for tort liability).

The same analysis applies here.  The evidence, allegations, and legal theories asserted in the Underlying Lawsuits were made directly against XTO as well as the subcontractors.  Based on the claims against XTO and the evidence in the record, including deposition testimony from the XTO subcontractors and XTO's own employees, there was significant evidence of XTO's control over the XTO subcontractors such that liability based on the retained control doctrine in Section 414 of the Restatement (Second) of Torts was likely.  The Restatement (Second) of Torts § 414 creates an exception to the general rule for an employer who retains control over the independent contractor's work.  Pectl v. Conoco, Inc., 567 N.W.2d 813, 816 (N.D. 1997) (noting that under the Restatement,"[o]ne who entrusts work to an independent contractor, but who retains control of any part of the work, is subject to liability for physical harm to others for whose safety the employer owes a duty to exercise reasonable care, which is caused by his failure to exercise his control with reasonable care.").  "The duty created by Section 414 may arise through express contractual provisions retaining the right to control some part of the operative details of the independent contractor's work or through the employer's actual exercise of retained control of the work." Rogstad v. Dakota Gasification Co., 623 N.W.2d 382, 386 (N.D. 2001); Madler v. McKenzie Cty., 467 N.W.2d 709, 712-13 (N.D. 1991) (analyzing contract and actual exercise of control to determine applicability of Section 414).  Thus, under the retained control doctrine as asserted by the plaintiffs in the Underlying Lawsuits, XTO could have been held directly liable for the XTO subcontractors' negligence if a jury found it retained control of their work.  Substantial evidence supported this theory.  The Court previously determined "XTO was in control of the Ryan Well and all activity that occurred at the site was done for the benefit of XTO."  See Doc. No. 190, p. 31.  In addition and apart from the retained control doctrine, XTO had a high risk of a finding of liability for its direct negligence or under a negligent supervision theory.  Indeed, a majority of the allegations and claims

asserted in the Underlying Lawsuits were focused against XTO, rather than the XTO subcontractors. See Doc. Nos. 74-17 and 74-20.  Because XTO only seeks coverage for its own direct liability, which was substantial, the StarStone and Seneca contractual liability exclusions do not apply.

### 3.    THE PROFESSIONAL LIABILITY EXCLUSION

StarStone also argues that the professional services exclusion bars coverage for  XTO because its liability arose out of its provision of supervisory and engineering services for the Underlying Lawsuits.  Notably, StarStone did not cite the professional services exclusion in its denial of coverage letter.  See Newman, 301 P.3d at 360 (noting that when an insurer denies coverage on one ground it waives all other grounds); See Doc. No. 83-17.  XTO maintains the professional services exclusion does not apply.  The StarStone policy professional services exclusion provides as follows:

**PROFESSIONAL LIABILITY-ENGINEERS, ARCHITECTS OR SURVEYORS EXCLUSION**

The Policy is amended as follows:

**SECTION IV – EXCLUSIONS**, is amended to include the following exclusion:

This insurance does not apply to any liability, damage, loss, cost or expense:

Arising out of professional services performed by or for any insured including:

1.    The preparing, approving, or the failure to prepare or approve: maps, drawings, opinions, reports, surveys, change orders, designs or specifications.

2.    Supervisory, inspection, or engineering services; or the failure to provide those services.

See Doc. No. 83-19, p. 46.

StarStone contends XTO was providing supervisory and/or engineering services, and thus,

the exclusion applies.  Specifically, StarStone argues that XTO's engineers approved the design of the drill string and XTO's engineers were providing supervisory services to ensure that the snubbing procedures were being followed.  XTO maintains the injuries and liability in the Underlying Lawsuit were caused by the snubbing of the last joint of tubing which contained a hole, released gas, and ultimately caused the explosion.  StarStone does not name these engineers or make any citations to record to support its contention.  XTO contends snubbing is a routine oilfield activity and not an engineering or supervisory decision.

StarStone's contention that the professional services exclusion in its policy precludes coverage fails in light of the decision of the Montana Supreme Court in Newman v. Scottsdale Ins. Co., 301 P.3d 348 (Mont. 2013).  In *Newman* the Montana Supreme Court found the professional services exclusion not unlike the one at issue in this case did not apply to the marketing arm of an organization that ran a tough love group home for wayward teens.  Id. at 356.  The case involved an insurer that refused to defend or indemnify its insured after a teenager in the group home committed suicide.  Id. at 350.  The insurer argued the alleged negligence and wrongdoing of the group home employees professional recommendations and placement services were excluded "professional services."  Id. at 351.  The Montana Supreme Court  concluded that the allegations against the insured did "not suggest the exercise of 'trained judgment' or 'specialized learning' unique to 'professional services', as [the insurer] argues; rather these allegations raise the specter of an injury caused by an occurrence resulting from non-professional services."  Id.  at 356.

The Court in *Newman* further held that the failure of the policy to define the terms "professional," "professional services," or "professional exposures," "renders the coverage confusing and ambiguous."  Id.  Finally, the Montana Supreme Court held that if it were to accept the insurer's broad interpretation of the professional services exclusion, the  coverage would be

illusory.  Id.  In so holding, the Court noted that under the insurer's interpretation, all of the insured's employees would be regarded as "professionals" and that, given the nature of the insured's business, "it is difficult to imagine a scenario under which coverage would be extended."  Id.  Given the confusing policy language, the Court construed the language against the insurer.  Id.

In this case, the record does not support StarStone's contention that the snubbing procedure was an engineering or professional service.  Rather, it appears to have been a routine oil field procedure.  Routine decisions that do not rise to the level of "specialized knowledge, training or judgement" are not "professional services" rendered by a member of a learned profession.  See Penn Star Ins. Co. v. Real Est. Consulting Specialists, Inc., 1 F. Supp. 3d 1168, 1174 (D. Mont. 2014) (explaining that allegations of failure to perform routine maintenance at an apartment complex did not constitute a professional service because "nothing in [the] complaint implicates a failure by a person belonging to a learned profession or whose occupation requires a high level of training and proficiency").  In Penn Star, the professional services exclusion was held not apply to claims for failure to perform routine maintenance duties in an apartment building.  Penn Star, 1 F. Supp. 3d at 1174.

Snubbing a well is routine in the oil and gas industry and the ultimate decision to kill the well belonged to XTO.  See Doc. No. 264-4, p. 57-59.  StarStone does not identify any engineers or others belonging to a learned profession who were at the Ryan Well site whose professional negligence caused the explosion and fire.  This was not a faulty engineering case as StarStone now attempts to argue.  XTO's decision to snub out the hole rather than kill the well was the ultimate cause of the explosion and fire.  OSHA cited XTO with a serious violation for failing to kill the well.  See Doc. No. 288-5, p. 9.  Because snubbing is a routine oil field procedure rather than a "professional service" and it was the decision to continue the snubbing procedure instead of killing

the well that was alleged to have caused the injuries in the Underlying Lawsuits, the professional services exclusion does not apply.

Further, the StarStone Policy does not define professional services, supervisory services, or engineering services.  This is reason enough to find the exclusion confusing and ambiguous and thus inapplicable.  Newman v. Scottsdale Ins. Co., 301 P.3d 348, 356 (Mont. 2013) (finding a professional services exclusion ambiguous because the term was not defined and thus failed to alert the insured as to what services were covered and what services were excluded).  Ambiguity in an insurance policy must be construed against the insurer.  Id.  StarStone's attempt to distinguish *Newman* and *Penn Star* are unpersuasive and the case law cited by StarStone from jurisdictions other than Montana is unavailing.

The claims in the Underlying Lawsuits were not for professional negligence or the performance of supervisory, inspection, or engineering services.  See Doc. Nos. 74-17 and 74-20.  Rather, the claims and allegations were for ordinary negligence.  StarStone's broad interpretation of professional services would render the policy illusory, as any decision taken by an XTO employee working on a drilling rig would be considered professional service.  See Newman, 301 P.3d at 356 (warning that regarding all of an insureds' employees as professionals would render the coverage illusory which is against public policy).  The Court refuses to read the StarStone professional services exclusion so broadly.  See Newman, 301 P.3d at 355 ("[e]xclusions must be narrowly and strictly construed because they are 'contrary to the fundamental protective purpose of an insurance policy'"); Cochran v. B.J. Servs. Co. USA, 302 F.3d 499, 507-08 (5th Cir. 2002) (finding that interpreting "the scope of a professional services exclusion in a CGL policy issued to the company man charged with overall supervision of a drilling operation . . . would virtually swallow the entirety of insurance coverage available to a drilling operation company man under a CGL.").

Because the professional services exclusion is ambiguous, the snubbing procedure was routine oil field work, the claims in the Underlying Lawsuits were not for professional negligence, and because StarStone reads the exclusion so broadly it would render the policy illusory, the Court concludes as a matter of law that the StarStone professional services exclusion does not apply to preclude coverage in this case.

## IV.   <u>CONCLUSION</u>

Accordingly, Commerce's motion for summary judgment as to XTO (Doc No. 248) is **GRANTED in part and DENIED in part** as explained herein.  XTO's motion for summary judgment against Commerce (Doc. No. 216) is **GRANTED in part and DENIED in part** as explained herein.  Starstone's motion for summary judgment as to XTO (Doc No. 250) is **DENIED**. XTO's motion for partial summary judgment against Starstone (Doc. No.253) is **GRANTED**.

Let Judgment be entered accordingly.

**IT IS SO ORDERED**.

Dated this 16th day of September, 2024.

*/s/ Daniel L. Hovland*
Daniel L. Hovland, District Judge
United States District Court

40